ACCEPTED
01-15-00989-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
12/3/2015 1:47:58 PM
CHRISTOPHER PRINE
CLERK

# No. 01-15-00989-CV

_____

IN THE
FIRST COURT OF APPEALS
at Houston

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS

12/3/2015 1:47:58 PM

CHRISTOPHER A. PRINE
Clerk

_____

ARNOLD & ITKIN, LLP, ET AL.
Petitioners,

v.

MARIA SANTOS LOPEZ DOMINGUEZ, ET AL.
Respondents,

_____

Trial Court Cause Number 2015-28543
From the 11th Judicial District Court of Harris County, Texas

_____

**RESPONDENTS' MOTION TO DISMISS FOR LACK OF APPELLATE JURISDICTION AND RESPONSE TO PETITIONERS' PETITION FOR PERMISSION TO APPEAL**

_____

**THE KASSAB LAW FIRM**
**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
lck@TexasLegalMalpractice.com
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
dek@TexasLegalMalpractice.com
1420 Alabama
Houston, Texas 77004
Phone (713) 522-7400
Facsimile (713) 522-7410

**DOHERTY✶WAGNER**
**BRETT WAGNER**
Texas State Bar No. 20654270
brett@dwlawyers.com
**LARRY JOE DOHERTY**
Texas State Bar No. 05950000
larry@dwlawyers.com
13810 Champion Forest Drive, Suite 225
Houston, Texas 77069
Phone (281) 583-8700
Facsimile (281) 583-8701

ATTORNEYS FOR RESPONDENTS

## IDENTITY OF PARTIES AND COUNSEL

The following is a list of all parties, and the names and addresses of all counsel.

**Defendants-Petitioners:**     Beck Redden LLP, Russell Post, Fields Alexander, Jas Brar, Arnold & Itkin, LLP, Kurt Arnold, Cory Itkin, Jason Itkin, Albritton Law Firm and Eric Albritton

**Petitioners' Counsel**
(Trial Court and on Appeal):

Reagan W. Simpson
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
Tel. (713) 632-8000
Fax (713) 632-8002
*Counsel for Defendants-Petitioners*
*Beck Redden LLP, Russell Post, Fields*
*Alexander and Jas Brar*

Jeremy L. Doyle
James Schuelke
Reynolds Frizzell LLP
1100 Louisiana, Suite 3500
Houston, Texas 77002
*Counsel for Defendants-Petitioners*
*Arnold & Itkin, L.L.P., Kurt Arnold,*
*Cory Itkin and Jason Itkin*

Sam Houston
Scott, Clawater & Houston L.L.P.
2777 Allen Parkway, 7th Floor
Houston, Texas 77019-2133
*Counsel for Defendants-Petitioners*
*Arnold & Itkin, L.L.P., Kurt Arnold,*
*Cory Itkin and Jason Itkin*

I

John Black
Daly & Black, P.C.
2211 Norfolk, Suite 800
Houston, Texas 77008
*Counsel for Defendants-Petitioners*
*Arnold & Itkin, L.L.P., Kurt Arnold,*
*Cory Itkin and Jason Itkin*

Billy Shepherd
Allison Standish Miller
Shepherd Prewett Miller PLLC
770 South Post Oak Lane, Suite 420
Houston, Texas 77056
*Counsel for Defendants-Petitioners*
*Albritton Law Firm and Eric Albritton*

| | |
|---|---|
| **Plaintiffs-Respondents** | Maria Santos Lopez Dominguez, Individually and as next friend of Karen Marien Andrade Lopez, Mairet Sameli Andrade Lopez and Imar Gerardine Andrade Lopez on behalf of the Estate of Omar Gerardo Andrade Zarate; Gabriel Gonzalez Toral; Jorge Arturo Jimenez Rangel; Antonio Montero Hernandez; Juan Antonio Palafox Navarrete; Leonel Fernandez Rivera; Fernando Augusto Cervera Ramirez; Libia Arredondo Chavez; individually and as Next Friend of Jorge Ricardo Barrancos Arredondo and Pedro Santiago Barrancos Arredondo on behalf of the Estate of Jorge Alonso Barrancos Dzul; Pastor Garcia Ocana; Jorge Guzman Martinez; Aldo Antonio Lopez Lorenzo and Monica Lopez; Miguel Cobos Salas, Jose Pedro Cobos Quiroz, Oscar Romero Ortega, Sergio Rosado Cortes, Sergio Solis Ponce, Martin Zuñiga Salazar, Josefa Santos Castellano, Individually and as Representative of the Estate of Benito De Los Santos, Joel Santos Ventura, Individually and as |

Representative of the Estate of Benito De Los Santos, Aleli Jiminez Perez, Individually and as Representative of the Estate of Aroer May Jimenez, Tayde Maria Pozo Roble, Individually and as Representative of the Estate of Leandro Manuel Hernandez Pozo, Miguel Hernandez Chan, Individually and as Representative of the Estate of Leandro Manuel Pozo, and Eudocio Alejandro Jacome Gomez

**Respondents' Counsel**
(Trial Court and on Appeal)

Lance Christopher Kassab
David Eric Kassab
THE KASSAB LAW FIRM
1420 Alabama
Houston, Texas 77004

Brett Wagner
Larry Joe Doherty
Ryan W. Smith
DOHERTY ✴ WAGNER
13810 Champion Forest Drive, Suite 225
Houston, Texas 77069

# TABLE OF CONTENTS

IDENTITY OF PARTIES AND COUNSEL ……………………………………...I

TABLE OF CONTENTS.................................................................................. .IV

INDEX OF AUTHORITIES.............................................................................V

PREFACE .........................................................................................................1

RECORD REFERENCES………………………………………………………1

STATEMENT OF THE CASE..........................................................................2

STATEMENT OF FACTS ................................................................................2

    A.   FACTUAL BACKGROUND ...........................................................................2
    B.   PROCEDURAL BACKGROUND .....................................................................7

ARGUMENT ....................................................................................................10

    A.   THE PETITION SHOULD BE DENIED BECAUSE THE LAWYERS HAVE ALSO FILED A MANDAMUS…………………………………………….... 10

    B.   THE PETITION SHOULD BE DENIED BECAUSE THE TRIAL COURT DEFERRED ITS RULING ON WHETHER THE LEGAL ISSUE IS CONTROLLING TO THIS COURT …………………………………………………….... 11

    C.   THE PETITION SHOULD BE DENIED BECAUSE THE ISSUE TO BE APPEALED IS NOT A CONTROLLING LEGAL ISSUE ABOUT WHICH THERE IS A SUBSTANTIAL DIFFERENCE OF OPINION …………………………….…….... 12

    D.   THE PETITION SHOULD BE DENIED BECAUSE AN IMMEDIATE APPEAL WILL NOT MATERIALLY ADVANCE THE ULTIMATE *TERMINATION* OF THE LITIGATION BUT WILL LEAD TO JUDICIAL INEFFICIENCY .................................17

CONCLUSION & PRAYER ........................................................................19

CERTIFICATE OF COMPLIANCE................................................................21

CERTIFICATE OF SERVICE .........................................................................22

VERIFICATION........................................ATTACHED TO END OF RESPONSE

APPENDIX ...............................................ATTACHED TO END OF RESPONSE

# INDEX OF AUTHORITIES

**TEXAS STATE CASES**                                                                    **PAGE(S)**

*Alexander v. Turtur & Assocs.*,
   146 S.W.3d 113 (Tex. 2004)……………………………………………………………14
*America Online, Inc. v. Williams*,
   958 S.W.2d 268 (Tex. App. – Houston [14th Dist.] 1997, no pet.)………………..…….17
*Bland Indep. Sch. Dist. v. Blue*,
   34 S.W.3d 547 (Tex. 2000)……………………………………………………………..2
*Borowski v. Ayers*,
   432 S.W.3d 344 (Tex. App.—Waco 2013, no pet.)………………………..……………15
*Diamond Prods. Int'l., Inc. v. Handsel,*
   142 S.W.3d 491 (Tex. App.—Houston [14th Dist.] 2004, no pet.)………………..……..15
*Fertitta Hospitality, LLC v. O'Balle*,
   2014 Tex. App. LEXIS 12141
   (Tex.App. – Houston [1st Dist.] Nov. 6, 2014, no pet.)…………………………………15
*Great Am. E & S Ins. Co. v. Lapolla Indus., Inc.*,
   2014 Tex. App. LEXIS 6746, 2014 WL 2895770
   (Tex. App.—Houston [1st Dist.] June 24, 2014, no pet.) (mem. op.)……..……………..12
*Gulf Coast Asphalt Co., L.L.C. v. Lloyd,*
   457 S.W.3d 539 (Tex. App.—Houston [14th] 2015, no pet.)……………12, 13, 16, 17, 19
*Gulley v. State Farm Lloyds*,
   350 S.W.3d 204 (Tex. App.—San Antonio 2011, no pet.)…..………………….…....10, 12
*In re Estate of Fisher*,
   421 S.W.3d 682 (Tex. App.—Texarkana 2014, no pet.) ………..……..……….……….10, 19
*King-A Corp. v. Wehling*,
   2013 Tex. App. LEXIS 2761
   (Tex. App.—Corpus Christi Mar. 14, 2013, no pet.) (mem. op.)…………………………15
*Lehmann v. Har-Con Corp.*,
   39 S.W.3d 191 (Tex. 2001)…………………………………………………………13
*Texas Animal Health Com'n v. Garza*,
   27 S.W.3d 54 (Tex. App.—San Antonio 2000, pet. denied)……………………………14
*Texas Ass'n of Bus. v. Texas Air Control Bd.,*
   852 S.W.2d 440 (Tex. 1993)………………………………………………………..2
*Vanderweyst v. Boudreaux,*
   2003 Tex. App. LEXIS 8549, 2003 WL 22255833
   (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.))………….…2, 18
*Vestalia, Ltd. v. Taylor-Watson*,
   2015 Tex. App. LEXIS 6249, 2015 WL 3799505
   (Tex. App.—Houston [1st Dist.] June 18, 2015, no pet.) (mem. op.)………….…..11, 13, 14
*Warren v. Weiner,*
   2015 Tex. App. LEXIS 8148
   (Tex.App. – Houston [1st Dist.] Aug. 4, 2015, no pet.)..............................................10, 14

**TEXAS STATUTES**                                                      **PAGE(S)**

TEX. CIV. PRAC. & REM. CODE § 51.014(a)…………………………………………………………..13
TEX. CIV. PRAC. & REM. CODE. § 51.014(d)……………………………………….....……8, 9, 12, 17
TEX. CIV. PRAC. & REM. CODE § 51.014(f)……………………………………..………………….....1

**TEXAS RULES**                                                        **PAGE(S)**

TEX. R. APP. P. 28.3(e)(3). . ......………...……………………………………………….……....1
TEX. R. APP. P. 28.3(f) …………………………………………………………………….…….1
TEX. R. APP. P. 28.3, cmt.…………...………………………………………….………….…….1

## PREFACE

Texas Rule of Appellate Procedure 28.3(e)(3) is clear that a petition for permissive appeal should "argue clearly and concisely why the order to be appealed involves a controlling question of law as to which there is a substantial ground for difference of opinion and how an immediate appeal from the order may materially advance the ultimate termination of the litigation." TEX. R. APP. P. 28.3(e)(3). Petitioners-Defendants' Petition for Permission to Appeal Interlocutory Order ("Petition") spends one single page attempting to comply with this rule. *See* Pet. Mot., at p. 11. In the remaining twenty-three (23) pages of the Petition, Petitioner-Defendants argue the merits of the trial court's decision. To this extent, the Petition is defective and Respondents-Plaintiffs move to strike these irrelevant portions.

Accordingly, Respondents-Plaintiffs' focus this Response on why a permissive appeal is inappropriate. TEX. R. APP. P. 28.3(f). In the event the Court grants a permissive appeal, Respondents-Plaintiffs will address the merits of the trial court's decision in further appellate briefing. *See* TEX. R. APP. P. 28.3, cmt.; *See also* TEX. CIV. PRAC. & REM. CODE § 51.014(f).

## RECORD REFERENCES

| Source | Citation Format |
|---|---|
| Petitioners' Appendix Tabs | Pet. Tab [number] |
| Respondents' Appendix Tabs | Resp. Tab [number] |

## STATEMENT OF FACTS

The statement of facts will be taken primarily from Respondents-Plaintiffs' Second Amended Petition because this was the live pleading before the trial court when it ruled on Petitioners' pleas to the jurisdiction.[1] When necessary, the facts will also be supported by additional evidence. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 554 (Tex. 2000). The statements of fact as set forth in Respondents' pleadings (and as set forth herein) must be liberally construed in Respondents' favor and taken as true. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993); *See also Vanderweyst v. Boudreaux*, No. 01-02-00928-CV, 2003 Tex. App. LEXIS 8549, 2003 WL 22255833, at *10 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.).

### A. FACTUAL BACKGROUND.

Respondents-Plaintiffs Maria Santos Lopez Dominguez, *et al.* (the "Clients") are offshore oilfield workers (or the surviving representatives of oil field workers) who were working on the mobile drilling rig, Usumacinta located in the Bay of Campeche, Mexico and who were injured or killed as a result of the

---

[1] For reasons unknown, Petitioners improperly attached Respondents' Third Amended Petition filed on September 25, 2013 to their Petition which was filed *after* the trial court denied the subject pleas on September 17, 2015. *See* Resp. Tab 4.

underlying defendants' acts or omissions occurring on or about October 23, 2007. Resp. Tab 1, p. 4-5; Pet. Tab 5, p. 2-3.

One or more of the Clients were improperly solicited to retain Arnold & Itkin, L.L.P., Kurt Arnold, Cory Itkin and Jason Itkin ("Itkin") to represent them in claims against the parties responsible for causing the injuries or death. Resp. Tab 1, p. 5. Eventually, however, all Clients retained Itkin to represent them in their claims. *Id.* Eric Albritton and the Albritton Law Firm ("Albritton") were enlisted by Itkin as local counsel. *Id.* Later, Beck Redden, LLP, Russell Post, Fields Alexander and Jas Brar ("Beck") also represented the Clients in seeking reinstatement of the Clients' claims in the United States. *Id.* Itkin, Albritton and Beck will be referred to collectively as the "Lawyers."

In October of 2008, the Itkin-Albritton, on behalf of the Clients, filed various lawsuits in the United States Federal District Court for the Eastern District of Texas (the "District Court") seeking actual and punitive damages against a number of American individuals and companies (the "underlying lawsuit"). Resp. Tab 1, p. 6; Pet. Tab 7, p. 2. Itkin-Albritton alleged claims based on Texas state law, general federal or international maritime law, including the Jones Act, and Mexican law. Resp. Tab 1, p. 6-7.

The District Court dismissed the Clients' state law claims with prejudice, finding they were preempted by the Jones Act. Resp. Tab 1, p. 7. In addition, the

3

District Court dismissed the Clients' federal maritime claims because the Lawyers negligently "failed to allege that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act." Pet. Tab 5, p. 5. Thus, the Clients allege that, due to the negligence of the Lawyers, the only claims remaining were the Clients' Mexican claims for civil liability and moral damages. Resp. Tab 1, p. 7.

The District Court, on September 15, 2010, consolidated the underlying lawsuit with six other lawsuits filed by other plaintiffs and a number of other law firms for the purpose of briefing and deciding a *forum non conveniens* issue raised by underlying defendants common to each case. *Id.* In responding to the *forum non conveniens* motions, the Lawyers failed to argue and submit evidence establishing that Mexico was not an available or adequate forum to litigate the underlying case. *Id.* at p. 7-8. The Clients allege that, had the appropriate substantive arguments been properly asserted by the Lawyers in the response to the *forum non conveniens* motion, the motion would not have been granted by the District Court thereby allowing the Clients' claims to proceed forward in the chosen forum. *Id.*

On March 10, 2011, the District Court conditionally granted the *forum non conveniens* motion. *Id.* at 8-9. The order acknowledged the underlying defendants' agreement to waive any statute of limitations defense that they did not possess as of the date the underlying case was filed. *Id.*; *See also* Pet. Tab 5, p. 27. The order

4

also carried with it a return jurisdiction clause stating, "[s]hould the courts of Mexico refuse to accept jurisdiction of any of these cases for reasons **other than Plaintiffs' refusal to pursue an action or to comply with the procedural requirements of Mexican courts**, this Court may reassert jurisdiction **upon timely notification of the same**." Pet. Tab 5, p. 27 (emphasis added). The Clients allege that the Lawyers' negligent failure to appeal the May 4, 2011 order was one proximate cause of damage. Resp. Tab 1, p. 11.

Between February and May of 2013, the Lawyers refiled in Mexico only eleven (11) of the more than eighty (80) original cases. *Id.* at p. 9. Due to the Lawyers' failure to comply with procedural requirements, the Mexican courts immediately rejected jurisdiction of the cases. *Id.* at p. 9-10; *See also* Pet. Tab 7, p. 4-5. Five months later on October 18, 2013, the Lawyers filed a motion to reinstate the Clients' underlying case in District Court, arguing Mexico would not accept jurisdiction over the cases. Resp. Tab 1, p. 10.

The District Court denied the Lawyers' attempt to re-file the cases in Texas and exposed their lack of good faith in great detail, noting the Lawyers "filed some, but not all, of the cases dismissed by Judge Ward in Mexico." Pet. Tab 7, p. 9. Judge Crone continued, "Because counsel made no attempt to litigate those cases in Mexico in compliance with the court's Memorandum and Order, there is no basis upon which to reopen them here." *Id.* Therefore, with regard to all of the

5

underlying cases, save and except the eleven that were refiled in Mexico, the Clients allege the Lawyers grossly failed to litigate diligently and in good faith thereby invalidating the waiver of the statute of limitations. Resp. Tab 1, p. 11. The Clients also allege the waivers were invalid under both Texas and Mexican law because they were indefinite and not specific. *Id.* Additionally, at this late date, any new filing in Mexico would be untimely.

With regard to the eleven cases that were refiled in Mexico, the District Court found that the Lawyers simply "did not prosecute the cases in good faith." Pet. Tab 7, p. 9. Thus, on May 14, 2014, as a direct and proximate result of the Lawyers' negligence, the District Court dismissed the Clients' underlying lawsuits. *Id.* at p. 11-15. Because the Lawyers failed to follow the District Court's reinstatement requirements, the District Court placed an additional burden on the Clients, stating the Clients could "not seek reinstatement in [the District Court] unless and until they have pursued their claims in Mexico with diligence and good faith, **including seeking final appellate review of any Mexican dismissal order**." *Id.* at p. 15 (emphasis added).

Several months after the dismissal, Kurt Arnold sent out deceitful withdrawal letters wherein he attempted to conceal and downplay the significance of the Lawyers' malfeasance and abandoning the Clients. Resp. Tab 2, Ex. D. The one bit of truth contained within these letters was Mr. Arnold's recognition of the

unlikelihood of the cases being reinstated in the United States: "I think the chances of the Court accepting the jurisdiction for these cases even after following all steps [and refiling the cases in Mexico] is remote." Resp. Tab 2, Ex. D. This statement by Mr. Arnold is accurate and comports with the Clients' allegations (supported by expert testimony) that any claim now filed in Mexico would be dismissed on limitations grounds because the waivers became invalid and unenforceable when the Lawyers failed to timely refile the cases in Mexico and litigate these cases diligently and in good faith. Resp. Tab 1, p. 11. Accordingly, the Clients' pleadings and the Lawyers' admissions establish that the waivers and stipulations are of no consequence at this late date and, as a result, the Clients' underlying claims are forever barred in both the United States and Mexico. *Id.*; *See also* Resp. Tab 3, at Ex. A, p. 11-13.

## B. PROCEDURAL BACKGROUND.

The Lawyers filed (or joined in) various Pleas to the Jurisdiction, and, in the Alternative, Pleas in Abatement (the "Pleas") arguing the underlying case was not yet concluded and seeking to dismiss or abate this case until the underlying claims were resolved. The Clients disputed this issue of fact, arguing the underlying claims were "concluded" and that the Clients underlying claims could not now be refiled in Mexico due to the Lawyers' negligence. Resp. Tab 2 and 3. The Clients also responded by arguing (and proving through expert testimony) that, even if the

7

claims could be refiled in Mexico, the Clients suffered injury when the Lawyers negligently allowed the Clients' United States cases to be dismissed on *forum non conveniens* grounds as litigating in Mexico hinders the Clients' ability to pursue their claims. Resp. Tab 3. On September 17, 2015, the trial court agreed with the Clients and signed an order simply denying the Lawyers' Pleas. Resp. Tab 4.

The Lawyers subsequently filed (or joined in) Motions for Permission to File Interlocutory Appeals moving the trial court to amend the original order to comply with the requirements of section 51.014(d) of the Texas Civil Practice & Remedies Code. The Clients opposed this request. Resp. Tab. 5. At the hearing on the motion, the trial court noted that its September 17, 2015 Order did not rule on any controlling question of law, stating: "I agree with you. I am not even sure what the issues are." Resp. Tab 5, p. 12. The trial court was very candid in expressing its concern about the validity of a permissive appeal due to the complexity of the factual issues involved:

> I kind of doubt also this is the sort of thing they had in mind because of the multiplicity of the issues and how complex it is. To say that there is some central narrow controlling legal issue that can be determined here that is outcome determinative, I think that is wishful thinking. I think that is probably the response you are going to get from [the court of appeals].

*Id.* at p. 10. The trial court further expressed that it is not possible to generalize what the controlling issues are in this case because there are so many issues

8

involved with the Pleas. *Id.* at p. 12. Nonetheless, the trial court granted the Lawyers' request to file a permissive appeal even though it "had [its] doubts" with regard to the validity of such appeal, stating "[l]et's see what the court of appeals thinks if [the Lawyers] are correct or not." *Id.* Thus, on November 9, 2015, the trial court entered an amended order attempting to comply with section 51.014(d) and identifying the "controlling question of law" as "[w]hether this case, as pleaded by the plaintiffs, is ripe for adjudication." Pet. Tab 1, p. 2.

The Lawyers' filed this Petition on November 24, 2015. The Lawyers have concurrently filed a Petition for Writ of Mandamus that is pending before this Honorable Court wherein they assert an identical argument.[2] Not only should the Petition be dismissed because the Lawyers' mandamus is currently pending before this Court, but the Lawyers have failed to demonstrate their right to a permissive appeal.

---

[2] *See* Cause No. 15-00990-CV; *In re Arnold & Itkin, LLP, et al.*; In the First Court of Appeals of Texas, at Houston.

# ARGUMENT

## A. THE PETITION SHOULD BE DENIED BECAUSE THE LAWYERS HAVE ALSO FILED A MANDAMUS.

This Honorable Court has recognized that a permissive appeal is inappropriate when, as here, the issues are raised in connection with a petition for writ of mandamus. *See Warren v. Weiner*, 2015 Tex. App. LEXIS 8148, at *1 (Tex.App. – Houston [1st Dist.] Aug. 4, 2015, no pet.). Although not articulated in *Warren*, the rationale for such a holding is likely premised on the notion that "[s]ubsection (d) was added to Section 51.014 to promote judicial efficiency." *In re Estate of Fisher,* 421 S.W.3d 682, 685 (Tex. App.—Texarkana 2014, no pet.); *Gulley v. State Farm Lloyds*, 350 S.W.3d 204, 207-208 (Tex. App.—San Antonio 2011, no pet.). Requiring the parties to brief and this Court to consider identical issues in two separate appellate proceedings does not "promote judicial efficiency" and, therefore, the Petition should be denied. *See Warren*, 2015 Tex. App. LEXIS 8148, at *1; *See also In re Estate of Fisher,* 421 S.W.3d at 685-686 ("Here, judicial economy will not be served if permissive appeal is allowed at this stage, since an unhappy party is free to appeal the order which would be expected to result soon from the court's summary judgment ruling…").

**B.** **THE PETITION SHOULD BE DENIED BECAUSE THE TRIAL COURT DEFERRED ITS RULING ON WHETHER THE LEGAL ISSUE IS CONTROLLING TO THIS COURT.**

The Lawyers contend that the "controlling question of law" or "The Issue" to be appealed is "[w]hether this case, as pleaded by the Clients, is ripe for adjudication." Pet. Mot., p. 10. Importantly, however, the trial court never found this issue to be controlling. Pet. Tab 1, p. 2 ("The Court is uncertain about the meaning of a controlling issue of law for purposes of section 51.0149(d), but believes that The Issue **may be** controlling.")(emphasis added). The uncertainty reflected in the trial court's order is further highlighted by the transcript from the hearing on the Lawyers' motion to file a permissive appeal wherein the trial court stated that its order denying the Lawyers' Pleas did not rule on any controlling question of law.[3] Resp. Tab 5, p. 12 ("I agree with you. I am not even sure what the issues are."). Rather, the trial court merely deferred a ruling on the legal issue to this Court. *Id.* ("Let's see what the court of appeals thinks if [the Lawyers] are correct or not.").

The trial court's deferral of ruling on any substantive legal issues deprives this Court of jurisdiction. See *Vestalia, Ltd. v. Taylor-Watson*, No. 01-15-00332-CV, 2015 Tex. App. LEXIS 6249, 2015 WL 3799505, at *2 (Tex. App.—Houston [1st Dist.] June 18, 2015, no pet.) (mem. op.)(denying petition for permissive

---

[3] This transcript, of course, was omitted from the Lawyers' record.

11

appeal when, among other things, "the trial court did not rule on a controlling question of law…"); *See also Great Am. E & S Ins. Co. v. Lapolla Indus.*, Inc., No. 01-14-00372-CV, 2014 Tex. App. LEXIS 6746, 2014 WL 2895770, at *2 (Tex. App.—Houston [1st Dist.] June 24, 2014, no pet.) (mem. op.); *See also Gulley*, 350 S.W.3d at 207 ("[w]e have found no reported case in which 51.014(d) was used in this manner to present an intermediate court of appeals with a 'controlling legal question' prior to the trial court making a substantive ruling on the legal issue.").[4] Thus, the Petition should be denied. *See Id.*

**C.     THE PETITION SHOULD BE DENIED BECAUSE THE ISSUE TO BE APPEALED IS NOT A CONTROLLING LEGAL ISSUE ABOUT WHICH THERE IS A SUBSTANTIAL DIFFERENCE OF OPINION.**

"There has been little development in the case law construing section 51.014 regarding just what constitutes a controlling legal issue about which there is a difference of opinion and the resolution of which disposes of primary issues in the case." *Gulf Coast Asphalt Co., L.L.C. v. Lloyd*, 457 S.W.3d 539, 544 (Tex. App.—Houston [14th] 2015, no pet.). Nonetheless, the Fourteenth Court of Appeals, citing to applicable legal treatises, has stated:

> [A] controlling question of law is one that deeply affects the ongoing process of litigation. If resolution of the question will considerably shorten the time, effort, and expense of fully litigating the case, the question is controlling. Generally, if the viability of a claim rests upon

---

[4] For reasons not present in this case, the court in *Gulley* held that the statutory requirements for an agreed interlocutory appeal technically were met and it had jurisdiction over the appeal. *See Gulley*, 350 S.W.3d at 208, n.2.

> the court's determination of a question of law, the question is controlling

*Id.* at 544-545. The Lawyers have failed to establish this first element.

The Lawyers argue that the trial court's denial of their Pleas was a ruling on a controlling legal issue for which an immediate appeal may advance the ultimate termination of litigation because the trail court's ruling dealt with jurisdiction. Pet. Mot., at p. 11. The Lawyers' logic is flawed. There is no doubt that jurisdiction is necessary in order for *any* court to entertain litigation of *any* kind. However, only specific interlocutory orders regarding jurisdiction are immediately appealable. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a). Otherwise, Texas law is clear: appeals may only be taken from final judgments. *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001).

The only "legal issue" that the trial court ruled on was "whether this case, as pleaded by plaintiffs, is ripe for adjudication." Pet. Tab 1, at p. 2. Although it is true that the trial court, at the request of the Lawyers, amended its original order merely denying the Pleas, the amendment is of no consequence because the amended order failed to provide a basis for the denial. Pet. Tab 1. "When a trial court in its order … provides no basis for its denial, the trial court fails to make [a] substantive ruling on the controlling question of law sought to be appealed." *Vestalia*, 2015 Tex. App. LEXIS 6249 at *1-2. In *Vestalia*, this Court denied a

petition for permissive appeal even though the trial court's order stated that it "involve[d] questions of law as to which there is a substantial ground for difference of opinion" and listed the questions because the trial court merely denied the summary judgment motion without explanation. *Id.* at *2. Just as in *Vestalia*, the trial court wholly failed to explain the reason for the denial and thus, the Petition should be denied. *See also Warren*, 2015 Tex. App. LEXIS 8148, at *1 (mere denial of a plea to the jurisdiction insufficient to warrant permissive appeal because such orders do not involve controlling questions of law as to which there are substantial grounds for difference of opinion).

Furthermore, there exist disputed questions of fact which render a permissive appeal inappropriate. The question of whether the Clients' underlying claims are actually barred from being refiled in Mexico is the proximate cause element of the Clients' negligence claim and is a question of **fact** for the jury to decide. *See Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 122 (Tex. 2004) (requiring fact finder to decide what a judge would have decided in the underlying case under hypothetical circumstances). Likewise, mitigation of damages is a defensive issue upon which the Lawyers bear the burden of proof at trial and is generally a question of fact. *See Texas Animal Health Com'n v. Garza*, 27 S.W.3d 54, 62 (Tex. App.—San Antonio 2000, pet. denied). These unresolved factual issues preclude a permissive appeal.

In *Fertitta Hospitality, LLC v. O'Balle*, 2014 Tex. App. LEXIS 12141 (Tex.App. – Houston [1st Dist.] Nov. 6, 2014, no pet.), this Court held that a permissive appeal of a denial of a summary judgment was inappropriate "[b]ecause the parties ha[d] identified neither a controlling legal principle nor **an agreed set of facts**[.]" *Id.* at *10 (emphasis added). The facts of this case are heavily in dispute: the Lawyers have an unsupported belief that the Clients can refile their underlying claims in Mexico whereas the Clients believe – and have provided expert testimony to support the fact that – their underlying claims cannot be refiled in Mexico and are barred by limitations. Without an undisputed or agreed set of facts, a permissive appeal is inappropriate. *See Id.*; *See also Borowski v. Ayers*, 432 S.W.3d 344, 348 (Tex. App.—Waco 2013, no pet.)(dismissing permissive appeal of denial of summary judgment motion because factual issues were in dispute); *See also King-A Corp. v. Wehling*, No. 13-13-00100-CV, 2013 Tex. App. LEXIS 2761, at *8-9(Tex. App.—Corpus Christi Mar. 14, 2013, no pet.) (mem. op.)(dismissing permissive appeal on issue of whether party exercised due diligence in securing service of process because this is generally a question of fact); *See also Diamond Prods. Int'l., Inc. v. Handsel*, 142 S.W.3d 491, 494 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ("The statute does not contemplate permissive appeals of summary judgments where the facts are in dispute").

Moreover, whether the Clients' claims are ripe under the disputed facts plead by the Clients is not a legal question that is subject to substantial grounds for disagreement. "Substantial grounds for disagreement exist when the question presented to the court is novel or difficult, when controlling circuit law is doubtful, when controlling circuit law is in disagreement with other courts of appeals, and when there simply is little authority upon which the district court can rely[.]" *Lloyd*, 457 S.W.3d at 544-545. In an effort to contort the question presented into a "novel" or "difficult" one, the Lawyers argue that the "issue presented" is "whether dismissal on *forum non conveniens* grounds in favor of Mexico conditioned on a limitations waiver and with a return jurisdiction clause represents the accrual of an injury for purposes of a legal malpractice claim." Pet. Mot., at p. 11. Yet, **this was not the question ruled upon by the trial court**. Rather, the question was simply "whether this case, as pleaded by plaintiffs, is ripe for adjudication." Pet. App. Tab 1, at p. 2. This is not a "novel or difficult" question the resolution of which will further Texas jurisprudence. Likewise, the courts of appeals are not struggling or in conflict with one another to determine the ripeness of the Clients' claims. Simply put; there is nothing "novel" or "controlling" about the trial court's denial of the Lawyers' Pleas and, therefore, the Petition should be dismissed.

**D. THE PETITION SHOULD BE DENIED BECAUSE AN IMMEDIATE APPEAL WILL NOT MATERIALLY ADVANCE THE ULTIMATE *TERMINATION* OF THE LITIGATION BUT WILL LEAD TO JUDICIAL INEFFICIENCY.**

The second element of the statute requires the Lawyers to show that "an immediate appeal from the order may materially advance the ultimate **termination** of the litigation." TEX. CIV. PRAC. & REM. CODE. § 51.014(d)(emphasis added). "Generally, a district court will make a finding that the appeal will facilitate final resolution of the case when resolution of the legal question dramatically affects **recovery** in a lawsuit." *Lloyd*, 457 S.W.3d at 544-545 (emphasis added)(internal brackets omitted). While a ruling on the Pleas may be "important" to the Lawyers, "it does not dispose of controlling issues in the case." *See Lloyd*, 457 S.W.3d at 545. Rather, a ruling on the Lawyers' Pleas – which sought to either dismiss or abate this lawsuit pending the Clients filing and litigating their claims in Mexico through exhaustion of all appeals – will merely postpone and delay this litigation, not terminate it. Indeed, abatement, by definition, means "to cause to cease for a time; to postpone; to stay, delay, or hinder; to discontinue temporarily, **but with an expectation or purpose of resumption**." *America Online, Inc. v. Williams*, 958 S.W.2d 268, 272 (Tex. App. – Houston [14th Dist.] 1997, no pet.)(emphasis added).

17

Judicial economy will not be served if a permissive appeal is allowed because the Lawyers will be delaying the inevitable malpractice suit as well as creating **three** other judicial proceedings: (1) the permissive appeal relating to the trial court's denial of the Pleas; (2) the mandamus proceeding relating to the trial court's denial of the Pleas; and, if either are successful; (3) another lawsuit in Mexico plus numerous appeals of any decision. Whatever the outcome, however, the Clients' claims against the Lawyers will remain relating to the failure to properly respond to the *forum non conveniens* motions which caused the Clients to have to refile the claims in Mexico in the first instance.

More specifically, the Clients contend that, due to the Lawyers' negligence, the underlying court granted the *forum non conveniens* motion and required the Clients to file their claims in Mexico, where, even if the claims are not barred, they are now faced with virtually non-existent discovery, no procedural protections, extensive delays to any resolution and the unlikelihood of any attorney taking their case. Resp. Tab 1 and Tab 3, at Ex. A. The lost benefit of pursuing their claims in a United States court is at least *some* "concrete injury" which has already occurred and is not contingent on any future event, thereby rendering these claims ripe. *See Vanderweyst,* 2003 Tex. App. LEXIS 8549, at *14-15 (lost opportunity found to constitute injury sufficient to demonstrate ripeness even if other damages were speculative, holding "[t]he loss of that benefit, whatever it may ultimately be

18

determined to be worth, constitutes the first of [the plaintiff's] pled injuries."). Accordingly, a ruling on the Lawyers' proposed legal question will not terminate this litigation because the Clients will still have claims against the Lawyers for these damages and thus, the Petition should be denied. *See Lloyd*, 457 S.W.3d at 545 (dismissing permissive appeal because trial court's ruling on summary judgment only affected "one facet" of the client's malpractice claim); *See also In re Estate of Fisher*, 421 S.W.3d at 686 (denying permissive appeal because "[t]he parties may also have the opportunity to appeal other future orders that adjudicate a substantial right and end various phases of the probate proceeding.").

## CONCLUSION & PRAYER

For these reasons, the Clients request this Honorable Court to deny the Lawyers' Petition for Permission to Appeal Interlocutory Order and grant the Clients all other relief to which they may be entitled.

Respectfully submitted,

**THE KASSAB LAW FIRM**

<u>/ s / David Eric Kassab</u>
**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
lck@texaslegalmalpractice.com
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
dek@texaslegalmalpractice.com
1420 Alabama
Houston, Texas 77004
t. 713.522.7400
f. 713.522.7410

**DOHERTY✶WAGNER**

<u>/ s / Brett Wagner</u>
**BRETT WAGNER**
Texas State Bar No. 20654270
brett@dwlawyers.com
**LARRY JOE DOHERTY**
Texas State Bar No. 05950000
larry@dwlawyers.com
**RYAN W. SMITH**
Texas State Bar No. 24063010
ryan@dwlawyers.com
13810 Champion Forest Drive, Suite 225
Houston, Texas  77069
t. 281 583-8700
f. 281 583-8701

**ATTORNEYS FOR RESPONDENTS**

## CERTIFICATE OF COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), I hereby certify that this motion/response contains approximately 4,487 words excluding the allowable items set forth in Texas Rule of Appellate Procedure 9.4(i)(1). This is a computer-generated document created in Microsoft Word 2010, using 14-point typeface for all text, except for footnotes which are in 12-point typeface. In making this certificate of compliance, I am relying on the word count provided by the software used to prepare the document.

Dated: December 3, 2015

/ s / David Eric Kassab
David Eric Kassab

## CERTIFICATE OF SERVICE

The undersigned certifies that on December 3, 2015, the foregoing response was served electronically on the following parties in accordance with the requirements of the Texas Rules of Appellate Procedure:

Reagan W. Simpson
State Bar No. 18404700
rsimpson@yettercoleman.com
YETTER COLEMAN LLP
909 Fannin, Suite 3600
Houston, Texas 77010
Tel. 713-632-8000
Fax 713-632-8002
**Counsel for Petitioners**
**Beck Redden LLP,**
**Russell Post, Fields**
**Alexander and Jas Bra**r

Billy Shepherd
State Bar No. 18219700
bshpeherd@spmlegal.com
SHEPHERD PREWETT MILLER PLLC
770 South Post Oak Lane
Suite 420
Houston, Texas 77056
Tel. 713-955-4440
Fax +1 713-766-6542
**Counsel for Petitioners**
**Albritton Law Firm and**
**Eric Albritton**

Jeremy L. Doyle
State Bar No. 24012553
jdoyle@reynoldsfrizzell.com
REYNOLDS FRIZZELL LLP
1100 Louisiana, Suite 3500
Houston, Texas 77002
Tel. 713-485-7200
Fax 713-488-7250
**Counsel for Petitioners**
**Arnold & Itkin, L.L.P.,**
**Kurt Arnold, Cory Itkin**
**and Jason Itkin**

Sam Houston
State Bar No.10059550
shouston@sschlaw.com
SCOTT, CLAWATER & HOUSTON L.L.P.
2777 Allen Parkway, 7th Floor
Houston, Texas 77019-2133
Tel. 713-650-6600
Fax 713-766-6542
**Counsel for Petitioners Arnold &**
**Itkin,**
**L.L.P., Kurt Arnold, Cory Itkin and**
**Jason Itkin**

John Black
State Bar No. 24012292
jblack@dalyblack.com
DALY & BLACK, P.C.
2211 Norfolk, Suite 800
Houston, Texas 77008
Tel. 888-492-2671
Fax 713-655-1587
**Counsel for Petitioners Arnold & Itkin,
L.L.P., Kurt Arnold, Cory Itkin and
Jason Itkin**

/ s / David Eric Kassab
David Eric Kassab

# VERIFICATION

STATE OF TEXAS         §

COUNTY OF HARRIS    §

BEFORE ME, the undersigned notary, on this day, personally appeared

David Eric Kassab, a person whose identity is known to me. After I administered

an oath to him, upon his oath, he said:

"My name is David Eric Kassab. I am one of the attorneys for Plaintiffs in the trial court and in this appeal. All pleadings, motions, order(s), and/or other documents attached to the Appendix of Plaintiffs-Respondents' Motion to Dismiss for Lack of Appellate Jurisdiction and Response to Petitioners' Petition for Permission to Appeal are true and correct copies of documents filed with, or obtained from, the trial court."

David Eric Kassab

SUBSCRIBED AND SWORN TO BEFORE ME by David Eric Kassab, on

this the 3rd day of December, 2015.

Notary Public, State of Texas

My commission expires:



ANDREA MENDEZ
Notary ID # 124698568
My Commission Expires
September 29, 2019

# No. 01-15-00989-CV

_____

IN THE
FIRST COURT OF APPEALS
at Houston

_____

ARNOLD & ITKIN, LLP, ET AL.
Petitioners,

v.

MARIA SANTOS LOPEZ DOMINGUEZ, ET AL.
Respondents,

_____

Trial Court Cause Number 2015-28543
From the 11th Judicial District Court of Harris County, Texas

_____

## RESPONDENTS' APPENDIX

_____

# INDEX OF APPENDIX

TAB NUMBER        DOCUMENT

1        Plaintiffs' Second Amended Petition

2        Plaintiffs' Response to All Defendants' Plea to the
         Jurisdiction, and, In the Alternative, Plea in Abatement

3        Plaintiffs' Sur-Reply to All Defendants' Plea to the
         Jurisdiction, and, In the Alternative, Plea in Abatement

4        September 17, 2015 Order Denying Defendants' Plea to
         the Jurisdiction, and, In the Alternative, Plea in Abatement

5        October 19, 2015 Transcript of Status Conference on
         Defendants' Motion for Permission to File Interlocutory
         Appeal

# Appendix Tab 1

| | | |
|---|---|---|
| **MARIA SANTOS LOPEZ DOMINGUEZ,** | § | **IN THE DISTRICT COURT** |
| **INDIVIDUALLY AND AS NEXT FRIEND** | § | |
| **OF KAREN MARIEN ANDRADE LOPEZ,** | § | |
| **MAIRET SAMELI ANDRADE LOPEZ** | § | |
| **AND IMAR GERARDO ANDRADE LOPEZ** | § | |
| **ON BEHALF THE ESTATE OF OMAR** | § | |
| **GERARDO ANDRADE LOPEZ, ET AL** | § | |
| | § | |
| **V.** | § | **OF HARRIS COUNTY, TEXAS** |
| | § | |
| **ARNOLD & ITKIN, L.L.P.,** | § | |
| **BECK REDDEN, L.L.P.,** | § | |
| **ALBRITTON LAW FIRM,** | § | |
| **KURT ARNOLD, CORY ITKIN,** | § | |
| **JASON ITKIN, RUSSELL POST,** | § | |
| **FIELDS ALEXANDER, JAS BRAR and** | § | |
| **ERIC ALBRITTON** | § | **11TH JUDICIAL DISTRICT** |

## PLAINTIFFS' SECOND AMENDED PETITION
## AND REQUEST FOR DISCLOSURE

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Plaintiffs, Maria Santos Lopez Dominguez, Individually and as next friend of Karen Marien Andrade Lopez, Mairet Sameli Andrade Lopez and Imar Gerardine Andrade Lopez on behalf of the Estate of Omar Gerardo Andrade Zarate; Gabriel Gonzalez Toral; Jorge Arturo Jimenez Rangel; Antonio Montero Hernandez; Juan Antonio Palafox Navarrete; Leonel Fernandez Rivera; Fernando Augusto Cervera Ramirez; Libia Arredondo Chavez; individually and as Next Friend of Jorge Ricardo Barrancos Arredondo and Pedro Santiago Barrancos Arredondo on behalf of the Estate of Jorge Alonso Barrancos Dzul; Pastor Garcia Ocana; Jorge Guzman Martinez; Aldo Antonio Lopez Lorenzo and Monica Lopez; and Miguel Cobos Salas complaining of Defendants, Arnold & Itkin, L.L.P., Beck Redden, L.L.P., Albritton Law Firm, Kurt Arnold, Cory Itkin, Jason Itkin, Russell Post, Fields Alexander, Jas Brar and Eric Albritton, and would respectfully show as follows:

# I
## DISCOVERY CONTROL PLAN

Based upon this Petition, this case should be controlled by discovery control plan Level 3 pursuant to the Texas Rules of Civil Procedure, Rule 190.4. Plaintiffs seek monetary relief over $1,000,000.00.

# II
## PARTIES

Plaintiff, Maria Santos Lopez Dominguez, Individually and as next friend of Karen Marien Andrade Lopez, Mairet Sameli Andrade Lopez and Imar Gerardine Andrade Lopez on behalf of the estate of Omar Gerardo Andrade Zarate is a resident of Mexico.

Plaintiff, Gabriel Gonzalez Toral is a resident of Mexico.

Plaintiff, Jorge Arturo Jimenez Rangel is a resident of Mexico.

Plaintiff, Antonio Montero Hernandez is a resident of Mexico.

Plaintiff, Juan Antonio Palafox Navarrete is a resident of Mexico.

Plaintiff, Leonel Fernandez Rivera is a resident of Mexico.

Plaintiff, Fernando Augusto Cervera Ramirez is a resident of Mexico.

Plaintiffs, Libia Arredondo Chavez, individually and as Next Friend of Jorge Ricardo Barrancos Arredondo and Pedro Santiago Barrancos Arredondo on behalf of the Estate of Jorge Alonso Barrancos Dzul is a resident of Mexico.

Plaintiff, Pastor Garcia Ocana is a resident of Mexico.

Plaintiff, Jorge Guzman Martinez is a resident of Mexico.

Plaintiff, Aldo Antonio Lopez Lorenzo and Monica Lopez are residents of Mexico.

Plaintiff, Miguel Cobos Salas is a resident of Mexico.

Defendant, Arnold & Itkin, L.L.P., is a Texas Limited Liability Partnership formed for the practice of law and has answered herein.

Defendant, Beck Redden, L.L.P., is a Texas Limited Liability Partnership formed for the practice of law and has answered herein.

Defendant, Albritton Law Firm is a law firm located in Longview, Texas and has answered herein.

Defendant, Kurt Arnold, is an individual residing in and/or doing business in Harris County, Texas and has answered herein.

Defendant, Jason Itkin, is an individual residing in and/or doing business in Harris County, Texas and has answered herein.

Defendant, Cory Itkin, is an individual residing in and/or doing business in Harris County, Texas and has answered herein.

Defendant, Russell Post, is an individual residing in and/or doing business in Harris County, Texas and has answered herein.

Defendant, Jas Brar, is an individual residing in and/or doing business in Harris County, Texas and has answered herein.

Defendant, Eric Albritton, is an individual residing in and/or doing business in Gregg County, Texas and has answered herein.

### III
### JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the controversy because the claims asserted in this Petition arose, in whole or in part, in Texas and the amount in controversy exceeds the minimum jurisdictional limits of this Court.

This Court has personal jurisdiction over each Defendant because the acts and omissions complained of herein occurred in Texas, each Defendant does and/or did do business in the State of Texas, has committed a tort, in whole or in part in Texas, is a resident and citizen of Texas,

and/or has minimum contacts with the State of Texas during the period of time complained of herein.

Venue is properly laid in the Harris County, Texas because Defendant, Arnold & Itkin, LLP has a principal office and headquarters in Harris County, Texas. *See* TEX. CIV. PRAC. & REM. CODE § 15.002(a)(3). All other Defendants jointly represented Plaintiffs in the underlying case and are responsible for each other's conduct. Because the claims and causes of action against all other Defendants arise out of the same transaction, occurrence, or series of transactions or occurrences, the Court has venue for all Defendants. *See* TEX. CIV. PRAC. & REM. CODE § 15.005.

## IV
## FACTUAL BACKGROUND

This is a legal malpractice case arising out of a grossly tragic, yet entirely avoidable mobile off-shore platform accident which took place off the Bay of Campeche, Mexico in October of 2007. The accident caused the death of twenty-two workers and injured sixty-three more. After the explosion, Plaintiffs were herded by the lawyers to sue the various American and Mexican oil companies responsible. Unfortunately, the lawyers, after filing the lawsuits, were found by the court to have failed to "prosecute the cases in good faith" thereby causing the cases to be dismissed. With the statute of limitations lapsed and unwaivable under Mexico law, the cases are forever barred to being refiled. In the end, the fatal negligence of the lawyers deprived these Plaintiffs of their right to seek redress for the injuries and deaths they sustained. The disastrous series of events is as follows.

### A.    THE ACCIDENT

Plaintiffs Maria Santos Lopez Dominguez, *et al.* ("Plaintiffs") are offshore oilfield workers (or the surviving representatives of oil field workers) who were working on the mobile

drilling rig, Usumacinta located in the Bay of Campeche, Mexico in October 2007. On October 23, 2007, a storm entered the Bay of Campeche, causing the Usumacinta to strike a stationary platform next to which the Usumacinta had been anchored. An oil and gas leak was detected in one of the wells, however, a defective safety valve failed to seal off the leak resulting in a release of poisonous gases necessitating the evacuation of the platform. As a result, twenty two offshore workers (including two rescuers) died and sixty three others were injured. Plaintiffs were among those injured and/or survivors of those killed in the tragedy.

### B.      THE IMPROPER SOLICITATION.

On information and belief, Plaintiffs were illegally and unethically contacted via telephone by an individual claiming to be a representative of a law firm (the "runner") shortly after the incident. The runner told some of the Plaintiffs that the law firm was interested in representing them against the American companies responsible for the faulty valve and ultimately the incident and their injuries. The runner advised some of the Plaintiffs to recruit others to be solicited by the law firm for representation. The runner then met with other Plaintiffs to solicit them into hiring the attorneys.

### C.      THE UNDERLYING LAWSUIT

Thereafter, Plaintiffs, either individually or collectively, retained Defendants Arnold & Itkin, L.L.P., Kurt Arnold, Cory Itkin, Jason Itkin, ("Defendants" or "Lawyers") to represent them in claims against the parties responsible for causing the injuries and deaths. Thereafter, Eric Albritton and the Albritton Law Firm ("Albritton Defendants") were enlisted as local counsel to represent the Plaintiffs. Beck Redden, L.L.P., Russell Post, Fields Alexander and Jas Brar ("Beck Defendants") were also enlisted to represent Plaintiffs with regard to the attempt to reinstate Plaintiffs' cases in the United States.

Beginning in October of 2008, Defendants, on behalf of Plaintiffs, filed various lawsuits in the United States Federal District Court for the Eastern District of Texas, Lufkin Division (the "District Court") seeking actual and punitive damages against an individual Glen Carter and a number of Mexican and American companies including Gulf Coast Marine & Associates, Inc., Schlumberger Technology Corporation, Halliburton Energy Services, Inc. and Matthews-Daniel Company (the "underlying lawsuit").

In the underlying lawsuit, the Lawyers alleged negligence, gross negligence, products liability, and wrongful death claims. These Texas corporate defendants were responsible for making policy, safety, corporate, manufacturing, supervision, and design decisions, in their United States headquarters, that directly affected the events relevant in the underlying lawsuit. More specifically, Defendants, on Plaintiffs' behalf, alleged the underlying defendants breached their duties by negligently failing to provide a safe working environment, accurate weather information, proper supervision, proper equipment that was in good repair; accurate information as to soil conditions and platform placement; and failing to timely engage in rescue efforts, among other claims. Defendants, on Plaintiffs' behalf, alleged that Schlumberger and Halliburton were liable for strict products liability for defective design and manufacture of the safety valves and/or sensors that failed in the underlying incident. Even more specifically, Defendants alleged that the valve design defect posed an unreasonably dangerous rate of fouling, a process leading to the buildup of solids which creates a false seal that erodes with time, significantly increasing the risk of a perilous and incessant oil and gas leak. Defendants also alleged that products in question contained inadequate warnings. Defendants alleged that these product defects rendered the offending products unreasonably dangerous and, therefore, Schlumberger and Halliburton were liable for all damages caused thereby without regard to fault. These claims were based on

Texas state law, general federal or international maritime law, including the Jones Act, and Mexican law.

The District Court dismissed Plaintiff's state law claims with prejudice, finding that they were preempted by the Jones Act. In addition, the District Court dismissed Plaintiff's federal maritime claims because the Lawyers negligently failed to allege that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act. Thus, due to the negligence of the Lawyer Defendants, including the Albritton Defendants, the only claims remaining were Plaintiff's Mexican claims for civil liability and moral damages.[1]

The District Court, on September 15, 2010, consolidated the underlying lawsuit with six other lawsuits filed by other plaintiffs and a number of other law firms for the purpose of briefing and deciding the *forum non conveniens* issue which was common to each case. More specifically, the defendants in the underlying lawsuit argued that because the underlying events arose out of the collision of a mobile drilling rig and oil platform in Mexico territorial waters, and because the plaintiffs were all Mexican residents and employed by Mexican companies, Mexico was the appropriate forum to hear the dispute. More importantly however, the underlying defendants argued that since the only remaining claims were brought under Mexican law, Mexico was an appropriate and adequate forum. The underlying defendants argued that Mexico was an adequate forum because they would waive any statute of limitations and agree to submit themselves to jurisdiction in Mexico.

In response, the Lawyers, including the Albritton Defendants, merely argued that all of the underlying defendants were U.S. companies or citizens and, therefore, the documents and witnesses regarding liability were located in the United States. However, the Defendants, the

Albritton Defendants and the Beck Defendants wholly failed to argue, among other things, that Mexico was not an available forum because:

1. The waiver of the statute of limitations is invalid under Mexican law;

2. Mexico lacks jurisdiction over United States residents and the unilateral consent by the underlying defendants does not create jurisdiction in Mexico;

3. Plaintiff would not be voluntarily choosing the Mexican forum as required under Mexican law; and

4. Mexico had lost any initial jurisdiction it ever had over the case after the case was initially filed in the United States.

Additionally, all of the Defendants wholly failed to argue, among other things, that Mexican courts were not adequate for adjudicating the case because:

1. Mexico does not have procedural safeguards to permit the Plaintiff to develop his evidence; and

2. Proceedings in Mexico will not be concluded within a reasonable time frame.

As discussed further below, had the foregoing substantive arguments been properly asserted by all of the Defendants in the response to the *forum non conveniens*, the outcome of the underlying case would have been different and the *forum non conveniens* would not have been granted by the District Court thereby allowing Plaintiff's claims to proceed forward in the chosen forum.

After a hearing on that motion on March 10, 2011, the District Court conditionally granted the motion. The granting of the motion carried five crucial conditions to the survival of Plaintiff's claims:

---

[1] Pursuant to Articles 500 and 502 of the Federal Labor Law in Mexico allows only approximately $9,500.00 U.S. Dollars as compensation for civil liability in death cases. Moral damages in Mexico are equally inadequate to compensate worker's personal injuries.

1. Defendants agree to appear and submit themselves to the jurisdiction of a Mexican federal or state court, waiving any jurisdictional defenses they might normally possess;

2. Defendants agree to waive any statute of limitations defense that they did not possess as of the date each of the seven cases was originally filed;

3. Defendants agree to submit to discovery in the Mexican forum in accordance with the procedural rules of the Mexican court;

4. Defendants agree that they will make all relevant witnesses and documents available in Mexico to the extent consistent with Mexican law;

5. Defendants further agree that they will make any employee witness available for trial in Mexico to the extent consistent with Mexican law.

The order also carried with it a return jurisdiction clause stating that, "Should the courts of Mexico refuse to accept jurisdiction of any of these cases for reasons other than Plaintiffs' refusal to pursue an action or to comply with the procedural requirements of Mexican courts, this Court may reassert jurisdiction upon timely notification of the same."

From February to May 2013, Defendants filed in Mexico only eleven (11) of the more than eighty (80) original cases. The underlying defendants then challenged the Mexican court's jurisdiction due to Defendants failure to comply with the District Court's Order. In what appears to be part of Defendants' sophomoric, jejune and grossly negligent trial strategy to have Plaintiffs' claims tried in Texas (where Defendants' practice and reside) as soon as possible, Defendants attempted to bypass the dictates of the District Court's Orders. Specifically, the Defendants did not make use of the stipulation to Mexican jurisdiction the underlying defendants signed as part of the dismissal in the District Court or otherwise contest the underlying defendant's resistance to Mexican jurisdiction. Not surprisingly, the Mexican courts immediately rejected jurisdiction of the cases.

Moreover, rather than appeal the dismissal for lack of jurisdiction to a higher Mexican court, all of the Defendants simply filed a motion to reinstate the Plaintiffs' case in District Court on or about October 18, 2013. After extensive briefing, the District Court denied Defendants' attempt to re-file the cases in Texas. In her May 14, 2014 memorandum opinion, Judge Marcia Crone exposed Defendants' fraud on the courts in great detail, noting that Defendants "filed some, but not all, of the cases dismissed by Judge Ward in Mexico." Judge Crone continued, "Because counsel made no attempt to litigate those cases in Mexico in compliance with the court's Memorandum and Order, there is no basis upon which to reopen them here." Therefore, with regard to all of the underlying cases, save and except the eleven that were refiled in Mexico, Defendants grossly failed to litigate diligently and in good faith.

With regard to the eleven cases that were refiled in Mexico, the District Court found that Defendants simply "did not prosecute the cases in good faith." Specifically, the District Court found that Defendants (1) failed to properly inform the Mexican courts of the underlying defendants' stipulation to jurisdiction; (2) failed to properly inform the Mexican courts of Judge Ward's Orders dated April 20 and May 4, 2011; (3) failed to state in the complaints filed in Mexico that the underlying defendants consented to jurisdiction; (4) failed to translate copies of the stipulations or court orders for the Mexican court; and (5) failed to provide the Beaumont Federal Court any copies of the original apostilled orders issued by Judge Ward or the underlying defendants' stipulations with markings confirming that the documents filed in the Mexican courts were filed properly. Thus, on May 14, 2014, as a direct and proximate result of the Lawyers' gross malfeasance, the District Court dismissed the Plaintiffs' underlying lawsuits.

With the accident and resulting injuries and deaths occurring in October of 2008, the Plaintiffs' underlying lawsuit may not be refiled in Mexico because it is now barred by

limitations. Moreover, while the underlying defendants agreed to stipulate to jurisdiction in Mexico and waive the statute of limitations, these stipulations and waivers were invalid under Texas and Mexican law from the outset. *See Sacks v. Four Seasons Hotel Ltd.*, 2006 U.S. Dist. LEXIS 17768 at \*18 (E.D. Tex. Mar. 7, 2006)(denying motion to dismiss under the doctrine of forum non conveniens based, in part, on Mexican law experts testimony that "stipulations made before a United States court to waive the Mexican statute of limitations are meaningless in Mexico."). The Lawyers, including all Defendants herein, wholly failed to raise these points in response to various motions to dismiss. Had such evidence, arguments and authority been presented, the District Court would not have dismissed the case and the case would have remained in the Texas District Court. Moreover, and in the alternative, all Defendants failed to appeal the District Court's rulings based upon the above arguments and authority. Had this appeal been undertaken, it would have been successful and the case would have remained in District Court.

Furthermore, the waivers became invalid and unenforceable when the Lawyers, including the Albritton Defendants, failed to comply with the initial March 10, 2011 order from the District Court requiring the underlying lawsuits to be litigated and refiled in Mexico diligently and in good faith. Accordingly, the waivers and stipulations are of no consequence. As a result, Plaintiffs' claims are forever barred in both the United States and Mexico.

Obviously, Defendants attempted to make jurisdiction in the United States as quickly as possible no matter what the cost to their clients. This is demonstrated by the fact that the suits were filed in Texas first rather than exhausting all remedies in Mexico. When that failed, Defendants filed only eleven cases in Mexico rather than waste their time filing all of them in Mexico. Even then, Defendants purposefully, intentionally and willfully sabotaged the cases so

that the Mexican courts would quickly dismiss them for lack of jurisdiction, which is exactly what they did. The obviousness of this failed strategy is underscored by the fact that Defendants chose to file similarly-worded and woefully inadequate complaints even after receiving dismissal orders from the Mexican courts for the first several cases instead of correcting the inadequacies by expressly stating that Defendants had submitted to Mexico's jurisdictions in writing.

To add insult to injury, after the May 14, 2014 dismissal, some of the Defendants sent deceitful withdrawal letters to the Plaintiffs wherein they attempted to conceal and downplay the significance of their actions and conceal their wrongdoing. Not only this, but to the extent the decision of the District Court was erroneous, all Defendants neglected to appeal the decision of the District Court or even advise the Plaintiffs of their rights to do so within the prescribed period of time. As a result of all the Defendants' grossly incompetent strategy, Plaintiffs were left with no remedy for themselves or their loved ones who lost lives.

## V
## RESPONDEAT SUPERIOR

At all times material hereto, Defendants, including the Albritton Defendants represented Plaintiffs in the legal matters described herein. Additionally, the Beck Defendants represented Plaintiffs with regard to strategy and litigation related to the attempted reinstatement of Plaintiffs' cases in the United States. Thus, at all times material hereto all of the specific acts complained of herein below are attributable to the conduct of the individual Defendants, who were attorneys associated with their respective law firm Defendant, as a partner, agent, servant, representative and/or employee. Thus, the liability and responsibility of the Defendants herein is vicarious and joint and several, and, further, Plaintiffs plead the legal theory of *respondeat superior* as between the individual Defendants and their respective law firms. Therefore, as

Plaintiffs' lawyers, Defendants, including the Albritton Defendants and the Beck Defendants owed Plaintiffs fiduciary and other duties of care as a matter of law.

## VI
## STATEMENT OF CLAIMS

Therefore, it has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs due to all of the Defendants' conduct as listed above and below. All the Defendants' actions, either individually or in consert constitute negligence, gross negligence, breach of fiduciary duty, fraud and constructive fraud as those terms are understood in law. Defendants also violated section 32.45 of the Texas Penal Code (Misapplication of Fiduciary Property).

### A.    NEGLIGENCE

It has become necessary to bring this suit to collect a legal debt of money damages owing to Plaintiffs because of all of the Defendants' negligence as that term is understood in law. Specifically, Plaintiffs would show the following errors and/or omissions as to the conduct of some or all Defendants in their legal representation of Plaintiffs:

1. Failure to properly represent Plaintiffs;

2. Failure to preserve Plaintiffs' rights and interests;

3. Failure to make the proper arguments in response to the motions filed in the District Court.

4. Failure to properly prosecute Plaintiffs' causes of action in Mexican courts in good faith;

5. Failure to properly advise and/or inform Plaintiffs regarding the benefits and/or risks associated with the course of action taken by Defendants in the prosecution of their claims;

6. Failure to timely and fully advise Plaintiffs as to the status of their claims;

7.     Failing to timely file suit against parties against whom Plaintiffs had lawful claims;

8.     Accepting representation for litigation for which Defendants were not competent to handle;

9.     Failing to fully comply with Judge Wards April 20 and May 4, 2011 Orders;

10.    Failing to comply with the procedural laws of Mexico;

11.    Failing to put forth sufficient evidence, argument and authority to the District Court to establish that any waivers of limitations or stipulations to jurisdiction by the underlying defendants would be invalid under Mexican law thereby rendering Mexico an inadequate forum;

12.    Conceding that Mexico is an available and adequate forum for the adjudication of Plaintiff's claims when it was not;

13.    Failing to advise Plaintiffs of their right to appeal the decisions of the District Court or undertaking this appeal within the proscribed period of time; and

14.    Failing to properly plead the Jones Act.

Of Course, nothing Plaintiffs did or failed to do caused or in any way contributed to cause the occurrences which resulted in losses and damages. On the contrary, all of the Defendants wholly failed and neglected to properly represent Plaintiffs, and their conduct was a proximate and/or producing cause of Plaintiffs' losses and damages.

B.     GROSS NEGLIGENCE

The acts and omissions of all Defendants described herein constitute gross negligence for which Plaintiffs now sue. All of the Defendants herein owed Plaintiffs a duty to render legal services with the care, skill and diligence of an attorney of ordinary and reasonable skill and knowledge. All of the Defendants failed to perform as an attorney of ordinary and reasonable prudence to a gross extent. Moreover, some or all of the Defendants hold themselves out as superior lawyers in ability and ethics, rising themselves to the status of an expert lawyer. In fact,

some of the lawyer Defendants classify and market themselves as "Super Lawyers." Thus, these Lawyer Defendants are held to the expert lawyer standard. Unfortunately however, all of hte Defendants' incompetence, as shown by the way they handled the underlying case, does not even rise to the level of an ordinarily prudent lawyer. All of the Defendants herein wholly failed to even uphold this minimal standard of care. Instead, all of the Defendants chose to treat Plaintiffs with an entire want of care, such that all of these Defendants' actions constitute an actual conscious disregard to the rights, welfare and safety of Plaintiffs. Thus, all of the Defendants' negligence and gross negligence proximately resulted in legal damages for which Plaintiffs sue.

### C. BREACH OF FIDUCIARY DUTY

An attorney client relationship existed between Plaintiffs and all Defendants herein. Thus, all the Defendants owed Plaintiffs various fiduciary duties as a matter of law, including:

1. Duty to act with loyalty and utmost good faith;
2. Duty to act with absolute perfect candor, openness, and honesty, and without any deception or concealment, no matter how slight;
3. Duty to refrain from self-dealing, which extends to dealings with persons whose interests are closely identified with those of the fiduciary;
4. Duty to act with integrity of the strictest kind;
5. Duty of fair, honest dealing;
6. Duty of full disclosure; that is, a duty not to conceal matters that might influence a fiduciary to act in a manner prejudicial to the principal;
7. Duty to represent Plaintiffs with undivided loyalty;
8. Duty to make a full and fair disclosure of every facet regarding the matters material to the representation;

Some or all of the Defendants knowingly and intentionally breached any one or all of the above fiduciary duties owed to Plaintiffs by the acts and omissions stated herein and above. All

of the Defendants' various breaches of the fiduciary duties owed to Plaintiffs resulted in legal damages to Plaintiffs and/or a benefit to Defendants, for which Plaintiffs now sue.

## D. FRAUD AND CONSTRUCTIVE FRAUD

Plaintiffs will show that the acts and omissions of some or all of the Defendants constitute fraud in that: (i) Defendants made material misrepresentations (ii) Defendants made the misrepresentations (and/or non-disclosures) with knowledge of its falsity or made them recklessly without any knowledge of the truth and as a positive assertion; (iii) the misrepresentations (and/or non-disclosures) were made with the intention that they should be acted and/or relied upon by Plaintiffs; and (iv) Plaintiffs relied on the misrepresentations (and/or non-disclosures) and suffered injury. Specifically, Defendants represented they would follow the District Court's Orders and litigate in good faith by re filing the underlying suits in Mexico and by exhausting all remedies in Mexico prior to reopening the cases in the United States. Defendants had no intention of following the District Court's Orders, nor litigate in good faith in Mexico as outlined above. Plaintiffs relied on these Defendants misrepresentations and/or lack thereof to their detriment. This was not only a fraud perpetrated against Plaintiffs, the Lawyers own clients, but was a fraud upon the Court as well.

## E. MISAPPLICATION OF FIDUCIARY PROPERTY

Defendants herein violated section 32.45 of the Texas Penal Code (Misapplication of Fiduciary Property). Pursuant to section 32.45, a violation occurs when a fiduciary intentionally, knowingly or recklessly misapplies property he holds as a fiduciary in a manner that involves substantial risk of loss to the owner of the property or to a person for whose benefit the property is held. These Defendants owed a fiduciary duty to Plaintiffs as a matter of law. Further, Plaintiffs' underlying lawsuit was considered "property" as that term is understood in law and

was held in these Defendants' safe keeping. These Defendants intentionally, knowingly or recklessly misapplied Plaintiffs' property (1) by attempting to bypass Mexican procedural law; (2) by failing to follow the simple dictates of Judge Ward's Orders; (3) by not diligently prosecuting Plaintiffs' claims; (4) by failing to argue that Mexican law does not recognize stipulations made in other jurisdictions; and (5) by failing to appeal Judge Ward's April 20 and May 4, 2011 Orders. Clearly, such conduct involved a substantial risk of loss to Plaintiffs' property, and in fact, such property was lost due to Defendants' actions. Therefore, Defendants violated section 32.45 of the Texas Penal Code. Moreover, pursuant to Civil Practice and Remedies Code, Section 41.008 (c) the statutory caps for punitive and/or exemplary damages do not apply to this case.

### F.   VIOLATION OF THE BARRATRY STATUTE

Texas Disciplinary Rule of Professional Conduct 8.04(a) prohibits an attorney from "engage[ing] in conduct that constitutes barratry as defined by the law of this state." TEX. DISCP. R. PROF'L CONDUCT 8.04. A person commits barratry "if, with intent to obtain an economic benefit the person… pays or gives or offers to pay or give a person money or anything of value to solicit employment." TEX. PENAL CODE § 38.12(a)(4). Simply put, "[b]arratry is the solicitation of employment to prosecute or defend a claim with intent to obtain a personal benefit." *State Bar of Texas v. Kilpatrick*, 874 S.W.2d 656, 659 (Tex. 1994). An agreement procured through barratry is voidable by the client. *Cobb v. Stern, Miller & Higdon*, 305 S.W.3d 36, 42 (Tex. App.—Houston [1st Dist.] 2009, no pet.). As stated above, Defendants violated the foregoing rules and statutes by engaging third parties to personally contact Plaintiffs and solicit Defendants' employment in the underlying lawsuit.

## VII
## DAMAGES

### A.     ACTUAL DAMAGES

Regarding the causes of action and conduct alleged above, Plaintiffs sustained pecuniary losses that were proximately caused by all of the Defendants' conduct. Plaintiffs' actual damages exceed the minimum jurisdictional limits of this court. After completion of discovery, Plaintiffs will amend their pleadings in order to indicate more specifically the damages they have suffered.

### B.     EXEMPLARY DAMAGES

Due to all of the Defendants' gross negligence, breach of fiduciary duty and fraud, Plaintiffs are entitled to exemplary/punitive damages which they seek herein. Moreover, based upon Defendants violation of the Texas Penal Code, Section 32.45, punitive damages are not capped pursuant to Section 41.008 of the Texas Civil Practice and Remedies Code with regard to these Defendants. Thus, Plaintiffs seek punitive damages to the maximum extent of what the jury awards.

## VIII
## DISCOVERY RULE

To the extent that any party pleads the statute of limitations as a defense, Plaintiffs hereby assert the provision of the "Discovery Rule" as pronounced by the Texas Supreme Court in *Willis v. Maverick*, 760 S.W.2d 642 (Tex. 1988), and would say and show that said suit has been filed within two years of the Plaintiffs' knowledge of such facts as would lead a reasonably prudent person to discover all of the Defendants' wrongful acts.

## IX
## JURY DEMAND

Plaintiffs desire to have a jury decide this case and make this formal request pursuant to Tex. R. Civ. P. 216. This request is filed more than thirty days before this case has been set for trial. A jury fee has been tendered herewith in the above entitled and numbered cause.

## X
## REQUEST FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, all of the Defendants are requested to disclose, within fifty (50) days of service of this request, the information or material described in Rule 194.2 (a) - (l).

## XI
## PRAYER

WHEREFORE, Plaintiffs pray that after trial herein, that judgment be entered against all of the Defendants jointly and severally as prayed for, that costs of court be taxed against all Defendants herein, that Plaintiffs be given prejudgment as well as post judgment interest, and for such other and further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs will ever pray.

Respectfully submitted,

**THE KASSAB LAW FIRM**

/ s / Lance Christopher Kassab
**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
lck@texaslegalmalpractice.com
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
dek@texaslegalmalpractice.com
1420 Alabama
Houston, Texas 77004
t.713.522.7400
f.713.522.7410

**DOHERTY★WAGNER**

/ s / Brett Wagner
**BRETT WAGNER**
Texas State Bar No. 20654270
brett@dwlawyers.com
**LARRY JOE DOHERTY**
Texas State Bar No. 05950000
larry@dwlawyers.com
**RYAN W. SMITH**
Texas State Bar No. 24063010
ryan@dwlawyers.com
13810 Champion Forest Drive, Suite 225
Houston, Texas  77069
t.281 583-8700
f.281 583-8701

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all parties pursuant to the Texas Rules of Civil Procedure on this the 11th day of August, 2015.

/s/ Lance Christopher Kassab
Lance Christopher Kassab

# Appendix Tab 2

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS NEXT FRIEND | § | |
| OF KAREN MARIEN ANDRADE LOPEZ, | § | |
| MAIRET SAMELI ANDRADE LOPEZ | § | |
| AND IMAR GERARDO ANDRADE LOPEZ | § | |
| ON BEHALF THE ESTATE OF OMAR | § | |
| GERARDO ANDRADE LOPEZ, ET AL | § | |
| | § | |
| V. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| ARNOLD & ITKIN, L.L.P., | § | |
| BECK REDDEN, L.L.P., | § | |
| ALBRITTON LAW FIRM, | § | |
| KURT ARNOLD, CORY ITKIN, | § | |
| JASON ITKIN, RUSSELL POST, | § | |
| FIELDS ALEXANDER, JAS BRAR and | § | |
| ERIC ALBRITTON | § | 11TH JUDICIAL DISTRICT |

**PLAINTIFFS' RESPONSE TO ALL DEFENDANTS' PLEA TO THE
JURISDICTION, AND, IN THE ALTERNATIVE, PLEA IN ABATEMENT**

TO THE HONORABLE JUDGE MIKE MILLER:

COME NOW Plaintiffs, Maria Santos Lopez Dominguez, *et al.*, and files this, their

Response to All Defendants Plea to the Jurisdiction, and, in the Alternative, Plea in Abatement,

and would respectfully show as follows:

**I
INTRODUCTION**

Plaintiffs, Maria Santos Lopez Dominguez, *et al.*, are Mexican nationals and former

clients of Defendants. Defendants are Arnold & Itkin, L.L.P., Kurt Arnold, Cory Itkin and Jason

Itkin (the "Itkin Defendants"), Beck Redden, L.L.P., Russell Post, Fields Alexander, Jas Brar

(the "Beck Redden Defendants") and Eric Albritton and his law firm Albritton Law Firm (the

"Albritton Defendants") (collectively "Defendants" or the "Lawyers").

Plaintiffs sued the Lawyers for, among other claims, negligence after Plaintiffs'

underlying claims were dismissed. Specifically, Plaintiffs allege that their underlying maritime

claims were wrongfully dismissed because "the Lawyers negligently failed to allege that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act."[1] "Thus, due to the negligence of the [Lawyers] the only claims remaining were Plaintiffs' Mexican claims for civil liability and moral damages."[2] Second, Plaintiffs allege that the Lawyers allowed Plaintiffs' remaining underlying claims to be wrongfully dismissed on *forum non conveniens* grounds because the Lawyers "wholly failed to argue, among other things, that Mexico was not an available forum" or that "that Mexican courts were not adequate for adjudicating the case…"[3] Plaintiffs allege that "had the [identified] substantive arguments been properly asserted by the Lawyers in the response to the *forum non conveniens*, the outcome of the underlying case would have been different and the *forum non conveniens* would not have been granted by the District Court thereby allowing Plaintiffs' claims to proceed forward in the chosen forum."[4] Finally, Plaintiffs allege that with the accident and resulting injuries and deaths occurring in October of 2007, "the Plaintiffs' underlying lawsuit may not be refiled in Mexico because it is now barred by limitations."[5]

The Beck Redden Defendants and the Itkin Defendants both filed the pending Plea to the Jurisdiction, and, in the Alternative, Plea in Abatement arguing that this lawsuit should be dismissed because it is not ripe. More specifically, the Lawyers allege that because Plaintiffs' underlying claims can allegedly be refiled in Mexico, "Plaintiffs have not suffered any concrete injury" and this case is therefore "premised on contingent and hypothetical events that have not yet come to pass."[6] Simply put; the Lawyers argue that Plaintiffs must continue to pursue their underlying claims in Mexico and, upon dismissal, again attempt to have the underlying case

---

[1] PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[2] PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[3] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.
[4] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.

reinstated in Texas before their legal malpractice claims are ripe for adjudication. The Albritton

Defendants joined in the other Defendants' pleas to the jurisdiction and requests for abatement.

The Lawyers' pleas to the jurisdiction and request for abatement should be denied for at

least the following reasons:

- The plea to the jurisdiction is premature because it implicates the merits of this lawsuit and there are genuine issue of material fact regarding a disputed jurisdictional facts and, therefore, the trial Court cannot grant the motion to dismiss;
- Plaintiffs have asserted negligence claims against Defendants for failing to properly assert their federal maritime claims and nothing about Plaintiffs' ability or inability to pursue Mexican law claims in Mexico changes the effect of Defendants' malpractice related to these claims;
- Defendants' negligence in failing to assert and prove the proper substantive arguments in the response to the *forum non conveniens* caused the District Court to render the decision that it did and had such arguments been properly asserted, the outcome of the underlying case would have been different and, even if the cases could be refiled in Mexico, Plaintiffs' damages would be the difference between the value of the case in Mexico verses the United States;
- There are genuine issues of material fact as to whether the waiver of limitations would be valid in Mexico as the case law is conflicting on this issue; and
- Even if a waiver of limitations is valid under Mexico law, the waiver became invalid due to the lapse of time caused by Defendants' delay in litigating the underlying case and, more importantly, the waiver is void as against public policy under Texas law and thus Plaintiffs' underlying case may not be refiled in Texas even if a Mexico court denied jurisdiction.

## II
## FACTUAL BACKGROUND

In ruling on this motion, the Court is required to construe the pleadings in the Plaintiffs'

favor. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993).

---

[5] PLAINTIFFS' SECOND AMENDED PETITION, p. 10-11.
[6] ITKIN DEFENDANTS' PLEA, p. 6.

Accordingly, the factual background will be comprised of Plaintiffs' most recent petition and, when necessary, filings from the underlying proceedings.[7]

Plaintiffs Maria Santos Lopez Dominguez, *et al.* ("Plaintiffs") are offshore oilfield workers (or the surviving representatives of oil field workers) who were working on the mobile drilling rig, Usumacinta located in the Bay of Campeche, Mexico in October 2007.[8] On October 23, 2007, a storm entered the Bay of Campeche, causing the Usumacinta to strike a stationary platform next to which the Usumacinta had been anchored.[9] An oil and gas leak was detected in one of the wells, however, a defective safety valve failed to seal off the leak resulting in a release of poisonous gases necessitating the evacuation of the platform.[10] As a result, twenty two offshore workers (including two rescuers) died and sixty three others were injured.[11] Plaintiffs were among those injured and/or survivors of those killed in the tragedy.[12]

In October of 2008, the Lawyers, on behalf of Plaintiffs, filed various lawsuits in the United States Federal District Court for the Eastern District of Texas, Lufkin Division (the "District Court") seeking actual and punitive damages against an individual Glen Carter and a number of American companies including Gulf Coast Marine & Associates, Inc., Schlumberger Technology Corporation, Halliburton Energy Services, Inc. and Matthews-Daniel Company (the "underlying lawsuit").[13] In the underlying lawsuit, the Lawyers alleged negligence, gross negligence, products liability, and wrongful death claims. These Texas corporate defendants were responsible for making policy, safety, corporate, manufacturing, supervision, and design

---

[7] Plaintiffs have included the affidavit of their counsel, David Eric Kassab, as Exhibit "G" authenticating the pleadings from the underlying case as well as other exhibits which may be helpful to the Court's resolution of the issues.

[8] PLAINTIFFS' SECOND AMENDED PETITION, pp. 4-5; Exhibit "A" – Judge Ward's April 20, 2011 Order, pp. 2-3.

[9] PLAINTIFFS' SECOND AMENDED PETITION, p. 5; Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 3.

[10] PLAINTIFFS' SECOND AMENDED PETITION, p. 5; Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 3.

[11] PLAINTIFFS' SECOND AMENDED PETITION, p. 5; Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 3.

[12] PLAINTIFFS' SECOND AMENDED PETITION, p. 5; Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 3.

[13] PLAINTIFFS' SECOND AMENDED PETITION, pp. 6; Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 2.

decisions, in their United States headquarters, that directly affected the events relevant in the underlying lawsuit.[14] More specifically, Defendants, on Plaintiffs' behalf, alleged the underlying defendants breached their duties by negligently failing to provide a safe working environment, accurate weather information, proper supervision, proper equipment that was in good repair; accurate information as to soil conditions and platform placement; and failing to timely engage in rescue efforts, among other claims.[15] Defendants, on Plaintiffs' behalf, alleged that Schlumberger and Halliburton were liable for strict products liability for defective design and manufacture of the safety valves and/or sensors that failed in the underlying incident. Even more specifically, Defendants alleged that the valve design defect posed an unreasonably dangerous rate of fouling, a process leading to the buildup of solids which creates a false seal that erodes with time, significantly increasing the risk of a perilous and incessant oil and gas leak.[16] Defendants also alleged that products in question contained inadequate warnings. Defendants alleged that these product defects rendered the offending products unreasonably dangerous and, therefore, Schlumberger and Halliburton were liable for all damages caused thereby without regard to fault.[17] These claims were based on Texas state law, general federal or international maritime law, including the Jones Act, and Mexican law.[18]

The District Court dismissed Plaintiffs' state law claims with prejudice, finding that they were preempted by the Jones Act.[19] In addition, the District Court dismissed Plaintiffs' federal maritime claims because the Lawyers negligently "failed to allege that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act."[20] This

---

[14] PLAINTIFFS' SECOND AMENDED PETITION, p. 6; Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 2.
[15] PLAINTIFFS' SECOND AMENDED PETITION, p. 6.
[16] PLAINTIFFS' SECOND AMENDED PETITION, p. 6.
[17] PLAINTIFFS' SECOND AMENDED PETITION, p. 6.
[18] PLAINTIFFS' SECOND AMENDED PETITION, p. 6-7.
[19] PLAINTIFFS' SECOND AMENDED PETITION, p. 7; Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 5.
[20] Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 5; *See also* PLAINTIFFS' SECOND AMENDED PETITION, p. 7.

allegation would have been successful as Section 1916 of the Mexican Civil Code provides for recovery of only 1/3 of the amount of civil liability.[21] Even then, Section 1916 requires to plaintiff to have "material damages" and is only recoverable for "illegal" conduct on part of the defendants.[22] Moreover, Mexican law only allows the plaintiff to recover from the specific person responsible for the illegal act.[23] Therefore, a Mexico forum would be inadequate to compensate Plaintiffs. Nonetheless, due to the negligence of Defendants, the only claims remaining were Plaintiffs' Mexican claims for civil liability and moral damages.[24]

The District Court, on September 15, 2010, consolidated the underlying lawsuit with six other lawsuits filed by other plaintiffs and a number of other law firms for the purpose of briefing and deciding the *forum non conveniens* issue which was common to each case.[25] More specifically, the defendants in the underlying lawsuit argued that because the underlying events arose out of the collision of a mobile drilling rig and oil platform in Mexico territorial waters, and because the plaintiffs were all Mexican residents and employed by Mexican companies, Mexico was the appropriate forum to hear the dispute.[26] More importantly however, the underlying defendants argued that since the ***only*** remaining claims were brought under Mexican law, Mexico was an appropriate and adequate forum.[27] The underlying defendants argued that Mexico was an adequate forum because they would waive any statute of limitations and agree to submit themselves to jurisdiction in Mexico.[28]

In response, the Lawyers merely argued that all of the underlying defendants were U.S. companies or citizens and, therefore, the documents and witnesses regarding liability were

---

[21] Exhibit "C" – Moral Damages in Mexican Law, p. 254.
[22] Exhibit "C" – Moral Damages in Mexican Law, p. 254-255.
[23] Exhibit "C" – Moral Damages in Mexican Law, p. 256.
[24] Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 5; *See also* PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[25] PLAINTIFFS' SECOND AMENDED PETITION, p. 7; Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 2.
[26] Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 5; *See also* PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[27] Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 5; *See also* PLAINTIFFS' SECOND AMENDED PETITION, p. 7.

located in the United States.[29] However, the Lawyers wholly failed to argue, among other things, that Mexico was not an available forum because:

1. The waiver of the statute of limitations is invalid under Mexican law;

2. Mexico lacks jurisdiction over United States residents and the unilateral consent by the underlying defendants does not create jurisdiction in Mexico;

3. Plaintiffs would not be voluntarily choosing the Mexican forum as required under Mexican law; and

4. Mexico had lost any initial jurisdiction it ever had over the case after the case was initially filed in the United States.[30]

Additionally, the Lawyers wholly failed to argue and establish, among other things, that Mexican courts were not adequate for adjudicating the case because:

1. Mexico does not have procedural safeguards to permit the Plaintiffs to develop their evidence; and

2. Proceedings in Mexico would not be concluded within a reasonable time frame.[31]

Plaintiffs allege that, had the foregoing substantive arguments been properly asserted by the Lawyers in the response to the *forum non conveniens*, the outcome of the underlying case would have been different and the *forum non conveniens* would not have been granted by the District Court thereby allowing Plaintiff's claims to proceed forward in the chosen forum.[32] As demonstrated below, Defendants have not (and cannot) affirmatively show that "but for" their failures, the District Court would have ruled the same.

---

[28] Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 5; *See also* PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[29] Exhibit "A" – Judge Ward's April 20, 2011 Order, pp. 5-6; *See also* PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[30] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.
[31] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.
[32] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.

---

After a hearing on the underlying defendants' *forum non conveniens* motion on March 10, 2011, the District Court conditionally granted the motion.[33] The granting of the motion carried five crucial conditions to the survival of Plaintiffs' claims:

1. The underlying defendants agree to appear and submit themselves to the jurisdiction of a Mexican federal or state court, waiving any jurisdictional defenses they might normally possess;

2. The underlying defendants agree to waive any statute of limitations defense that they did not possess as of the date each of the seven cases was originally filed;

3. The underlying defendants agree to submit to discovery in the Mexican forum in accordance with the procedural rules of the Mexican court;

4. The underlying defendants agree that they will make all relevant witnesses and documents available in Mexico to the extent consistent with Mexican law;

5. The underlying defendants agree that they will make any employee witness available for trial in Mexico to the extent consistent with Mexican law.[34]

The order also carried with it a return jurisdiction clause stating that, "Should the courts of Mexico refuse to accept jurisdiction of any of these cases for reasons other than Plaintiffs' refusal to pursue an action or to comply with the procedural requirements of Mexican courts, this Court may reassert jurisdiction upon timely notification of the same."[35] The Lawyers did not appeal the May 4, 2011 order.[36] Plaintiffs allege that, had the Lawyers appealed this order, the appeal would have been successful.[37] Again, Defendants have not (and cannot) affirmatively show that "but for" this failure, the appeal would have been unsuccessful.

---

[33] PLAINTIFFS' SECOND AMENDED PETITION, p. 8; Exhibit "A" – Judge Ward's April 20, 2011 Order, pp. 26-27.
[34] PLAINTIFFS' SECOND AMENDED PETITION, pp. 8-9; Exhibit "A" – Judge Ward's April 20, 2011 Order, pp. 26-27.
[35] PLAINTIFFS' SECOND AMENDED PETITION, p. 9; Exhibit "A" – Judge Ward's April 20, 2011 Order, p. 27.
[36] PLAINTIFFS' SECOND AMENDED PETITION, p. 11.
[37] PLAINTIFFS' SECOND AMENDED PETITION, p. 11.

From February to May 2013, Defendants filed in Mexico only eleven (11) of the more than eighty (80) original cases.[38] However, Defendants did not make use of the stipulation to Mexican jurisdiction the underlying defendants signed as part of the dismissal in the District Court or otherwise contest the underlying defendant's resistance to Mexican jurisdiction.[39] As a result, the Mexican courts immediately rejected jurisdiction of the cases.[40]

On October 18, 2013, Defendants filed a motion to reinstate Plaintiffs' case in District Court arguing that Mexico would not accept jurisdiction over the cases.[41] After extensive briefing, the District Court denied Defendants' attempt to re-file the cases in Texas and exposed Defendants' lack of good faith in great detail, noting that Defendants "filed some, but not all, of the cases dismissed by Judge Ward in Mexico."[42] Judge Crone continued, "Because counsel made no attempt to litigate those cases in Mexico in compliance with the court's Memorandum and Order, there is no basis upon which to reopen them here."[43] Therefore, with regard to all of the underlying cases, save and except the eleven that were refiled in Mexico, Plaintiffs allege that Defendants grossly failed to litigate diligently and in good faith thereby invalidating the waiver of the statute of limitations.[44] Further, as discussed below, the waivers were invalid under Texas law because they were indefinite and not specific.

With regard to the eleven cases that were refiled in Mexico, the District Court found that Defendants simply "did not prosecute the cases in good faith."[45] Specifically, the District Court found that Defendants (1) failed to properly inform the Mexican courts of the underlying defendants' stipulation to jurisdiction; (2) failed to properly inform the Mexican courts of Judge

---

[38] PLAINTIFFS' SECOND AMENDED PETITION, p. 9; Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 3.
[39] PLAINTIFFS' SECOND AMENDED PETITION, p. 9; Exhibit "B" – Judge Crone's August 14, 2014 Order, pp. 4-5.
[40] PLAINTIFFS' SECOND AMENDED PETITION, p. 9; Exhibit "B" – Judge Crone's August 14, 2014 Order, pp. 4-5.
[41] PLAINTIFFS' SECOND AMENDED PETITION, p. 10; Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 5.
[42] Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 9.
[43] Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 9.
[44] PLAINTIFFS' SECOND AMENDED PETITION, p. 10.

Ward's Orders dated April 20 and May 4, 2011; (3) failed to state in the complaints filed in Mexico that the underlying defendants consented to jurisdiction; (4) failed to translate copies of the stipulations or court orders for the Mexican court; and (5) failed to provide the Beaumont Federal Court any copies of the original apostilled orders issued by Judge Ward or the underlying defendants' stipulations with markings confirming that the documents filed in the Mexican courts were filed properly.[46] Thus, on May 14, 2014, as a direct and proximate result of the Lawyers' gross malfeasance, the District Court dismissed the Plaintiffs' underlying lawsuits.[47] The District Court stated that Plaintiffs could "not seek reinstatement in [the District Court] unless and until they have pursued their claims in Mexico with diligence and good faith, including seeking final appellate review of any Mexican dismissal order."[48]

Several months after the dismissal, the Itkin Defendants sent out deceitful withdrawal letters wherein they attempted to conceal and downplay the significance of their wrongdoing and abandoning Plaintiffs.[49] The one bit of truth contained within these letters was Kurt Arnold's recognition that the chances of the District Court accepting jurisdiction over the cases in light of what had occurred was slim. Specifically, Mr. Arnold states: "I think the chances of the Court accepting the jurisdiction for these cases even after following all steps [and refiling the cases in Mexico] is remote."[50] Mr. Arnold is accurate as any claim now filed in Mexico would be dismissed on limitations grounds because the waivers became invalid and unenforceable when the Lawyers failed to comply with the initial March 10, 2011 order from the District Court requiring the underlying lawsuits to be litigated and refiled in Mexico diligently and in good

---

[45] Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 9.
[46] Exhibit "B" – Judge Crone's August 14, 2014 Order, pp. 11-15.
[47] PLAINTIFFS' SECOND AMENDED PETITION, p. 10; *See* Exhibit "B" – Judge Crone's August 14, 2014 Order, pp. 11-15.
[48] Exhibit "B" – Judge Crone's August 14, 2014 Order, p. 15.
[49] Exhibit "D" – Arnold & Itkin October 3, 2014 Letter to Clients.
[50] Exhibit "D" – Arnold & Itkin October 3, 2014 Letter to Clients.

faith.[51] In fact, as explained below, the waiver was invalid under Texas law to begin with and, under Mexican law, limitations may only be waived for a certain period of time. Accordingly, the waivers and stipulations are of no consequence at this late date and, as a result, Plaintiffs' claims are forever barred in both the United States and Mexico.[52]

Immediately after this lawsuit was filed, the Lawyers filed the present pleas to the jurisdiction arguing that Plaintiffs must continue to pursue their clearly-barred underlying claims in Mexico and, upon dismissal, again attempt to have the underlying case reinstated in Texas before their legal malpractice claims are ripe for adjudication. Thus, the Lawyers request the Court to dismiss this action or, alternatively, abate these proceedings until the filings of the underlying case have occurred. For the reasons stated herein, Defendants' pleas to the jurisdiction and request for abatement should be denied.

### III
### ARGUMENT & AUTHORITIES

Ripeness is a component of subject matter jurisdiction. *Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849 (Tex. 2000). Ripeness focuses on when an action may be brought. *Id.* at 851. "[R]ipeness, like standing, is a threshold issue that implicates subject matter jurisdiction, and like standing, emphasizes the need for a concrete injury for a justiciable claim to be presented." *Id.* When, as here, a defendant asks a court to dismiss the case for want of subject matter jurisdiction, the Court must overrule the motion unless the moving parties' evidence clearly demonstrates that the court lacks jurisdiction. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). Defendants have utterly failed to carry their burden.

---

[51] PLAINTIFFS' SECOND AMENDED PETITION, p. 11.

## A. DEFENDANTS' PLEA TO THE JURISDICTION SHOULD BE DENIED BECAUSE IT IMPLICATES THE MERITS OF PLAINTIFFS' CLAIMS.

Defendants essentially argue that their conduct caused no damage to Plaintiffs because the underlying cases can still be refiled in Mexico.[53] However, as discussed above, the failure of Defendants to litigate Plaintiffs' case in good faith is only one act of negligence at issue. Plaintiffs have also sued Defendants for failing to properly maintain Plaintiffs' maritime claims, failing to properly respond to the *forum non conveniens* motions and, alternatively, failing to appeal the District Court's dismissal of the underlying case.[54] Regardless, the malpractice concerning Defendants' good faith necessarily implicates the merits of this lawsuit because if the statute of limitations waiver is void due to Defendants' failure to litigate the claims in good faith, then Plaintiffs have been damaged as a result of Defendants' negligence because the lawsuits may not be refiled in Mexico.

The Beck Redden Defendants argue that "there has been no court order…indicating that the statute of limitations on Plaintiffs' claims has run, or that the statute of limitations would not be honored by the Mexican courts."[55] However, a plaintiff in a legal malpractice case who is suing his attorney for missing a statute of limitations is not required to file the underlying case anyway in order to obtain a court order stating that the statute of limitations has run on the plaintiff's claim. *See Rhodes v. Batilla*, 848 S.W.2d 833, 842 (Tex. App. – Houston [14th Dist.] 1993, writ denied)("there was no requirement that [the client] appeal the final assessment by the IRS in order to establish the open and obvious malpractice committed by appellant…"). Rather, the plaintiff must prove that his claims are barred (*i.e.* causation) by way of expert testimony. *Rangel v. Lapin*, 177 S.W.3d 17, 22 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)("In

---

[52] PLAINTIFFS' SECOND AMENDED PETITION, p. 11.
[53] *See* BECK REDDEN DEFENDANTS' PLEA, p. 7; ITKIN DEFENDANTS' PLEA, p. 3.
[54] PLAINTIFFS' SECOND AMENDED PETITION, pp. 8, 11, 13-14.

general, one proves causation in a legal malpractice suit by expert testimony."). Thus, to prove causation in this case, Plaintiffs must introduce expert testimony to establish that, even if they would refile the claims in Mexico, they would be dismissed due to the Defendants' conduct. *See Id.* (affirming summary judgment against client because the client "did not offer expert testimony from which one could infer that the underlying case would have had merit…"); *See also Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 118 (Tex. 2004)(in a legal malpractice case a jury, with the benefit and guidance of expert testimony, is required to determine whether the "omitted evidence was different from, and more compelling than, the evidence and testimony presented [to the underlying judge]" and "whether the result of the underlying …proceeding would have been different but for the alleged malpractice.").

When jurisdictional facts are disputed, the manner in which the trial court analyzes the jurisdictional challenge depends on whether the disputed jurisdictional fact issues do or do not implicate the merits of the plaintiff's case. *See University of Tex. v. Poindexter*, 306 S.W.3d 798, 806-07 (Tex. App.—Austin 2009, no pet.). If the disputed jurisdictional issue or facts do not implicate the merits, the court—not the jury—must make the necessary factual findings to resolve the jurisdictional issue. *Tex. Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 226 (Tex. 2004). However, when, as here, "the jurisdictional inquiry *does* implicate the merits of the plaintiff's case, a very different standard applies." *Martin v. Nat'l Instruments Corp.*, 2013 Tex. App. LEXIS 7021, at *6 (Tex.App. – Austin June 11, 2013, no pet.). "In that instance, the trial court **does not** act as a fact-finder." *Id.* (emphasis added)(citing *Poindexter*, 306 S.W.3d at 807 and *Miranda*, 133 S.W.3d at 227-28). "If the evidence submitted by the parties creates a genuine issue of material fact regarding a disputed jurisdictional fact, then the trial court cannot grant the motion to dismiss, and the fact issue must be resolved by the fact-finder at trial." *Id.* at *6-*7.

---

[55] *See* BECK REDDEN DEFENDANTS' PLEA, p. 2.

At this stage, the Defendants that have the burden to show through their pleas to the jurisdiction and attached evidence that this Court lacks jurisdiction as a matter of law. *Miranda*, 133 S.W.3d at 228. The only evidence submitted by Defendants are certain pleadings from the underlying proceedings and court orders stating that Plaintiffs can allegedly refile their cases in Mexico.[56] Using these exhibits, Defendants argue that the statements in Plaintiffs' pleadings are invalid and that Plaintiffs' underlying claims are not forever barred because Plaintiffs have not validly attempted to re-assert their claims in the Courts of Mexico and, therefore, jurisdiction is not conferred upon this Court.[57] However, the Texas Supreme Court and the Houston Court of Appeals have made clear that such an assertion "attacks [the plaintiff's] right of recovery" and should be made in a motion for summary judgment, not in a plea to the jurisdiction. *See Concerned Cmty. Involved Dev., Inc. v. City of Houston*, 209 S.W.3d 666, 673 (Tex. App – Houston [14th Dist.] 2006, pet. denied)(citing *Dubai Petroleum Co. v. Kazi*, 12 S.W.3d 71, 76-77 (Tex. 2000)). "The right of a plaintiff to maintain a suit, while frequently treated as going to the question of jurisdiction, has been said to go in reality to the right of the plaintiff to relief rather than to the jurisdiction of the court to afford it." *Kazi*, 12 S.W.3d at 76-77. Therefore, the Court should deny Defendants' pleas to the jurisdiction as they implicate the merits of Plaintiffs' claims. See *Concerned,* 209 S.W.3d at 673 (holding it was error for the trial court to dispose of claims by way of a plea to the jurisdiction rather than a summary judgment when the defendants alleged that the court lacked jurisdiction because plaintiff had not made a valid open records claim to confer jurisdiction).

---

[56] *See, e.g.*, BECK REDDEN DEFENDANTS' PLEA, at Exhibits, *generally*.
[57] ITKIN DEFENDANTS' PLEA, p. 6.

**B.** **DEFENDANTS' PLEA TO THE JURISDICTION SHOULD BE DENIED BECAUSE DEFENDANTS' NEGLIGENCE CAUSED THE DISMISSAL OF PLAINTIFFS' FEDERAL LAW CLAIMS AND THESE CLAIMS CANNOT BE REFILED IN MEXICO.**

Defendants' sole argument for lack of jurisdiction and/or abatement is based on the false premise that Plaintiffs' malpractice claims *all* relate to their inability to pursue their Mexican law claims in Mexico. While that is certainly _**part**_ of Plaintiffs' negligence allegations against Defendants, Plaintiffs' live pleading _**also**_ alleges that Defendants negligently lost Plaintiffs' ability to pursue Jones Act claims in the United States by failing to properly plead those claims and/or competently resist the underlying defendants' attempts to dismiss Plaintiffs' underlying claims.[58] Specifically, Plaintiffs allege: "the District Court dismissed Plaintiff's federal maritime claims because the Lawyers negligently failed to allege that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act."[59] Nothing about Plaintiffs' ability or inability to pursue Mexican law claims in Mexico changes the effect of Defendants' malpractice related to Plaintiffs' Jones Act claims.

"The party contesting jurisdiction must meet the summary-judgment standard of proof to support its contention that the trial court lacks subject-matter jurisdiction." *HSBC Bank USA, N.A. v. Watson,* 377 S.W.3d 766, 773 (Tex. App.—Dallas 2012, pet. dism'd). "This means the movant must support its plea with conclusive evidence establishing facts that defeat jurisdiction." *Id.* "If the movant fails to meet its burden, the claimant has no burden at all, and the jurisdictional challenge fails." *Id.* "The defendant cannot simply deny the existence of jurisdictional facts and force the plaintiff to raise a fact issue." *Id.* (internal quotations omitted). Even if Plaintiffs could still pursue their Mexican law claims in Mexico, which Plaintiffs deny, Plaintiffs have forever lost their ability to pursue their Jones Act claims in the United States due

---

[58] PLAINTIFFS' SECOND AMENDED PETITION, p. 7.

to the negligence of Defendants. Defendants' pleas to the jurisdiction are devoid of any argument, analysis or evidence proving, as a matter of law, that these claims could be refiled in Mexico. For this reason alone, Defendants' pleas to the jurisdiction should be denied.

### C. DEFENDANTS' PLEA TO THE JURISDICTION SHOULD BE DENIED BECAUSE DEFENDANTS' NEGLIGENCE CAUSED THE DISTRICT COURT TO DISMISS PLAINTIFFS' TEXAS CASE IN THE FIRST INSTANCE.

Defendants' pleas to the jurisdiction should also be denied because Defendants have not disproven Plaintiffs' theory that, had the proper substantive arguments been asserted by the Lawyers in the response to the *forum non conveniens*, the outcome of the underlying case would have been different and the *forum non conveniens* would not have been granted by the District Court.[60] This theory of malpractice may be simplified by the venerable principle "garbage in, garbage out."[61] If a court is presented with inaccurate or incomplete evidence and argument it is going to reach inaccurate conclusions and produce an inaccurate result. *See United States v. Seminerio*, 680 F. Supp. 2d 523, 542 (S.D.N.Y. 2010)(noting that ethics opinion was "a classic illustration of 'garbage in, garbage out' because the individual seeking the opinion omitted material facts in requesting the opinion); *See also Moyle v. Liberty Mut. Ret. Benefit Plan*, 2013 U.S. Dist. LEXIS 2237 at *7 (S.D. Cal. Jan. 7, 2013)(noting the difficulty of the court in having to render a ruling because of inadequate and confusing briefing, stating: "[t]he Court has been asked to rule and it will do so. The result, considering the confusing, incomplete mishmash before the Court, may be a function of the old adage, 'garbage in, garbage out.'"); *Smith v. ABN AMRO Mortg. Group, Inc.*, 2007 U.S. Dist. LEXIS 26585 (S.D. Ohio Mar. 27, 2007)(ordering *pro se* plaintiffs to obtain counsel due to the inadequacies of their court filings and recognizing

---

[59] PLAINTIFFS' SECOND AMENDED PETITION, p. 7.
[60] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.
[61] This principle is most commonly referred to in computer science but is traced back to the philosopher Charles Babbage: "On two occasions I have been asked,—'Pray Mr. Babbage, if you put into the machine wrong figures,

that, because of this, "the 'garbage in - garbage out' computer analogy may characterize the Court's attempt to render a fair and just verdict."); *Hunt v. Sullivan*, 1992 U.S. Dist. LEXIS 13091 at *9 (N.D. Ill. Aug. 31, 1992)(noting that Appeals Counsel's decision denying supplemental security income was based on an inadequate record, stating "[t]his was simply the social security version of what in familiar computer jargon bears the GIGO acronym: 'Garbage in, garbage out.'").

In articulating this concept with respect to the judicial system, one California court noted that, while "[t]he federal judicial process is not a GIGO (garbage in, garbage out) system" with respect to the *law* – because "a federal judge has the responsibility to make his or her decision based on the correct law" – it may certainly be so with respect to the *facts* as "the federal judge **is dependent** on the parties to present the competent, credible evidence from which the judge is to make the required findings of fact." *Cal. Franchise Tax Bd. v. Wilshire Courtyard (In re Wilshire Courtyard)*, 2015 Bankr. LEXIS 1172 at *19 (B.A.P. 9th Cir. Apr. 7, 2015)(emphasis added). In this case, Plaintiffs allege that the Lawyers wholly failed to argue a litany of reasons as to why Mexican courts were not adequate for adjudicating the case and, had the listed substantive arguments been properly asserted by the Lawyers in the response to the *forum non conveniens*, the outcome of the underlying case would have been different. [62] Simply put, had the Lawyers put forth competent, credible evidence before the District Court concerning the adequacy of the Mexican forum rather than allowing the inaccurate "garbage" that was presented to it by the underlying defendants to go uncontroverted, then the *forum non conveniens* would not have been granted by the District Court thereby allowing Plaintiffs claims to proceed forward in their chosen forum.[63]

---

will the right answers come out?' . . . I am not able rightly to apprehend the kind of confusion of ideas that could provoke such a question." Charles Babbage, PASSAGES FROM THE LIFE OF A PHILOSOPHER 67 (1864).
[62] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.
[63] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.

The Texas Supreme Court has held that, in a legal malpractice case such as this, what would have happened had proper argument and evidence been submitted in the underlying case **is a fact question for the jury**. *See Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 118 (Tex. 2004). Specifically, a jury, with the benefit and guidance of expert testimony, is required to determine whether the "omitted evidence was different from, and more compelling than, the evidence and testimony presented [to the underlying judge]" and "whether the result of the underlying …proceeding would have been different but for the alleged malpractice." *Id.* at 118. Thus, because this Court at this juncture must take Plaintiffs' pleadings as true, *Miranda*, 133 S.W.3d at 226, whether the omitted evidence and argument set forth in Plaintiffs' Petition – which was omitted from the response filed by the Lawyers in the underlying case – "was different from, and more compelling than, the evidence and testimony presented" to the courts in the underlying case and whether the District Court would have ruled differently had this evidence and argument been presented are all fact issues for the jury. *See Alexander* 146 S.W.3d at 118 (in legal malpractice case, jury was charged with deciding whether, in reasonable probability, a bankruptcy judge would have decided the underlying adversary proceeding differently, absent the alleged malpractice). Accordingly, Defendants' pleas to the jurisdiction are without merit.

**D.     DEFENDANTS' PLEA TO THE JURISDICTION SHOULD BE DENIED BECAUSE NEITHER A MEXICO NOR A TEXAS COURT WILL ACCEPT JURISDICTION OF THE UNDERLYING CASE AS THE CLAIMS ARE BARRED BY LIMITATIONS.**

Defendants argue that dismissal is appropriate because Plaintiffs' malpractice claims are not yet ripe as "Plaintiffs have not suffered any concrete injury" and the question of whether a Mexico court will still accept jurisdiction over Plaintiffs' claims "is a hypothetical one at this

point."[64] To support this argument, Defendants claim that Texas courts have "determined that statute of limitations defenses can be waived under Mexico law" and cite *Seguros Comercial Ams. S.A. De C.V. v. American President Lines*, 933 F. Supp. 1301 (S.D. Tex. 1996) as support. Yet, in *Seguros*, the plaintiff's expert did not provide the court with any authority for its position that waivers of limitations were invalid under Mexican law. *Id.* at 1308. Thus, that court never analyzed Mexican law in this regard or considered the overall validity of the waivers. *See Id.*

The Beck Redden Defendants also cite to *Zermeno v. McDonnell Douglas Corp.*, 246 F. Supp. 2d 646 (S.D. Tex. 2003) and *Dominguez-Cota v. Cooper Tire & Rubber Co.*, 284 F. Supp. 2d 444 (N.D. Miss. 2003) to support their wavier of limitations argument.[65] Like the court in *Seguros*, however, neither the courts in *Zermeno* nor *Dominguez-Cota* truly analyzed the ability to waive limitations under Mexican law. *See Zermeno*, 246 F. Supp. 2d at 658 (holding stipulation to waive limitations is valid under Mexican law without any analysis); *see also Dominguez-Cota*, 284 F. Supp. 2d at 448 (holding same).

On the other hand, in the more recent Texas federal case *Sacks v. Four Seasons Hotel Ltd.*, 2006 U.S. Dist. LEXIS 17768 (E.D. Tex. Mar. 7, 2006), the court denied the defendants' motion to dismiss on *forum non conveniens* based, in part, on the plaintiff's Mexican law experts' properly supported testimony that waivers of limitations are meaningless in Mexico. *Id.* at *18. In *Sacks*, the plaintiff sued a Four Seasons hotel in Mexico for the death of her husband. *Id.* at *2-3. The hotel sought to dismiss the action on *forum non conveniens* grounds and, like the underlying defendants, agreed to waive any defense of limitations. *Id.* at *10. In denying the hotel's motion, the *Sacks* court considered Mexican law as supported by plaintiff's Mexican law expert and recognized that "stipulations made before a United States court to waive the Mexican

---

[64] ITKIN DEFENDANTS' PLEA, p. 6.
[65] BECK REDDEN DEFENDANTS' PLEA, p. 5-6.

statute of limitations are meaningless in Mexico." *Id.* at \*18. Thus, the *Sacks* court found that the case could not be refiled in Mexico because it was past the statute of limitations and, therefore, the plaintiff did not have an adequate remedy under Mexican law. *See Id.* Accordingly, more recent Texas case law indicates that, when properly and/or competently challenged with reference to evidence and Mexican law, waivers of limitations are ineffective as a basis for granting a *forum non conveniens*.

In fact, the underlying defendants' waiver of limitations is invalid under Texas law and, therefore, Plaintiffs may not refile their underlying case in Texas or anywhere else because the claims are past the statute of limitations – thereby rendering a "concrete injury" to Plaintiffs. In Texas, parties may agree to waive the statute of limitations before or after the statutory bar has fallen. *Segal v. Emmes Capital, L.L.C.*, 155 S.W.3d 267, 280-281 (Tex. App.—Houston [1st Dist.] 2004, pet. denied); *Starcrest Trust v. Berry*, 926 S.W.2d 343, 351 (Tex. App.--Austin 1996, no writ); *American Alloy Steel v. Armco, Inc.*, 777 S.W.2d 173, 177 (Tex. App. – Houston [14th Dist.] 1989, no writ); However, "[a] general agreement in advance to waive or not to plead the statute of limitations on a particular obligation is void as against public policy." *Segal*, 155 S.W.3d at 281; *American Alloy*, 777 S.W.2d at 177. Rather, "[t]he agreement must be specific and for a pre-determined length of time." *Segal*, 155 S.W.3d at 281. The same rule applies under Federal law. *Lett v. Crown Cork & Seal Co.*, 2015 U.S. Dist. LEXIS 14627, at \*9-\*10, at n. 2 (N.D. Tex. Feb. 5, 2015).

Intentionally ignoring the foregoing authority, Defendants contend that dismissal is appropriate because Plaintiffs can still allegedly refile their claims in Mexico or, if the Mexican courts refuse jurisdiction, the District Court, because "the underlying defendants … have filed a binding stipulation in Federal Court stating that they have waived any argument that the statute

of limitations on those claims have expired."[66] However, the alleged stipulation concerning the statute of limitations in the underlying case did not meet the criteria for an effective tolling. The stipulation merely stated "Defendants agree to waive any statute of limitations or laches defense that they did not possess as of the date this lawsuit was originally filed."[67] The sentence is not specific and does not provide a pre-determined length of time for a tolling period. *See Duncan*, 912 S.W.2d at 859; *Lett*, 2015 U.S. Dist. LEXIS 14627, at *9-*10. Therefore, as a matter of Texas law, Plaintiffs would not be entitled to a tolling of the statute for an undetermined period of time. *See Hoff v. Texas Med. Liab. Trust*, 1998 Tex. App. LEXIS 2219, at *8 (Tex.App. – Austin Apr. 16, 1998, pet. denied)(affirming summary judgment on statute of limitations ground because a waiver of limitations was void as against public policy because it was not specific and did not provide for a pre-determined length of time). Accordingly, with the incident occurring on October 23, 2007, the statute of limitations on Plaintiffs' underlying claims have clearly lapsed and the waiver of limitations is invalid as a matter of law. *See Id.*

The waiver of limitations does not fare any better under Mexican law. Plaintiffs' underlying personal injury claims arise out of a maritime accident that occurred in Mexican territorial waters, those claims are governed by Mexican federal law, including the Federal Civil Code. MEXICAN CONSTITUTION, Art. 27; MEXICAN FEDERAL CIVIL CODE, Art. 1.[68] The limitations period applicable to Plaintiffs' claims is 2 years from the date on which the injury occurred. MEXICAN FEDERAL CIVIL CODE, Art. 1934. In this case, absent the filing of any suit, limitations would have run on Plaintiffs' claims on October 23, 2009, the second anniversary of the accident. *Id.* While the Mexican Federal Civil Code provides that the running of limitations

---

[66] ITKIN DEFENDANTS' PLEA, p. 2.
[67] Exhibit "F" – Stipulation, p. 1.
[68] For the Court's convenience, Plaintiffs have attached English and Spanish versions of the applicable Mexican statutes and codes referred to herein as Exhibit "E".

may be tolled by the commencement of any action of which the potentially liable party receives notice, the code also provides that there is no tolling of limitations if the judicial proceeding that initially tolled limitations is dismissed. *See* MEXICAN FEDERAL CIVIL CODE, Art. 1168. Applied literally, Judge Ward's dismissal of the underlying case in May 2011 had the effect under Mexican law of stripping Plaintiffs of the benefit of tolling. In other words, by virtue of the 2011 dismissal, Plaintiffs' Mexican law claims would be deemed to have been barred by limitations as of October 23, 2009 unless a Mexican court would accept the underlying defendants' waiver of limitations.

While there is some question as to whether a Mexican court would even accept a waiver of limitations made before a United States court, see *Sacks*, 2006 U.S. Dist. LEXIS 17768 at *18, the Mexican Federal Code does seem to provide a proper way for a party to renounce or waive limitations in Mexico. *See* MEXICAN FEDERAL CIVIL CODE, Art. 1141. Article 1141 of the Mexican Federal Civil Code provides:

> *Las personas con capacidad para enajenar pueden renunciar la prescripción ganada, pero no el derecho de prescriber para lo sucesivo.*

Professor Jorge Vargas, in what is viewed as a leading, authoritative translation of the Mexican Federal Civil Code, translates Article 1141 as follows:

> Any person who has the capacity to convey may renounce the **limitations period attained**, but not the right of adverse possession to accrue in the future.

Jorge A. Vargas, MEXICAN CIVIL CODE ANNOTATED – BILINGUAL EDITION 431 (West 2009) (emphasis added). The maximum limitations period that can be "attained" is two years for the claims at issue in the underlying case. MEXICAN FEDERAL CIVIL CODE, Art. 1934. Therefore, even assuming that a waiver of limitations is valid and appropriately obtained under Mexican law, the underlying defendants would have had to waive limitations in a Mexican court prior to

October 23, 2011. Because Defendants did not refile Plaintiffs' underlying cases in Mexico until February 2013, Plaintiffs' claims were subject to a limitations defense by this date that could no longer be waived in Mexico and the contention that the underlying defendants' statute of limitations waivers would still be honored by the Mexican courts in 2015 is incorrect. *See* MEXICAN FEDERAL CIVIL CODE, Art. 1141. Thus, Plaintiffs' Mexican law claims may not be refiled in Mexico and, with Plaintiffs' United States claims being irretrievably lost due to Defendants' negligence, these claims are also forever barred.

The Defendants urge this Court to dismiss this action and **require** Plaintiffs – Mexican nationals with little or no means and all of whom suffered injury or loss due to the underlying tragedy – to locate and obtain a Mexican law firm to attempt to pursue their now stale claims against the underlying defendants. The Lawyers argue that, because Plaintiffs have not done so, "Plaintiffs' claimed injury has not and may never occur and consequently, is based entirely on contingent and hypothetical facts."[69] As support, Defendants cite the Court to two Dallas cases: *Rothrock v. Akin, Gump, Hauer & Feld*, 1994 Tex. App. LEXIS 3526 (Tex.App. – Dallas May 11, 1994, no pet.) and *Philips v. Giles*, 620 S.W.2d 750 (Tex. Civ. App.—Dallas 1981, no writ). However, not only are *Rothrock* and *Philips* distinguishable from the present case, but the proposition in these cases – that a cause of action for malpractice does not accrue until a deficiency is assessed – is contrary to Houston Court of Appeals precedent which this Honorable Court must follow. *See Rhodes*, 848 S.W.2d at 842.

In *Rhodes*, the client sued her attorney for gross negligence in connection with the client's tax defense from the IRS. *Id.* at 837. The attorney argued – similar to Defendants in this case – that the claim was premature because "she had not exhausted her administrative or judicial remedies prior to bringing this action." *Id.* at 842. Rejecting this argument, the Houston

Court of Appeals made clear that "there was no requirement that [the client] appeal the final assessment by the IRS in order to establish the open and obvious malpractice committed by [the lawyer]." *Id.*; *See also Estate of Jobe v. Berry*, 428 S.W.3d 888, 900 (Tex. App.—Texarkana 2014, no pet.)(distinguishing *Philips* and holding that malpractice claim may accrue even before tax penalties are assessed). Defendants' request for this Court to require Plaintiffs to refile their clearly already barred claims in Mexico and, later, the District Court (and potentially be subject to sanctions under Federal Rule of Civil Procedure 11[70]) is out of line with the law set forth in *Rhodes*, *Berry* and other malpractice cases which do not require a malpractice plaintiff to appeal decisions or otherwise file lawsuits elsewhere to establish the "open and obvious" malpractice of Defendants. *See Belt v. Oppenheimer, Blend, Harrison & Tate, Inc.*, 192 S.W.3d 780, 785-86 (Tex. 2006)(in malpractice action involving estate planning, cause of action for malpractice accrued when attorney committed negligent act, not when estate suffered the tax consequences of that act).

Texas law has made clear that a cause of action for malpractice accrues "when facts have come into existence that authorize a claimant to seek a judicial remedy". *Apex Towing Co. v. Tolin*, 41 S.W. 3d 118, 120 (Tex. 2001). "[A] cause of action accrues when a wrongful act causes some legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred." *S.V. v. R.V.*, 933 S.W.2d 1, 4 (Tex. 1996). A legal malpractice claim is governed by the limitations period prescribed in Section 16.003(a) of the Texas Civil Practices & Remedies Code because it is considered a claim for personal injury. *Estate of Degley v. Vega*, 797 S.W.2d 299, 302-303 (Tex.App. – Corpus Christi 1990, no writ). Section 16.003(a)

---

[69] BECK REDDEN DEFENDANTS' PLEA, p. 7.
[70] *See Comer v. Interstate United Corp.*, 119 F.R.D. 392, 393 (N.D. Ill. 1988) (sanctioning attorney under Federal Rule of Civil Procedure 11 for filing a frivolous pleading because a cursory investigation of documents contained in

states that "a person must bring suit for … personal injury … not later than two years after the day the cause of action accrues." TEX. CIV. PRAC. & REM. CODE § 16.003(a). Thus, the legal malpractice claims in this case accrued when Plaintiffs suffered *some* injury and Plaintiffs have a legal right to file this lawsuit now. A dismissal under these circumstances merely rewards and incentivizes Defendants dilatory and negligent acts in failing to properly handle Plaintiffs' underlying claims from the beginning of their representation until they belatedly terminated the representation.

### E.    DEFENDANTS' REQUEST FOR ABATEMENT SHOULD ALSO BE DENIED.

In the alternative, and despite their own failures to comply with the District Court's orders over the last several years, Defendants request this Court to abate this case to "wait and see if Plaintiffs follow through on the federal district courts' orders…"[71] In support of their request for abetment, Defendants cite primarily to *Philips v. Giles*, 620 S.W.2d 750 (Tex. Civ. App.—Dallas 1981, no writ) and *In re Tex. Collegiate Baseball League, Ltd.*, 367 S.W.3d 462 (Tex.App. – Fort Worth 2012, orig. proceeding). Both *Philips* and *Tex. Collegiate* are distinguishable and the circumstances of this case do not warrant abatement.

In *Philips*, a wife's ex-husband, as part of a negotiated divorce settlement, executed a promissory note in her favor for $500,000.00 as compensation for her community property interest in a jointly-owned business. *Id.* at 750. The wife's attorney told her that there would be no tax consequences arising from a divorce settlement with her ex-husband, including the note payments. *Id.* The wife's accountant disagreed and encouraged her to file income tax returns which reported the monthly note payments from her ex-husband as income. *Id.* Relying on the accountant's advice, the wife filed the tax returns and sued the defendant for legal malpractice.

---

plaintiff's file irrefutably demonstrated that he had not filed his suit within set time limits or, at best, plaintiff's attorney failed to conduct reasonable investigation before filing suit).

*Id.* However, the IRS never assessed any taxes on the money and had not made a determination at the time suit was filed that the note payments were income. *Id.* The Dallas Court of Appeals ruled that the trial court correctly abated the case because the suit for malpractice was premature, no damages had been established, and it was possible that none would ever be established. *Id.* at 750. Simply put, there was no certainty of any injury-causing conduct on the part of the attorney. *See Id.*

First, *Philips* has been severely criticized by the Fifth Circuit Court of Appeals for placing the client in a discriminating situation:

> Our trouble with this decision is on two levels. First, the court placed the taxpayer in an unfortunate "catch-22". She could choose to pay the IRS the money she thinks she owes without being able to recover from the party whose acts caused her to owe this liability, or she can deliberately defy the tax code by refusing to pay what she perceives to be her full tax liability. This is not a fair choice for the taxpayer because, either way, she loses.

*State Farm Life Ins. Co. v. Swift (In re Swift)*, 129 F.3d 792, 800 (5th Cir. Tex. 1997). The court in *Swift* also criticized *Philips* for prematurely dismissing the case for lack of damages contrary to well-established law concerning the discovery rule:

> We also find the decision troubling in that the court dismissed the suit because of a lack of damages when there was a genuine issue of fact concerning the existence of damages. As [sic] such an early stage, it was premature for the court to make the assumption.

*Id.* Indeed, the Texarkana Court of Appeals recently noted that "*Philips* does not stand for the idea that an injury cannot be discovered until a penalty is actually assessed" because "[s]uch a holding would be contrary to the caselaw regarding the discovery rule…" *Estate of Jobe v. Berry*, 428 S.W.3d 888, 900 (Tex. App.—Texarkana 2014, no pet.).

Second, the facts of this case are distinguishable from *Philips*. As discussed above, the Lawyers' failures concerning the Jones Act claims was injury-causing conduct because it

---

[71] ITKIN DEFENDANTS' PLEA, p. 8-9.

immediately damaged Plaintiffs as these claims were immediately lost. Plaintiffs cannot refile these claims in Mexico because these claims do not exist under Mexican law. Likewise, Defendants failure to litigate the cases in Mexico in good faith and subsequent lapse of the statutes of limitations in both Texas and Mexico has now prevented the cases from being refiled in Mexico or Texas. Accordingly, unlike the yet-to-be-determined damages at issue in *Philips*, Plaintiffs have suffered concrete damages and abatement is inappropriate. *See Rhodes*, 848 S.W.2d at 842.

Moreover, unlike the parties in this case, the parties in *Tex. Collegiate* "acknowledge[d] that the statute of limitations [was] not at issue…" *Tex. Collegiate*, 367 S.W.3d at 465. Furthermore, unlike the situation in *Tex. Collegiate* where the malpractice claims "may have no merit upon final resolution" of the underlying litigation, the Plaintiffs' malpractice claims at issue in this case concerning the Jones Act claims, the failure to appeal the District Court's order and the failure to prosecute the claims in good faith leading to the lapsing of the statute of limitations will have merit irrespective of whether the claims are refiled in Mexico. Accordingly, abatement is not appropriate.

## IV
## CONCLUSION & PRAYER

The damages at issue are not contingent upon the refiling of the underlying case in Mexico. Several instances of negligence plead in Plaintiffs' current pleadings exist whether the claims are refiled or not. Moreover, the waivers of limitations are invalid under Texas and Mexico law because they are void against public policy or because of Defendants' negligence in failing to timely and diligently prosecute these cases in Mexico. Plaintiffs' claims against Defendants accrued when these acts of negligence occurred and Plaintiffs are not required to file

untimely lawsuits elsewhere to establish the "open and obvious" malpractice of Defendants. Simply put; Plaintiffs' claims are ripe for adjudication and should proceed as filed.

WHEREFORE, Plaintiffs pray that the Court deny Defendants' Pleas to the Jurisdiction and Alternative Pleas in Abatement and grant Plaintiffs any further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs will ever pray.

Respectfully submitted,

**THE KASSAB LAW FIRM**

/ s / David Eric Kassab
**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
lck@texaslegalmalpractice.com
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
dek@texaslegalmalpractice.com
1420 Alabama
Houston, Texas 77004
t.713.522.7400
f.713.522.7410

**DOHERTY✶WAGNER**

/ s / Brett Wagner
**BRETT WAGNER**
Texas State Bar No. 20654270
brett@dwlawyers.com
**LARRY JOE DOHERTY**
Texas State Bar No. 05950000
larry@dwlawyers.com
**RYAN W. SMITH**
Texas State Bar No. 24063010
ryan@dwlawyers.com
13810 Champion Forest Drive, Suite 225
Houston, Texas  77069
t.281 583-8700
f.281 583-8701

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all parties pursuant to the Texas Rules of Civil Procedure on this the 12th day of August, 2015.

/s/ David Eric Kassab
David Eric Kassab

EXHIBIT "A"

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ | § | |
| Individually and next friend of KAREN | § | |
| MARLEN ANDRADE LOPEZ, et al, | § | |
|     Plaintiffs, | § | CIVIL ACTION NO. 9:08-cv-200 (TJW) |
| | § | |
| v. | § | |
| | § | |
| GULF COAST MARINE & ASSOCIATES, | § | |
| INC, et al, | § | |
|     Defendants. | § | |

### MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendants' Consolidated Motion to Dismiss for Forum Non Conveniens (Dkt. No. 196 in Case No. 9:08cv200).   On September 15, 2010, the Court consolidated the following seven cases for the limited purpose of briefing and deciding the common *forum non conveniens* issue in each case:  *Dominguez v. Gulf Coast Marine & Assoc., Inc., et al*, Case No. 9:08cv200; *Lorenzana v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv150; *Friaz v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv162; *Perez v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv156; *Jimenez Govea v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv170; *Gordillo v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv164; *De La Cruz v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv167 (Dkt. No. 196 in Case No. 9:08cv200).[1]  The cases all arise out of the same accident and involve virtually identical causes of action against the same defendants.[2]  Pursuant to the Court's Order, Defendants Schlumberger Technology Corporation ("STC"), Schlumberger

---

[1] The Order is Dkt. No. 63 in Case No. 9:09cv150, Dkt. No. 87  in Case No. 9:09cv162, Dkt. No. 83 in Case No. 9:09cv156, Dkt.  No. 77 in Case No. 9:09cv170, Dkt. No. 51  in Case No. 9:09cv164, and Dkt. No. 100 in Case No. 9:09cv167.

[2] Glen Carter is a defendant in Case Nos. 9:08cv200, 9:09cv164, and 9:09cv167, but has been dismissed from Case Nos. 9:09cv150, 9:09cv156, 9:09cv162, and 9:09cv170.

1

Limited ("SL") (collectively, Schlumberger), Gulf Coast Marine & Associates ("Gulf Coast"), Glen Carter ("Carter"),[3] Halliburton Energy Services, Inc., f/k/a Halliburton Company ("Halliburton"), and Matthews-Daniel Company ("Matthews-Daniel") (collectively, "Defendants") filed a consolidated motion to dismiss all seven consolidated cases for *forum non conveniens*. The Court held a hearing on Defendants' consolidated motion on March 10, 2011. Having considered the parties' arguments, the applicable law, and the evidence presented, the Court CONDITIONALLY GRANTS Defendants' Consolidated Motion to Dismiss for Forum Non Conveniens (Dkt. No. 225 in Case No. 9:08cv200). The Court FURTHER ORDERS that, subject to a return jurisdiction clause and the other conditions laid out in this order, the following seven cases be dismissed for forum non conveniens: *Dominguez v. Gulf Coast Marine & Assoc., Inc., et al*, Case No. 9:08cv200; *Lorenzana v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv150; *Friaz v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv162; *Perez v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv156; *Jimenez Govea v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv170; *Gordillo v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv164; *De La Cruz v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv167.

## I.   Factual Background

These cases are based on an accident that occurred on a mobile drilling rig and oil production platform just north of the Mexican coast in the Gulf of Campeche on October 23, 2007. On October 21, 2007, the drilling rig Usumacinta was moved alongside the KAB-101 production platform to begin work on several oil wells in Mexican territorial waters, approximately 18 kilometers off the coast in the Bay of Campeche. Mexico's state-owned oil

---

[3] Defendant Glen Carter was named in the Motion, but was left out of the ECF filing caption. Glen Carter then filed an adoption and joinder in the consolidated motion (Dkt. No. 227).

company, Petróleos Mexicanos ("PEMEX"), owned the KAB-101 platform, and Perforadora Central, a Mexican company, owned the Usumacinta rig and leased it to PEMEX.  Plaintiffs are all Mexican residents, and they, or their decedents, were employed by Perforadora Central, PEMEX, or PEMEX contractors Central de Desarrollos Marinos, S.A. de C.V. and Sercomsa, S.A. de C.V. (Servicios Comodatarios), to assist on the rigs.

On October 23, 2007, the Bay of Campeche was engulfed in hurricane-level conditions when a cold front moved into the Bay.  The Usumacinta rig shifted positions during the storm and struck the KAB-101 platform, damaging one of the oil wells' production valve trees and causing a hydrocarbon leak.  After efforts to control the leak failed, Plaintiffs allege that PEMEX ordered the evacuation of the platform and drilling rig.  The workers boarded two lifeboats, known as *mandarinas*, which PEMEX owned and operated.  While in the water, the *mandarinas*, began taking on water and sustained damage in the rough water.  Some of the occupants abandoned the *mandarinas*, both of which eventually capsized.  Once the storm subsided, a search was undertaken and 68 people were rescued.  However, 22 people died as a result of the accident.

Plaintiffs allege that the accident was set into motion when Defendant Matthews-Daniel, a United States company based in Texas, approved the decision to move the Usumacinta rig next to the KAB-101 platform in near-hurricane-force winds and anchor it to the seafloor next to the rig.  According to Plaintiffs, Matthews-Daniel had been hired to assess the suitability of the seabed and erroneously certified it as "virgin," based on outdated information.  Plaintiffs allege that a prudent operator would have done a proper analysis of the seafloor and discovered that previous operations had penetrated the seafloor, making it unstable.  When the Usumacinta rig was moved alongside the KAB-101 platform, the unstable seafloor shifted and caused the rig to

settle and collapse onto the KAB-101 platform.  This collision, in turn, caused the hydrocarbon leak.

Plaintiffs further allege that Defendant Gulf Coast, a U.S. company, and Defendant Carter, a U.S. resident, were responsible for moving the Usumacinta rig into location and anchoring it to the seabed alongside the KAB-101 platform.  Plaintiffs claim that Gulf Coast and Carter did so without "variable loads"—i.e., adequate loads to maintain the stability of the rig— in near hurricane-force winds.  Plaintiffs contend that Gulf Coast and Carter should have paid closer attention to the weather conditions and should have known that the Usumacinta's stability without a variable load was inadequate for serious weather conditions.

Finally, Plaintiffs assert that one or both of the subsurface safety valves on the KAB-101 platform were faulty, failed to cut off the leak, and forced the evacuation of the platform.  According to Plaintiffs, the valves were intended to stop the flow of oil and gas should anything hit the well below or above the water, but the valves failed to seal the oil and gas leak.  Plaintiffs allege that the valves were designed, manufactured, and installed by Defendants Schlumberger and/or Halliburton in the United States.  Plaintiffs claim that Schlumberger's witnesses on the design and manufacture of its valve reside in Rosharon and Houston, Texas, and Plaintiffs presume that Halliburton's witnesses reside in Dallas, Texas.

Numerous investigations of the accident occurred in Mexico.  The most important investigation for purposes of the motion to dismiss was a root cause analysis done by Battelle Memorial Institute (the "Battelle Report"), which was sponsored by PEMEX.  The Battelle Report concluded that numerous U.S. companies, including the Defendants in these cases, were ultimately responsible for the accident.  Most, if not all, of Plaintiffs' allegations against Defendants are based on the conclusions drawn in the Battelle Report.

4

Plaintiffs' original complaints in the consolidated cases asserted negligence, gross negligence, products liability, and wrongful death claims against various defendants under general federal or international maritime law or, in the alternative, under Texas law or the relevant law of Mexico.  The Court dismissed Plaintiffs' state law claims with prejudice because they were preempted by the Jones Act.  In addition, the Court dismissed Plaintiffs' federal maritime claims without prejudice because Plaintiffs failed to alleged that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act.  In their amended complaints, Plaintiffs abandoned their federal maritime claims and alleged only state law claims and claims under Mexican law.  The Court then dismissed, again, Plaintiffs' state law claims as being preempted by the Jones Act.  Accordingly, the only claims remaining are Plaintiffs' Mexican law claims for civil liability and moral damages.[4]

Defendants argue that Mexico is a more appropriate forum for the adjudication of these claims because the cases arise out of the collision of a mobile drilling rig and oil platform in Mexican territorial waters during the production of Mexican oil and gas resources.  Additionally, all of the plaintiffs are Mexican residents and they, or there decedents, were all employed by Mexican companies.  Defendants argue that because Plaintiffs make claims under Mexican law, arising from events that occurred within the jurisdiction of the Mexican courts and involving Mexican residents and companies, Mexico is the appropriate forum for adjudicating the claims.  Defendants also argue that the witnesses and documents regarding the accident and subsequent investigation are all located in Mexico.  Plaintiffs, however, argue that all of the remaining

---

[4] Plaintiffs' claims are identical in every case except for the *De La Cruz* case, Case No. 9:09cv167.  In that case, Plaintiffs' amended complaint included claims under Texas state law, OSHA, DOSHA, Mexican law, and several international treaties. *See De La Cruz* Amended Complaint, ¶¶ 48-93 (Dkt. No. 200).  In an Order dated March 7, 2011, the Court dismissed the *De La Cruz* plaintiffs' state law claims, federal maritime law claims, and the plaintiffs' claims under OSHA, DOSHA, and various international conventions and treaties (Dkt. No. 152).  As a result, only the plaintiffs' claims under Mexican law survived.

Defendants are U.S. companies or citizens and that they made policy, safety, corporate, manufacturing, supervision, and design decisions in the United States that directly led to the events at issue in the action.   Therefore, according to Plaintiffs, the documents and witnesses regarding liability are located in the United States.

## II.   Analysis

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947) and *Koster v. American Lumbermens Mutual Casulty Co*., 330 U.S. 518, 67 S.Ct. 828, 91 L.Ed. 1067 (1947), the Supreme Court established the principle "that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized." *Gulf Oil*, 330 U.S. at 507.   Therefore, "[t]he doctrine of *forum non conveniens* rests upon a court's inherent power to control the parties and cases before it and to prevent its processes from becoming an instrument of abuse or injustice." *In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1153-54 (5th Cir.1987)(en banc), *vacated by* Pan Am. World Airways, Inc. V. Lopez, 490 U.S. 1032, 109 S.Ct. 1928, 104 L.Ed.2d 400 (1989), *reinstated except as to damages by Air Crash Disaster v. Pan Am. World Airways, Inc*., 883 F.2d 17 (5th Cir.1989)(en banc).   According to the Court, in deciding whether to exercise or decline jurisdiction, "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster*, 330 U.S. at 527.   "The determination of what is most convenient rests upon several private and public factors which the Court stated should be considered and balanced by a court when presented with a motion to dismiss for *forum non conveniens*." *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1162.   "A defendant of course bears the burden of invoking the doctrine and moving to dismiss in favor of a foreign forum." *Id.* at 1164.   "This burden of persuasion runs to all elements of the *forum non conveniens* analysis," including demonstrating that an "adequate and available forum exists as to

6

all defendants if there are several." *Id*. If the defendant meets this initial burden, "it must also establish that the private and public interests weigh heavily on the side of trial in the foreign forum." *Id*. The Supreme Court has held that a moving defendant need not submit overly detailed affidavits to carry its burden, but it "must provide enough information to enable the district court to balance the parties' interests." *Reyno*, 454 U.S. at 258.

In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981), the Supreme Court reaffirmed that the principles enunciated in *Gulf Oil* and *Koster* are appropriate for use in diversity cases. The decision of whether to grant or deny a motion to dismiss for *forum non conveniens* is within the discretion of the court. *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1165. The decision "should be an exercise in structured discretion founded on a procedural framework guiding the district court's decisionmaking process." *Id*. The denial of a motion to dismiss for *forum non conveniens* may be reversed only when there has been a clear abuse of discretion. *Reyno*, 454 U.S. at 255. The trial court's decision "deserves substantial deference" when the court has considered all relevant factors and where its balancing of the factors is reasonable. *Id*.

## A. Available and Adequate Alternative Forum

Prior to balancing the private and public interest factors, a court must first determine whether another adequate forum is available to hear the case "because the *forum non conveniens* presupposes the existence of at least two forums in which all defendants are amenable to process." *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1164. An alternative forum is available, for purposes of a *forum non conveniens* analysis, when the entire case and all parties can come within the jurisdiction of that forum. *Saqui v. Pride Central America, LLC*, 595 F.3d 206, 211 (5th Cir. 2010).

7

An alternative forum is adequate, for purposes of *forum non conveniens* analysis, when the parties will not be deprived of all remedies or treated unfairly, even though they might not enjoy the same benefits as they might receive in an American Court. *Saqui*, 595 F.3d at 212. Additionally, the mere fact that the amount of damages would be more limited under Mexican as opposed to American law, does not provide the basis for finding that Mexican courts are an inadequate alternative forum. *Id*. The Supreme Court has made it clear that the Court may not give substantial weight to the fact that trail in a foreign forum will result in a change in law unfavorable to the plaintiff or the fact that the defendants may be motivated by a desire to obtain a more favorable forum in bringing the motion to dismiss for *forum non conveniens*. *Id.* at 252-52 and n. 19.

Because the Defendants have agreed to submit to the jurisdiction of the Mexican courts, Plaintiffs concede that Mexico is an available and adequate forum for the adjudication of these claims.[5] *See In re Ford Motor Co.*, 591 F.3d 406, 412 (5th Cir. 2009).

---

[5] Plaintiffs' consolidated briefing in response to the motion to dismiss for *forum non conveniens* concedes that Mexico is an available and adequate forum for these cases. Plaintiffs also conceded that they were not challenging the adequacy or availability of the Mexican courts as an alternative forum during their oral argument at the hearing on the motion to dismiss. Counsel for plaintiffs in Case No. 9:09cv167 (the "De La Cruz Plaintiffs") appeared at the hearing and made a passing reference to State Department advisories warning against travel to Mexico. Then, after the hearing, the De La Cruz Plaintiffs filed a motion seeking leave to take additional discovery and file post-argument supplemental briefing on the motion to dismiss for *forum non conveniens* (Dkt. No. 155 in Case No. 9:09cv167). In their motion, the De La Cruz Plaintiffs contested the adequacy of Mexico as an alternative forum for the first time. The Court denied the De La Cruz Plaintiffs' motion for leave to file supplemental briefing on various grounds (Dkt. No. 157). However, even if the De La Cruz Plaintiffs had been allowed to belatedly contest the adequacy of Mexico as an alternative forum, the Fifth Circuit has made it abundantly clear that where the Defendants will submit to jurisdiction, Mexico is an available and adequate forum for the resolution of these types of disputes.

The Fifth Circuit has repeatedly held that Mexico is an available and adequate forum for Mexican residents to pursue claims against American companies for injuries arising from accidents in Mexico. *See, e.g., Saqui*, 595 F.3d at 211-213; *In re Ford Motor Co.*, 591 F.3d at 412-13; *DTEX, LLC v. BBVA Bancomer, S.A.*, 508 F.3d 785, 804 (5th Cir. 2007). In *In re Ford Motor Co.*, the Fifth Circuit noted that "[w]e have held in numerous cases that Mexico is an available forum for tort suits against a defendant that is willing to submit to jurisdiction there." 591 F.3d at 412 (citing *Gonzalex v. Chrysler Corp.*. 301 F.3d 377, 380 n. 3 (5th Cir. 2002); *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003); *DTEX*, 508 F.3d at 804). After referencing numerous Fifth Circuit opinions on the issue, the Court emphasized that:

**B.  Private and Public Interest Factors**

Plaintiffs have conceded that Mexico is an available and adequate forum for the adjudication of these claims, and, therefore, the only issue in dispute is whether the private and public interest factors weigh heavily in favor of dismissal to Mexico.  *In re Air Crash Disaster Near New Orleans*, 821 F.2d. at 1164.  Although a plaintiff's choice of forum is generally given great deference, "a foreign plaintiff's selection of an American forum deserves less deference than an American citizen's selection of his home forum."  *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1164.  "When the home forum has been chosen, it is reasonable to assume that this choice is convenient.  When the plaintiff is foreign, however, this assumption is much less reasonable."  *Reyno*, 454 U.S. at 255-56.  Plaintiffs are all Mexican citizens, and, therefore, their choice to bring suit in this Court is entitled to less deference in balancing the private and public interest factors.

**1.  Private Interest Factors**

The private interest factors to be considered in the *forum non conveniens* analysis are: (1) the relative ease of access to sources of proof; (2) the availability of compulsory process for attendance of unwilling witnesses; (3) the costs of obtaining attendance of willing witnesses; (4) the probability of view of the premises, if view would be appropriate to the action; and (5) all

---

[t]hese many decisions create a nearly airtight presumption that Mexico is an available forum.  We have held that if a defendant submits to jurisdiction, there is a presumption of forum availability . . . . petitioners' willingness to submit to jurisdiction in Mexico makes it an available forum for FNC purposes, based on the binding precedent of this court.

*In re Ford Motor Co.*, 591 F.3d at 412.  In another recent Fifth Circuit opinion, the Court rejected the argument that Mexico was an inadequate forum because (1) the amount of damages would be more limited under Mexican law, (2) there exists corruption in the Mexican courts, (3) the case would experience long delays in the Mexican court system, and (3) that, under Mexican law, it would be virtually impossible to subpoena out of country witnesses. *Saqui*, 595 F.3d at 212.  In reaching this decision, the Fifth Circuit upheld the district court's ruling that the plaintiff had not produced compelling evidence that corruption in the Mexican courts made Mexico an inadequate forum and that there would likely be fewer delays in a Mexican court because the accident took place in Mexican waters and involved Mexican citizens and corporations. *Id*. at 212-13.

9

other practical problems that make trial of a case easy, expeditious, and inexpensive.  *Saqui*, 595

F.3d at 213 (citing *Gulf Oil Corp.*, 330 U.S at 508).

### a.  The Relative Ease of Access to Sources of Proof

The first private interest factor, the relative ease of access to sources of proof, favors

dismissal.  These cases arise out of an accident that occurred on a drilling rig and platform in

Mexican territorial waters.  Plaintiffs are all Mexican residents, and they, or their decedents,

were working on the platform as a result of their employment by Mexican companies during the

production of Mexican oil and gas resources.  The physical and documentary evidence regarding

the drilling rig Usumancinta, the KAB-101 production platform, the relevant oil wells, and the

lifeboats, or *mandarinas*, that are at the center of this disaster are all located in Mexico.  It would

be impossible to investigate and evaluate the cause or causes of the accident without access to

this evidence.  In addition, the Defendants have shown that Plaintiffs' employment, tax, and

medical records, PEMEX's and Pemex Exploración y Prodution's  records, policies, and other

documents, as well as the rescue workers' records, policies, and other documents are all located

in Mexico.  Not only are all of these documents located in Mexico, but they are the property of

third parties who could not be compelled to produce them in this forum.  Even if they could

somehow be obtained, most if not all of these documents are in Spanish and translating them

would be burdensome, time-consuming, and costly in this forum.

Plaintiffs, however, argue that although the accident itself took place in Mexico and the

Plaintiffs are Mexican residents, these facts are secondary to the substantive liability issues.

Plaintiffs contend that these cases are really about the wrongful conduct of U.S. companies and

one U.S. resident, Glen Carter, whose acts and omission occurred in the United States.  Plaintiffs

argue that the witnesses and evidence in Mexico go primarily to damages, and that the damage

issues are secondary to the liability issues, the evidence for which is primarily in the United States.  Plaintiffs point out that all of the Defendants are located in the United States, along with the evidence and witnesses concerning their liability.

For example, Plaintiff alleges that: (1) Matthews-Daniel surveyed the seafloor and made decisions about the movement and placement of mobile rigs from its offices in Texas, where its records are held; (2) Gulf Coast and Glen Carter moved the rig in the Bay of Campeche, but their records and witnesses are in the United States; and (3) Schlumberger and Halliburton designed the faulty subsurface safety valves in the United States.  Plaintiffs argue that the essential evidence related to Defendants' liability is in the United States, including:

- Evidence relating to the research, development, design, manufacture, and installation of Schlumberger's Camco valves;
- Schlumberger's testing records relating to its Camco valves;
- Schlumberger's records relating to the accident rate of its Camco valves;
- Evidence of Gulf Coast's analysis of Cold Front No. 4 and its decision to move the Usumacinta rig;
- Gulf Coast's policies and procedure regarding moving drilling rigs;
- Gulf Coasts' policies and procedure regarding monitoring weather conditions;
- Gulf Coasts' policies and procedures regarding safety;
- Halliburton's evidence relating to the research, development, design, manufacture, and installation of its subsurface valves;
- Halliburton's testing records relating to its subsurface valves;
- Halliburton's records relating to the accident rate of its subsurface valves;
- Evidence gathered and discovered in connection with Battelle's investigation of the accident;
- Evidence relating to Matthews-Daniel's decision to move the Usimatica rig alongside the KAB-101 platform;
- Evidence of Glen Carter's knowledge, expertise, and decision-making as the person on the scene of the move.

Ultimately, Plaintiffs argue that most of the documents in Mexico relate to damages while the documents in the United States related to liability and that the volume of evidence needed to prove damages will be less than the volume of documents needed to prove liability.  Plaintiffs' assertions, however, are not supported by the record.  While it is certainly true that some liability

11

evidence is in the Defendants' possession in the United States, it is simply not true that these documents constitute all or even the majority of the liability documents.

As previously discussed, many of the core liability documents relating to the rig, platform, oil wells, and life boats are located in Mexico and in the possession of third parties. This is the evidence necessary to demonstrate how the disaster unfolded, what decisions were made before, during, and after the disaster, who made those decisions, and what possible causes contributed to the accident.   Plaintiffs cannot escape the fact that evidence related to the decisions made by those on and in control of the Usumacinta rig and KAB-101 platform at the time of the accident are central to the liability issues in this case.   Plaintiffs' argument that the Court should give little weight to the damages documents located in Mexico because damages is unlikely to be a hotly contested issue is also unpersuasive.   Finally, Plaintiffs theory of liability—and their corresponding assertion that most of the liability evidence is in the United States—is based largely on the findings of the Battelle Report that liability for the disaster in the Bay of Campeche rests not with PEMEX or Perforadora Central but with the Defendants.   The Battelle Report, however, was commissioned by PEMEX and was the result of an investigation of witnesses, documents, and other evidence located largely in Mexico.   If these cases were to proceed in this Court, the Defendants would not have access to the evidence located in Mexico— including PEMEX's documents and the witnesses to the disaster—in order to challenge the conclusions of the Battelle Report.   Plaintiffs may not dictate the Defendants' litigation strategy by limiting their access to evidence and, thus, the issues and defenses available to Defendants. Keeping the case would require the Court to essentially adopt Plaintiffs' theory of liability while hamstringing the Defendants' ability to counter that theory.

Despite Plaintiffs' efforts to convince the Court that many of the important liability documents and witnesses are in the United States, the reality of the situation is that the vast majority of the evidence and witnesses regarding the accident itself are located in Mexico as well as all of the documents regarding Plaintiffs' injuries and damages.  While it is true that some of the evidence and witnesses are in the United States, the great balance of the evidence is in Mexico and would be unavailable in this forum.  The Court, however, recognizes that Defendants have relevant witnesses and documentary evidence in the United States that might not be readily available in Mexico.  Accordingly, the Court ORDERS that the case will not be dismissed for *forum non conveniens* unless and until each defendant enters a stipulation that it will make its relevant witnesses and documents available in Mexico to the extent consistent with Mexican law.

The relative ease of access to evidence heavily favors Mexico as the appropriate forum for the consolidated cases.

### b. The Availability of Compulsory Process for Attendance of Unwilling Witnesses

The second private interest factor, the availability of compulsory process for the attendance of unwilling witnesses, also weighs heavily in favor of dismissal.  This Court cannot compel attendance by any unwilling nonparty witness who is in Mexico.  *DTEX, LLC v. BBVA Bancomer, S.A.*, 512 F.Supp.2d 1012, 1025 (S.D.TX. 2007), *affirmed and opinion adopted as the opinion of the Fifth Circuit*, 508 F.3d 785 (5th Cir. 2007).  Defendants argue that many third-party witnesses are Mexican residents who will not be subject to the Court's subpoena power.  These witnesses include:

- PEMEX, Pemex Exploración y Productión, Perforadora Central, Central de Desarrollos Marinos, S.A. de C.V., Sercomsa S.A. de C.V., and other employees working on the Usumacinta rig, the KAB-101 platform, and Wells 101, 103, and 121;

- PEMEX, Pemex Exploración y Produción, Perforadora Central, Central de Desarrollos Marinos, S.A. de C.V., Sercomsa S.A. de C.V., and other employees familiar with the maintenance and operation of the Usumacinta rig, the KAB-101 platform, Wells 101, 103, and 121, and the two *mandarinas*;
- Plaintiffs' medical providers; and
- The rescue workers.

These are the eye witnesses to the events leading up to the accident, the accident itself, and the Plaintiffs' injuries. As such, their testimony is crucial to the issues of liability and damages in this case. Even if these witnesses were available, they would likely only be available by deposition and would require translators, which would increase the cost of litigation. Obtaining depositions of any unwilling witnesses located in Mexico would have to be obtained through letters rogatory pursuant to the Hague Convention. "The procedure presents difficulties in obtaining adequate deposition testimony, is expensive, and is time consuming." *Vasquez v. Bridgestone/Firestone, Inc.*, 192 F. Supp. 2d 715, 725 (E.D. Tex. 2001), *rev'd on other grounds*, 325 F.3d 665 (5th Cir. 2003). "[T]o fix the place of trial at a point where litigants cannot compel personal attendance and may be forced to try their cases on deposition is to create a condition not satisfactory to court, jury or most litigants." *Perez & Compania (Cataluna), S.A. v. M/V Mexico I*, 826 F.2d 1449, 1453 (5th Cir. 1987) (citing *Gulf Oil Corp.*, 330 U.S. at 511). This is because "conducting a substantial portion of a trial on deposition testimony precludes the trier of fact from its most important role; evaluating the credibility of the witnesses." *Torreblanca de Aguilar v. Boeing Co.*, 806 F. Supp. 139, 144 (E.D. Tex. 1992).

However, Plaintiffs contend that neither Mexico nor the United States has absolute subpoena power over all non-party witnesses. Plaintiffs list the following third party witnesses as being available only in the U.S.:

- ABS Consulting, a subcontractor involved in the investigation and drafting of the Battelle Report (as to maritime aspects of offshore oil exploration and production) and its employees;

14

- Sea Engineering Incorporated, a subcontractor involved in the investigation and drafting of the Battelle Report (as to soil-foundation issues) and its employees;
- Bethlehem Steel Company, the developer and manufacturer of the Usumacinta rig, and its employees;
- Houston Offshore Joint Venture, the former owner of Usumacinta, and its employees;
- Wilkens Weather Technologies and Oceanweather, Inc., both of which performed hindcast estimations of the offshore sea conditions caused by Cold Front No. 4, and their employees;
- Wittaker and Watercraft companies, the manufacturers of the lifeboats, and their employees;
- Alexander/Ryan Marine & Safety Company, which evaluated the construction and repair of the lifeboats, and its employees;
- Geoscience Earth & Marine Services, Inc., which evaluated likely scenarios for Usumacinta's sliding and effects of prior footprints on the foundation behavior, and its employees;

Many of these third party witnesses, though, are investigators involved in the Battelle Report who have no direct knowledge of the accident.    In addition, much of the direct evidence they relied on in their investigation appears to be in Mexico.  Thus, even if they are unavailable to testify at a trial in Mexico, much of the evidence they rely on in making their conclusions would be available.  Finally, while Plaintiffs state that these third party witnesses are located in the United States, they do not indicate where in the United States.  Accordingly, there is no evidence that this Court would have subpoena power over them.

Plaintiffs also lists as potential unwilling third-party witnesses: (1) the component part manufacturers for the products at issue; (2) independent contractors or other third parties in the United States who were involved in the decision to move or the actual process of moving Usumacinta alongside the KAB-101 platform; and (3) independent contractors or other third parties in the United States who were involved in the training of the personnel that worked on Usumacinta and the KAB-101 platform.   However, Plaintiffs have provided nothing to demonstrate or even suggest that there are any such manufacturers or independent contractors in the United States.

15

Finally, Plaintiffs argue that the witnesses listed by Defendants as being available only in Mexico are mostly oilfield and rescue workers who know very little about the root causes of the accident.  Plaintiffs contend that the witnesses who participated in the decisions that resulted in the accident are in the United States and that these witnesses are more important than the witnesses in Mexico.  However, the witnesses who participated in the decisions made by the Defendants that, according to Plaintiffs, resulted in the accident appear to be primarily party witnesses.  Plaintiffs have not suggested that such party witnesses would be unavailable if this case were to proceed in Mexico.  *See Lehman v. Humphrey Cayman, Ltd*., 713 F.2d 339, 343 (8th Cir.1983), cert. denied, 464 U.S. 1042, 104 S.Ct. 708, 79 L.Ed.2d 172 (1984) (holding that the location of witnesses in the Cayman Islands did not weigh strongly in favor of dismissal because many of the witnesses were employees of the defendant, which could obtain their cooperation in traveling to testify).  To ensure that the Defendants will make their employees available for trial, the Court ORDERS that as a condition of dismissal, Defendants each sign a stipulation that they will make any employee witness available for trial in Mexico to the extent consistent with Mexican law.  However, the oilfield workers, rescue workers, and accident investigators located in Mexico are clearly necessary third party witnesses outside the subpoena power of the United States who cannot be made available by a similar stipulation.

Neither the United States nor Mexico is a perfect forum for these cases as there are third party witnesses who will likely be unavailable in each forum; however, the Court finds that the majority of the key third party witnesses are located in Mexico.  Accordingly, the inability to compel the attendance of these third party witnesses weighs heavily in favor of dismissal.

### c. The Cost of Obtaining Attendance of Willing Witnesses

Because of the large number of witnesses located in both Mexico and the United States, the cost of obtaining the attendance of willing witnesses will be significant regardless of whether the case is tried in this Court or in Mexico. Accordingly, this factor is neutral.

### d. The Probability of View of the Premises

The next private interest factor, the ability to view the premises, can only weigh in favor of dismissal since the accident took place in Mexican territorial waters. Nonetheless, Plaintiffs are correct that viewing the scene of the accident by any court in the United States or in Mexico is unlikely because the accident took place 18 miles out to sea. Plaintiffs also persuasively argue that viewing the scene of the accident is less important now because of the availability of pictures and animation software that can recreate the accident scene. For these reasons, the Court gives this factor little weight.

### e. All Other Practical Problems

A court must consider practical factors, such as the ability to implead other entities, in its *forum non conveniens* analysis. *See Reyno*, 454 U.S. at 276-78. The inability to implead potential third-party defendants "clearly support[s]" dismissal of the case in favor of trial in a foreign court were all claims can be resolved in a single action. *Id*. Plaintiffs contend that they would be unable to implead any unwilling American third party in a Mexican court. Plaintiffs, however, do not suggest that there are, in fact, any American third parties they wish to implead. Similarly, Defendants argue that their inability to pursue claims for contribution against Mexican third parties who are not subject to the jurisdiction of the Court in this action—i.e., PEMEX, Pemex Exploración y Producción, Perforadora Central, Central de Desarrollos Marinos, S.A. de C.V., Sercomsa S.A. de C.V—weighs in favor of dismissing the case because judicial economy

17

favors resolution of all claims in one trial.  On the other hand, Plaintiffs contend that Defendants have not shown that they would even be able to implead PEMEX or the other Mexican entities in Mexico or that PEMEX would be subject to liability in Mexico.  At the hearing, the Court asked counsel for Defendants whether PEMEX would be subject to liability in Mexico.  Defendants repeatedly stated that Mexican courts have exclusive jurisdiction over cases involving PEMEX, but could not answer the Court's question regarding whether PEMEX would be subject to actual liability in Mexico.  As a result, the parties' supplemental briefing focused on this issue.  Defendants' supplemental briefing pointed to statements by their Mexican law experts and asserted that PEMEX could be impleaded and would be subject to liability if the consolidated cases were dismissed and brought in Mexico.  Plaintiffs, however, argue in their supplemental brief that the two year statute of limitations has run on any claims against PEMEX or the other Mexican entities.  Thus, Plaintiffs argue that Defendants would not be able to implead PEMEX or any other Mexican company even if the case were to proceed in Mexico.

In his original expert declaration, filed before the alleged expiration of limitations while this case was still pending before Judge Clark, Defendants' Mexican law expert, Mr. Claus Von Wobeser ("Mr. Von Wobeser") stated that the statute of limitations for negligence claims was two years from the date on which the breach occurred and that the breach in this case occurred on or about October 23, 2007.  Neither party has offered evidence disputing the two year statute of limitations or the date on which limitations began to run, nor is there any evidence as to whether the statute of limitations would be tolled under Mexican law.  Thus, it appears that the statute of limitations for any negligence claim against PEMEX or any other Mexican entity may have expired on October 23, 2009.[6]  Even if the statute of limitations has run, it is unclear

---

[6] The Court notes that the declaration of Mr. Von Wobeser attached to Defendants' consolidated motion to dismiss for *forum non conveniens* omitted this information, as did the supplemental affidavit of Mr. Von Wobeser attached

whether, under Mexican law, the statue of limitations for negligence claims would apply to any contribution claims Defendants might have against PEMEX or other Mexican entities.[7] What is clear, however, is that PEMEX cannot be impleaded if the cases proceed in this Court, and this suggests that this factor leans slightly in favor of transfer. Nonetheless, because of the uncertainty that any impleader will be available or necessary in either Mexico or this district, the Court gives this factor scant weight.

### f. The Private Interest Factors Weigh in Favor of Dismissal

The Court finds that the private interest factors alone require dismissal of this case for *forum non conveniens*. In a case strikingly similar to this action, The Fifth Circuit held that the private interest factors weighed in favor of granting a motion to dismiss on *forum non conveniens* grounds. *Saqui* involved the death of a Mexican citizen while working on a mobile drilling rig in Mexican territorial waters. *Saqui*, 595 F.3d 206. The rig was owned by an American company and leased to PEMEX, and PEMEX controlled the well operations and provided the drilling crew to manage and operate the rig. *Id.* at 208. In upholding the district court's decision to dismiss the case for *forum non conveniens*, the Fifth Circuit noted that:

> (1) the accident occurred off the coast of Mexico; (2) the injured crew members and their surviving families . . . are citizens of and reside in Mexico; (3) [the deceased] died while working aboard a [rig owned by the defendant, American company,] that was leased to, and under the control of, Pemex, the national oil corporation of Mexico; (4) the maintenance crew . . . were employees of . . . a Mexican company with its principal place of business in Mexico; (5) [the American defendant] did not control the operations or have any employees aboard the vessel; (6) the key physical evidence and most of the witnesses to the accident were located in Mexico; and (7) the Mexican National Government investigated

to Schlumberger's post-hearing supplemental memorandum. Defendants also failed to mention the expiration of the statute of limitations to the Court in response to the Court's direct questioning at the hearing as to whether PEMEX could be impleaded and whether it would be subject to liability in Mexico.

[7] For example, under Texas law, a claim for contribution does not arise until the underlying liability is determined. *See Arnold v. Garlock Inc.*, 288 F.3d 234, 237 (5th Cir. 2002) ("The essential prerequisites for a contribution claim are a judgment finding the party seeking contribution to be a joint tortfeasor and the payment by such party of a disproportionate share of the common liability") (citation omitted).

the accident, created documents, and conducted interviews and site inspections in Mexico.

*Id*. at 213.

One important difference between *Saqui* and the present case is that the drilling rig at issue in *Saqui* was manufactured by the American defendant in Mexico.   In this case, however, the allegedly faulty valves on the Usumacinta rig were developed, manufactured, and installed by two of the American defendants—Schlumberger and Halliburton—in the United States. Nevertheless, this fact is not enough to overcome the clear weight of the evidence that is located in Mexico.  In *Reyno*, the Supreme Court upheld the district court's determination that fewer evidentiary problems would be posed in the trial of American plane manufactures in Scotland for liability arising from a plane crash in Scotland.  *Reyno*, 454 U.S. at 257.  The Court noted that a large proportion of the relevant evidence was in Scotland, despite the fact that documents concerning the design, manufacture, and testing of the propeller and plane were located in the United States.  *Id*.

In the present cases, the key evidence and witnesses necessary to effectively investigate and try Plaintiffs' claims are located primarily in Mexico and would likely be unavailable if trial were to proceed in this Court.  Accordingly, the private interest factors require dismissal in favor of trial in a Mexican court.

### 2.  Public Interest Factors

Because the Court finds that the private interest factors require dismissal, it need not reach the public interest factors.  *See In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1165 ("If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors").  However, the Court holds that the public interest factors also necessitate transfer and will briefly address them as well.  The public interest

20

factors include (1) the administrative difficulties flowing from court congestion; (2) the local interest in having localized controversies resolved at home; (3) the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; (4) the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and (5) the unfairness of burdening citizens in an unrelated forum with jury duty.  *Id*. at 1162-63.

### a.  Administrative Difficulties

The first public interest factor, administrative difficulties, weighs only slightly in favor of dismissal.  Defendants claim that the administrative difficulties of obtaining evidence from Mexico and applying Mexican law weigh in favor of dismissal.  On the other hand, Plaintiffs assert that administrative considerations weigh in favor of trying these cases in this Court because, according to Plaintiffs' Mexican law expert, trial in Mexico would likely take a decade.  The Court finds both arguments compelling.  However, given the difficulties in obtaining key evidence and witnesses from Mexico and the necessity of applying Mexican law in these cases, the Court finds that the administrative difficulties weigh slightly in favor of dismissal despite the potential delay in resolution of these cases that may result from dismissal.  *See DTEX*, 512 F. Supp. 2d at 1027 (holding that administrative difficulties such as obtaining evidence from Mexico and applying Mexican law weigh in favor of dismissal for *forum non conveniens*).

### b.  Local Interest

The next public interest factor, the interest in resolving local controversies locally, supports dismissal in favor of a Mexican court.  The Supreme Court has held that a foreign country has a strong interest in the litigation when the accident giving rise to the action occurred within its borders and where the victims are its citizens because there is a "local interest in having localized controversies decided at home."  *Reyno*, 545 U.S. at 260.  Plaintiffs are all

21

Mexican residents and they, or their decedents, were working on the platform as a result of their employment by either the Mexico's state-owned oil company, PEMEX, or various Mexican companies working in cooperation with PEMEX during the production of Mexican oil and gas resources. In addition, numerous investigations of the accident occurred in Mexico at the behest of the Mexican government. For example, multiple Mexican government agencies investigated and imposed monetary penalties on Mexican companies as a result of the accident, including the Mexican Environmental Protection Agency for environmental violations and the Mexican Merchant Marine Department for safety violations. The Mexican Attorney General also investigated the incident for possible criminal wrongdoing. All of this makes it abundantly clear that Mexico has a much stronger interest in these cases than the United States.

Plaintiffs argue that the United States and its citizens have an interest in this lawsuit because the defendants are Texas companies and residents and because the decisions—and in some cases the manufacturing and installation of allegedly faulty products—resulting in the accident were made in Texas. In short, Plaintiffs argue that Texas has a keen interest in the activities of companies doing business within its borders. Plaintiffs' argument, however, is not supported by the case law. In *Reyno*, the Supreme Court upheld the dismissal for *forum non conveniens* of a wrongful death action stemming from an airplane crash in Scotland brought by Scottish citizens against the American companies that manufactured the plane and propeller. *Reyno*, 454 U.S. at 260-61. In doing so, the Court rejected the plaintiffs' argument that American citizens had a strong interest in ensuring that American manufacturers are deterred from producing defective products and that additional deterrence might be obtained if the American companies were tried in the United States. *Id*. at 260-61. "The American interest in

22

this accident is simply not sufficient to justify the enormous commitment of judicial time and resources that would inevitably be required if the case were to be tried here." *Id*. at 261.

Mexico's strong local interest in resolving these cases weighs heavily in favor of dismissal of these cases for *forum non conveniens*.

### c.  The Application of Mexican Law

The third and fourth public interest factors—the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action and the avoidance of unnecessary problems in conflicts of law, or in the application of foreign law—counsel in favor of dismissal because the only remaining claims in all seven of these cases are claims under Mexican law.  The need to apply foreign law points towards dismissal.  *Reyno*, 454 U.S. at 260. The Court is not persuaded by the Plaintiffs' argument that the applicability of Mexican law is immaterial.  In deciding Plaintiffs' Mexican law claims, the Court would require translators to translate the Mexican law as well as Mexican legal experts to explain the law.  Accordingly, this factor weighs heavily in favor of dismissal.

### d.  The Burden of Jury Duty

The final public interest factor, the interest in avoiding an unfair burden on citizens in an unrelated forum with jury duty, also weighs in favor of dismissal.  As previously noted, Mexico has a far greater interest in this case than Texas.  In addition, this case has almost no connection with the Eastern District of Texas.  The only connection with this district is the fact one defendant, Gulf Coast, has an office in Lufkin, Texas.  Jury duty should not be imposed on the citizens of the Eastern District of Texas in a case that is so slightly connected with the United States, much less this district. *See In re Bridgestone/Firestone*, 420 F.3d at 705 ("The citizens of the Western District of Texas have no connection to the Mañez-Reyes accident.  The family does

23

not reside there, the accident did not occur there, and the tires at issue were neither designed nor manufactured there.").

### e.  The Public Interest Factors Favor Transfer

Four of the five public interest factors—local interest, trial of a diversity case in a forum familiar with the law, avoidance of unnecessary problems in conflict of laws or in application of foreign law, and the burden of jury duty—weigh heavily in favor of dismissal for *forum non conveniens* and one factor—administrative difficulties—weighs slightly in favor of dismissal. Accordingly, the public interest factors, like the private interest factors, dictate dismissal of all seven cases in favor of trial in a Mexican court.

### C.  Jurisdictional Stipulations and Return Jurisdiction Clause

According to the Fifth Circuit, if the court determines that the above considerations favor trial in a foreign forum, "it must finally ensure that a plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice and that if a defendant obstructs such reinstatement in the alternative forum that the plaintiff may return to the American forum." *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1166; *see also In re Ford Motor Co.*, 591 F.3d at 414 ("There is no guarantee that Mexico will remain an available forum . . . . A return jurisdiction clause remedies this concern by permitting parties to return to the dismissing court should the lawsuit become impossible in the foreign forum") (internal quotations and citation omitted).  The dismissal of the seven consolidated cases for forum non conveniens is, therefore, subject to the following return jurisdiction clause: should the courts of Mexico refuse to accept jurisdiction for reasons other than Plaintiffs' refusal to pursue an action or to comply with the procedural requirements of Mexican courts, this Court may reassert jurisdiction upon timely notification of the same.

In addition to the return jurisdiction clause, the dismissal of this action is conditioned on Defendants making the following stipulations:

1) Defendants agree to appear and submit themselves to the jurisdiction of a Mexican federal or state court, waiving any jurisdictional defenses they might normally possess.

2) Defendants agree to waive any statute of limitations defense that they did not possess as of the date each of the seven cases was originally filed.

3) Defendants agree to submit to discovery in the Mexican forum in accordance with the procedural rules of the Mexican court.

4) Defendants agree that they will make all relevant witnesses and documents available in Mexico to the extent consistent with Mexican law.

5) Defendants further agree that they will make any employee witness available for trial in Mexico to the extent consistent with Mexican law.

### III.   Plaintiffs' Request for Additional Discovery

In their response to Defendants' consolidated motion, Plaintiffs request leave to take additional discovery related to the *forum non conveniens* issue.  Plaintiffs admit that Judge Clark allowed them to conduct discovery on the *forum non conveniens* issue in the *Dominguez* case (Case No. 9:08cv200).  However, Plaintiffs argue that the discovery was too narrow and request that each defendant be required to produce a 30(b)(6) witness on the "factual and legal issues raised in this motion" as well as respond to written discovery with regard to "the factual and legal issues raised in this motion.  The Court does not believe that additional discovery is needed in order to rule on the motion to dismiss.  The parties have already provided extensive evidence on the location of the documents and witnesses in this case as well as evidence relevant to the other private and public interest factors in the forum non conveniens analysis.  Accordingly,

25

Plaintiffs' request for additional discovery related to Defendants' motion to dismiss for *forum non conveniens* is DENIED.

## IV.    Conclusion

For the reasons discussed above, the Court CONDITIONALLY GRANTS Defendants' Consolidated Motion to Dismiss for Forum Non Conveniens (Dkt. No. 225 in Case No. 9:08cv200).  The Court FURTHER ORDERS that, subject to a return jurisdiction clause and the conditions laid out in this order, the following seven cases be dismissed for *forum non conveniens*:  *Dominguez v. Gulf Coast Marine & Assoc., Inc., et al*, Case No. 9:08cv200; *Lorenzana v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv150; *Friaz v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv162; *Perez v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv156; *Jimenez Govea v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv170; *Gordillo v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv164; *De La Cruz v. Gulf Coast Marine & Assoc., Inc., et al.*, Case No. 9:09cv167.

The dismissal of each case from the Court's docket shall become effective once the Defendants have tendered a written statement assenting to be bound by the following conditions:

1) Defendants agree to appear and submit themselves to the jurisdiction of a Mexican federal or state court, waiving any jurisdictional defenses they might normally possess.

2) Defendants agree to waive any statute of limitations defense that they did not possess as of the date each of the seven cases was originally filed.

3) Defendants agree to submit to discovery in the Mexican forum in accordance with the procedural rules of the Mexican court.

4) Defendants agree that they will make all relevant witnesses and documents available in Mexico to the extent consistent with Mexican law.

26

5) Defendants further agree that they will make any employee witness available for trial in Mexico to the extent consistent with Mexican law.

Should any defendant fail to do so by May 2, 2011, Defendants' Consolidated Motion for Dismissal for Forum Non Conveniens will be considered waived, and all seven cases will proceed to trial in this Court.

Should the courts of Mexico refuse to accept jurisdiction of any of these cases for reasons other than Plaintiffs' refusal to pursue an action or to comply with the procedural requirements of Mexican courts, this Court may reassert jurisdiction upon timely notification of the same.

A copy of this order will be filed in each of the following seven consolidated cases: *Dominguez v. Gulf Coast Marine & Assoc., Inc., et al*, Case No. 9:08cv200; *Lorenzana v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv150; *Friaz v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv162; *Perez v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv156; *Jimenez Govea v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv170; *Gordillo v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv164; *De La Cruz v. Gulf Coast Marine & Assoc., Inc., et al*., Case No. 9:09cv167.

IT IS SO ORDERED.

SIGNED this 20th day of April, 2011.

_____
T. JOHN WARD
UNITED STATES DISTRICT JUDGE

27

# EXHIBIT "B"

| | |
|---|---|
| **UNITED STATES DISTRICT COURT** | **EASTERN DISTRICT OF TEXAS** |

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, *et al.*, | § § § | |
| Plaintiffs, | § § § | |
| *versus* | § § | CIVIL ACTION NO. 9:08-CV-200 |
| GULF COAST MARINE & ASSOCIATES, INC., *et al.*, | § § § | |
| Defendants. | § § § | |

## MEMORANDUM AND ORDER

Pending before the court is Plaintiffs' Motion to Reinstate Case (#261), wherein Plaintiffs seek to reopen this action following a dismissal under the doctrine of forum non conveniens. Having reviewed the pending motion, the submissions of the parties, the pleadings, and the applicable law, the court is of the opinion that the motion should be denied.

## I.     Background

This case arises from a fatal maritime accident off the coast of Mexico.  On October 23, 2007, a powerful storm blew across the Bay of Campeche, where the mobile drilling rig USUMACINTA was positioned near the oil production platform KAB-101, approximately ten miles north of the Mexican coast.  As a result of hurricane force winds, the USUMACINTA allided with the KAB-101, damaging the platform and causing crude oil and natural gas to leak from one of its wells.  The workers onboard were forced to evacuate the platform, which subsequently exploded.  Although the workers boarded two lifeboats, the boats capsized in the rough waters.  Twenty-two offshore workers (including two rescuers) perished and numerous others were injured.

Plaintiffs, who are residents of Mexico, are survivors and relatives of the workers killed in the accident as well as representatives of their estates.  Those injured or killed in the accident worked for Mexico's state-owned oil company Petróleos Mexicanos ("Pemex") or Perforadora Central ("Perforadora"), a Mexican company that assists Pemex in oil exploration.  At the time of the incident, Pemex owned the KAB-101 platform and was leasing the USUMACINTA rig from Perforadora.

In October 2008, Plaintiffs filed seven different cases in the Eastern District of Texas, Lufkin Division, asserting negligence, gross negligence, products liability, and wrongful death claims against four American companies, Defendants Gulf Coast Marine & Associates, Inc. ("Gulf Coast"), Schlumberger Technology Corporation, Halliburton Energy Services, Inc., and Matthews-Daniel Company, and Defendant Glen Carter, allegedly an American employee of Gulf Coast (collectively, "Defendants").[1]  The court consolidated the cases on September 15, 2010, for the purpose of briefing and deciding the forum non conveniens issue common to each case.  *See* Docket No. 196.

Acting on a motion to dismiss filed by Defendants, former United States District Judge T. John Ward conditionally dismissed the case pursuant to the doctrine of forum non conveniens on April 20, 2011.  As a condition of dismissal, the court required Defendants to tender a written statement in which they agreed to "appear and submit themselves to the jurisdiction of a Mexican federal or state court, waiving any jurisdictional defenses they might normally possess."  *See* Docket No. 257 (Memorandum Opinion, Apr. 20, 2011).  On April 29, 2011, Defendants filed

---

[1] Pemex and Perforadora are not defendants in this suit.

the required stipulations.[2]   *See* Docket No. 258.   Accordingly, on May 4, 2011, the court

dismissed the case based on forum non conveniens, subject to the following return-jurisdiction

clause:

> Should the courts of Mexico refuse to accept jurisdiction of this case for reasons
> other than Plaintiffs' refusal to pursue an action or to comply with the procedural
> requirements of Mexican courts, this Court may reassert jurisdiction upon timely
> notification of the same.

*See* Order, Docket No. 259.   Plaintiffs did not appeal the May 4, 2011, order.

Pursuant to the court's order, between February and May 2013, eleven Plaintiffs filed

separate lawsuits in the State of Campeche.[3]   Shortly thereafter, however, the Mexican courts

dismissed the cases.   Each court stated that it could not assert jurisdiction over Defendants because

of the "Interamerican Convention concerning the Jurisdiction on the international sphere for the

extraterritorial efficacy of foreign verdicts" and "by reason that the territory concerned to which

---

[2] The court's subsequent order dismissing the case pursuant to forum non conveniens acknowledges
that Defendants filed the required following stipulations:

> 1) Defendants agree to appear and submit themselves to the jurisdiction of a Mexican
> federal or state court, waiving any jurisdictional defenses they might normally possess.
> 2) Defendants agree to waive any statute of limitations defense that they did not possess
> as of the date each of the seven cases was originally filed.
> 3) Defendants agree to submit to discovery in the Mexican forum in accordance with the
> procedural rules of the Mexican court.
> 4) Defendants agree that they will make all relevant witnesses and documents available in
> Mexico to the extent consistent with Mexican law.
> 5) Defendants further agree that they will make any employee witness available for trial
> in Mexico to the extent consistent with Mexican law.

[3] The eleven Plaintiffs are:  (1) Aldo Antonio Lopez Lorenzo; (2) Antonio Montero Hernandez;
(3) Feliciana Perez Lopez de Alcudia; (4) Virginia Castellanos Casanova de Porter; (5) Maria Candelaria
Dzul Xool; (6) Julissa Bovio Chagoya de Solis; (7) Maria Santos Lopez Dominguez; (8) Gabriel Gonzales
Toral; (9) Juan Antonio Palafox Navarrete; (10) Oscar Romero Ortega; and (11) Fernando Augusto
Cervera Ramirez.

the residence of the defendants are not found in . . . this federal entity to avail itself of the acknowledgment of the lawsuit of origin."[4]

Rather than appeal the Mexican dismissals to a higher court, on October 18, 2013, Plaintiffs filed a motion to reopen or reinstate the instant case pursuant to the return-jurisdiction clause above.  Plaintiffs contend that they complied with the court's order by filing suit in the State of Campeche and complying with all of Mexico's relevant procedural rules.  Plaintiffs also maintain that they pursued the Mexican cases in good faith without attempting to defeat jurisdiction in Mexico.

Defendants dispute Plaintiff assertions, arguing that:  (1) Plaintiffs did not provide Defendants notice of the Mexican proceedings; (2) Plaintiffs failed to offer any argument or evidence that they informed the Mexican courts of Defendants' consent to jurisdiction in Mexico; (3) Plaintiffs did not appeal the Mexican dismissals; and (4) Plaintiffs' motion is untimely.  Defendants also stress that Plaintiffs are improperly attempting to relitigate the adequacy and availability of Mexico as an alternative forum.

II.     Analysis

A.     FED. R. CIV. P. 60(b)

Rule 60(b) of the Federal Rules of Civil Procedure provides that a court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:

(1)     mistake, inadvertence, surprise, or excusable neglect;

---

[4] In most of the cases, the Mexican courts dismissed the lawsuits one or two days after the cases were filed.

(2)     newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);

(3)     fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;

(4)     the judgment is void;

(5)     the judgment has been satisfied, released or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

(6)     any other reason that justifies relief.

FED. R. CIV. P. 60(b).

A motion brought under Rule 60(b) must be made within a "reasonable time—and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." FED. R. CIV. P. 60(c). "The party seeking relief from a judgment or order bears the burden of demonstrating that the prerequisites for such relief are satisfied." *Turner v. Chase*, No. 08-3884, 2010 WL 2545277, at *2 (E.D. La. June 16, 2010) (citing *Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009)); *see United States v. City of New Orleans*, 947 F. Supp. 2d 601, 615 (E.D. La.), *aff'd*, 731 F.3d 434 (5th Cir. 2013). "A decision with respect to a motion to reconsider pursuant to Rule 60(b) is left to the 'sound discretion of the district court and will only be reversed if there is an abuse of that discretion.'" *Laborde v. Lunceford*, No. 6:10-CV-30, 2010 WL 3946508, at *3 (E.D. Tex. Oct. 8, 2010) (quoting *Steverson v. GlobalSantaFe Corp.*, 508 F.3d 300, 303 (5th Cir. 2007)); *see Gov't Fin. Servs. One Ltd. P'ship v. Peyton Place, Inc.*, 62 F.3d 767, 770 (5th Cir. 1995) ("[T]o overturn the district court's denial of [a] Rule 60(b) motion, it is not enough that a grant of the motion might have been permissible

5

or warranted; rather, the decision to deny the motion must have been sufficiently unwarranted as to amount to an abuse of discretion.") (internal quotations omitted).

Plaintiffs filed the instant motion, asserting that "the [c]ourt may reinstate this case pursuant to FED. R. CIV. P. 60(b)(6)." Nonetheless, in their reply brief, Plaintiffs argue that Rule 60(b)(6) does not apply to cases like this one, where Plaintiffs seek reinstatement pursuant to a return-jurisdiction clause following a dismissal for forum non conveniens. Plaintiffs, however, cite no case, binding or persuasive, in which a court has expressly concluded that Rule 60(b) does *not* apply under circumstances similar to those presented here. Further, it does not appear that the United States Court of Appeals for the Fifth Circuit has spoken on the issue. In contrast, several courts have applied Rule 60(b)(6) in considering the propriety of reopening a case after a dismissal for forum non conveniens. *See Aldana v. Fresh Del Monte Produce, Inc.*, No. 01-3399-CIV, 2012 WL 5364241, at *4-5 (S.D. Fla. Oct. 30, 2012), *aff'd*, 741 F.3d 1349 (11th Cir. 2014); *see also Galbert v. W. Caribbean Airways*, 715 F.3d 1290, 1294 (11th Cir. 2013); *Mendes Junior Int'l Co. v. Banco Do Brasil S.A.*, No. 09-3478-CV, 2010 WL 3818094, at *1-2 (2d Cir. Oct. 1, 2010).

Under Rule 60(b)(6), a district court may relieve a party from an order or proceeding for any reason that justifies relief, other than those also enumerated in Rule 60(b). *See Rocha v. Thaler*, 619 F.3d 387, 399-400 (5th Cir. 2010), *cert. denied*, 132 S. Ct. 397 (2011). "Rule 60(b)(6) is a grand reservoir of equitable power to do justice in a particular case when relief is not warranted by the preceding clauses, [and] [the Fifth Circuit] [has] also narrowly circumscribed its availability, holding that Rule 60(b)(6) relief will be granted only if extraordinary circumstances are present." *Balentine v. Thaler*, 626 F.3d 842, 846 (5th Cir. 2010), *cert. denied*,

6

131 S. Ct. 2292 (2011) (quoting *Batts v. Tow-Motor Forklife Co.*, 66 F.3d 743, 747 (5th Cir. 1995)); *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 593 n.19 (5th Cir. 2014). "'[T]he rule seeks to strike a delicate balance between two countervailing impulses: the desire to preserve the finality of judgments and the "incessant command of the court's conscience that justice be done in light of all the facts."'" *Borne v. River Parishes Hosp., L.L.C.*, No. 12-30749, 2013 WL 5977133, at *2 (5th Cir. Apr. 22, 2013) (quoting *Seven Elves, Inc. v. Eskenazi*, 635 F.2d 396, 401 (5th Cir. 1981) (quoting *Bankers Mortg. Co. v. United States*, 423 F.2d 73, 77 (5th Cir.), *cert. denied*, 399 U.S. 927 (1970))). Rule 60(b)(6) is a "catch-all provision, meant to encompass circumstances not covered by Rule 60(b)'s other enumerated provisions." *See Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002); *accord Margoles v. Johns*, 798 F.2d 1069, 1073 n.6 (7th Cir. 1986) ("Relief under Rule 60(b)(6) is appropriate only if the grounds asserted for relief do not fit under any of the other subsections of Rule 60(b)."); *Hindi v. Toyota Motor Corp.*, No. 2:05-CV-11, 2011 WL 865488, at *4 (E.D. Tex. Mar. 10, 2011) ("Plaintiff cannot circumvent the time limitations of Rule 60(c)(1) by asserting a Rule 60(b)(6) motion with allegations that are more appropriate to support a Rule 60(b)(3) motion [which pertain to fraud, misrepresentation, or misconduct by the opposing party].").

B.      Litigation in the Foreign Forum

Without regard to whether Rule 60(b)(6)'s "exceptional circumstances" standard applies here, "a plaintiff whose case is dismissed for forum non conveniens must litigate in the foreign forum in good faith." *In re Air Crash Over the Mid-Atl.*, 792 F. Supp. 2d 1090, 1095 (N.D. Cal. June 15, 2011); *see Gutierrez v. Advanced Med. Optics, Inc.*, 640 F.3d 1025, 1031 (9th Cir. 2011) ("If the district court determines that the primary reason the Mexican courts declined to take

7

jurisdiction of Plaintiffs' case was Plaintiffs' actions or inactions in the case, it retains discretion to again order dismissal, with appropriate conditions, if any."); *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 573-74 (D.C. Cir. 2010) (holding that plaintiffs were not entitled to litigate in United States because they "consistently worked to undermine their suit in Cameroon"); *In re Bridgestone/Firestone, Inc.*, 420 F.3d 702, 706-07 (7th Cir. 2005) (remanding action to district court to assess whether the plaintiffs' efforts to litigate in Mexico were taken in good faith); *Huang v. Advanced Battery Tech., Inc.*, No. 09-8297, 2011 WL 813600, at *2 (S.D.N.Y. Mar. 8, 2011) (denying request to reinstate lawsuit dismissed on forum non conveniens grounds because "it appears that [plaintiff] has not pursued his claims in China with any real diligence"). Indeed, "[a] conditional forum non conveniens dismissal protects a plaintiff against the possibility that the foreign forum will not hear his case. It does not give the plaintiff license to deliberately prevent his suit in the foreign court from going forward in order to render an alternative forum defective." *MBI Grp., Inc.*, 616 F.3d at 572; *see Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 675 (5th Cir. 2003) ("A return jurisdiction clause remedies [the concern that the foreign forum will remain available] by permitting parties to return to the dismissing court should the lawsuit become impossible in the foreign forum.").

In this case, it is unnecessary to determine whether Rule 60(b)(6) applies, as Plaintiffs have not satisfied the terms of the return-jurisdiction provision imposed by Judge Ward. As set forth above, the return-jurisdiction clause provided:

> Should the courts of Mexico refuse to accept jurisdiction of this case for reasons other than Plaintiffs' refusal to pursue an action or to comply with the procedural requirements of Mexican courts, this Court may reassert jurisdiction upon timely notification of the same.

8

Here, Plaintiffs filed some, but not all, of the cases dismissed by Judge Ward in Mexico.  Because counsel made no attempt to litigate those cases in Mexico in compliance with the court's Memorandum and Order, there is no basis upon which to reopen them here.

With regard to the cases filed in Mexico, Defendants argue that reinstatement is not warranted because Plaintiffs failed to inform the Mexican courts of Defendants' consent to jurisdiction and to comply with the procedural requirements of the Mexican Courts.  Essentially, Defendants argue that Plaintiffs did not prosecute the cases in good faith.  The court agrees.

First, as explained by Defendants' Mexican legal expert, Claus Werner von Wobeser Hoepfner ("Wobeser Hoepfner"), a Mexican court should defer to the parties' consent when determining whether to exercise jurisdiction over Defendants.  *See* Docket No. 263-1 (Wobeser Hoepfner Declaration, Nov. 1, 2013); Docket No. 277-1 (Wobeser Hoepfner Declaration, Jan. 10, 2014); *see also City of New Orleans Emps. Ret. Sys. v. Hayward*, 508 F. App'x 293, 296 (5th Cir. 2013) ("A defendant's submission to the jurisdiction of a foreign forum sufficiently satisfies the availability requirement."); *Ibarra v. Orica U.S.A. Inc.*, 493 F. App'x 489, 493 (5th Cir. 2012) ("Mexico is presumed to be an available forum for tort suits against a defendant willing to submit to jurisdiction there.") (citing *In re Ford Motor Co.*, 591 F.3d 406, 412-13 (5th Cir. 2009) (stating that "many decisions create a nearly airtight presumption that Mexico is an available forum")).

Article 104, section II, of the Mexican Constitution provides that Mexico's federal courts will have jurisdiction over "all controversies of a civil or criminal nature regarding the implementation or application of federal laws or of international treaties entered into by the Mexican State" and "controversies involving maritime law."  Jorge A. Vargas, *Mexican Law for*

9

*the American Lawyer*, 30-31 (2009); *see* Docket No 277-1 (Wobeser Hoepfner Declaration).  In addition, article 4 of the Mexican Navigation and Maritime Trade Act provides that federal jurisdiction encompasses "in general all the acts and facts that take place" in the Mexican internal marine waters and the Mexican marine zones. LEY DE NAVEGACION Y COMERCI MARITIMOS, art. 4. Plaintiffs' Mexican lawyer, Hector Tijerina Aguilar ("Tijerina Aguilar"), appears to agree with the proposition that the Mexican courts have subject matter jurisdiction, as he recognized in his declaration that a Mexican court "[a]nalyzes its competence by subject, that is to say in this concrete case the federal judge is competent by subject because it relates to a petroleum platform accident and it occurred in high seas." *See* Docket No. 272-1 (Tijerina Aguilar Letter, Nov. 13, 2013).

Article 23 of Mexico's Federal Code of Civil Procedure ("FCCP") provides that territorial jurisdiction can be extended through the mutual consent of the parties.  It states:

> The territorial jurisdiction is extendable by the parties' express or tacit mutual consent:
>
> There is tacit extension:
>
> I.     By plaintiff, by appearing before the court upon filing its claim;
>
> II.    By defendant, by answering the complaint and counterclaiming against the plaintiff; and
>
> III.   By any of the interested parties, when such party desists from a jurisdiction.

CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES [FCCP], art. 23.

Absent express or tacit consent to jurisdiction, however, article 24 of the FCCP, section IV, states that by reason of territory the competent court is that "from the defendant's domicile, when dealing with . . . personal actions."  CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES

10

[FCCP], art. 24.  Further, the First Chamber of Mexico's Supreme Court held in April 1998, that "when dealing with competence conflicts, . . . full evidentiary weight should be granted to documents where it appears that the parties have submitted themselves expressly and conclusively to the jurisdiction of certain courts." *See* Docket No. 263-1 (Competencia. Para Su Resolución Debe Darse Valor Probatorio Pleno a Las Documentales Que Contengansometimiento Expreso de Las Partes, 9a. Época; 1a. Sala; S.J.F. y su Gaceta; Tomo VII, Abril de 1998; Pág. 143.). Plaintiffs' expert does not specifically challenge any of the aforementioned authorities, which were attached by Wobeser Hoepfner.

Based on the foregoing authorities, Wobeser Hoepfner opines that where, as here, "a potential group of defendants have expressly submitted themselves in writing to the jurisdiction of Mexico's federal courts in connection with a civil dispute arising from events which took place in Mexican waters, upon a Plaintiff's filing informing the court of the defendants' express submission, a federal court will assume jurisdiction under article 23 of the FCCP." The question becomes, then, whether Plaintiffs properly informed the Mexican courts of Defendants' stipulations or Judge Ward's orders dated April 20 and May 4, 2011.  The court finds they did not.

Despite Plaintiffs' assertions to the contrary, the evidence in the record suggests that the Mexican courts were not aware of Defendants' consent to jurisdiction.  First, the dismissal orders by the Mexican judges made no reference to Defendants' jurisdictional submission.[5]   This indicates that the Mexican judges were not apprised of Defendants' position or their stipulations

---

[5] The Mexican dismissal orders did not state or suggest, for example, that despite Defendants' submission to jurisdiction, the court nonetheless declined to exercise jurisdiction.

by Plaintiffs.  Second, the complaints filed in Mexico do not state that Defendants submitted to jurisdiction in Mexico.  Rather, the complaints contain the following paragraphs:

> [T]he order from the Court of the United States in the East [sic] District of Texas, Lufkin Division, the same that serves to justify the facts narrated in this document as number 10 and which has its basis on the Articles 129, 130, 132, and the other related articles of the Federal Code of Civil Procedures.

> [T]here has been an attempt to sue before the United States Court in the Eastern District of Texas, Lufkin Division, the parties hereby sued but nevertheless, such Court provided on April 20, 2011, that such claim shall be filed before the Mexican Courts, being competence of this District Court.

Although Plaintiffs cite to these paragraphs as proof the they advised the Mexican courts of Defendants' consent to jurisdiction, these provisions merely acknowledge that the lawsuits were previously filed in the Lufkin Division of the Eastern District of Texas.  They do not advise the court of Defendants' express consent to jurisdiction.  Notably, Plaintiffs' counsel chose to file similarly-worded complaints after receiving dismissal orders for the first several cases instead of correcting the inadequacies by expressly stating that Defendants had submitted to Mexico's jurisdiction in writing.

Third, Plaintiffs did not file translated copies of the stipulations or the court's orders dated April 20 and May 4, 2011.  Under article 271 of the FCCP, "any writing in a foreign language shall be accompanied by its corresponding translation to Spanish."  CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES [FCCP], art. 271.  In addition, Article 569 of the FCCP provides that when dealing with "judgments, decisions or jurisdictional determinations that will only be used as evidence before the Mexican courts, it will suffice if those documents satisfy the necessary requirements to be considered authentic."  CODIGO FEDERAL DE PROCEDIMIENTOS CIVILES [FCCP], art. 569.  As explained by Wobeser Hoepfner, this court's documents are considered

authentic in Mexico if they satisfy the requirements from the Hague Convention Abolishing the Requirement for Legalization for Foreign Public Documents (Articles 2-5), to which both Mexico and the United States are parties, by presenting such documents duly apostilled and with a proper translation pursuant to FCCP Article 271.  *See* Jorge A. Vargas, *Mexican Law for the American Lawyer*, 117, 199-200 (2009) (explaining "authentic documents" as a form of evidence and the need for an "apostille"[6]); *see also* Texas Secretary of State, Authentication of Documents, *http://www.sos.state.tx.us/authfaqs.shtml*.

Plaintiffs have attached receipts acknowledging the filing of the complaints in Mexico.  The receipts include a list of exhibits attached to each complaint.  A review of the lists, however, suggests that Plaintiffs failed to file with the Mexican courts *original* apostilled copies with their corresponding translations into Spanish of Judge Ward's orders dated April 20, 2011, and May 4, 2011, or an original apostilled copy and translation of the Defendants' April 29, 2011, stipulations.  Several of the receipts make reference to:  (i) "simple" copies of the English version of the April 20, 2011, order; (ii) "simple" copies of the English version of the April 20, 2011, and May 4, 2011, orders; and (iii) "simple" copies of the court's orders without noting which specific order or whether it was in English or Spanish.  Some of the lists of attachments also mention the inclusion of an "apostille" and "statement of effect of apostille," but these appear to be "simple" copies rather than originals.  According to various Mexican precedents, simple copies

---

[6] An "apostille" is "a standard certification provided under the Hague Convention for authenticating documents used in foreign countries." BLACK'S LAW DICTIONARY 112 (9th ed. 2009). The purpose of an apostille is to "abolish the requirement of diplomatic or consular legalization for foreign public documents." Secretary of State, Authentication of Documents, *http://www.sos.state.tx. us/authfaqs.shtml*.  A completed apostille certifies the authenticity of a signature, the capacity in which the person signing the document has acted, and identifies the seal/stamp which the document bears. *See id.*; *see also* Jorge A. Vargas, *Mexican Law for the American Lawyer*, 117, 199-200 (2009).

(those lacking any stamp, seal, or signature) are accorded little or no probative value unless they are weighed together with other evidence.  *See* Docket No. 277-1 (Declaration of Wobeser Hoepfner and copies of Mexican precedents).  Moreover, except in the case of Plaintiff Feliciana Perez Lopez de Alcudia ("Perez Lopez"),[7] there appears to be no Spanish translation of Judge Ward's orders.

Apart from the aforementioned receipts, Plaintiffs have also failed to provide this court with any copies of the original apostilled orders issued by Judge Ward or Defendants' stipulations (and their translation into Spanish) with some sort of marking (such as a date stamp by the Mexican court) to confirm that the documents were properly filed in the Mexican courts.  These failures, along with counsel's decision to omit any express statement in the complaints informing the Mexican courts of Defendants' written submission to jurisdiction strongly suggests that Plaintiffs did not provide the Mexican courts with translated copies of Defendants' stipulations and duly apostilled, translated copies of Judge Ward's April 20 and May 4, 2011, orders.

Furthermore, although the return-jurisdiction clause in this case did not expressly require Plaintiffs to appeal the Mexican judgment, their failure to do so is perplexing given the clear Mexican legal authority supporting the exercise of jurisdiction in cases where, as here, Defendants have consented in writing to the jurisdiction of the Mexican courts.  *See Aldana*, 2012 WL 5364241, at \*7 (holding that even though the return-jurisdiction clause did not condition reinstatement on appellate review by the foreign court, the plaintiffs' failure to seek "final

---

[7] In Perez Lopez's case, it is unclear from the record which documents were produced in English and which were produced in Spanish.

appellate review" "preclude[ed] [the court] from finding the 'exceptional circumstances' standard is met").

For these reasons, the court finds that Plaintiffs did not comply with Mexican procedural law and did not prosecute their cases in good faith. Thus, because they have not satisfied the conditions set forth in the return-jurisdiction clause, reinstatement is not warranted.[8]

III.     Conclusion

Consistent with the foregoing analysis, Plaintiffs' motion to reinstate is DENIED. Plaintiffs shall not seek reinstatement in this court unless and until they have pursued their claims in Mexico with diligence and good faith, including seeking final appellate review of any Mexican dismissal order.[9]

SIGNED at Beaumont, Texas, this 14th day of May, 2014.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE

---

[8] Given this conclusion, the court need not address Defendants' other arguments against reinstatement.

[9] According to Defendants' expert, Plaintiffs' claims were dismissed without prejudice by the Mexican courts. Thus, Plaintiffs can revise their complaints and re-file them in Mexico.

15

# EXHIBIT "C"



**Loyola Marymount University and Loyola Law School**
**Digital Commons at Loyola Marymount University and Loyola Law School**

Loyola of Los Angeles International and Comparative Law Review

Law Reviews

3-1-1986

# Moral Damages in Mexican Law: A Comparative Approach

Edith Friedler

Recommended Citation

Edith Friedler, *Moral Damages in Mexican Law: A Comparative Approach*, 8 Loy. L.A. Int'l & Comp. L. Rev. 235 (1986).
Available at: http://digitalcommons.lmu.edu/ilr/vol8/iss2/2

This Article is brought to you for free and open access by the Law Reviews at Digital Commons @ Loyola Marymount University and Loyola Law School. It has been accepted for inclusion in Loyola of Los Angeles International and Comparative Law Review by an authorized administrator of Digital Commons @ Loyola Marymount University and Loyola Law School. For more information, please contact digitalcommons@lmu.edu.

# Moral Damages in Mexican Law: A Comparative Approach

EDITH FRIEDLER*

## I.  INTRODUCTION**

*A California resident is severely injured while vacationing in a small Mexican resort. The airline that operates the only flight to Los Angeles at the time of the accident refuses to fly the injured person home, disregarding the serious condition and possible threat to human life. In an action for wrongful death against the airline by the spouse, one of the issues likely to be raised will be whether under Mexican law punitive damages are recoverable.*

Situations like this occur rather frequently, raising numerous legal issues under foreign law. Although the preceding fact situation may raise conflict of laws issues and issues under the Warsaw Convention,[1] this article deals exclusively with the governing tort liability and damages.  In particular it focuses on "moral damages"[2] under Mexican law.

The geographical proximity between California and Mexico provides opportunities for commercial and non-commercial interaction between citizens of Mexico and citizens of the United States.  The relationships thus created often involve legal issues that may eventually result in litigation.  Conflict of laws issues are likely to arise and application of foreign law is frequent, in spite of modern theories of

*    J.D., 1964, University of Chile; J.D., 1980, Loyola Law School, Los Angeles, California.  Associate Professor of Law, Loyola Law School.
**    The author gratefully acknowledges Professor Harry Laughran's invaluable suggestions and continuous support in the development of this article.  The author is also grateful to professors Michael Wolfson and Victor Gold for their comments in developing ·various drafts of this article.  The writer wishes to thank her research assistants Mary Ann Morrison and Carmen Castello for their contributions in the preparation of this article.
    1.  The Warsaw Convention, formally titled Convention for the Unification of Certain Rules Relating to International Transportation by Air, was created on October 12, 1929, and was adhered to by the United States on June 15, 1934.  The official text of the treaty is in French and is published at 49 Stat. 3000 (1934).  An English translation is published at 49 Stat. 3014 (1934) and *reprinted in* T.S. No. 876, 137 L.N.T.S. 11 and 49 U.S.C. app. § 1502 (1976).  For a comprehensive comment, see Lowenfeld and Mendelsohn, *The United States and the Warsaw Convention*, 80 HARV. L. REV. 497 (1967).
    2.  Moral damages are damages that can be recovered for a non-pecuniary or non-material loss or injury.  *See infra* text accompanying notes 91-93.

interest analysis.[3]  Therefore, the California practitioner benefits from a basic knowledge of civil law and Mexican law.

While Mexico and the United States are geographically close, socially and culturally they are light years apart.  Mexico is part of the third world.  The differences between the United States and Mexico have many significant implications on legal relations between Mexicans and Americans who visit Mexico.  For example, because many Americans do not realize the hazards of life and business in Mexico, they cannot anticipate potential problems.  Once such problems are encountered Americans may misjudge what Mexican law can and will do for them.  Americans tend to assume that the moral principles and value hierarchy that govern life in the United States also govern the lives of people everywhere.  This ethnocentric view of the world presents a great problem when Americans have dealings in Mexico.

The law of punitive damages is one of the best illustrations of the diverging values and expectations concerning the law between Mexico and the United States.  This article will show that while the concept of moral damages under Mexican law has nothing to do with the notion of punitive damages present in American jurisprudence, it is similar to the United States' practice of awarding damages for emotional distress.

Since Mexico is a civil law, rather than a common law country, Section II will discuss fundamental civil law concepts, including a brief discussion of torts and damages.  Section III will explore basic theories of tort liability according to Mexican law, and deals with the notion of moral damages in Mexico and applies this concept to specific fact situations.  Section IV discusses the relationship between moral damages in Mexico and the United States' practice of awarding damages for emotional distress.[4]

---

3.  Professor Brainard Currie developed the "governmental interest analysis approach" to choice of law.  This approach examines the policies expressed in the respective laws that may govern a case and the circumstances in which it is reasonable for the respective states to assert an interest in the application of these policies.  If after going through the analysis that Currie suggests, a court finds that a conflict between the legitimate interests of the two states is unavoidable, it should apply forum law.  *See generally* B. CURRIE, SELECTED ESSAYS ON THE CONFLICTS OF LAWS (1963).  However, in a recent case between a California grower and a United States corporation the California Supreme Court held that Mexican law rather than California law should apply.  Wong v. Tenneco, Inc., 39 Cal. 3d 126 (1985).  In *Wong* the California grower was conducting farming operations in Mexico that were illegal under a Mexican law which prohibited foreign ownership and control of farming operations.  He sued the United States corporation for anticipatory damages for breach of a marketing agreement concerning crops grown in Mexico.  *Id.*

4.  Civil law and common law evolved from different sources and in different ways.

## II.  Basic Civil Law Concepts Relating to Tort Liability and Damages

### A.  *Fundamentals of Civil Law*

The term "civil law" originated from the latin words *jus civile*, the law of the *civitas*. Civitas was a Roman city where only Roman citizens or *cives* could assert legal rights and privileges under the Roman law.[5] The *ius gentium*, "principles of law . . . *common to mankind (gentes)* applied to all other free inhabitants of the Roman Empire."[6]

The system of civil law is commonly believed to have originated at the time of the publication of the Law of the XII Tables in Rome in 450 B.C. Today, civil law is the dominant body of law throughout most of Western Europe, all of Central and South America, many parts of Asia and Africa, and even in a few enclaves in common law countries. For example, the United States is a common law country, but Louisiana and Puerto Rico are civil law jurisdictions. Similarly, though Canada is a common law country, Quebec is a civil law jurisdiction.[7]

The term "civil law" refers to the Roman law as set forth in the Justinian Code in the 6th Century A.D.[8] as reinterpreted by the

---

There are terms like "tort" in common law and "fault" in civil law that cannot be translated from one legal system into the other because the concepts themselves are different. Therefore, an effort is made to provide the reader with a basic explanation as to the meaning of unfamiliar terms. To aid in the understanding of the paper, the author uses some conventional terms with a given meaning. For example, instead of talking about *civil delicts* and *quasi delicts* which together are the closest equivalent in civil law to the common law "tort," the word "civil tort" is employed. Each term is defined in the section in which it appears.

    5.  Dainow, *The Civil Law and the Common Law: Some Points of Comparison*, 15 AM. J. COMP. L. 419, 420 (1967).

    6.  The *ius gentium* may be defined as the universal element, in antithesis to the national peculiarities (*ius civile*), to be found in the positive law of every state. . . . In a practical sense *ius gentium* covered only those rules, institutions and principles of actual Roman Law which, owing to their simplicity and correspondence with the general practice of mankind, were applied to *cives* and *peregrini* indifferently, the *ius civile* describing, in this antithesis, those not so extended.

F. DE ZULUETA, THE SCIENCE OF LAW IN THE LEGACY OF ROME 201-02 (1962).

    7.  J. MERRYMAN & D. CLARK, COMPARATIVE LAW: WESTERN EUROPEAN AND LATIN-AMERICAN LEGAL SYSTEMS, CASES AND MATERIALS 3 (1978).

    8.  Roman law was the law of the Roman citizens from 450 B.C., the date of the publication of the Law of the Twelve Tables, until 565 A.D., the date of the death of the emperor Justinian. This emperor codified the existing Roman law, including his own legislative enactments in a monumental work, *The Corpus Juris Civilis*. With the fall of the Roman Empire, *The Corpus Juris Civilis* fell into disuse and systems of Roman Vulgar Law (Roman law in a cruder version) took its place together with Germanic legal customs as the law of the peoples settling in Western Europe. In the 11th century, with the founding of the University of

Glossators, Commentators, Humanists and Natural Law exponents, and ultimately recodified in the nineteenth century.[9] Modern civil law has also been influenced by Canon Law and Germanic customary law.[10]

There are three fundamental differences between civil law and common law: (1) the sources of law; (2) the role of the judge; and (3) the nature of the proceedings.

In a civil law system the primary source of law is codified legislation, whereas a common law system relies primarily on *stare decisis*, or case law. Civil law codes usually differ from common law statutes in the following ways:

> A [civil law] code is not a list of special rules for particular situations; it is rather, a body of general principles carefully arranged and closely integrated. A [civil law] Code achieves the highest level of generalization based upon a scientific structure of classification. A [civil law] Code purports to be comprehensive and to

---

Bologna, *The Corpus Juris Civilis* of Justinian was not only the subject matter of legal education, but it became the law of the Holy Roman Empire. The law courses at Bologna attracted students from all over Europe. These students in turn, applied Roman law in their own countries. New universities were founded in the image of Bologna and, so, Roman law became the *ius commune* (the common law) of Western Europe.

There were different opinions as to the right way of approaching the study of Justinian's *The Corpus Juris Civilis* and so, Glossators, Post Glossators, Humanists, Natural Law exponents and scholars of the Historical school all left their mark in this system of law. With the growth of the concept of nation and sovereignty in the 15th Century, the idea of *ius commune* faded and Roman law was "received," that is incorporated as a binding body of law in the national law of each country. Eventually, in the 19th Century the principal states of Western Europe enacted civil codes (and other codes) of which the French Civil Code of 1804 is the archetype. *Id.* at 72-73.

> The subject matter of these civil codes was almost identical with the subject matter of the first three books of the *Institutes* of Justinian and the *ius commune* of medieval Europe. . . . A European or Latin American [Mexican] civil code of today clearly demonstrates the influence of the Roman law and its medieval revival.

*Id.* at 73.

The French Civil Code together with its legal institutions and scholarship has influenced a majority of civil law countries. The armies of Napoleon carried French law throughout Europe and later this influence took place under French Colonialism. When the Spanish Empire in Latin America dissolved in the 19th Century, it was to the French Civil Code that the law makers of the new nations turned for inspiration. The French Civil Code remains in effect to this day with revisions, *inter alia*, in the Spanish Civil Code of 1888. M. GLENDON, M. GORDON & C. OSAKWE, COMPARATIVE LEGAL TRADITIONS. TEXT, MATERIALS AND CASES 55 (1985). Thus, mentions to the French Civil Code and to French scholarship are frequent in this paper.

9.   Schiller, *The Nature and Significance of Jurists Law*, 47 B.U.L. REV. 20, 37-38 (1967).

10.   For a very good study of the influence of Roman Law on Western law see P. KOSCHAKER, EUROPA UND DAS ROMISCHE RECHT (1947).

encompass the entire subject matter, not in the details but in the principles, and to provide answers for questions which may arise.[11]

Common law statutes do not maintain the same level of generality as civil law codes do, nor do they purport to be all embracing. They do not have the conceptual and terminological consistency found in the codes. The legislature resorts to statutes to respond to current particularized needs, i.e., rent control, environmental regulation, labor practices, etc. Statutes outside of the codes are more easily amended and, therefore, more appropriate as circumstances change.

Civil law codes tend to be more general and encompass a broader range of circumstances than do common law statutes. In civil law, legal scholars' views and treatises are treated as a primary source of law, while in common law the legal scholars' views are given less weight. In spite of the differences between common law and civil law, the growing importance of case decisions in civil law and the greater tendency to rely on statutes in common law has begun to create an area of convergence between common law and civil law.[12]

The role of the judge in civil law differs from the role of the judge in common law. This is due in part to the difference in the source of law between the two systems. Civil law judges must apply codified law by means of a process of deduction, in which general codified principles are applied to a specific case before the judge.[13] For instance, in an action for wrongful death brought in a French court, a judge must look at the specific fact situation and decide whether there is a tort which is actionable under section 1382[14] of the French Civil Code.[15]

Civil law codes attempt to cover a wide range of unforeseen fact situations by way of substantive provisions of utmost generality and

---

11.  Dainow, *supra* note 5, at 424.

12.  For a good analysis of the role of statutes in modern civil law and common law, see Glendon, *The Sources of Law in a Changing Legal Order*,17 CREIGHTON L. REV., 663, 668-69 (1984).

13.  For a good discussion of the role of a judge in civil matters in France, see Perrot, *The Judge: The Extent and Limit of His Role in Civil Matters*, 50 TUL. L. REV. 495 (1976).

14.  In France and most civil law countries including Mexico, the code sections are numbered using the term *article* or *articulo*. These terms have been translated into English as "articles" or "sections." Since the term "article" is more appropriate for use in constitutional and international law, for the purposes of this paper, the word "section" will be used where referring to the codes.

15.  CIVIL CODE [C. CIV.] § 1382 (amended July 1, 1976) (J. Crabb trans. 1976) (Fr.). Section 1382 is the most important statute on tort liability in French law. In very general terms it provides that: "Any act whatever of man which causes damage to another obliges him by whose fault it occurred to make reparation." *Id.*

flexibility. These so called "general clauses" of the codes may provide, for example, that all immoral transactions are void or that every obligation must be performed in good faith.[16] Thus, in an action for damage of goods in a civil law country which has not enacted anti-trust legislation, an exclusion of liability clause in a contract will most likely be considered immoral or *contra bonos mores*,[17] and the judge will declare the exclusion clause void and find for the plaintiff.[18]

If there are gaps or *lacunae* in the code (that is, there are no statutes which specifically pertain to the particular case), the judge must nevertheless decide the case, either by use of general clauses, by analogy, or by applying general principles of law. A judge cannot refuse to decide a case simply because there is no applicable law governing the case.[19]

For example, the French legislature in 1804 did not envision liability for automobile accidents. The only code section that by analogy could be said to apply to automobiles was section 1384 of the Civil

---

16. Section 242 German Civil Code: "The obligor is bound to perform the obligation in such a way as is required by the principles of bona fides with due regard to existing usage." The CIVIL CODE. [C. CIV.] § 242 (amended Jan. 1, 1976) (W. Ger.) (J. Forrester, S. Goren & H. Ilgen trans. 1976). The German Civil Code enacted in 1896 and in effect as of January 1, 1900 as amended, remains the law of the German Federal Republic (West Germany). All references to the German Civil Code in this paper refer to the 1896 (West German) Code as amended.

17. Section 138 Subdivision (1) German Civil Code: "A jural act which is *contra bonos mores* (violative of the commands of morality) is void." C. CIV. § 138 SUB. 1 (amended Jan. 1, 1976) (W. Ger.) (J. Forrester, S. Goren & H. Ilgen trans. 1976).

18. Many civil law countries use *contra bonos mores* (against good morals or against good customs or simply immoral) as a "general clause" that allows a judge great flexibility in deciding whether a particular conduct is immoral and, therefore, becomes a basis of liability. For example, Section 1133 of the French Civil Code states: "A *causa* is illicit when it is prohibited by law, or when it is contrary to morality or public policy." C. CIV. § 1133 (amended July, 1976) (Fr.) (J. Crabb trans. 1976). The same idea is reflected in Section 1910 of the Mexican Civil Code: "He who acting illegally or against good customs causes damage to another, is obliged to repair it, unless he proves that the damage occurred in consequence of the fault or inexcusable negligence of the victim." (M. Gordon trans. 1980). Mexico, like the United States, is a Federal Republic with twenty nine states, two territories and a federal district like the District of Columbia. All references to the Mexican Civil Code in this paper are directed to the Civil Code for the Federal District and Territories, promulgated August 30, 1928, effective October 1, 1932. This Code has served as a model to the civil code of the individual states and is also used as a "back up" code for interpreting federal case law. *See* Butte, *Strict Liability in Mexico*, 18 AM. J. COMP. L. 805 n.2 (1970).

19. "The judge who refuses to judge, on pretext of the silence, obscurity or insufficiency of the law, may be prosecuted as guilty of a denial of justice." C. CIV. 4 (amended July 1, 1976) (J. Crabb trans 1976) (Fr.). "The silence, obscurity or insufficiency of the law do not authorize the judges or courts to refrain from deciding a controversy." Mexican Civil Code 18. (M. Gordon trans. 1980).

Code which states: "[e]veryone is responsible not only for the damages caused by his own acts, but also for damage caused by acts of persons for whom he must answer or by objects in his custody."[20] In 1930 the highest French court (Cour de Cassation) decided that this section established an independent basis of liability and that the custodian (owner or driver) of an automobile (or other instrumentality) which causes an accident, is presumptively liable.[21]

The preliminary titles of most civil codes, with the exception of the German Code, contain directions on interpretation and application of the code.[22] The codes normally order judges to base their decisions on specific code sections.[23] Normally, a judge may not base his/her decision on prior case law. To do so would convert a prior judicial decision into a "general rule of conduct"[24] (*stare decisis*), which is not normally permitted in a civil law system.

Civil law judges must cite at least one statutory provision as a basis for their decision. A decision based solely on case precedent will be reversed for "lack of legal basis."[25] However, in some civil law countries, including Mexico, a court decision may become law. This occurs when a particular legal issue is decided by the highest court, or another specified tribunal, in an appreciable number of cases. The uniform judicial decisions become *juris prudence constante* or *jurisprudencia* (Mexico), which may become binding law in future cases. Resort to *jurisprudence constante* is particularly helpful in situations where there are very few legislative provisions, as in France in con-

---

20. C. CIV. § 1384 (J. Crabb trans. 1976) (Fr.).
21. R. SCHLESINGER, COMPARATIVE LAW, CASES AND MATERIALS 514-15 (4th ed. 1980).
22. "When there is no law exactly applicable to the point in controversy, the customs of the place shall be observed, and in the absence thereof, the general principles of law." Spanish Civil Code § 6, *quoted in id.* at 228. "Juridical controversies of a civil nature shall be decided in accordance with the letter of the law or its juridical interpretation. In the absence of a law, they shall be decided in accordance with general legal principles." Mexican Civil Code § 19 (M. Gordon trans. 1980).
23. "Judges are forbidden to pronounce decisions by way of general and regulative disposition on causes which are submitted to them." C. CIV. § 5 (J. Crabb trans. 1976) (Fr.). A judge who violates this prohibition is, theoretically, guilty of a criminal offense. CODE PENAL [C. PEN.] 127 (Fr.) *quoted in* R. SCHLESINGER, *supra* note 21, at 578.
24. R. SCHLESINGER, *supra* note 21, at 578.
25. The traditional style of French decisions has historical roots. After the Revolution of 1789, the French people deeply distrusted judges because of the experiences under the royal regime. Also, Montesquieu had proclaimed the doctrine of separation of powers and only the legislature could make law in a general way. H. CAPITANT, LES GRANDS ARRETS DE LA JU-RISPRUDENCE CIVILE (7th ed. 1976) *reprinted in* H. LIEBESNY, FOREIGN LEGAL SYSTEMS, A COMPARATIVE ANALYSIS 56-59 (4th ed. 1981).

nection with tort liability.[26]

The final difference between civil law and common law is found in the nature of the judicial proceeding. In civil law there is neither a "trial," nor a jury. The civil law system prefers documentary evidence over witness testimony, with the latter receiving very little weight.[27] In addition, in a civil law court, only the judge cross-examines witnesses. Civil court proceedings consist of a series of isolated hearings. Further, there is no formal pre-trial discovery.

## B.   The Concept of Tort in Civil Law

In order to comprehend the notion of tort liability under Mexican law, and in particular, moral damages, a brief explanation of the civil law counterpart of common law tort liability is necessary. The statements that follow refer to the civil law in general. The basic principles of civil law tort liability apply to Mexican law. Any general differences between Mexican law and civil law will also be discussed below.

There is no equivalent civil law term for the common law term "tort." The common law term "tort" is extremely difficult to translate into civil law terminology because of the fundamental division of civil law into "public law" and "private law."[28] As a consequence of this division, tort liability belongs to the category of private law and is part of the law of obligation or a source of an obligation.[29] The law of

---

26. It is interesting to observe that out of a total of 2283 sections in the French Civil Code, only five (1382-86) are devoted to what the common law calls tort liability. Most of the French law on this subject was developed by the French highest court, the Cour de cassation, acting very much like a Common Law court. Tunc, *The Twentieth Century Development and Function of the Law of Torts in France*, 14 INT'L & COMP. L.Q. 1089, 1091 (1965).

27. Documentary evidence is similar to common law "writings" which are one category of demonstrative evidence. MCCORMICK ON EVIDENCE 524 (E. Cleary 2d ed. 1972).

28. Roman law and continental European legal doctrine and its offspring divide all law into public law and private law. Public law is understood to be that body of law which governs the affairs of the community (state, municipalities, etc.). Private law regulates such legal relations in which persons (without any display of authority, that is, on the basis of equality) stand against each other as individuals. M. KASER, ROMAN PRIVATE LAW 22 (R. Sannenberg & Butterworths trans. 1965).

29. An obligation is a bond by which the one party is bound to perform and the other entitled to receive some act or forbearance. The term *obligatio* sometimes denotes the right, oftentimes the duty, but more properly it denotes the whole relationship. B. NICHOLAS, AN INTRODUCTION TO ROMAN LAW 158 (1962). This concept of obligation is derived from the Roman Law as found in *Digest* 44.7.1 and *Inst.* 3, 13.2. (These references are to the *Digest* and the *Institutes* which comprise two parts of Justinian's *The Corpus Juris Civilis*. *See supra* note 8). The other two parts are the *Code* and the *Novels*. *Id.* For a good summary of Roman sources and explanations as to their conventional citation, see A. SCHILLER, ROMAN LAW

obligations covers all acts or situations which can give rise to rights or claims and is customarily divided into three parts: the law of contracts, the law of torts, and the law of unjust enrichment.[30]

There are two civil law terms which relate to the common law concept of tort. They are *delict* and *quasi-delict*.[31] These terms apply to both criminal and civil causes of action. *Penal delicts* and *penal quasi-delicts* are governed exclusively by the penal codes and therefore are not pertinent to this discussion of tort liability.

The terms *civil delict* and *civil quasi-delict* parallel the common law notions of intentional and negligent tort.[32] Generally, a *delict* is an unlawful or illicit act committed with intent to harm and a *quasi-delict* is an unlawful or illicit act committed without intent to harm.[33]

In civil law there are no torts, there is only a law of tort.[34] This means that in civil law there are no specific torts such as false imprisonment, assault or battery. Section 1382 of the French Civil Code is a good example of a civil law code concerning the law of tort. It provides: "Any act whatever of man which causes damage to another obliges him by whose fault it occurred to make reparation."[35] The section is drafted in a very general manner. There are no specific torts and therefore even the distinction between negligent and intentional torts becomes irrelevant. The only distinction among the different theories of liability is reflected in the amount of damages awarded.

chapter II (1978). The situations that give rise to an obligation according to the Romans were contracts, quasi contracts, *delicts* and *quasi-delicts*. *Inst.* 3, 27, 4, 5 respectively.

30. "The distinction between contractual and delictual (tort) responsibility has been treated as fundamental in civil law theory, even though both contract and delict are regarded as parts of the single field of obligations." M. GLENDON, M. GORDON & C. OSAKWE, *supra* note 8, at 262.

31. As an example, one person may have a claim against another because he or she gave a sum of money to another as a loan. This claim arises from a *contract*. A person may also have a claim against another because someone wrongfully damaged a thing belonging to that person. This claim against the wrongdoer arises from the *delict*. Today, this would be a claim for damages. M. KASER, *supra* note 28, at 135.

32. The term "civil tort" will be used in this paper to refer to civil law torts, that is *civil delicts* and *civil quasi-delicts* (intentional and negligent tort).

33. A. VON MEHREN & J. GORDLEY, THE CIVIL LAW SYSTEM 577 n.44 (2d ed. 1977).

34. Speaking of French law, Tunc says: "We have no specific torts. We have a general law of tort, based on the general principles of Articles 1382 and 1383." Tunc, *supra* note 26, at 1091. The use of the word in the singular is deliberate. "The common law knows not tort but torts—a bag of nuts and bolts." Catala & Weir, *Delicts and Torts: A Study in Parallel Part I*, 37 TUL. L. REV. 573, 580 (1963). "The French law of tort is essentially judicial application of five articles of the civil code. In contrast, the common law systems know not contracts, but contract." H. DE VRIES, CIVIL LAW AND THE ANGLO-AMERICAN LAWYER 367 (1973).

35. C. CIV. § 1382 (J. Crabb trans.) (Fr.).

Tort law in most civil law countries, including Mexico, is founded on sections 1382 and 1383 of the French Civil Code.[36]

Sections 1382 and 1383 are derived from the famous *Lex Aquilia* enacted by the Romans in 286 B.C.[37] The *Lex Aquilia* with its extensions provided the most comprehensive and important tort remedy available in Roman law. A brief look at the Roman notion of "tort" is necessary to understand the modern civil tort.

Roman law was also divided into public and private law.[38] Consequently, the Romans distinguished between crimes against the community or state, called *crimina publica* and wrongs against the individual, his family or his property, called *delicta privata*. *Crimina publica* were litigated by the state and typically involved treason and assaults on government officials. The *delicta privata*, from which today's civil law concepts of *delict* and *quasi-delict* originated, could be litigated in a private suit only by the victim. The wrongdoer was treated as the debtor of the victim, which meant that the victim was entitled to a sum of money from the wrongdoer. Thus, the Roman law *delict* action gave rise to an obligation to pay a sum of money (*poena*)[39] to the victim, in addition to any other damages awarded to the victim.[40]

For example, *delictal* actions were classified as penal (*actio ex*

---

36. "Any act whatever of man which causes damage to another obliges him by whose fault it occurred to make reparation." C. CIV. § 1382 (J. Crabb trans.) (Fr.). "Everyone is responsible for the damage he causes, not only by his act, but also by his negligence or his imprudence." *Id.* at § 1383.

37. The *Lex Aquilia* allegedly of 286 B.C. was voted as a plebiscite, that is by the *consilium plebis*, the assembly of the Plebeians. Initially it would only have been enforced amongst the Plebeians, but in the same year the *Lex Hortensia* was passed and it gave plebiscites general force of law over Patricians and Plebeians alike. JORS & KUNKEL, DERECHO PRIVADO ROMANO, 364-65 (1965). The text of the *Lex Aquilia* as extended by the Praetor (the Roman magistrate in charge of judicial affairs) and with the comments of the jurists is found in *Digest*, 2, 1-11. *See supra* note 29.

38. *See supra* note 28.

39. The *poena* (punishment) is pecuniary and its purpose is to benefit the victim. This is a residue of the primitive concept that the sanction for every wrong was private vengeance from which the wrongdoer could not escape unless the victim or his family would accept ransom money. That the punishment was a sum of money and that the cause of action belonged to the victim does not prevent it from being primarily a way of inflicting punishment. V. ARANGIO-RUIZ, LAS ACCIONES EN EL DERECHO PRIVADO ROMANO 127-28 (1945). The same line of thought is found in W. BUCKLAND & A. MCNAIR, ROMAN LAW AND COMMON LAW 344 (1952).

40. B. NICHOLAS, *supra* note 29, at 210. R. MONIER, MANUEL DE DROIT ROMAIN. LES OBLIGATIONS 38 (1954).

*delicto*).[41]  In contrast, all other private law actions, whether *in rem*[42] or *in personam*,[43] were classified as compensatory actions (*rei persecutory* or *ad rem persequendam*).[44]  One of the *delicta privata* was theft (*furtum*), and the appropriate action for theft was the *actio furti*, a penal action.  It allowed for the recovery of double, triple, or quadruple the value of the stolen thing according to certain distinctions in the law.  If the stolen thing was in the hands of a third party, the victim could use the *actio furti* as *rei persequendam* to recover the stolen property or its value.[45]

Unlike civil law today, Roman law did not use the terms *delict* and *quasi-delict* to distinguish between intentional and negligent actions.  However, the terms *delict* and *quasi-delict* did exist in Roman law.  In Roman law, *delict* referred to four fact patterns which constituted a private offense.  These four private law delicts (*delicta privata*) were: (1) theft (*furtum*), (2) robbery (*rapina*), (3) damage unlawfully caused (*danum iniuria datum*), and (4) insult (*iniuria*).[46]  A *delict* in Roman law could consist of either intentional or negligent conduct.

There were also only four fact situations which comprised the Roman law *quasi-delict*.  These were: (1) judicial acts contrary to the law (*iudex, qui litem suam fecerit*); (2) things thrown or poured into the street from a dwelling (*directum vel effusum*); (3) something placed on, or suspended from, a building which fell and injured someone (*positum vel suspensum*); and (4) loss to a customer by thievery or by damaging the customer's property caused by an innkeeper's assistants (*nauta, caupo* and *stabularius*).[47]  Thus, Roman law *quasi-delicts* could consist of either intentional or negligent conduct.  Furthermore, the last three situations actually gave rise to actions based on what the common law would consider strict liability.  The criteria for categorizing the aforementioned fact patterns as either *delicts* or *quasi-delicts* remains unclear.

---

41.  Examples of these *actiones delicto* are: *actio furti* (theft), *actio iniurarum* (bodily injury and insult to person).  B. NICHOLAS, *supra* note 29.

42.  Typical actions *in rem* were *reivindicatio* (protection of property) and *vindicatio servitutis* (protection of easement). *Id.*

43.  Frequently used actions *in personam* were *actio certae creditae pecuniae* (recovery of money loaned) and *actio venditi* (action of the seller to obtain payment for the thing sold). *Id.*

44.  "A rei persecutory action commonly results in the payment of compensation, and a penal action in the payment of more than compensation, but the essential distinction is to be found in the punitive or vindicative character of the penal action." *Id.* at 210.

45.  *Id.* at 212-13.

46.  *Gaius, Institutes* 3, 182. *See supra* note 29 for reference to Roman sources.

47.  *Digest* 44.7.5; *Inst.* 4, 5. *See supra* note 29.

The concept of fault or *culpa*, the cornerstone of civil tort liability, originated from the *Lex Aquilia* which introduced extra-contractual fault[48] for the first time (although the concept of fault existed in contract actions prior to the *Lex Aquilia*). The *Lex Aquilia* essentially made the defendant liable for damages if the defendant acted *iniuria*, that is, *non iure* or without a right.[49] The Roman law concept of "fault" was referred to as *Aquilian* or *delictal* in order to differentiate it from contractual fault. *Aquilian* or *delictal* fault formed the basis of French civil tort liability[50] which in turn formed the basis of Mexican civil tort liability.

The French Civil Code does not define fault. However, section 1382 of the French Civil Code alludes to the concept of fault. Section 1382 provides that: "[a]ny act whatever of man which causes damage to another obliges him by whose fault it occurred to make reparation."[51] The French scholar Toullier, stated that:

> The true meaning of our article 1382 is, therefore, that one who causes damage to another by doing something which he does not have the right to do or by neglecting to do what he ought to do, is obligated to make reparation for the damage that has occurred through his fault.[52]

In common law terms, French civil law "fault" exists when there is a breach of a duty of care. Modern civil law scholars Von Mehren and Gordley stated that "besides duties imposed by the criminal law and by specific texts from the civil or other codes, it [French civil law "duty of care"] includes a general duty not to act in such a way as to injure others."[53]

This duty of care is owed to all the world and therefore the de-

---

48. It originated in actions not involving a contract.

49. "To act without a right came to mean to act with *dolus* or *culpa*, that is, willfully or negligently." A. VON MEHREN & J. GORDLEY, *supra* note 33, at 567.

50. OURLIAC ET MALAFOSSE, L'HISTOIRE DU DROIT PRIVE. LES OBLIGATIONS 375 (1961).

51. The French Civil Code merges the *delict* and *quasi-delict* under the generic term "fault." "The idea of fault includes all; it is the unjustified injury which gives rise to the obligation to indemnify; it matters little in what manner the injury was caused." 2 PLANIOL, TRAITE ELEMENTAIRE DU DROIT CIVIL 442, Part I, No. 827 (Louisiana State Law Institute trans. 1959).

52. Toullier, *Le Droit Francais*, in A. VON MEHREN & J. GORDLEY, *supra* note 33, at 576.

53. A. VON MEHREN & J. GORDLEY, *supra* note 33, at 581. The well-known contemporary French scholar André Tunc uses the same language: "The duty of care is owed not to certain people or to certain circles of people. It is a general duty to the public at large." Tunc, *supra* note 26, at 1091.

fendant will almost always be found at fault with respect to someone.[54]

## C.  *"Damages" in Civil Law*

In order to understand the notion of "moral damages" in Mexican law, it is important to understand the civil law concept of damages. The term "damages" is often used to refer to two distinct concepts: "injury," which constitutes grounds for a suit, and "recovery," what the court awards to the plaintiff. To avoid confusion, the words "damage" and "damages" will be used herein to refer to the civil law injury, loss, or violation of rights suffered by the plaintiff. The term "recovery" will be used, instead of "damages," to denote the civil law recovery awarded by the court to the plaintiff.

Most civil law scholars define damage as any loss of a person's "patrimony."[55] The word "patrimony" is a term of art which, like many other civil law terms, does not have an equivalent term in common law.[56] There is some disagreement as to the definition of patrimony. Some scholars define patrimony as the *totality* of a person's legal rights and assets[57] which include: (1) real and personal property (referred to in civil law as "material" property), and (2) rights (referred to in civil law as "moral rights" or "rights of personality"). "Rights" include such things as the right to be free from emotional distress, the right to maintain and protect one's honor and reputation, and rights comparable to those espoused in the United States Constitution Bill of Rights.

Some civil law scholars who disagree with the view that patrimony consists of both material property and moral rights[58] define patrimony as consisting of only the totality of a person's personal property and real property rights ("material" property). These scholars use the term "extra-patrimony" to refer to the totality of one's moral rights.

---

54.  *Id.*

55.  R. ROJINA VILLEGAS, DERECHO CIVIL MEXICANO 117 (3d ed. 1976); E. GUTIERREZ Y GONZALEZ, DERECHO DE LAS OBLIGACIONES 640 (5th ed. 1974).

56.  The term patrimony is a legal fiction which is separate and independent from its individual components. In a sense, the notion of patrimony is similar to the common law concept of a corporation which is a legal fiction independent from its individual shareholders.

57.  E. GUTIERREZ Y GONZALEZ, *supra* note 55, at 642.

58.  M. BORJA SORIANO, TEORIA GENERAL DE LAS OBLIGACIONES 427 (7th ed. 1971). *See also* PLANIOL, *supra* note 51, at 471.

### D.  Moral Damages in Civil Law

Most civil law scholars define moral damage in a negative sense as any loss which does not affect material property.[59] More accurately, moral damage is a loss to the "rights of personality" (*droits de la personalite*), or moral rights, which involve an affront to one's honor, reputation, feelings, emotions, or peace of mind.[60]

Civil law scholars classify moral damages into three categories. These are: (a) injuries involving social concerns, such as one's honor, prestige, or reputation in the community; (b) injuries involving a person's feelings (similar to common law emotional distress and pain and suffering injuries); and (c) physical injuries which have an emotional impact on the victim (such as scars, disfiguration and the like, which might not involve physical disability, but cause emotional distress).[61] Material damage, unlike moral damage, occurs when there is loss or injury to one's real or personal property ("material" property).

Civil law scholars are in disagreement as to whether the courts should award recovery for moral damages. Civil law scholars can be divided into three groups on this point: (1) those who do not believe there should be any recovery at all for moral damages; (2) those who believe there should be recovery for moral damages only if there is proof of material damage; and (3) those who believe that there should be recovery for moral damages even if there is no proof of material damage. The argument of the first group of scholars against awarding any recovery for moral damages is similar to common law arguments that negligent infliction of emotional distress should not be an independent cause of action due to the difficulty of measuring and proving loss, and the likelihood of abuse. The second group of scholars would require, for example, that moral damage recovery be awarded to a widow for the wrongful death of her deceased husband only if the widow established that she had been financially dependent upon her husband and that her relationship (marriage) with her husband prior to his death was sanctioned by law. Finally, the third group would permit recovery for the interference with a person's religious or patriotic feelings and beliefs.[62]

59.  R. BREBBIA, EL DANO MORAL 75 (1967); M. BORJA SORIANO, *supra* note 58; Y. AVILA RAMIREZ, LA REPARACION DEL DANO MORAL 30-34 (1960).

60.  R. ROJINA VILLEGAS, *supra* note 55, at 128.

61.  M. BORJA SORIANO, *supra* note 58, at 427.

62.  The following discuss all three scholarly arguments: PLANIOL, *supra* note 51, at 471; R. TOULEMON & J. MOORE, LE PREJUDICE CORPOREL ET MORAL EN DROIT COMMUN. 135 (3d ed. 1968); Catala & Weir, *Delicts and Torts: A Study in Parallel Part III*, 39 TUL. L.R. 663,

French courts previously adhered to the view that there should not be any recovery for moral damages. French courts would not allow recovery unless the loss or injury constituted material damage, and could be measured in monetary terms. Since moral damages consist of violations of moral rights, such as the right to free exercise of religion, the French courts would not grant recovery because of the difficulty of putting a price tag on such damage. Therefore, French courts only permitted recovery for loss to one's "material" property. Recently, the French courts adopted the third view and began awarding recovery for moral damages without requiring proof of material damage.[63] However, the majority of civil law jurisdictions still follow the second view and allow recovery for moral damage only if there is proof of material damage.

Civil law scholars are well aware of the difficulty of putting a price tag on moral damage injuries. Under the French Civil Code, determination of awards for moral damages is extremely subjective because there are no specific code guidelines or limitations. French Civil Code[64] section 1382 simply requires the wrongdoer "to make reparation."[65] French scholars, acutely aware of the subjective, vague nature of the French Civil Code's provision for awarding moral damages recovery, often facetiously quote French writer Anatole France's statement that "justice is giving each one his due: to the wealthy, his wealth and to the poor, his poverty."[66]

## III.  TORT LIABILITY AND RECOVERY UNDER MEXICAN LAW

### A.   General Theories of Tort Liability

An overview of the fundamental concepts of tort liability under

---

701 (1964). E. GUTIERREZ Y GONZALEZ, *supra* note 55, at 646-49;M. BORJA SORIANO, *supra* note 58, at 428-30; A.M. VERA CID, EL DANO MORAL 37-42 (1966); and Y. AVILA RAMIREZ, *supra* note 59, at 37.

63.   This change of attitude is clearly noticed by Toulemon and Moore when they say: "La jurisprudence, a fini par admettre le prejudice sentimental sans aucun alliage de dommage pecuniaire et pour ainsi dire a l'etat pur." Judicial decisions have finally accepted the idea of sentimental (non-pecuniary) damage without any relationship to a finding of material damage, in a pure state, so to speak (translation by the author). R. TOULEMON & J. MOORE, *supra* note 62, at 138.

64.   *See supra* text accompanying note 15.

65.   In the words of Touleman and Moore, "*le judge lorsqu'il applique l'article 1382 a pour fonction, non de punir la faute, mais d'ordonner la reparation du dommage. Le Prejudice Corporel et Moral,*" R. TOULEMAN & J. MOORE, *supra* note 62, at 115. The judge in applying Section 1382 has the task, not of punishing the negligent act, but of decreeing the reparation of the damage that has been caused (translation by the author).

66.   R. TOULEMON & J. MOORE, *supra* note 62, at 119.

Mexican law will assist in the comparison of Mexican moral damages with the common law notion of punitive damages. The fundamental basis of tort liability in Mexican law, as in French law, is the occurrence of an unlawful or illicit act causing injury which necessitates reparation. This is known as the "subjective" theory of tort liability which is based on fault (*culpa*). Section 1910 of the Mexican Civil Code sets forth the obligation to repair and reads as follows: "[h]e who acting illegally or against good customs, causes damage to another, is obliged to repair it unless he proves that the damage occurred in consequence of the fault or inexcusable negligence of the victim."[67]

This section, like section 1382 of the French Civil Code, bases civil tort liability squarely on fault.[68] The term "illegally" in section 1910 refers to illegal conduct, whether intentional (*dolosa*) or negligent (*culposa*). Although today's civil law term *delict* refers to intentional conduct and *quasi-delict* refers to negligent conduct, under section 1910 of the Mexican Civil Code (and section 1382 of the French Civil Code) there is no distinction between intentional and negligent conduct.[69] For example, a defendant driving a car commits the illicit act of hitting the plaintiff in the crosswalk as the plaintiff crosses the street. The defendant is at "fault" regardless of whether the defendant intentionally hit the plaintiff or negligently failed to notice the plaintiff crossing the street.

In 1928, Mexican Civil Code section 1913 introduced for the first time an additional theory of tort liability which is still in effect in essentially its original form.[70] This additional form of liability focuses exclusively on whether there has been injury due to the defendant's use of a dangerous instrumentality. This theory, called "objective" or "created risk" liability, abandons the Roman law tradition of looking to "fault" as the source of civil tort liability. Under section 1913, objective liability is quite similar to the common law notion of strict liability, and in particular, strict liability for ultrahazardous activity.[71]

---

67. Mexican Civil Code § 1910 (M. Gordon trans. 1980).
68. *See supra* text accompanying notes 54-55.
69. With respect to the distinction between *delict* and *quasi-delict*, Planiol says:
    On closer analysis, there appears to be no reason for maintaining two distinct categories of the sources of obligations, both are illicit acts, both obligate their authors to repair the damage they cause. It would seem then that the distinction should disappear, it not being founded on any practical difference.
PLANIOL, *supra* note 51, at 443.
70. Mexican Civil Code § 1913 (M. Gordon trans. 1980).
71. *Id.*

Section 1913 of the Mexican Civil Code provides as follows:

> When a person makes use of mechanisms, instruments, apparatus
> or substances which are dangerous in themselves, by reason of ve-
> locity which they develop, their explosive or inflammable nature,
> the strength of the electric current they conduct, or for other
> analogous causes, he is liable for the damage he causes although he
> does not act illegally, unless he proves that such damage was pro-
> duced by the fault or inexcusable negligence of the victim.[72]

Under section 1913, the defendant who hit the plaintiff crossing the
street will be held liable (unless the plaintiff was contributorily negli-
gent), regardless of whether there was civil fault, because the defend-
ant caused injury to the plaintiff by using a dangerous
instrumentality, a car.[73]

   Whether or not a plaintiff can recover for moral damage depends
upon whether or not the plaintiff must prove fault. Proof of fault is
required under section 1910, but is not required if the cause of action
is based on section 1913. Proof of fault is an essential prerequisite to
obtaining moral damages recovery.[74]

### B.   Mexican Law Civil Tort Recovery

   Section 1910 of the Mexican Civil Code provides the fundamen-
tal basis for Mexican tort liability and recovery.[75] Most Mexican
scholars follow the civil law majority view that a plaintiff can recover
for "material" *and* "moral" damage.[76] This view is based on the fact
that section 1916 of the Mexican Civil Code[77] specifically refers to
moral damages.

   The general rule for Mexican civil tort recovery is found in sec-
tion 1915, subdivision (1) of the Mexican Civil Code, which provides

---

   72.   *Id.*
   73.   *Id.*
   74.   *Id.* § 1910.
   75.   "He who acting illegally or against good customs causes damage to another, is
obliged to repair it, unless he proves that the damage occurred in consequence of the fault or
inexcusable negligence of the victim." Mexican Civil Code § 1910 (M. Gordon trans. 1980).
*See also* M. BORJA SORIANO, *supra* note 58, at 409.
   76.   M. BORJA SORIANO, *supra* note 58, at 409, 428-30.
   77.   The statutory basis for the award of moral damages in Mexico is § 1916:
         Independently of the damages and losses, the judge may grant in favor of the
      victim of an illegal act, or of his family if the victim dies, an equitable indemnity as a
      moral reparation to be paid by the person responsible for the act. Such indemnity
      cannot exceed one-third (1/3) of the amount of civil liability. The provisions of this
      article shall not be applied to the State in the case mentioned in Article 1928.
Mexican Civil Code § 1916 (M. Gordon trans. 1980).

as follows: "The repair of the damage shall consist, at the election of the injured party, in the restoration of the status previously existing, when this is possible, or in the payment of damages and losses."[78]

Section 1915, as originally enacted, was modeled after the French Cour de Cassation's[79] interpretation of French Civil Code section 1382.[80] According to the Cour de Cassation, section 1382 provided recovery for "the damage, the whole damage and nothing but the damage."[81] Originally, section 1915 of the Mexican Civil Code also provided for complete reparation of loss to the victim, regardless of the nature of damage suffered.[82]

Section 1915 originally provided for two methods of reparation.[83] These were: (1) reparation by restitution, that is, restoration of the item lost (exact reparation), and (2) reparation by providing compensation equivalent in value to that which was lost.[84] Since the purpose of section 1915 was to return the victim to the *status quo ante*, exact reparation was the preferred method of reparation. Normally, the plaintiff would only receive monetary compensation if it was impossible to provide exact reparation.[85]

Section 1915, as amended in 1940, now contains two additional subdivisions. Today section 1915, subdivisions (2) and (3), provide:

> (2) When the damage is caused to persons and produces death, total permanent, partial permanent, total temporary or partial temporary incapacity, the amount of the indemnity shall be determined according to the provisions established by the Federal Labor Law. To calculate the appropriate indemnity one shall take as the base four times the minimum daily salary, which is the highest in force in the region and shall be multiplied by the number of days indicated in the Federal Labor Laws for each of the incapacities mentioned.
>
> (3) Credits for indemnity when the victim is a wage-earner are

---

78. *Id.* § 1915.
79. R. ROJINA VILLEGAS, *supra* note 55, at 130.
80. *See supra* note 36.
81. R. TOULEMON & J. MOORE, *supra* note 62, at 116.
82. The original version of Section 1915 read as follows: "The reparation of damage shall consist in the restoration to the status existing prior to the damage and when this is not possible, in the payment of damages and losses." R. ROJINA VILLEGAS, *supra* note 55, at 130.
83. *Id.*
84. *Id.*
85. A literal reading of this section as originally enacted allowed the Mexican courts to follow the lead of the French *Cour de cassation* and to order the repair of "the damage, the whole damage and nothing but the damage" without any distinction as to the type of injury suffered by the victim. R. ROJINA VILLEGAS, *supra* note 55, at 130 n.17.

not transferable and shall be paid preferentially in a single pay-
ment, except when otherwise agreed amongst the parties. The
foregoing provisions shall be observed in the case of Article 2647 of
this Code.[86]

Subdivision (2), in particular, changed the previous theory of
complete reparation. Today section 1915 provides for complete repa-
ration only when the illicit act causes damage to "things."[87] When
the injury is to persons, the amount of monetary recovery is limited to
the provisions established by the Federal Labor Law.[88] An example
of the Federal Labor Law reads as follows:

In case of death of the worker, the indemnification to the persons
to which the preceding article refers shall be an amount equal to
the sum of seven hundred and thirty-five days of wages, without
deducting the indemnification received by the worker during the
period in which he was subject to the rules for temporary
disability.[89]

This is why personal injury awards in the United States are often
much higher than Mexican personal injury awards.

Other factors contribute to the significant difference between
United States and Mexican personal injury awards. First, the absence
of a jury in the Mexican judicial system means that the judge alone
will hear and decide all aspects of the case. Second, most countries
which adhere to civil law principles, including Mexico, do not have
compulsory insurance, such as mandatory car insurance. Therefore,
there is no "deep pocket" from which to recover. In most cases, the
defendant will bear the entire financial burden of the award. Third,
punitive damages for tort liability are not permitted. Only a criminal
law judge can award punitive damages in Mexico.[90]

## C. Mexican Moral Damages

Most Mexican scholars agree with the civil law view that there
are two types of damage: "material" damage, also referred to as "pat-
rimonial" damage, and "moral" damage, also referred to as "extra-
patrimonial" damage. However, one of Mexico's best known legal

---

86. Mexican Civil Code § 1915 (M. Gordon trans. 1980).
87. *See supra* text accompanying note 78.
88. Mexican Labor Law art. 502 (CCH) 227 (1974), *quoted in* Kozolchyk, *Mexican Law
of Damages for Automobile Accidents: Damages or Restitution?*, 1 ARIZ. J. INT'L & COMP. L.
189, 203 (1982).
89. *Id.*
90. *See infra* text accompanying note 99.

scholars, E. Gutierrez y Gonzalez, strongly believes that moral rights should be included as part of one's patrimony, rather than categorized as extra-patrimony.[91] He therefore believes the Court should award recovery for moral damages as well as for material damages under certain circumstances.[92]

Mexican Civil Code section 1916 specifically provides for recovery for moral damages:

> Independently of the damages and losses, the judge may grant in favor of the victim of an illegal act, or of his family if the victim dies, an equitable indemnity as a moral reparation to be paid by the person responsible for the act. Such indemnity cannot exceed one-third (1/3) of the amount of civil liability. The provisions of this article shall not be applied to the State in the case mentioned in Article 1928.[93]

Section 1916 raises a number of important issues, such as: (1) whether section 1916 requires a finding of material damage before moral damages recovery will be awarded; (2) whether moral damages recovery is available only upon proof of fault committed by the defendant; and (3) who is liable for moral damages recovery? These will be discussed separately.

### 1. Whether section 1916 requires proof of material damage before moral damages recovery will be awarded

Most Mexican scholars agree that section 1916 is literally consistent with the civil law view that recovery for moral damage is recoverable only if there is proof of material damage.[94] However, most Mexican scholars also agree that section 1916 should be amended to allow moral damages recovery regardless of whether there is proof of material damage.[95]

The Mexican courts seem to share this view. The landmark case *Constructora Cross, S.A.*[96] dealt with the issue of whether the father of

---

91. E. GUTIERREZ Y GONZALEZ, *supra* note 57, at 642.

92. *Id.*

93. Mexican Civil Code § 1916 (M. Gordon trans. 1980).

94. M. BORJA SORIANO, *supra* note 58, at 428-30; E. GUTIERREZ Y GONZALEZ, *supra* note 55, at 651.

95. M. BORJA SORIANO, *supra* note 58, at 428-30. "It is only objectionable in our view, that the amount of the moral damage is limited to one-third of the material damage since this appears to state that there is necessarily a relationship between patrimonial and moral damage, which is completely inaccurate." R. BREBBIA, *supra* note 59, at 142 (translation by the author).

96. *Constructora Cross, S.A.*, 15 S/F 6a 4:290 (1958). Decisions of the Mexican Supreme

a minor child killed by a truck driven by an employee of the defend-
ant corporation was entitled to recover for the death of his son even
though there was no proof of material damage. The defendant
claimed that since the minor was not employed and the father had not
been financially dependent upon him, there was no material damage
and, therefore, the plaintiff could not recover anything.

The Supreme Court of Mexico said that the theory that a father
cannot receive reparation for the death of his minor child because the
child did not contribute to the economic welfare of the family,

> is devoid of any legal justification and is repugnant to the most
> basic principles of justice. The greatest asset a father can have is
> the life of a child and its death results in an obvious damage, that
> goes beyond— because it has no limit—the notion of damage and
> loss employed by the law to refer to the responsibility of one of the
> parties for the breach of an agreed obligation.[97]

The Court suggested that there should be recovery regardless of
whether the parents suffered material damage of financial loss. How-
ever, the Court did not go so far as to conclude that proof of material
damage is not required for moral damage recovery. The Court con-
strued the parents' loss of their son as material damage rather than as
moral damage. Nevertheless, the parents were still unable to recover
for their son's death as is explained in the next section.[98]

2. Whether moral damages recovery is available only upon proof
of "illicit" conduct committed by the defendant

According to a literal reading of section 1916, the defendant's
conduct must be illegal. Section 1916 states that "the judge may
grant in favor of the victim of an *illegal act* . . . an equitable indem-
nity as moral reparation."[99]

An act is illicit or illegal if there is proof of fault. Fault exists
when the wrongdoer has acted without right. The wrongdoer has ac-

---

Court are reported in the *Semanario Judicial de la Federacion*, created in 1870 and the only
authorized official publication of these reports. Decisions of the Federal Supreme Court are
the only court decisions that are regularly published. *See* Butte, *supra* note 18, at 807 n.5.
Professor Butte has created his own method of citing Mexican cases. This same method will
be followed throughout this article: volume number, followed by epoch number, followed by
part number, followed by page number. For example: 15 S/F 6a 4:290 means that the case is
in Volume 15 of the Sixth Epoch of the Semanario Judicial, on page 290 of the Fourth Part of
the volume. *Id.*

  97. *Constructora Cross, S.A.*, 15 S/F 6a 4:290, 296 (translation by the author).
  98. *See infra* text accompanying note 101.
  99. Mexican Civil Code § 1916 (M. Gordon trans. 1980) (emphasis added).

ted without right when his/her conduct is in violation of law or against good customs. In other words, that conduct is immoral or *contra bonos mores.*

In *Constructora Cross, S.A.,*[100] the Supreme Court of Mexico disagreed with the trial and appellate courts' decision allowing recovery for moral damages. The Court declared that moral damages recovery can only be recovered from the person responsible for the "illicit" act.[101]

In other words, even if the Court in *Constructora Cross, S.A.* concluded that there was proof of material damage, the plaintiff could not recover for moral damages because the alleged cause of action was premised on Mexican Civil Code section 1913.[102] This code section overlooks civil fault and presumes fault by imposing strict liability. Conversely, section 1910 requires proof of fault.[103] If the plaintiff had asserted a cause of action based on section 1910, he might have been awarded a moral damage recovery.

Alternatively, a plaintiff could base his or her action on section 1913, which provides for "objective liability" for injury caused by use of a dangerous instrumentality. However, the Court will not award recovery for moral damages since the defendant's injurious conduct, consisting of the use of a dangerous instrumentality which under Mexican law includes the act of driving a car or flying a plane, normally is lawful.

Section 1913 relieves the plaintiff of the burden of proving fault because of the inherent danger of certain activities which the defendant undertakes knowing full well that he is risking the safety of others. In *Constructora Cross, S.A.,* the Supreme Court of Mexico held:

> [S]ince in the present case there was no finding of any fault whatsoever on the part of the defendant corporation, nor was the accident caused by mechanic [sic] defects of the truck, nor due to any other causes attributable to the said corporation, the order [of the lower court] directing the defendant corporation to pay moral damages is in violation of sections 1910 and 1916 of the Civil Code and, therefore, the defendant is entitled to the constitutional protection it

---

100.  *Constructora Cross, S.A.,* 15 S/F 6a 4:290, 299-300.

101.  *Id.*

102.  Mexican Civil Code § 1913 (M. Gordon trans. 1980). *See supra* text accompanying note 72.

103.  Mexican Civil Code § 1910 (M. Gordon trans. 1980). *See supra* note 75.

requests.[104]

Mexican scholars have criticized the Court for this conclusion. These critics claim there are no grounds which justify requiring proof of illegal conduct in order to recover for moral damages while allowing recovery for material damages regardless of whether or not the defendant's conduct is legal or illegal.[105]

Justice Garcia Rojas articulates this criticism in his dissent in *Constructora Cross, S.A.*[106] He stated that the term "illegal conduct," as used in the Mexican Civil Code, was not intended to limit recovery to instances where there is proof of fault.[107] According to Justice Rojas, although the Mexican Civil Code occasionally refers to "negligent" and "intentional" conduct as "illegal," this does not necessarily mean that there must be proof of fault in order for there to be "illegal conduct."[108] Justice Rojas defines "illegal conduct" as any "conduct done without right that causes damages or loss in someone's patrimony, whether intentional, whether negligent, or without proof of either."[109] Therefore, there is no need to determine whether the defendant's conduct is intentional or negligent. All that is required is a finding of damage. "[H]e who causes injury is acting illegally; it is a fundamental principle of the law not to injure others."[110]

For example, in an action for wrongful death caused by an automobile accident, the plaintiff cannot recover for moral damages because under section 1913 driving an automobile is a dangerous

---

104. *Constructora Cross, S.A.*, 15 S/F 6a 4:290, 300:

Como en el caso concreto no se ha atribruido culpa de ningun genero a la sociedad demandada, ni el atropellamiento se produjo por defectos del camion materialista o por othas causas imputables a la propia sociedad, la condena a pagar el dano moral que le impuso la autoridad responsable viola los ariculos 1910 y 1916 del Codigo Civil por lo que por este concepto debe otorgarsele la protecion constitucional que solicita.

*Id.* (translation in the text by the author).

105. E. GUTIERREZ Y GONZALEZ, *supra* note 55, at 651.

106. *Constructora Cross, S.A.*, 15 S/F 6a 4:290, 303 (Garcia Rojas, J., dissenting).

107. *Id.*

108. *Id.*

109. *Id.* at 303. "Es acto ilicito todo dano que se causa sin derecho a un patrimonio, haya culpa, haya dolo, o no los haya." *Id.* (translation in text by the author).

110. *Id.* at 305. "[E]l que produce un dano obra ilicitamente, es principio basico del derecho: no danar a otro." *Id.* (translation in text by the author). This approach is similar to the one followed by the French courts.

[D]amage must be assessed in its entirety, independently of the fault committed; it is only for the criminal judge to inflict a punishment. The judge in a civil proceeding must award the total reparation of the damage caused by the fault, even if this fault is minimal.

R. TOULEMON & J. MOORE, *supra* note 62, at 131.

activity and fault is presumed. However, if the death is caused by a horse and buggy, there will be recovery for moral damages since such activity is not considered a dangerous activity. In the latter instance, recovery will be premised on section 1920 which does not presume fault.[111]

In spite of Justice Rojas' strong dissenting opinion and scholars' criticism, the Supreme Court of Mexico continues to deny recovery for moral damages in actions based on section 1913 objective liability, as seen in the cases that follow.

In *Pensionarios Unidos del Suroeste de Jalisco, S.A. de C.V.*,[112] the plaintiff, spouse of the deceased victim, requested recovery for both material and moral damages from defendant corporation for the death of her husband. Plaintiff's husband was killed when an employee of the defendant corporation, while driving a company truck, collided with the decedent's car. Plaintiff brought suit under section 1834 of the Civil Code of the State of Jalisco. At the time of suit, section 1834 was identical to section 1913 of the Mexican Civil Code.[113]

The Supreme Court reversed the lower court's award to the plaintiff of recovery for moral damages. The Supreme Court's holding was based on a literal reading of section 1913 (section 1834), the objective liability provision, and section 1916 (section 1837), the moral damages provision. The Court reiterated "that the cause of action founded on objective liability is independent from a finding of legality or illegality of the facts that give rise to it."[114] Therefore, reparation for moral damages will only lie where plaintiff squarely bases his or her action on section 1910 and there is a finding of fault on the part of the defendant.[115]

Although the plaintiff failed to expressly assert a cause of action founded on section 1910, and based her action entirely on section 1913, the Court's decision was suspect since the plaintiff provided evidence of the defendant's negligence.[116] In other words, the Court did not make an independent finding of negligence on the part of the driver (subjective liability under section 1910), although the plaintiff introduced such evidence. The Court denied recovery for moral dam-

---

111.  *Constructora Cross, S.A.*, 15 S/F 6a 4:290, 303 (Garcia Rojas, J., dissenting).
112.  *Pensionarios Unidos del Suroeste de Jalisco, S.A. de C.V.*, 41 S/F 7a 6:83 (1972).
113.  *Id.* at 99.
114.  *Id.* at 106.
115.  *Id.* at 105.
116.  *Id.* at 106.

ages basing its decision solely upon section 1913 (objective liability), which does not require proof of fault.[117]

In *Pensionarios Unidos del Suroeste de Jalisco S.A. de C.V.*,[118] the plaintiff provided evidence that defendant's truck was loaded with lumber protruding fifty centimeters from each side of the truck bed, thus preventing vehicles from passing it on the extremely narrow road. The protruding lumber violated section 105 of the Jalisco State Traffic Ordinance. In addition, there was evidence that the truck had stopped where the road curved, which also constituted a State Traffic Ordinance violation.[119] Justice Jose Abitia Arazapalo stated in his dissent that the cause of action should be treated as based on both the objective liability theory of section 1834[120] of the Civil Code of Jalisco and on Jalisco Civil Code section 1831,[121] which provides for liability based on fault and permits moral damages recovery.[122] He argued there is no inconsistency or contradiction in asserting a cause of action based on the objective liability of section 1834 and simultaneously asserting a section 1831 cause of action based on fault. "The coexistence of the moral damage that arises from an illicit act and objective liability, which, as is well known, is independent from a finding of fault on the part of the wrongdoer . . . do not necessarily contradict each other."[123]

The majority of the Court, however, did not elaborate on this point, nor did it mention the possibility of recovery based on fault (violation of statute).[124] The Court might have decided in the plaintiff's favor if the plaintiff had founded her cause of action on section 1910 and proved fault based on the Jalisco Traffic Ordinance violations.[125]

---

117.  *Id.*

118.  *Id.*

119.  *Id.* at 94.

120.  *Id.* at 97.

121.  *Id.*

122.  *Id.* at 106 (Jose Abitia Arazapalo, J., dissenting).

123.  *Id.*

124.  This type of negligence is similar to the common law concept of negligence per se. Prosser describes it as follows:

> When a statute provides that under certain circumstances particular acts shall or shall not be done, it may be interpreted as fixing a standard for all members of the community, from which it is negligence to deviate. Within the limits of municipal authority, the same may be true of ordinances.

W. PROSSER, LAW OF TORTS 190 (4th ed. 1974).

125.  In *Wings, S.A. y Jesus Garcia Moreno*, 75 S/F 7a 7:16 (1983), a case reported in the latest *Semanario Judicial de la Federacion, supra* note 96, the Mexican Supreme Court, following the reasoning of the dissent in *Pensionarios Unidos del Suroeste de Jalisco, S.A. de C.V.*, 41

In its decision, the Court did not mention that the truck driver, either in his individual or employee capacity, should be held liable based on "fault" and should compensate the plaintiff for moral damages. This may be due to the fact that the truck driver committed a hit and run offense and could not be found at the time of the trial.[126]

### 3. Liability for moral damages

Mexican Civil Code section 1916[127] states that the judge may grant moral damages "recovery to the victim of an illegal act and such reparation shall be paid by *the person responsible for the act.*"[128] Therefore, only when there is a finding of illegal conduct or fault will the judge consider awarding moral damages recovery. A majority of civil tort cases involve actions based on section 1913 objective liability in which the Court has consistently denied moral damages recovery because objective liability does not require proof of illegal conduct.

The Court articulates its narrow reading of section 1916 in *Constructora Cross, S.A.*,[129] *Pensionarios Unidos del Suroeste de Jalisco, S.A. de C.V.*[130] and in *Octavio Gonzalez.*[131]

In *Octavio Gonzalez,* one of the defendants violated a traffic ordinance and hit the co-defendant's station wagon, which in turn injured

---

S/F 7a 6:83, stated that liability under Sections 1910 and 1913 of the Mexican Civil Code are not mutually exclusive. In *Wings, S.A. y Jesus Garcia Moreno* the court in deciding an action for wrongful death and personal injuries against the defendant corporation and its employee driver, stated:

> Subjective and objective liability, provided by Section 1910 and Section 1913 of the Civil Code for the Federal District, are not mutually exclusive and can co-exist since a person who makes use of mechanisms, instruments, apparatus or substances which are dangerous in themselves, by reason of their explosive or inflammable nature, even if not acting unlawfully, can in addition, perform illicit acts that can cause damage to another person. Therefore, the plaintiff in a suit for civil tort liability can validly base his cause of action on both these sections, so that the objection that they contradict each other will not hold.

*Wings, S.A. y Jesus Garcia Moreno,* at 55-56 (translation by the author). Here, plaintiff had based her action on both these sections and the defendant driver had been sentenced by the criminal judge. However, recovery for moral damages was not at issue.

126. *Pensionarios Unidos del Suroeste de Jalisco S.A.*, at 87.

127. Mexican Civil Code § 1916 (M. Gordon trans. 1980) (emphasis added).

128. Independently of the damages and losses, the judge may grant in favor of the victim of an illegal act, or of his family if the victim dies, an equitable indemnity as a moral reparation to be paid by the person responsible for the act. Such indemnity cannot exceed one-third of the amount of the civil liability. The provisions of this article shall not be applied to the State in the case mentioned in article 1928.

*Id.*

129. *See* text accompanying *supra* note 96-98.

130. *See* text accompanying *supra* note 112-15.

131. *Octavio Gonzalez,* 15 S/F 6a 20:197 (1958).

the plaintiff. Both defendants were found jointly liable under the objective liability section 1810 of the Code of Nuevo Leon,[132] which is identical to section 1913 of the Mexican Civil Code.[133] The driver who violated the traffic ordinance and hit the co-defendant's station wagon, was ordered to pay moral damages recovery to the plaintiff. The Court concluded that the co-defendant (whose station wagon was hit) was not at fault because he did not create any risk of harm to the plaintiff. The Court stated:

> Section 1810 of the Local Civil Code, identical to section 1913 of the Code of the Federal District, provides for objective liability for the use of mechanisms, instruments, apparatus or substances potentially dangerous, independently of whether damage is caused illegally, whether intentionally or negligently; that is, with respect to the person who suffers the injury, the responsible parties are those who cause it, for the only reason of having created the risk, and therefore, are jointly liable for the damage caused, pursuant to Section 1814. The determination of which of the responsible actors was the direct or immediate cause of the happening of the risk is totally irrelevant to the victim and should be a matter for the wrongdoers to deal between themselves.[134]

In *Quirina de Aquilar Vda de Nino*[135] the Supreme Court once again denied moral damages recovery. There the plaintiff sued a bus company (a corporation) and its insurer. The company owned the bus in which plaintiff's husband had been a passenger and it had employed the driver of the bus. While maneuvering the bus down a curvy road, the driver crashed into the center divider. Both the driver and the plaintiff's husband died as a result.[136]

The defendant corporation and its insurance company were both found liable only for material damages because the suit was based on section 1913. It is unclear from the opinion whether if the bus driver had lived, he would have been liable for moral damages, since evidence suggested the driver was at fault and lacked adequate training.[137] The Court stated:

> Moral damages may only be recovered from the person who is liable for the illicit act as provided by section 1910 of the same code, a

---

132.  *Id.* at 200.
133.  *Id.*
134.  *Id.* (translation by the author).
135.  *Quirina de Aguilar Vda de Nino*, 2 S/F 6a 4:158 (1957).
136.  *Id.* at 159-60.
137.  *Id.* at 164.

liability that is different from the object one prescribed by section 1913. In the case at bar, only the objective liability of the defendant was proved by the use of a potentially dangerous mechanism, but in the performance of a lawful activity as is the carriage of persons. In order to subject the defendant to the payment of moral damages it is indispensable to prove that the wrongful death of Jose Nino Ruiz was due to an intentional act of the defendant company or to a negligent act of the same, as for example, that the accident occurred due to the lack of maintenance of the vehicle.[138]

The question remains whether the Court would have affirmed the award of moral damages if the plaintiff had proved defendant at fault for selecting an incompetent driver. There is no indication that such an attempt was made in the case.[139]

In his strong dissenting opinion in *Quirina de Aguilar Vda de Nino*,[140] Justice Garcia Rojas points out that the Court should not focus on whether there was an illicit act as defined by section 1910.[141] Section 1910 broadly defines an illicit act as not only an act which is against the law or good morals, but also includes any act which causes physical injury. In addition, he stated that there is sufficient showing of lack of training on the part of the driver and of the driver's fault. Justice Rojas, therefore, agrees with the lower court's order directing the defendant corporation to pay the plaintiff $1,600.00 (Mexican pesos) as moral reparation.[142]

### D. Moral Damages Versus Punitive Damages Recovery

As a result of the prerequisite proof of fault or illegal conduct for moral damages recovery, some scholars believe that moral damages recovery is the equivalent of punitive damages in American law.[143] In

---

138. *Id.* (translation by the author).

139. The plaintiff could have also pursued an action under Section 1924 which creates a rebuttable presumption of fault or negligence in the selection or supervision of one's employees who, while acting within the scope of their employment, injure others. Section 1924 provides a theory of recovery which is separate and distinct from a 1913 cause of action which involves use of a dangerous instrumentality. Section 1924 provides: "Managers and owners of mercantile establishments are liable for the damages caused by their workmen or servants in the exercise of their duties. This liability ceases if they show that in the commission of the damage no fault or negligence can be imputed to them." Mexican Civil Code § 1924 (M. Gordon trans. 1980). *See* Butte, *supra* note 18, at 813.

140. *Quirinia de Aguilar Vda de Nino*, 2 S/F 6a 4:158 (1957).

141. *Id.* at 165-66 (Garcia Rojas, J., dissenting).

142. *Id. See also Constructora Cross, S.A.*, 15 S/F 6a 4:290, 303-05 (Garcia Rojas, J., dissenting).

143. "Mexico's Supreme Court has drawn a sharp line between the entitlement to morals,

actuality, moral damages recovery has nothing to do with the common law notion of punitive damages. Proof of fault (willful or negligent conduct) is required in order to establish that the act was illicit, not for the purpose of establishing motivation or malice. Moral damages recovery is not awarded for the purpose of punishing the wrongdoer, although it does ultimately result in decreasing the wrongdoer's assets. The purpose of moral damages recovery in civil law tort actions is to compensate the victim.[144]

Unlike the distinction in tort liability between common law punitive damages and civil law moral damages, in Mexican criminal law, moral damage awards are much like the common law concept of punitive damages. Therefore under Mexican law, the court's approach to resolving criminal disputes differs from its approach to resolving civil tort disputes. In civil tort proceedings the court focuses on compensating the victim. Whereas, in criminal proceedings, the court's primary function is to punish the wrongdoer. This fundamental distinction between criminal and civil proceedings is derived from French law.[145]

> It is only for the criminal judge to inflict a punishment. The judge in a civil proceeding must award total reparation of the damage caused by the illegal conduct [or fault] even if this fault is minimal. . . . The function of the criminal judge is to order sanctions; that of the civil judge is to make reparation. . . . In order to insure complete reparation, the [civil] judge must *not* take into consideration those circumstances that may increase or decrease the degree of fault.[146]

The Mexican scholar Rafael Rojina Villegas points out:

> In the criminal proceeding, moral damages will be awarded even without proof of material damage, since the former is not determined in function of the latter as unjustly required by section 1916 of the civil code. The amount of both moral and material damages

or punitive damages in actions based upon 'illicit' acts, i.e. willful or negligent torts and those based upon the strict liability of dangerous mechanisms or instrumentalities." Kozolchyk, *supra* note 88, at 206. Moral damages understood as punitive damages is also found in S. BAYITCH & J. SIQUEIROS, CONFLICT OF LAWS: MEXICO AND THE UNITED STATES 149 (1968).

144. M. BORJA SORIANO, *supra* note 58, at 431.

145. Although Roman private law appears to have included a notion of punitive damages in its concept of penal action, the drafters of the French Civil Code did not follow this approach. They left it up to the criminal judge to impose any sanction as punishment on the wrongdoer as opposed to compensation for the victim.

146. R. TOULEMON & J. MOORE, *supra* note 62, at 131, 142.

is left to the judge's discretion and the financial ability of the defendant."[147]

The erroneous equating of moral damage recovery with punitive damages in tort actions may be a cause of a confusion with Mexico's Penal Code. The Penal Code specifically refers to moral damages when discussing punishment to the wrongdoer.[148] However, moral damages in the Civil Code are not punitive. They are limited to damages awarded as satisfaction to the victim.[149]

## IV.  RELATIONSHIP BETWEEN MORAL DAMAGES RECOVERY IN MEXICO AND COMMON LAW DAMAGES FOR EMOTIONAL DISTRESS

### A.  *Comparison Between Common Law Emotional Distress Recovery and Civil Law "Affective Patrimony" Recovery*

The concept of moral damages encompasses a broad range of injuries. It includes such injuries as harm to one's honor or reputation or loss of one's personal freedom, which would normally constitute common law defamation and false imprisonment, respectively.

The term "moral damages" also includes loss of, or interference with, a variety of inherent rights; for example, the right to good health, the right to the pursuit of happiness, and the right to be free from interference with one's personal feelings and intellect.[150] Interference with these interests involves injuries similar to those which form the basis of common law emotional distress actions. This type of injury, detrimentally affecting the plaintiff's feelings, is referred to in civil law as "affective patrimony" damage. Moral damages recovery is most frequently awarded for "affective patrimony" damage. Mexican Civil Code section 1916 specifically provides for such

147.  R. ROJINA VILLEGAS, *supra* note 55, at 129. *See also* R. BREBBIA, *supra* note 59, at 142. "The amount of reparation shall be determined by the judges in light of the damage that must be repaired according to the evidence presented at trial." *Codigo Penal Para El Distrito Federal* (Penal Code for the Federal District) § 31 (amended 1984).

148.  Section 30 of the Mexican Penal Code for the Federal District provides in part:
The reparation of injury includes:
1.  The restitution of the thing obtained because of the offense, and if this is not possible, then the value of the same, and
2.  Repair of the material and moral damages caused by the injury.

149.  "Satisfaction is distinct from punishment since it concerns the injured person, not the wrongdoer. While punishment inflicts a wound, satisfaction is intended to heal a wound." Stroll, *Penal Purposes in the Law of Torts*, 18 AM. J. COMP. L. 3, 6 (1970).

150.  M. BORJA SORIANO, *supra* note 58, at 427-28.

recovery.[151]

Although there is no equivalent common law term for "affective patrimony" damage, the common law concept of infliction of emotional distress comes the closest to the Mexican law notion of "affective patrimony."[152] As previously mentioned, there are no distinct "torts" in civil law. There is only the Law of Civil Tort.[153] Therefore, it is unnecessary in Mexican civil law to establish whether the conduct causing "affective patrimony" damage was negligent or intentional. However, section 1916[154] implies that there must be material damage in order to recover for affective patrimony damage, just as in many common law jurisdictions the plaintiff must establish physical injury before he can recover for infliction of emotional distress. Section 1916 states that recovery for moral damage (which includes affective patrimony damage) cannot exceed one-third (1/3) of the material damage.[155] Thus, absence of material damage precludes moral damage recovery.

It is unclear why this limitation of moral damages recovery in section 1916 was enacted. Mexican legislators may have intended to adopt the view of numerous scholars that moral damages recovery should not be awarded unless there is proof of material damage.[156] Also, they may have wanted to prevent flagrant abuse and unfair subjectivity in awarding moral damages recovery.[157] Alternatively, these legislators simply may have wanted to provide the judge with definitive, somewhat objective guidelines of determining the amount of moral damages recovery to be awarded.

There seems to be no indication in the treatises as to the exact motivation for the wording of section 1916. However, both Mexican scholars Rafael Rojina Villegas[158] and Ernesto Gutierrez y Gonzalez[159] believe that the Mexican legislature intended to adopt what is called a "mixed theory" award for moral damages recovery which

---

151.  *See supra* note 77.
152.  "Moral damages," which include the things we would call pain and suffering, mental anguish, loss of consortium and so on may be given to the victim, or to his family if he dies, only if he is the victim of an illicit act, which the plaintiff must prove and which brings the case under article 1910 instead of 1913.
Butte, *supra* note 18, at 814.
153.  A. VON MEHREN & J. GORDLEY, *supra* note 33, at 577 n.44.
154.  *See supra* note 77.
155.  Mexican Civil Code § 1916 (M. Gordon trans. 1980).
156.  *See supra* text accompanying note 94.
157.  *See supra* text accompanying note 62.
158.  R. ROJINA VILLEGAS, *supra* note 55, at 137.
159.  E. GUTIERREZ Y GONZALEZ, *supra* note 55, at 651.

allows an award for moral damage recovery, but makes such award contingent upon a finding of material damage.[160] Mexican scholar Manuel Borja Soriano states that "with respect to the second part of Article 1916 of our Civil Code, it must be mentioned that there cannot be an award of moral damages without a prior finding of material damage."[161]

Consistent application of the "mixed theory" is hindered by the wording of section 1916 and the fact that civil law judges are bound to strict rules of interpretation of the codes.[162] Judges are forbidden from assuming the role of a legislator.[163] Therefore, normally, when the meaning of a code is clear on its face, the literal meaning of the code shall not be disregarded even though the spirit and intent of the code arguably contradict the literal meaning of the code.[164] Since section 1916 does not specifically provide for an independent cause of action for intentional or negligent infliction of moral damages, courts are unlikely to allow moral damages recovery independent of material damage.

In order for the courts to consistently grant recovery for moral damages, section 1916 must be amended such that: (1) the award of moral damage recovery is mandatory and not permissive as it is now; (2) moral damages recovery is available regardless of the legality of the wrongdoer's conduct; (3) the award for moral damages recovery does not require a prior finding of material damage; and (4) there be no arbitrary limitation upon recovery to one-third of the material damage.[165]

### B.   *Mexican Law Actions for Intentional and Negligent Infliction of Emotional Distress*

This section of the Article will discuss possible outcomes in Mex-

---

160.  *Id.* at 647.

161.  "*En orden a la segunda parte del articulo 1916 de nuestro codigo Civil, hay que observar que no prodra haber indemnizacion de un dano moral si no acompana a un dano material*". M. BORJA SORIANO, *supra* note 58, at 432 (emphasis added) (translation in text by author).

162.  *See supra* note 31 and accompanying text.

163.  *See supra* note 18 and accompanying text.

164.  Mexican Civil Code § 1916 (M. Gordon trans. 1980). *See also* R. SCHLESINGER, *supra* note 21, at 514-15.

165.  However, it is interesting to note that California has adopted this idea of a cap on pain and suffering damages awards in medical malpractice cases. The ceiling placed by the medical Injury Compensation Act of 1975 is $250,000. *See* Fine v. Permanents Medical Group, 38 Cal. 3d 137 (1985).

ican courts of various fact situations which under California law would constitute actions for negligent infliction of emotional distress.

In *Accounts Adjustment Bureau v. Cooperman*,[166] decided July 22, 1984, the California Court of Appeals held that parents could assert a cause of action for negligent infliction of emotional distress against a psychologist who allegedly misdiagnosed their son's learning disability, if the parents established the serious nature of the misdiagnosis.[167] In *Cooperman*, the parents took their son to a psychologist for diagnosis and treatment of his learning problems. The psychologist misdiagnosed the child as suffering from DSMII non-psychotic organic brain syndrome 309.9.[168] The parents argued that a proper diagnosis would have revealed that their son did not have any sort of psychological problem, but was merely going through a typical childhood readjustment phase.

California courts follow the requirements set forth in *Dillon v. Legg*[169] in situations of non-impact injury[170] which is the situation created by the facts of *Cooperman*. In these cases, in order to determine whether a plaintiff is entitled to protection from negligent infliction of emotional distress the foreseeability of risk is the critical inquiry.[171]

In *Molien v. Kaiser Foundation Hospitals*,[172] the California Supreme Court refined *Dillon v. Legg* for application of the non-impact type case.[173] In *Molien*, the court defined Mr. Molien as a "direct victim"[174] of the defendant's negligence, although he was not the primary victim of the diagnosis. By defining the plaintiff as a "direct victim," the court established that a duty was owed to the plaintiff without showing that the plaintiff was foreseeable within the bounds

---

166. Accounts Adjustment Bureau v. Cooperman, 158 Cal. App. 3d 844, 204 Cal. Rptr. 881 (1984).

167. *Id.*

168. *Id.* at 848.

169. 68 Cal. 2d 728, 441 P.2d 912, 69 Cal. Rptr. 72 (1968).

170. The factors delineated in *Dillon* with respect to foreseeability of risk are: (1) proximity of the bystander to the scene of the accident; (2) sensory and contemporary observation by the bystander of the accident; and (3) closeness of the relationship between the victim and the bystander. *Id.* at 740-41.

171. *Dillon*, 68 Cal. 2d at 741.

172. 27 Cal. 3d 916, 616 P.2d 813, 167 Cal. Rptr. 831 (1980).

173. The defendant physicians in *Molien* negligently misdiagnosed Mrs. Molien as having syphilis. Mrs. Molien was advised to inform her husband of the diagnosis. The misdiagnosis crated suspicion and tension in the marriage, eventually resulting in dissolution of marriage. Mr. Molien sought damages for negligent infliction of emotional distress.

174. *Molien*, 27 Cal. 3d at 922-23.

set by the *Dillon* factors.[175] The court also noted the difficulty in drawing a line between physiological and psychological injury, and concluded: "the attempted distinctions between physical and psychological injury merely clouds the issue. The essential question is one of proof; whether the plaintiff has suffered a serious and compensable injury should not turn on this artificial and often arbitrary classification scheme."[176]

*Molien* held that physical injury is not required for recovery for negligent infliction of emotional distress as long as there is some "guarantee of genuiness"[177] found in the circumstances of the case. Accordingly, *Molien* mandates that courts now leave to the jury questions of whether a plaintiff's claim is genuine and whether a defendant's conduct caused the plaintiff serious emotional distress.[178]

Under Mexican law the analysis would be different. Fundamental civil law concepts help explain how a Mexican court would decide the *Cooperman* case. The codes, in particular the Civil Code, being the main sources of law, must be addressed at the beginning of any analysis of a particular fact situation.[179] These codes are necessarily general to encompass a broad range of circumstances.[180] The judge must interpret these general statutes and by a process of deduction apply the general law to the specific fact situation before him/her.[181]

The specific sections of the Mexican Civil Code which apply in the *Cooperman* case are sections 1910, 1915 and 1916.[182] These statutes pertain to tort liability damages and moral damage recovery. Even though these statutes might not cover a particular fact situation, section 18 of the Preliminary Provisions of the Civil Code states: "[t]he silence, obscurity or insufficiency of the law do not authorize the judges or courts to refrain from deciding a controversy."[183] In addition, section 19 of the same Preliminary Provisions states: "Juridical controversies of a civil nature shall be decided in accordance with the letter of the law or its juridical interpretation. In the absence of a law, they shall be decided in accordance with general legal princi-

---

175.  *Id.*
176.  *Id.* at 929-30.
177.  *Id.* at 930.
178.  *Id.*
179.  *See supra* text accompanying notes 11-24.
180.  *Id.*
181.  *Id.*
182.  *See supra* text accompanying notes 67, 72 and 93.
183.  Mexican Civil Code § 18 (M. Gordon trans. 1980).

ples."[184] This latter section is frequently referred to by courts reviewing lower court decisions because the party appealing the lower court decision usually argues that the lower court erred in its interpretation of the codes.[185] Section 1910 provides for subjective liability by saying that "he who acting illegally or against good customs causes damage to another is obliged to repair it. . . ."[186] As previously mentioned, there are no independent torts in Mexican law. There is only a law of tort.[187] Since there is no independent cause of action for either intentional or negligent infliction of emotional distress, the only significant issue is whether the victim suffered injury due to the "fault" of the wrongdoer.

As in California, to recover for negligence under Mexican Civil Code section 1910, the parents of the misdiagnosed child must prove actual damages to the child and/or parents.[188] This is, of course, in addition to establishing duty, breach, and causation. In *Cooperman*, the child could allege that as a proximate cause of the negligent diagnosis by the psychologist, the child will be prevented from procuring appropriate life and medical insurance and will also be precluded from pursuing certain occupations in the future. The child's moral damages, arguably, would consist of any detrimental impact caused by the misdiagnosis on the child's ability to fully enjoy a normal

---

184. Mexican Civil Code § 19 (M. Gordon trans. 1980).

185. This review is normally available by filing a "writ of *amparo*." *Amparo* is a procedure directed at challenging certain acts performed by the authorities in violation of rights recognized by the Constitution of Mexico for the protection of nationals and foreigners. It is also directed to the maintenance of the respect for legality by means of the guarantee of the exact and accurate application of the law. During the 113 years which have elapsed since it was incorporated in article 102 of the Constitution of 1857, *amparo* has evolved into a highly complex and, in some respects, peculiarly Mexican institution performing three distinct functions: (1) the defense of the civil liberties enumerated in the first twenty-nine articles of the Constitution; (2) the determination of the constitutionality of federal and state legislation; and (3) causation. R. BAKER, JUDICIAL REVIEW IN MEXICO: A STUDY OF THE AMPARO SUIT 267 (1971). In the words of C. Schwartz:

The *Amparo* operates formally to protect the individual and social rights guaranteed by the first twenty-nine articles of the Mexican Constitution, the 'Bill of Rights.' But because of modern statutory and judicial interpretation of articles fourteen and sixteen of the constitution, the writ may extend to violations of other constitutional limits on governmental activity as well. Article fourteen permits district courts to enjoin officials who fail to follow essential formalities of procedure and statutes issued prior to the controversy. Article sixteen requires officials to demonstrate the competency of their authority and the legal basis and justification for the action taken.

Schwartz, *Rights and Remedies in the Federal District Courts of Mexico and the United States*, 4 HASTINGS CONST. L.Q. 67, 72 (1977).

186. *See supra* text accompanying note 67.

187. *See supra* text accompanying note 34.

188. *See supra* text accompanying notes 67-69.

life.[189] However, in order for the parents to recover damages, most likely a finding of material damage to the parents would be a prerequisite.[190]

In contrast to California case law, Mexican courts do not distinguish between physical and non-physical injury.[191] Therefore, proof of foreseeability of harm to the plaintiff, which is required in California courts in order to establish that the defendant owed the plaintiff a duty of care, would not be required in a case like *Cooperman* in Mexican courts. Additionally, since the prerequisite factors set forth in *Dillon* [192] are not required in Mexican law, lawsuits are arguably more prone to fraudulent claims. One way Mexican courts can guard against fraud, abuse and unfairness is in limiting the award for the moral damages recovery. Section 1916 limits these awards for moral damages to one-third of the award for material damage.[193]

Another way the Mexican courts guard against fraudulent or abusive claims is to only award moral damages recovery "in favor of the victim of an *illegal* act, or of his family if the victim dies. . . ."[194] Unless the victim dies, section 1916 clearly only allows the *victim of an illegal act* to recover moral damages. Therefore, only the child in *Cooperman* could recover moral damages under section 1916. Nevertheless, as the California Court of Appeals points out in *Cooperman*, it is difficult to envision a two-year old child suffering from emotional distress caused by the misdiagnosis of a psychologist. The parents are the ones who are more likely to suffer emotional distress from the misdiagnosis of their child.[195]

Even if the Mexican court concludes that the child's difficulty in pursuing certain types of occupations and obtaining medical and life insurance constitutes moral damage to the parents, the court still might not award the parents moral damages recovery. Section 1916

---

189. However, the broad interpretation given by the Supreme Court of Mexico to the term "patrimonial damage" in *Constructora Cross, S.A.*, 15 S/F 6a 4:290, may indicate a willingness to allow recovery for damages even if under the label of "patrimonial" (material) instead of extra-patrimonial (moral).

190. Mexican Civil Code § 1916 (M. Gordon trans. 1980). *See supra* text accompanying note 93.

191. Instead, Section 1916 of the Mexican Civil Code seems to require a prior finding of material damage. *See supra* text accompanying note 93.

192. *See supra* note 170.

193. Mexican Civil Code § 1916 (M. Gordon trans. 1980). *See supra* text accompanying note 93.

194. *Id.*

195. *Cooperman*, 158 Cal. App. 3d 844 (1984).

does not specifically provide that parents (nonvictims) can recover moral damages for harm suffered by their child.[196] However, section 19 of the Preliminary Provisions of the Mexican Civil Code specifically states that the judge must decide judicial controversies *"in accordance with the letter of the law or its juridical interpretation."*[197] This means the court must consider whether awarding moral damages recovery to the parents would result in reversal by the Supreme Court of Mexico due to such award constituting a mistake of law or misinterpretation of the law. In a civil law country such as Mexico, a judge would be accused of usurping legislative functions were he or she to extend the award of moral damages recovery to the parents under the facts of *Cooperman*.

The only way the parents could recover for moral damages, other than by amending section 1916, is for the court to conclude that section 1916 is inapplicable. There would then, arguably, be a gap or *lacuna*[198] in the law codes and the court could award moral damages recovery to the parents pursuant to section 19 of the Preliminary Title which provides that in the "absence of law," the court may decide a case "in accordance with general legal principles."[199] In order to determine what are the applicable relevant "general legal principles,"[200] the court will look to the writings of both Mexican and civil law scholars. It will also, usually, consider the decisions of the highest courts of Mexico and other civil law countries; in particular, the French Cour de Cassation.

If *Molien*[201] had been decided by a Mexican court pursuant to Mexican law, the plaintiff's husband probably would not recover moral damages compensation from the doctors who negligently misdiagnosed his wife as having syphilis, for the same reason the parents in *Cooperman* would not be able to recover for moral damages. The

---

196. Mexican Civil Code § 1916 (M. Gordon trans. 1980). *See supra* text accompanying note 93.

197. *See supra* text accompanying note 184 (emphasis added).

198. *See supra* text accompanying note 19.

199. *Id.*

200. There is disagreement as to the meaning of "general principles of law" in the different codes. During the 19th Century, (when codification began) it was believed that these principles derived only from positive norms of a given national system, thus sharply differentiating the "general principles" from natural law. In recent years, "general principles of law," are found in the enacted law and also outside of it. *See* R. SCHLESINGER, *supra* note 21, at 602-03. *See also* R. DAVID & J. BRIELEY, MAJOR LEGAL SYSTEMS IN THE WORLD TODAY 114-18 (1968).

201. 27 Cal. 3d 916.

delegation by the California Supreme Court to the trier of fact of the duty to determine the genuiness of a claim and whether there is relia- ble proof of serious injury[202] cannot be accomplished under Mexican law since there is no jury.

In *Slaughter v. Legal Process and Courier Service*[203] a process server improperly served the plaintiff by merely dropping a copy of a complaint in the plaintiff's mailbox while the plaintiff was away on vacation. The process server then signed a sworn affidavit of personal service on plaintiff Slaughter. Based upon this affidavit, a default judgment was entered against the plaintiff. In an action by the tenant against Legal Process and others alleging, *inter alia*, intentional and negligent infliction of emotional distress, the California Court of Ap- peals denied defendant's summary judgment motion only on the issue of negligent infliction of emotional distress.[204]

If *Slaughter* had been decided by a Mexican court under Mexi- can law, the Mexican court very likely would have awarded to the plaintiff moral damages. The court would reason that the plaintiff was the victim of the defendant's wrongful conduct and suffered ma- terial damage (eviction) as a result of the improper service of process. The plaintiff in *Slaughter* might also possibly recover moral damages compensation from the defendant based on the civil law theory of abuse of right.[205] According to this theory, conduct which is per se lawful may[206] become illegal and therefore constitute a civil tort if the conduct constitutes an abuse of right, which in turn constitutes "fault."[207] If there is "fault" or an "illicit act," the court can award moral damages recovery. However, moral damages recovery based on this reasoning has not yet been argued before the Mexican courts. This is strange since section 1912 of the Civil Code expressly provides

---

202. The court in *Molien* stated that in emotional distress cases when proof of mental distress is not of a medically significant nature, "the jurors are best situated to determine whether and to what extent the defendant's conduct caused emotional distress, by referring to their own experience." 27 Cal. 3d at 930.

203. 162 Cal. App. 3d 1236, 209 Cal. Rptr. 189 (1984).

204. *Id.* at 1251.

205. For a good understanding of the civilian notion of abuse of right, see Gutteridge, *Abuse of Rights*, 5 CAMBRIDGE L.J. 22 (1933).

206. That is, the owner of a house erected a tall dummy chimney on his roof for the sole purpose of annoying a neighbor by depriving him of the access of light to certain of his rooms. Although this owner was doing something that he had an absolute right to do (lawful *per se*), the French Cour de cassation held the act to be wrongful as an abuse of right. Gutteridge, *supra* note 205, at 32.

207. PLANIOL, *supra* note 51, at 477.

for a cause of action for abuse of right.[208]

The abuse of rights theory of recovery for moral damages might also be used in instances involving section 1913 strict liability.[209] As has been explained,[210] this section does away with the requirement of fault, making the legality or illegality of defendant's conduct irrelevant as long as it is dangerous, and, thereby, precluding moral damages recovery. However, since a finding of abuse of right carries with it the element of fault (whether intentional or negligent) an argument can be made in favor of a moral damages award even under a strict liability theory as provided by section 1913.[211]

Finally, the fact situation described at the outset of this Article should be examined. A widow of a California resident has a cause of action against a Mexican airline for the wrongful death of her husband who was seriously injured while vacationing in a Mexican resort. The outrageous conduct of the airline in refusing to fly the injured man to Los Angeles raises the possibility of a moral damage award.

The plaintiff could base her action on section 1913[212] (objective liability) since an airline, like an automobile, is considered a dangerous instrumentality. Fault or negligence by the airline will be presumed and the court will order the airline to pay damages. However, the widow will not be able to receive an additional amount as recovery for moral damages. If, on the other hand, the plaintiff bases her cause of action on section 1910[213] (subjective liability) it is very likely that she will be able to prove illegal conduct by the airline on the facts mentioned. This is also one of those few instances in which a cause of action for immoral conduct, or *contra bonos mores*, may be successful, especially if the plaintiff manages to prove monopoly on the part of

---

208. "When in the exercise of a right, damage is caused to another, there is an obligation to indemnify such damage, if it is proved that the right was exercised merely for the purpose of causing the damage, without profit to the owner of the right." Mexican Civil Code § 1912 (M. Gordon trans. 1980).

209. *See supra* text accompanying note 72.

210. *See supra* text accompanying notes 103-04.

211. *See supra* text accompanying note 72. This appears to be a novel approach to the problem in strict liability actions. Mexican scholars have not discussed this possibility. Traditionally the theory of abuse of rights was confined to intentional and malicious acts that caused damage without benefit to the actor. Only recently has this theory been extended to negligent abuse of a right. *See* Bolgar, *Abuse of Rights in France, Germany and Switzerland: A Survey of a Recent Chapter in Legal Doctrine*, 35 LA. L. REV. 1016, 1020 (1975).

212. *See supra* text accompanying note 72.

213. *See supra* text accompanying note 67.

the airline.[214] Assuming that causation is not at issue, there will be a finding of fault and very likely the court will award her recovery for moral damages. An analogy to the reasoning employed by the Supreme Court of Mexico in *Constructora Cross, S.A.*,[215] demonstrates that plaintiff suffered "material damage" by the loss of her husband. In that case, the Court discussed what the death of a minor son meant to a father even though the son did not as yet have an income. Therefore, whether or not plaintiff depended on her deceased husband for support is irrelevant.[216]

The airline would be "the person responsible for the act" under the theory of *respondeat superior* as provided by section 1924 of the Mexican Civil Code.[217] If the victim dies, the widow would qualify as family[218] entitled to an equitable indemnity as moral reparation.

## V. CONCLUSION

Tort liability in civil law countries generally, and in Mexico in particular, developed from historical and legal concepts different from those of the Anglo-American tradition. The characterization of this discipline as the "law of tort" in opposition to that of the "law of torts" leads to sharp conceptual differences in the approach to tort liability in civil law versus common law. The emphasis on liability based on fault in contrast to strict liability also accounts for some of the conceptual differences between the two legal systems. This liability based on fault does not distinguish conceptually between intentional and negligent conduct: either one will trigger fault or illegal conduct under the system.

This approach is totally different from a common law analysis with respect to a cause of action for intentional tort and the analysis that is required in dealing with a cause of action based on negligence. Thus, different results as to liability and damage awards may be easier to understand. The lack of juries, the unsophisticated insurance laws and limitations in the amount of the awards contained in the statutes

---

214. *See supra* text accompanying note 18.

215. *See supra* text accompanying note 96.

216. *See supra* text accompanying note 97.

217. "Managers and owners of mercantile establishments are liable for damages caused by their workmen or servants in the exercise of their duties. This liability ceases if they show that in the commission of the damage no fault or negligence can be imputed to them." Mexican Civil Code § 1924 (M. Gordon trans. 1980).

218. Mexican Civil Code § 1916 (M. Gordon trans. 1980). *See supra* text accompanying note 97.

also explain differences in the amount of damages awarded. Additionally, the strict concept of separation of powers in Mexico that prevents a judge from creating law hampers the ability of the judges to decide novel issues in areas like negligent infliction of emotional distress.

With respect to moral damages, the clearly marked role of the judge in a civil proceding as that of ordering damages to provide satisfaction to the victim, in contrast to the role of the judge in a criminal proceeding, who orders damages as punishment to the wrongdoer, initially explains the absence of punitive damages in tort liability.

This difference in roles between the civil and criminal judges in turn results from the Roman distinction between public law and private law. This division of the law is also expressed in the strict concept of separation of powers that is followed in Mexico and most civil law countries. The statutory scheme that places a limit to the amount of moral damage and requires a finding of material damage further explains the absence of punitive damages in tort law.

All the considerations point to a marked difference in the area of damage award for tort liability between Mexican law and American law. At a time in which much is heard about crisis in our tort system and a need to restructure our insurance laws, it may be useful to learn about the experiences of our neighbors and that of other legal systems in order to arrive at a more realistic determination of damage award for liability in tort.



October 3, 2014

*Via Email*

     Re:     Usumacinta Case.

I am writing you to update you concerning recent developments in your case. I am very sad to inform you that we have suffered another significant setback in your case after years of work. By way of background, I want to remind you about the timeline of the litigation.

We initially filed the case in Texas against the various defendants that we believe played a role in the explosion. The Defendants moved to dismiss the case back to Mexico in January 2009. We timely opposed the motion in May 2009. The federal judge in the Eastern District of Texas dismissed the case in July 2009. Subsequently, he vacated the award and the case was transferred to a different federal judge from the Eastern District of Texas. The Defendants again filed a motion to dismiss in December 2010. We responded in January 2011. Unfortunately, the judge rejected our arguments and dismissed the case back to Mexico in April 2011.

My firm undertook an extensive search to retain Mexican counsel. We drafted extensive petitions and filed the cases in Mexico consistent with the Court's order. The Mexican Court dismissed the petitions for lack of jurisdiction in May 2013. Subsequently, we moved to reopen the cases again in the United States.

Defendants moved in November 2013 to dismiss the cases again arguing that the cases were still proper to be prosecuted in Mexico only. However, the cases in the United States were assigned to a different federal judge. We opposed Defendants motions. Unfortunately, the Judge dismissed the cases again in May of this year.

I truly regret that we were not able to obtain justice for you. We spent hundreds of thousands of dollars seeking to hold the Defendants accountable on your behalf. The most recent judge provided a possibility that the cases could be brought again in the United States. I have attached the order to this letter. Unfortunately, I think the chances of the Court accepting the jurisdiction for these cases even after following all steps is remote.

As a result, my firm and The Gomez Law Firm P.L.L.C. are withdrawing as counsel. I urge you to seek the advice of Mexican Counsel concerning refiling these cases in Mexico to see if the Courts will accept jurisdiction consistent with the requirements of the Eastern District of Texas order.

Please call or email if you have any questions or need access to any documents from the file and we will be happy to assist.

Sincerely,

Kurt B. Arnold



*Via Email*

      Asunto:  Caso Usumacinta.

      Le estoy escribiendo a usted para actualizarlo sobre lo que concierne recientes desarrollos en su caso. Estoy muy triste en informarle a usted que hemos sufridos otro obstáculo significante en su caso después de años de trabajo. Por medio de los antecedentes, yo quiero recordarle a usted acerca de la cronología de la litigación.

      Nosotros inicialmente presentamos el caso en Texas en contra varios demandados que creíamos tomaron un papel en la explosión. Los Demandados tomaron medidas para rechazar el caso para atrás a México en enero del 2009. Nosotros oportunamente presentamos contraposición a la moción en mayo del 2009. El juez federal en el Distrito Este de Texas rechazó el caso en julio del 2009. Subsiguientemente, él dejó sin efecto el fallo y el caso fue traspasado a un juez federal diferente del Distrito Este de Texas. Los Demandados de nuevo presentaron una moción para rechazar en diciembre del 2010. Nosotros respondimos en enero del 2011. Desafortunadamente, el juez rechazó nuestros argumentos y rechazó el caso para atrás a México en abril del 2011.

      Mi abogacía emprendió una extensiva búsqueda para retener un abogado en México. Nosotros borramos extensivos petitorios y presentamos los casos en México consistente con la orden del Tribunal. El Tribunal de México rechazó los petitorios por falta de jurisdicción en mayo del 2013. Subsiguientemente, nosotros presentamos una medida para reabrir los casos de nuevo en los Estados Unidos.

      Los Demandados presentaron una medida en noviembre del 2013 para rechazar los casos de nuevo alegando que los casos todavía estaban apropiados para ser perseguidos en sólo México. Sin embargo, los casos en los Estados Unidos fueron asignados a un juez federal diferente. Nosotros estábamos en contraposición con las mociones de los Demandados. Desafortunadamente, el juez rechazó los casos de nuevo en mayo del presente año.

      Yo realmente arrepiento que nosotros no fuimos capaces de obtener justicia para usted. Nosotros gastamos cienes de miles de dólares buscando a mantener los Demandados responsables por parte suya. El juez más reciente proveyó una posibilidad que los casos podrían ser presentados de nuevo en los Estados Unidos. Yo he anexado la orden a esta carta. Desafortunadamente, yo pienso que las posibilidades que el Tribunal aceptará la jurisdicción por estos casos aun después de seguir todos los pasos son remotas.

      Como un resultado, mi abogacía y la abogacía de Julian C. Gomez nos estamos retirando como abogados. Le urjo a usted que busque el consejo de un Abogado de México sobre los que concierne presentando estos casos de nuevo en México para ver si los Tribunales acepten jurisdicción consistente con los requerimientos de la orden del Distrito Este de Texas.

      Favor de llamar o enviarnos un correo electrónico si usted tiene algunas preguntas o necesita acceso a cualesquiera documentos del archivo y estaríamos gustosos de asistirlo.

                     Sinceramente,

                     Kurt B. Arnold

EXHIBIT "E"

# MEXICAN CIVIL CODE ANNOTATED

Bilingual Edition

2009 Edition

Translated and Updated by

**PROFESSOR JORGE A. VARGAS**
University of San Diego
School of Law

**WEST**®
A Thomson Reuters business

*For Customer Assistance Call 1-800-328-4880*

Mat # 40695131

# CODIGO CIVIL FEDERAL

## DISPOSICIONES PRELIMINARES

**Artículo 1** Las disposiciones de este Código regirán en toda la República en asuntos del orden federal.

**Artículo 2** La capacidad jurídica es igual para el hombre y la mujer; en consecuencia, la mujer no queda sometida, por razón de su sexo, a restricción alguna en la adquisición y ejercicio de sus derechos civiles.

**Artículo 3** Las leyes, reglamentos, circulares o cualesquiera otras disposiciones de observancia general, obligan y surten sus efectos tres días después de su publicación en el Periódico Oficial.

En los distintos lugares en que se publique el Periódico Oficial, para que las leyes, reglamentos, etc., se reputen publicados y sean obligatorios, se necesita que además del plazo que fija el párrafo anterior, transcurra un día más por cada cuarenta kilómetros de distancia o fracción que exceda de la mitad.

**Artículo 4** Si la ley, reglamento, circular o disposición de observancia general, fija el día en que debe comenzar a regir, obliga desde ese día, con tal de que su publicación haya sido anterior.

**Artículo 5** A ninguna ley ni disposición gubernativa se le dará efecto retroactivo en perjuicio de persona alguna.

**Artículo 6** La voluntad de los particulares no puede eximir de la observancia de la ley, ni alterarla o modificarla. Sólo pueden renunciarse los derechos privados que no afecten directamente al interés público, cuando la renuncia no perjudique derechos de terceros.

**Artículo 7** La renuncia autorizada en el artículo anterior no produce efecto alguno si no se hace en términos claros y precisos, de tal suerte que no quede duda del derecho que se renuncia.

**Artículo 8** Los actos ejecutados contra el tenor de las leyes prohibitivas o de interés público serán nulos, excepto en los casos en que la ley ordene lo contrario.

**Artículo 9** La ley sólo queda abrogada o derogada por otra posterior que así lo declare expresamente o que contenga disposiciones total o parcialmente incompatibles con la ley anterior.

**Artículo 10** Contra la observancia de la ley no puede alegarse desuso, costumbre o práctica en contrario.

**Artículo 11** Las leyes que establecen excepción a las reglas generales, no son aplicables a caso alguno que no esté expresamente especificado en las mismas leyes.

a la República en

la mujer; en
e su sexo, a restricción
iles.

a otras disposiciones
s días después de su

Oficial, para que las
ligatorios, se necesita
urra un día más por
ceda de la mitad.

bservancia general,
e día, con tal de que su

rá efecto retroactivo en

de la observancia
arse los derechos
cuando la renuncia no

produce efecto alguno
que no quede duda del

prohibitivas o de
la ley ordene lo

osterior que así
tal o parcialmente

se desuso, costumbre o

erales, no son aplicables
mismas leyes.

# FEDERAL CIVIL CODE

## PRELIMINARY PROVISIONS

**Article 1** The provisions of this Code shall apply to the entire Republic in matters of a Federal nature.

**Article 2** The civil status of men and women is equal; wherefore, women are not restricted, by reason of their sex, in the full enjoyment and exercise of their civil rights.

**Article 3** The laws, regulations, circulars, or any other provisions of general observance are compulsory and take effect three (3) days after their publication in the official daily.

For the laws, regulations, etc., to be deemed published and become obligatory in places other than where the official daily is published, the time period determined in the preceding paragraph shall be increased by one (1) additional day for each forty (40) kilometers of distance, or fraction thereof exceeding one-half (1/2), from the place of such publication.

**Article 4** If a law, regulation, circular or provision of general observance designates the day when it is to take effect, it shall take effect on such day, provided it was previously published.

**Article 5** No law or other governmental provision which shall be applied in a retroactive manner to the prejudice of any person.

**Article 6** No person may be exempted by agreement from observance of the law, nor may alter or modify it. Private rights can only be waived when they do not directly affect the public interest or impair the rights of third parties.

**Article 7** The waiver authorized in the preceding Article produces no effect unless it is made in clear and precise terms, so that there is no doubt as to the rights waived.

**Article 8** Any act prohibited by law or those contrary to the public interest shall be null and void, unless otherwise provided by law.

**Article 9** A law is abrogated or repealed only by a subsequent law which expressly so declares it or which contains provisions totally or partially incompatible with the previous law.

**Article 10** Disuse, custom or contrary practice cannot be alleged for noncompliance with the law.

**Article 11** Laws that establish an exception to general rules are not applicable to cases not expressly specified in the excepting laws.

# TITULO SEPTIMO DE LA PRESCRIPCION

## Capítulo I—Disposiciones Generales

**Artículo 1135** Prescripción es un medio de adquirir bienes o de librarse de obligaciones, mediante el transcurso de cierto tiempo y bajo las condiciones establecidas por la ley.

**Artículo 1136** La adquisición de bienes en virtud de la posesión se llama prescripción positiva; la liberación de obligaciones, por no exigirse su cumplimiento, se llama prescripción negativa.

**Artículo 1137** Sólo pueden prescribirse los bienes y obligaciones que están en el comercio, salvo las excepciones establecidas por la ley.

**Artículo 1138** Pueden adquirir por prescripción positiva todos los que son capaces de adquirir por cualquier otro título; los menores y demás incapacitados pueden hacerlo por medio de sus legítimos representantes.

**Artículo 1139** Para los efectos de los artículos 826 y 827, se dice legalmente cambiada la causa de la posesión cuando el poseedor que no poseía a título de dueño comienza a poseer con este carácter, y en tal caso la prescripción no corre sino desde el día en que se haya cambiado la causa de la posesión.

**Artículo 1140** La prescripción negativa aprovecha a todos, aun a los que por sí mismos no pueden obligarse.

**Artículo 1141** Las personas con capacidad para enajenar pueden renunciar la prescripción ganada, pero no el derecho de prescribir para lo sucesivo.

**Artículo 1142** La renuncia de la prescripción es expresa o tácita, siendo esta última la que resulta de un hecho que importa el abandono del derecho adquirido.

**Artículo 1143** Los acreedores y todos los que tuvieren legítimo interés en que la prescripción subsista, pueden hacerla valer aunque el deudor o el propietario hayan renunciado los derechos en esa virtud adquiridos.

**Artículo 1144** Si varias personas poseen en común alguna cosa, no puede ninguna de ellas prescribir contra sus copropietarios o coposeedores; pero sí puede prescribir contra un extraño, y en este caso la prescripción aprovecha a todos los partícipes.

# TITLE SEVEN LIMITATIONS OF ACTIONS

## Chapter I—General Provisions

**Article 1135** Limitations of actions is the means whereby one can acquire property or be released from an obligation by the passage of a specified period of time and under conditions established by law.

**Article 1136** The acquisition of assets by possession is referred to as affirmative limitations of actions; the release from obligations for failure to demand with its compliance is referred to as negative limitations.

**Article 1137** Only those assets and obligations that are in the stream of commerce can be the subject of limitations of actions, except for those specifically exempted by law.

**Article 1138** All persons can acquire property by affirmative prescription if they have capacity to acquire title in any other manner. Minors and other incompetents can acquire property by affirmative limitations through their legal representatives.

**Article 1139** For the purposes of Articles 826 and 827, the character of possession changes when the person in possession no longer holds as owner but thereafter asserts possession as such. The statute of limitations begins to run from the time of the change in the character of the asserted possession.

**Article 1140** Negative limitation is available to all persons, including those who cannot incur an obligation in their own name.

**Article 1141** Any person who has the capacity to convey may renounce the limitations period attained, but not the right of adverse possession to accrue in the future.

**Article 1142** The renunciation of limitations is either express or implied. An implied renunciation results from some act that implies the abandonment of acquired rights.

**Article 1143** Creditors and all others who have a legitimate interest in the subsistence of limitations may assert their rights against the owner of the property or the obligor, even though the owner/obligor has renounced any rights so acquired.

**Article 1144** If more than one person has possession of an asset, none of them can assert adverse possession against his co-owner or co-possessors; but one person's adverse holding shall be effective against a third party and shall inure to the benefit of all the co-possessors.

## Capítulo V—De la Interrupción de la Prescripción

**Artículo 1168** La prescripción se interrumpe:

I. Si el poseedor es privado de la posesión de la cosa o del goce del derecho por más de un año;

II. Por demanda u otro cualquier género de interpelación judicial notificada al poseedor o al deudor en su caso.

Se considerará la prescripción como no interrumpida por la interpelación judicial si el actor desistiese de ella o fuese desestimada su demanda;

III. Porque la persona a cuyo favor corre la prescripción reconozca expresamente, de palabra o por escrito, o tácitamente por hechos indudables, el derecho de la persona contra quien prescribe.

Empezará a contarse el nuevo término de la prescripción, en caso de reconocimiento de las obligaciones, desde el día en que se haga; si se renueva el documento, desde la fecha del nuevo título, y si se hubiere prorrogado el plazo del cumplimiento de la obligación, desde que éste hubiere vencido.

## TESIS SOBRESALIENTE

PRESCRIPCIÓN ADQUISITIVA. EXISTE RENUNCIA TACITA A ESA FORMA DE ADQUIRIR LA PROPRIEDAD, CUANDO EL POSEEDOR RECONOCE EL DERECHO DEL PROPIETARIO, ANTES THE PROMOVER EL JUICIO DE USUCAPIÓN (LEGISLACIÓN DEL ESTADO DE PUEBLA).—"... cuando el beneficiado con la prescripción positiva, antes de solicitar a la autoridad judicial competente la declaratoria de usucapión en su favor, reconoce por hecho indubitable el derecho del propietario, debe entenderse que renunció tácitamente a la prescripción que había comenzado o ... ganado, toda vez que la interrupción de que habla la ley, evidentemente deja sin efectos los derechos del poseedor con respecto a la prescripción, hasta el momento del reconocimiento."

*Amparo directo 418/987. José Flores Tobón. 14 de abril de 1988. Unanimidad de votos. Ponente: Enrique Dueñas Sarabia. Secretario: Ramón Sandoval Hernández. Primer Tribunal Colegiado del Sexto Circuito. Informe rendido a la Suprema Corte de Justicia de la Nación por su Presidente, Tercera Parte, Vol. II, Mayo Ediciones, S. de R.L. México, 1988, p. 755.*

**Artículo 1169** Las causas que interrumpen la prescripción respecto de uno de los deudores solidarios, la interrumpen también respecto de los otros.

**Artículo 1170** Si el acreedor, consintiendo en la división de la deuda respecto de uno de los deudores solidarios, sólo exigiere de él la parte que le corresponda, no se tendrá por interrumpida la prescripción respecto de los demás.

**Artículo 1171** Lo dispuesto en los dos artículos anteriores es aplicable a los herederos del deudor.

## Chapter V—Tolling of the Statute of Limitations

**Article 1168** The running of the statute of limitations shall be interrupted:

I.    If the possessor is deprived of possession of the property or of the enjoyment of a right for more than one year;

II.   By the commencement of any action or proceeding where the possessor or obligor is notified.

There is no interruption in the running of the statute of limitations if the plaintiff subsequently waives his claim or the judicial proceeding or action is dismissed;

III.  If the person who asserts adverse title or bar expressly acknowledges, verbally or in writing, or impliedly through unequivocal acts, the right of the person against whom the statute is running.

The statute shall commence to run anew, in case of such acknowledgement, from the date it is made; and if a credit instrument is renewed, from its new issue date, and if extended from its new due date.

### SALIENT THESIS

ADQUISITIVE PRESCRIPTION. THERE EXISTS A TACIT RENUNCIATION TO THAT FORM OF ADQUIRING PROPERTY, WHEN THE POSSESSOR RECOGNIZES THE RIGHT OF THE OWNER, BEFORE FILING AN USUCAPIION LAW SUIT (LEGISLATION OF THE STATE OF PUEBLA).—"... when the beneficiary who has the positive prescription, prior to requesting the declaration of usucapion to a competent judicial authority, recognizes by an undoubtable fact, the right of the owner, it has to be understood that he/she tacitly renounced to the prescription that he/she had started or ... won, since the interruption established by law evidently leaves the rights of the possessor without effects with respect to prescription, up until the moment of recognition."

*Amparo directo 418/987. José Flores Tobón. 14 de abril de 1988. Unanimidad de votos. Ponente: Enrique Dueñas Sarabia. Secretario: Ramón Sandoval Hernández. Primer Tribunal Colegiado del Sexto Circuito. Informe rendido a la Suprema Corte de Justicia de la Nación por su Presidente, Tercera Parte, Vol. II, Mayo Ediciones, S. de R.L. México, 1988, p. 755.*

**Article 1169** If the running of the statute of limitations is interrupted for any reason against one of joint and several obligors, it shall be interrupted against all.

**Article 1170** If the obligee of a joint and several obligation consents to the division of the obligation as to one of the obligors and demands of him only his proportional share, the running of the statute shall not be interrupted against the other joint obligors.

**Article 1171** The provisions of Articles 1169 and 1170 are applicable to the heirs of the debtor.

## Capítulo V—De las Obligaciones que Nacen de los Actos Ilícitos (Responsabilidad Extra-Contractual)

**Artículo 1910** El que obrando ilícitamente o contra las buenas costumbres cause daño a otro, está obligado a repararlo, a menos que demuestre que el daño se produjo como consecuencia de culpa o negligencia inexcusable de la víctima.

**Artículo 1911** El incapaz que cause daño debe repararlo, salvo que la responsabilidad recaiga en las personas de él encargadas, conforme lo dispuesto en los artículos 1919, 1920, 1921 y 1922.

**Artículo 1912** Cuando al ejercitar un derecho se cause daño a otro, hay obligación de indemnizarlo si se demuestra que el derecho sólo se ejercitó a fin de causar el daño, sin utilidad para el titular del derecho.

**Artículo 1913** Cuando una persona hace uso de mecanismos, instrumentos, aparatos o sustancias peligrosas por sí mismos, por la velocidad que desarrollen, por su naturaleza explosiva o inflamable, por la energía de la corriente eléctrica que conduzcan o por otras causas análogas, está obligada a responder del daño que cause, aunque no obre ilícitamente; a no ser que demuestre que ese daño se produjo por culpa o negligencia inexcusable de la víctima.

**Artículo 1914** Cuando sin el empleo de mecanismos, instrumentos, etc., a que se refiere el artículo anterior, y sin culpa o negligencia de ninguna de las partes, se producen daños, cada una de ellas los soportará sin derecho a indemnización.

**Artículo 1915** La reparación del daño debe consistir, a elección del ofendido, en el restablecimiento de la situación anterior, cuando ello sea posible, o en el pago de daños y perjuicios.

Cuando el daño se cause a las personas y produzca la muerte, incapacidad total permanente, parcial permanente, total temporal o parcial temporal, el grado de la reparación se determinará atendiendo a lo dispuesto por la Ley Federal del Trabajo. Para calcular la indemnización que corresponda se tomará como base el cuádruplo del salario mínimo más alto que esté en vigor en la región y se extenderá al número de días que para cada una de las incapacidades mencionadas señala la Ley Federal del Trabajo. En caso de muerte, la indemnización corresponderá a los herederos de la víctima.

Los créditos por indemnización, cuando la víctima fuere un asalariado, son intransferibles y se cubrirán preferentemente en una sola exhibición, salvo convenio entre las partes.

Las anteriores disposiciones se observarán en el caso del artículo 2647 de este código.

## Chapter V—Liabilities From Illicit Acts (Torts)

**Article 1910** Whoever, by acting illicitly or against the good customs, causes damage to another shall be obligated to compensate him/her, unless he/she can prove that the damage was caused as a result of the fault or inexcusable negligence of the victim.

**Article 1911** If an incompetent person causes damage, he/she is obligated to compensate for it, unless the liability falls on those responsible for him/her in accordance with the provisions of Articles 1919 to 1922 inclusive.

**Article 1912** If in the exercise of a right damage is caused to another, there is an obligation to indemnify the injured party if it is shown that the right was exercised only to cause injury, without any benefit to the holder of the right.

**Article 1913** If a person employs mechanisms, instruments, equipment or substances which are inherently dangerous, because of the speed they develop, their explosive nature or inflammable characteristics, or by the intensity of the electric current, or similar causes, he/she is liable for the damages or injuries they cause even though he/she is using them licitly, unless he can prove that the damage was caused by the fault or inexcusable negligence of the victim.

**Article 1914** If without the use of machinery, equipment, etc., as referred to in Article 1913 and without fault or negligence of either party damages are caused, each party shall bear his/her own losses, without a right of indemnity from the other.

**Article 1915** Damages shall consist, at the election of the injured party, either in the restoration of the damaged item to its previous condition when this is possible or in the payment of the damages and loss.

If an injury is caused to individuals and causes death or disability (either total or partial, temporary or permanent), the amount due for reparations shall be determined by the provisions of the Federal Labor Act. In order to calculate the indemnity due, the highest minimum daily wage in force in the region shall be multiplied by four (4), and shall extend for the number of days during which the victim suffers from each of the incapacities set forth in the Federal Labor Act. In the event of the victim's death, the indemnity shall be paid to his/her heirs.

If the injured party is a wage-earner, the indemnification cannot be assigned or transferred, and it shall preferably be paid in one lump sum, except as agreed between the parties.

The preceding provisions shall be followed in those cases referred to by Article 2647 of this Code.

**Artículo 1916** (Reformado según enmienda publicada en el DOF del 13 de abril de 2007)

Por daño moral se entiende la afectación que una persona sufre en sus sentimientos, afectos, creencias, decoro, honor, reputación, vida privada, configuración y aspectos físicos, o bien en la consideración que de sí misma tienen los demás. Se presumirá que hubo daño moral cuando se vulnere o menoscabe ilegítimamente la libertad o la integridad física o psíquica de las personas.

Cuando un hecho u omisión ilícitos produzcan un daño moral, el responsable del mismo tendrá la obligación de repararlo mediante una indemnización en dinero, con independencia de que se haya causado daño material, tanto en responsabilidad contractual como extracontractual. Igual obligación de reparar el daño moral tendrá quien incurra en responsabilidad objetiva conforme al artículo 1913, así como el Estado y sus servidores públicos, conforme a los artículos 1927 y 1928, todos ellos del presente código.

La acción de reparación no es transmisible a terceros por pacto entre vivos y sólo pasa a los herederos de la víctima cuando ésta haya intentado la acción en vida.

El monto de la indemnización lo determinará el juez tomando en cuenta los derechos lesionados, el grado de responsabilidad, la situación económica del responsable y la de la víctima, así como las demás circunstancias del caso.

Cuando el daño moral haya afectado a la víctima en su decoro, honor, reputación o consideración, el juez ordenará, a petición de ésta y con cargo al responsable, la publicación de un extracto de la sentencia que refleje adecuadamente la naturaleza y alcance de la misma, a través de los medios informativos que considere convenientes. En los casos en que el daño derive de un acto que haya tenido difusión en los medios informativos, el juez ordenará que los mismos den publicidad al extracto de la sentencia, con la misma relevancia que hubiere tenido la difusión original.

**DAÑO MORAL, DERECHO A LA REPARACIÓN DEL. SE DA EN FAVOR DE UNA PERSONA, COMO CONSECUENCIA DE UNA INADECUADA ATENCIÓN MÉDICA PRESTADA POR UN CENTRO HOSPITALARIO QUE VULNERE O MENOSCABE SU INTEGRIDAD FÍSICA O PSÍQUICA.**—En términos del artículo 1916 del Código Civil para el Distrito Federal y Código Civil Federal, el daño moral consiste en la afectación que una persona sufre en sus sentimientos, afectos, creencias, decoro, honor, reputación, vida privada, configuración y aspectos físicos, o bien en la consideración que de sí misma tienen los demás. Se presumirá que hay daño moral, cuando se vulnere o menoscabe ilegítimamente la libertad o la "integridad física o psíquica" de las personas, siendo independiente el daño moral, del daño material que se cause; luego, si un centro hospitalario le presta a una persona una inadecuada atención médica y por esa circunstancia

**Article 1916** (As amended by DOF of April 13, 2007)

For moral damage it is understood the injuries inflicted upon a person's feelings, affections, beliefs, decorum, honor, reputation, privacy, image and physical appearance, or how that person is perceived in the opinion of others. Moral damages shall be presumed when a person's freedom or his/her physical or psychological integrity is illegitimately injured or diminished.

If an illicit act or omission causes moral damage, the person responsible shall be liable to pay a monetary indemnification, independent of any other liability for material damages by virtue of a contract or extra-contractually. He/she shall also be liable for moral damages resulting from strict liability, pursuant to Article 1913, including the state and its public servants as provided by Articles 1927 and 1928 of this Code.

The cause of action for moral damage cannot be transferred to third parties and can only be passed to the victim's heirs when the victim has filed it when he/she was alive.

The amount of the indemnification shall be determined by the judge taking into account the injured person's rights, the degree of liability, the economic situation of the responsible, and that of the victim, as well as the other circumstances of the case.

When the moral damage has injured the victim's decorum, honor, reputation or personal esteem, the judge shall order, at the victim's request and at the expense of the responsible, the publication of the judgment's summary which is to adequately reflect its nature and scope, through the news media deemed appropriate. In case [moral] damage derives from an act that has disseminated through the mass media, the judge shall order said media to publicize the judgment's summary with the same prominence given to the original dissemination.

**MORAL, RIGHT DAMAGE TO THE REPAIR OF. THERE HAPPENS IN FAVOR OF A PERSON, AS CONSEQUENCE OF INADEQUATE UNA MEDICAL ATTENTION GIVEN BY A HOSPITABLE CENTER THAT DAMAGES OR REDUCES HIS PHYSICAL OR PSYCHIC INTEGRITY.**—In terms of the article 1916 of the Civil Code for the Federal District and Civil Federal Code, the moral damage consists of the affectation that a person suffers in his feelings, affections, credence, decorum, honor, reputation, private life, configuration and physical aspects, or in the consideration that of yes same have the others. It will be presumed that there is moral damage, when there is damaged or reduces illegitimately the freedom or the "physical or psychic integrity" of the persons, being independent the moral damage, of the property damage that is caused; then, if a hospitable center gives to a person an inadequate medical attention and for this circumstance is

III. Por la caída de sus árboles, cuando no sea ocasionada por fuerza mayor;

IV. Por las emanaciones de cloacas o depósitos de materias infectantes;

V. Por los depósitos de agua que humedezcan la pared del vecino o derramen sobre la propiedad de éste;

VI. Por el peso o movimiento de las máquinas, por las aglomeraciones de materias o animales nocivos a la salud, o por cualquier causa que sin derecho origine algún daño.

**Artículo 1933** Los jefes de familia que habiten en una casa o parte de ella, son responsables de los daños causados por las cosas que se arrojen o cayeren de la misma.

**Artículo 1934** La acción para exigir la reparación de los daños causados en los términos del presente capítulo, prescribe en dos años contados a partir del día en que se haya causado el daño.

III.     From falling trees, if not caused by force majeure;

IV.     From the escape of noxious substances from drainage ditches or holding tanks;

V.     From water tank filtrations through the wall of the neighbor or their spillage onto his property;

VI.     From the weight or vibration of machines, the accumulation of hazardous materials or animals that are injurious to health, or from the existence of any unlawful condition he creates.

**Article 1933** The head of a household who resides therein or occupies a part thereof is liable for damages resulting from objects thrown or falling from the building.

**Article 1934** A cause of action for damages resulting from any of the acts referred to in this Chapter shall be barred after two years from the date that the damage occurred.

# EXHIBIT "F"

## IN THE UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF TEXAS
### LUFKIN DIVISION

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, ET AL., | § § § § § § § § § § § § § | |
| | | Civil Action No. 9:08-CV-200-TJW |
| Plaintiffs, | | |
| v. | | |
| GULF COAST MARINE & ASSOCIATES, INC., ET AL., | | |
| Defendants. | | |

## STIPULATION OF DEFENDANTS REGARDING DISMISSAL

COME NOW, Defendants Gulf Coast Marine & Associates, Inc., Glen Carter, Halliburton Energy Services, Inc., f/k/a Halliburton Company, Schlumberger Technology Corporation, and Matthews Daniel Company (collectively, "Defendants"), and file their stipulation in accordance with the Court's Memorandum Opinion and Order conditionally granting Defendants' Consolidated Motion to Dismiss for *Forum Non Conveniens*. (Docket Entry 257.)

## STIPULATIONS

In the event the Plaintiffs in this lawsuit re-file any of their claims arising from the allegations set forth in their Complaint in a Mexican court, Defendants hereby stipulate to the following:

1.  Defendants agree to appear and submit themselves to the jurisdiction of a Mexican federal or state court, waiving any jurisdictional defenses they might normally possess.

2.  Defendants agree to waive any statute of limitations or laches defense that they did not possess as of the date this lawsuit was originally filed.

DB1/67142056.2

3.      Defendants agree to submit to discovery in the Mexican forum in accordance with

the procedural rules of the Mexican court.

4.      Defendants agree that they will make all relevant witnesses and documents

available in Mexico to the extent consistent with Mexican law.

5.      Defendants further agree that they will make any employee witness available for

trial in Mexico to the extent consistent with Mexican law.

Dated:  April 29, 2011                          Respectfully submitted,


                                                */s/ Hugh E. Tanner*
                                                Hugh E. Tanner
                                                  Texas Bar No. 19637400
                                                MORGAN, LEWIS & BOCKIUS LLP
                                                1000 Louisiana St., Suite 4200
                                                Houston, TX  77002-5006
                                                Telephone: (713) 890-5000
                                                Fax: (713) 890-5001
                                                htanner@MorganLewis.com

                                                ATTORNEY-IN-CHARGE FOR DEFENDANT
                                                SCHLUMBERGER TECHNOLOGY
                                                CORPORATION


                                                */s/ Michael D. Williams**
                                                Michael D. Williams
                                                  Texas Bar No. 21564330
                                                BROWN SIMS, P.C.
                                                1177 West Loop South, 10th Floor
                                                Houston, Texas 77027-9007
                                                Telephone:  (713) 629-1580
                                                Facsimile:  (713) 629-5027

                                                ATTORNEY-IN-CHARGE FOR DEFENDANTS
                                                GULF COAST MARINE & ASSOCIATES, INC.,
                                                AND GLEN CARTER


                                                2

/s/ *R. Bruce Hurley**

R. Bruce Hurley
  State Bar No. 10311400
KING & SPALDING
1100 Louisiana, Suite 3300
Houston, Texas 77002-5219
Telephone:  713.751.3200
Fax: 713.751.3290

ATTORNEY-IN-CHARGE FOR DEFENDANT
HALLIBURTON ENERGY SERVICES, INC.
F/K/A HALLIBURTON CO.

/s/ *Mark C. Clemer**

Mark C. Clemer
  Texas Bar No. 04372300
Brown Sims, P.C.
1177 West Loop South, Tenth Floor
Houston, Texas 77027
[t] 713-629-1590
[f] 713-629-5027
mclemer@brownsims.com

ATTORNEY-IN-CHARGE FOR DEFENDANT
MATTHEWS DANIEL COMPANY

*Signed by Hugh E. Tanner with express permission.

3

## CERTIFICATE OF SERVICE

I hereby certify that on the 29th day of April, 2011, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all CM/ECF participants.

/s/ *Hugh E. Tanner*
Hugh E. Tanner

CAUSE NO. 2015-28543

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS NEXT FRIEND | § | |
| OF KAREN MARIEN ANDRADE LOPEZ, | § | |
| MAIRET SAMELI ANDRADE LOPEZ | § | |
| AND IMAR GERARDO ANDRADE LOPEZ | § | |
| ON BEHALF THE ESTATE OF OMAR | § | |
| GERARDO ANDRADE LOPEZ, ET AL | § | |
| | § | |
| V. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| ARNOLD & ITKIN, L.L.P., | § | |
| BECK REDDEN, L.L.P., | § | |
| ALBRITTON LAW FIRM, | § | |
| KURT ARNOLD, CORY ITKIN, | § | |
| JASON ITKIN, RUSSELL POST, | § | |
| FIELDS ALEXANDER, JAS BRAR and | § | |
| ERIC ALBRITTON | § | 11TH JUDICIAL DISTRICT |

## AFFIDAVIT OF DAVID ERIC KASSAB

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared David Eric Kassab who, being by me duly sworn, deposed as follows:

"My name is David Eric Kassab. I am of sound mind, over the age of eighteen (18) years, capable of making this affidavit and personally acquainted with the facts herein stated and they are true and correct. The opinions contained herein, if any, are based upon my experience, training and education as an attorney and are held to a reasonable degree of legal probability.

I am an attorney licensed to practice law in the State of Texas. I have been licensed to practice law by the State of Texas since 2010 and I am in good standing. I am a lawyer at the Law Offices of Lance Christopher Kassab, P.C. d/b/a The Kassab Law Firm, which has been retained to represent Plaintiffs in the above-entitled case. I am an attorney of record for the Plaintiffs in this case and have been very active in all aspects of this case. In representing Plaintiffs in this case, I have obtained documents from the underlying action Civil Action No. 9:08-cv-200; *Maria Santos Lopez Dominguez, et al., v. Gulf Coast Marine & Associates, Inc. et al*; In the United States District Court for the Eastern District of Texas Lufkin Division (the "underlying case").

Attached to Plaintiffs' Response to All Defendants Plea to the Jurisdiction, and, in the Alternative, Plea in Abatement (the "Response") as **Exhibit "A"** is a true and correct copy of the April 20, 2011 Memorandum Opinion and Order from Judge T. John Ward which my office obtained from the official governmental website PACER (Public Access to Court Electronic Records).

Attached to Plaintiffs' Response as **Exhibit "B"** is a true and correct copy of the May 14, 2014 Memorandum and Order from Judge Marcia A. Crone which my office obtained from the official governmental website PACER (Public Access to Court Electronic Records).

Attached to Plaintiffs' Response as **Exhibit "C"** is a true and correct copy of the Law Review *Article Moral Damages in Mexican Law: A Comparative Approach* which my office obtained from online legal resources.

Attached to Plaintiffs' Response as **Exhibit "D"** is a true and correct copy of an October 3, 2014 letter sent from Arnold & Itkin, LLP to one of the Plaintiffs in this lawsuit which I obtained from my client in this case.

Attached to Plaintiffs' Response as **Exhibit "E"** are true and correct copies of the relevant sections of the Mexican Civil Code Annotated (Bilingual Edition) authored by Professor Jorge A. Vargas of the San Diego School of Law.

Attached to Plaintiffs' Response as **Exhibit "F"** is a true and correct copy of the Stipulation of Defendants Regarding Dismissal filed by the defendants in the underlying case which my office obtained from the official governmental website PACER (Public Access to Court Electronic Records).

I am one of the custodians of records for The Kassab Law Firm and I have care, custody and control of the records and litigation files maintained in this case. The Exhibits attached to the Response are kept in the regular course of business of The Kassab Law Firm and maintained by The Kassab Law Firm on behalf of Plaintiff as during the course of this litigation.

Further, Affiant saith not."

David Eric Kassab

SWORN TO AND SUBSCRIBED before me on the 12th day of August, 2015.

Notary Public State of Texas

ANDREA MENDEZ
Notary Public, State of Texas
My Commission Expires
September 29, 2015

**CAUSE NO. 2015-28543**

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS NEXT FRIEND | § | |
| OF KAREN MARIEN ANDRADE LOPEZ, | § | |
| MAIRET SAMELI ANDRADE LOPEZ | § | |
| AND IMAR GERARDO ANDRADE LOPEZ | § | |
| ON BEHALF THE ESTATE OF OMAR | § | |
| GERARDO ANDRADE LOPEZ, ET AL | § | |
| | § | |
| V. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| ARNOLD & ITKIN, L.L.P., | § | |
| BECK REDDEN, L.L.P., | § | |
| ALBRITTON LAW FIRM, | § | |
| KURT ARNOLD, CORY ITKIN, | § | |
| JASON ITKIN, RUSSELL POST, | § | |
| FIELDS ALEXANDER, JAS BRAR and | § | |
| ERIC ALBRITTON | § | 11TH JUDICIAL DISTRICT |

## ORDER DENYING DEFENDANTS' PLEA TO THE JURISDICTION
## AND PLEA IN ABATEMENT

**On this day** came on to be considered the Plea to the Jurisdiction, and, in the Alternative, Plea in Abatement of Defendants, **ARNOLD & ITKIN, L.L.P., BECK REDDEN, L.L.P., ALBRITTON LAW FIRM, KURT ARNOLD, CORY ITKIN, JASON ITKIN, RUSSELL POST, FIELDS ALEXANDER, JAS BRAR AND ERIC ALBRITTON**, and Plaintiff's Response to All Defendants' Plea to the Jurisdiction, and, In the Alternative, Plea in Abatement, and the Court, after considering same and hearing argument of counsel is of the opinion that said motion and pleas should be denied, and it is, therefore

**Ordered** that all Pleas to the Jurisdiction and all Pleas in Abatement of Defendants, **ARNOLD & ITKIN, L.L.P., BECK REDDEN, L.L.P., ALBRITTON LAW FIRM, KURT ARNOLD, CORY ITKIN, JASON ITKIN, RUSSELL POST, FIELDS ALEXANDER, JAS BRAR AND ERIC ALBRITTON**, are hereby denied in their entirety.

**Signed** this _____ day of _____, 2015.


_____

Judge Mike Miller

# Appendix Tab 3

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS NEXT FRIEND | § | |
| OF KAREN MARIEN ANDRADE LOPEZ, | § | |
| MAIRET SAMELI ANDRADE LOPEZ | § | |
| AND IMAR GERARDO ANDRADE LOPEZ | § | |
| ON BEHALF THE ESTATE OF OMAR | § | |
| GERARDO ANDRADE LOPEZ, ET AL | § | |
| | § | |
| V. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| ARNOLD & ITKIN, L.L.P., | § | |
| BECK REDDEN, L.L.P., | § | |
| ALBRITTON LAW FIRM, | § | |
| KURT ARNOLD, CORY ITKIN, | § | |
| JASON ITKIN, RUSSELL POST, | § | |
| FIELDS ALEXANDER, JAS BRAR and | § | |
| ERIC ALBRITTON | § | 11TH JUDICIAL DISTRICT |

**PLAINTIFFS' SUR-REPLY TO ALL DEFENDANTS' PLEA TO THE
JURISDICTION, AND, IN THE ALTERNATIVE, PLEA IN ABATEMENT**

TO THE HONORABLE JUDGE MIKE MILLER:

COME NOW Plaintiffs, Maria Santos Lopez Dominguez, *et al.*, and files this, their Sur-Reply to All Defendants Plea to the Jurisdiction, and, in the Alternative, Plea in Abatement, and would respectfully show as follows:

**I
INTRODUCTION**

Only "some injury" needs to be shown for Plaintiffs' claims to be ripe. *See Vanderweyst v. Boudreaux*, No. 01-02-00928-CV, 2003 Tex. App. LEXIS 8549, 2003 WL 22255833, at *4 (Tex. App.—Houston [1st Dist.] Oct. 2, 2003, pet. denied) (mem. op.); *In re Marriage of Pyrtle*, 433 S.W.3d 152, 164 (Tex. App.—Dallas 2014, pet. denied). Defendants do not dispute that, had the *forum non conveniens* motion been denied in the underlying case, Plaintiffs, at minimum, could have pursued their Mexican law claims in the United States. Plaintiffs contend that, due to Defendants' negligence, the underlying court granted the *forum non conveniens* motion and

required Plaintiffs to file their claims in Mexico, where, even if the claims are not barred, they are now faced with virtually non-existent discovery, no procedural protections, extensive delays to any resolution and the unlikelihood of any attorney taking their case. The lost benefit of pursuing their claims in a United States court is at least *some* "concrete injury" which has already occurred and is not contingent on any future event, thereby rendering these claims ripe. *See Vanderweyst*, 2003 Tex. App. LEXIS 8549, at *14-*15 (lost opportunity found to constitute injury sufficient to demonstrate ripeness even if other damages were speculative, holding "[t]he loss of that benefit, whatever it may ultimately be determined to be worth, constitutes the first of [the plaintiff's] pled injuries.").

Further, the underlying proceedings have clearly been concluded. Plaintiffs' United States case has been dismissed. While the Jones Act claims were dismissed without prejudice, they were dismissed on September 20, 2010. The entire United States case was then dismissed on April 20, 2011. Plaintiffs cannot re-file their Jones Act claims because they are now barred by limitations. The dismissal of the Jones Act claims is not an "interlocutory order" as Defendants contend, but is a final judgment because the claims may not be refiled. And, because Defendants' refused to timely pursue these claims in Mexico, the "return jurisdiction" clause is inapplicable. Accordingly, Plaintiffs' claims are barred by limitations in both Mexico and the United States. This may be proven through expert testimony and Plaintiffs are not required to re-file clearly barred claims to litigate this malpractice case. *Alexander v. Turtur & Assocs.*, 146 S.W.3d 113, 122 (Tex. 2004)(client proves what court would have done under different circumstances by way of expert testimony); *Rangel v. Lapin*, 177 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied)(client filed lawsuit against attorney without first filing the underlying product liability suit); *Garcia v. Boyar & Miller, P.C.*, 2007 U.S. Dist. LEXIS 63432 (N.D. Tex. Aug. 28,

2007)(client not required to exhaust administrative remedies prior to suing attorney); *Mayer v. Biafore, Florek & O'Neill*, 245 Conn. 88, 89 (Conn. 1998)("because the trier of fact hearing the plaintiff's malpractice case must determine … whether [the underlying] action is time barred, there is no need for a prior determination that the statute of limitations has run as a condition precedent to the plaintiff pursuing this case.").

## II
## SUR-REPLY TO DEFENDANTS' ARGUMENTS

### A. RIPENESS STANDARD AND REVIEW.

A claim is ripe for review if the pleadings demonstrate at least *some* injury – no matter how slight. *See Vanderweyst*, 2003 Tex. App. LEXIS 8549, at *4 (fact that amount of damages was not yet determined at time of filing did not make plaintiff's claims unripe where record showed "some injury" to plaintiff at that time). In addition, a claim is ripe if the pleadings demonstrate that further injury is merely "likely to occur." *Robinson v. Parker*, 353 S.W.3d 753, 755 (Tex. 2011). In making its determination, the Court is required to construe the pleadings in the Plaintiffs' favor. *See Texas Ass'n of Bus. v. Texas Air Control Bd.*, 852 S.W.2d 440, 446 (Tex. 1993). More importantly, the Court **must** overrule the motion **unless** Defendants' evidence **clearly** demonstrates that the Court lacks jurisdiction. *See Bland Indep. Sch. Dist. v. Blue*, 34 S.W.3d 547, 555 (Tex. 2000). Generally, no order on a plea to the jurisdiction filed by a party other than a governmental unit may be appealed before final judgment. TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8); *Prada de Portugal v. Prada*, 2005 Tex. App. LEXIS 192, at *5 (Tex.App. – San Antonio Jan. 12, 2005, no pet.)("an appellate court will not entertain an interlocutory appeal from a court's denial of a plea to the jurisdiction unless it relates to a governmental unit.").

## B. PLAINTIFFS' CLAIMS ARE RIPE BECAUSE PLAINTIFFS HAVE SUFFERED AT LEAST *SOME* INJURY CAUSED BY DEFENDANTS' CONDUCT.

Defendants contend that "there obviously has not been any final outcome in the underlying case, so any malpractice lawsuit relating to how the attorneys handled the venue arguments is premature, and must be either dismissed or abated."[1] Yet, the underlying United States case was dismissed with Judge Ward's April 20, 2011 order dismissing the case on *forum non conveniens* grounds.[2] In the Fifth Circuit, "[d]ismissals for forum non conveniens … have been considered **final** and appealable by right." *Koke v. Phillips Petroleum Co.,* 730 F.2d 211, 214 (5th Cir. Tex. 1984) (emphasis added); *See also Vinson v. Am. Bureau of Shipping*, 318 S.W.3d 34, 41 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)(noting that "dismissal of a case on grounds of forum non conveniens is deemed a final judgment appealable . . . even though it does not end the litigation."). In fact, Defendants appealed the prior final dismissal entered by Judge Clark on May 29, 2009 on *forum non conveniens* grounds, but the case was remanded to allow Judge Ward to indicate to the Court of Appeals whether he was inclined to vacate Judge Clark's dismissal of this case in light of Judge Clark's subsequent recusal. *See Dominguez v. Gulf Coast Marine & Assocs.*, 607 F.3d 1066, 1076 (5th Cir. Tex. 2010). The "conditions" placed on the dismissal are immaterial to creating finality. *See Id.* at 1072, n. 3 ("this Court has held that conditional forum non conveniens dismissals are final, despite the fact that the orders may literally appear to have more typically nonfinal characteristics because they are conditional.")(internal quotations omitted).

It is undisputed that, had the *forum non conveniens* motion been decided differently, Plaintiffs would have, at bare minimum, been permitted to pursue their Mexican law or general maritime tort law claims in the United States because these claims were **not** pre-empted by the

---

[1] *See* ARNOLD & ITKIN REPLY, at p. 6.

Jones Act. *Lorenzana v. Gulf Coast Marine & Assocs.*, 2010 U.S. Dist. LEXIS 99356, at *15 (E.D. Tex. Sept. 20, 2010); *Stier v. Reading & Bates Corp.*, 992 S.W.2d 423, 434 (Tex. 1999). Thus, the "injury" caused by Defendants' failure to assert the proper evidence and argument in response to the *forum non conveniens* motion or, alternatively, timely appeal the dismissal is having to spend time and effort in exhausting their remedies in Mexico which, according to Plaintiffs' experts, will be futile.[3]

The underlying defendants stipulated that they would "agree to submit to discovery in the Mexican forum **in accordance with the procedural rules of the Mexican court**" and make "all witnesses and documents available in Mexico **to the extent consistent with Mexican law**."[4] As a result of Defendants' negligence, Plaintiffs are now required to pursue their claims in Mexico according to these stipulations. Even if Plaintiffs' claims are not barred in Mexico and a Mexican court would accept jurisdiction (which they would not), then Plaintiffs have still suffered a "concrete" injury that is not contingent on any future events because the courts in Mexico provide for very limited discovery and do not afford Plaintiffs with procedural safeguards, which will undoubtedly hinder Plaintiffs' ability to pursue these claims.[5]

To demonstrate this point, Plaintiffs have attached the joint affidavit of Mexican attorney and conflicts of law professor, Aranau Muria and professor of Mexican law, Henry Saint Dahl, two Mexican law experts. Mr. Muria and Mr. Dahl opine that "Mexico has no discovery and no depositions."[6] When filing the lawsuit, the plaintiff "has to produce all the documentary evidence, and without discovery" and "Mexican law is very clear in the sense that documents

---

[2] *See* PLAINTIFFS' RESPONSE, at Exhibit "A".
[3] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[4] *See* PLAINTIFFS' RESPONSE, at Exhibit "F", p. 2 (emphasis added).
[5] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 10-11.
[6] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 10.

found after the lawsuit is filed, are inadmissible[.]"[7] Witness testimony must take place in open court and "[a] party can only present up to five witnesses for each fact…"[8] "This means that, in a case where plaintiff needs to prove some type of engineering malfunctioning, for instance if a valve failed to operate as intended to, and the defendants are in the U.S., the support afforded by Mexican evidentiary rules is close to zero."[9] Simply put, "Mexican law completely rejects any American type of discovery."[10] The lack of these procedural safeguards and ability to conduct discovery that would have been available to them in the United States is at least *some* concrete "injury" that is not contingent on any further hypothetical or undeveloped facts.

In *Vanderweyst v. Boudreaux*, *supra*, the Houston Court of Appeals held that a damages claim, though speculative, was "fodder for a summary judgment motion, not a dismissal for lack of ripeness in a plea to the [trial court's] jurisdiction." *Vanderweyst*, 2003 Tex. App. LEXIS 8549, at *14-15. There, the plaintiff sued the defendant for her lost opportunity to execute a judgment against Nationwide. *Id.* at *13. The defendant filed a plea to the jurisdiction based on ripeness, asserting that the trial court lacked subject matter jurisdiction over the plaintiff's claims because Nationwide had appealed the judgment obtained by the plaintiff and because the "appeal was still pending, judgment had not been rendered on the bond." *Id.* at *5-6. Further, defendants alleged that, even if [the plaintiff] had a right to collect on the judgment today, and Nationwide could not satisfy the judgment, [the plaintiff] has never attempted to collect on the supersedeas bond, nor does she allege." *Id.* at *6. Thus the defendants argued, similar to Defendants in this case, that plaintiff's claims were "premature because it is possible that she will not prevail on

---

[7] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 10.
[8] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 11.
[9] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 11.
[10] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 11.

appeal, or if she does prevail, it is possible she may recover on the bond." *Id.* The trial court granted the plea to the jurisdiction and the client appealed. *Id.* at *7.

The First Court of Appeals reversed and remanded the case. *Id.* at *13. The court found that the plaintiff's "lost opportunity" to immediately execute on the judgment against Nationwide was at least some injury caused to the plaintiff regardless of whether said injuries were merely hypothetical or still undetermined. *Id.* at *14 ("The loss of that benefit, whatever it may ultimately be determined to be worth, constitutes the first of [the plaintiff's] pled injuries."). The Houston Court of Appeals noted that even if the damages were speculative, that issue was more appropriately obtained by way of summary judgment, not a motion to dismiss. *Id.* Accordingly, the Houston Court of Appeals allowed the claim to proceed even without the underlying litigation to reach a conclusion. *See Id.*

The Northern District of Texas case *Garcia v. Boyar & Miller, P.C.*, 2007 U.S. Dist. LEXIS 63432 (N.D. Tex. Aug. 28, 2007) is also instructive. In *Garcia*, the clients, undocumented workers, sued their attorneys Boyar & Miller after they failed to file timely immigration applications. *Id.* at *3. In response, Boyar & Miller filed a motion to dismiss arguing, like Defendants herein, that the clients' claims were not ripe because they had not exhausted their future administrative remedies and that the applications may be accepted. *Id.* More specifically, Boyar & Miller argued that the clients' claims were "based on speculative future events and therefore are not ripe" because "they [were] based on the assumption that their [a]pplications will be denied solely on the ground that they are untimely…" *Id.* at *14-*15. Thus, Boyer & Miller contended that the clients had "not exhausted their administrative remedies in an attempt to adjust their status" and that, should the clients appeal the decision, a "reviewing court

may conclude that the [a]pplications were timely" and therefore, the clients' malpractice claims were not ripe. *Id.* at \*15.

In response, the clients in *Garcia* contended that their malpractice claims were ripe and not hypothetical because, notwithstanding what any administrative agency or reviewing court may conclude, as a result of Boyer & Miller's conduct "there is very little likelihood that [they] will ever obtain permanent residency or United States citizenship, [they] can expect to be deported, and [they] must begin the application process anew, **facing the long delays and improbabilities that accompany the process.**" *Id.* at \*18 (emphasis added). The *Garcia* court rejected Boyer & Miller's ripeness and failure-to-appeal argument, stating "plaintiffs have alleged that they will be unable to **cure insuperable impediments** to obtaining lawful permanent residency through the administrative process, except by remaining outside the United States for ten years and initiating the adjustment process anew." *Id.* at \*20-\*21. Thus, the delay caused to the clients was sufficient to demonstrate ripeness of clients' claims. *Id.*

Just as the plaintiff in *Vanderweyst*, Plaintiffs' have lost the benefit and opportunity to pursue their claims in the United States in a timely fashion. "The loss of that benefit, whatever it may ultimately be determined to be worth, constitutes the first of [the plaintiff's] pled injuries." *Vanderweyst*, 2003 Tex. App. LEXIS 8549, at \*14. Moreover, similar to the clients in *Garcia*, Plaintiffs will suffer long delays in the resolution of these claims in Mexico, if any, and the "improbabilities that accompany the process" of refiling the claims in Mexico or proving their claims through Mexican discovery rules. *Garcia*, 2007 U.S. Dist. LEXIS 63432 at \*20-21.

Caselaw outside Texas on ripeness of legal malpractice claims is consistent with the Texas law cited by Plaintiffs' herein. For instance, the Connecticut Supreme Court case *Mayer v. Biafore, Florek & O'Neill*, 245 Conn. 88, 89 (Conn. 1998) is directly on point and supports

Plaintiffs' common-sense argument that one does not need to file clearly barred underlying claims prior to instituting a malpractice case. The sole issue in *Mayer* was nearly identical to the issue at hand: whether the plaintiff "must obtain a judicial determination that the statute of limitations bars his claim for uninsured motorist benefits before he can bring th[e] legal malpractice action against the [the defendant lawyers]." *Id.* at 89. The court echoed Plaintiffs' contentions in this case: "there is no need for a prior determination that the statute of limitations has run as a condition precedent to the plaintiff pursuing th[e] case." *Id.* at 93.

In *Mayer*, the client sued the lawyers alleging that they failed to file an action against his automobile insurance carrier, Aetna, for uninsured motorist benefits. *Id.* The lawyers, like Defendants in this case, argued that the claims were not ripe because, if the client continued to pursue the underlying claim, "he still might prevail in an action against Aetna for uninsured motorist benefits." *Id.* at 90. More specifically, the lawyers asserted the same "we don't know what a court will do" argument that the Defendants argue herein:

> [T]he defendants argue that Aetna may choose not to raise the statute of limitations as an affirmative defense. Therefore, they contend that until a court determines, after the statute of limitations defense is asserted by Aetna, that the statute of limitations has run, the plaintiff's malpractice action against the defendants is not ripe for adjudication.

*Id.* at 91. The trial court granted the motion and the appellate court affirmed concluding that "because the plaintiff's claim against Aetna has not been adjudicated, and consequently no determination has been made that the plaintiff is time barred from pursuing his claim against Aetna, no actual controversy exists between the parties in this dispute." *Id.*

In reversing the trial court and the court of appeals, the Connecticut Supreme Court held that an "antecedent determination by a court that the plaintiff's uninsured motorist action against

Aetna is time barred is unnecessary…" *Id.* Through well-reasoned analysis equally applicable to this case, the *Mayer* court explained:

> The fact that the defendants contest the issues of causation and damages does not require the plaintiff first to file an action against Aetna. Merely because the issues in this case concern claims between a party and a nonparty does not require such an action. To require the plaintiff to obtain a separate ruling that his uninsured motorist action is time barred does not further judicial economy… All legal malpractice cases are based on underlying rights, for which the plaintiff originally sought legal representation. To require that the underlying dispute as to those rights, in all cases, must be completely resolved prior to bringing a malpractice action would unduly restrict the plaintiff's remedy against the allegedly negligent lawyer. **Here, because the trier of fact hearing the plaintiff's malpractice case must determine, on the basis of proper instructions as to the law [i.e. expert testimony], whether an uninsured motorist action is time barred, there is no need for a prior determination that the statute of limitations has run as a condition precedent to the plaintiff pursuing this case.**

*Id.* at 92 (emphasis added). Thus, the *Mayer* court rejected the ripeness contentions and reversed the lower courts. *Id.*

The same rationale applies to this case. Defendants argue, without citing a single Mexican legal authority, that the present claims are not ripe because Plaintiffs may still be able to file their claims in Mexico and there has been no determination that the claims are actually barred by limitations. Yet, Plaintiffs contend that these claims may not be refiled in Mexico due to the negligence of Defendants because, among other things, the claims are barred by limitations. Consistent with *Mayer*, "the trier of fact hearing the plaintiff's malpractice case must determine," supported by the proper expert testimony, "whether [the underlying] action is time barred, [and] there is no need for a prior determination that the statute of limitations has run as a condition precedent to the [Plaintiffs] pursuing this case." *Id.*; *See also Finch v. Tooher,Wocl & Leydon, LLC*, 2010 U.S. Dist. LEXIS 136958, at *3 (D. Conn. Dec. 28, 2010)(client's malpractice case against lawyer was ripe even while underlying suit was still pending, noting that "[a]lthough the resolution of the [underlying case] may have an impact on the quantity of

damages [the client] may be able to recover from the firm, this suit is nevertheless still ripe for review now."); *Augman v. Colwart*, 874 So. 2d 191, 194 (La.App. 1 Cir. Feb. 23, 2004)(client's claim against attorney was ripe even though underlying case had not yet gone to trial); *In re Street*, 283 B.R. 775, 777 (Bankr. D. Ariz. 2002)(client's claim against lawyer for failing to properly prepare deed of trust was ripe even though a separate lawsuit relating to the appropriateness of the deed of trust was pending because client incurred costs in remedying lawyers' errors); *Schaeffer v. Kessler, Civ. No. 12-8576 PKC*, 2013 U.S. Dist. LEXIS 38781, 2013 WL 1155587, at *11 (S.D.N.Y. March 20, 2013)(legal malpractice claim against attorney for drafting fraudulent contracts was "ripe for adjudication" even though attorney had filed suit to enforce those contracts because and "even if not all of the possible damages resulting from his alleged malpractice have materialized.").

Legal malpractice cases are unique in the ripeness context because they necessarily require the fact finder to consider a hypothetical set of facts to establish causation. *See Alexander*, 146 S.W.3d at 122 (requiring fact finder to decide what a judge would have decided in the underlying case under hypothetical circumstances). "[B]ecause of the backward-looking nature of a legal malpractice claim, the question [of causation] is posed in a merely hypothetical sense…" *Wonders v. Johnson*, 2013 Tex. App. LEXIS 8750 (Tex.App. – Houston [1st Dist.] July 16, 2013, no pet.)(citing *Gunn v. Minton*, 133 S. Ct. 1059, 1068 (U.S. 2013)). With causation in a legal malpractice case "posed in a merely hypothetical sense", Plaintiffs may demonstrate what would have happened had their underlying claims been properly prosecuted through expert testimony. *Alexander*, 146 S.W.3d at 122. Indeed, as noted by the Texas Supreme Court in *Alexander*, it is this very expert testimony that converts proximate causation in a malpractice case from mere speculation to reasonable legal probability. *See Id.* at 120 ("without competent

expert testimony in a trial malpractice case demonstrating that the result of the underlying proceeding would have been different but for the alleged negligence, the factfinder would be compelled to speculate as to proximate causation.")(internal quotations omitted).Plaintiffs' claims in this case became ripe when the case was dismissed from the United States thereby subjecting Plaintiffs' to the detriments of a Mexican court[11] and, further, after Defendants failed to prosecute Plaintiffs' Mexico cases diligently and in good faith thereby causing the statutes of limitations to lapse on Plaintiffs' Mexico claims.[12] *See Vanderweyst*, 2003 Tex. App. LEXIS 8549, at \*4. Simply put, Plaintiffs' have alleged *some* injury – their lost benefit – which is already established and concrete and Plaintiffs are not required to re-file clearly barred claims in Mexico.[13] *See Id.* at \*14; *Garcia*, 2007 U.S. Dist. LEXIS 63432 at \*20-21; *Mayer*, 245 Conn. at 89.

C. **THE LOSS OF PLAINTIFFS' JONES ACT AND GENERAL MARITIME CLAIMS CONSTITUTE FURTHER INJURY.**

As discussed above, the dismissal of Plaintiffs' Jones Act claims was not interlocutory; it was final when the entire United States lawsuit was dismissed. This final dismissal of Plaintiffs' United States lawsuit caused the loss of their Jones Act and general maritime law claims. Defendants contend that Plaintiffs' damages relating to the loss of these claims does not constitute injury because (1) the claims were dismissed without prejudice and may be refiled pursuant to the "return jurisdiction" clause should a Mexico court decline jurisdiction; and (2) the Jones Act claims are inapplicable to Plaintiffs – Mexican nationals – because Plaintiffs have a remedy under Mexican law.[14] Both arguments are unavailing.

---

[11] *See, generally,* Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[12] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 12-13.
[13] *See, generally,* Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[14] ARNOLD & ITKIN REPLY, at p. 9-10.

First, Plaintiffs cannot now file their case in Mexico.[15] While Plaintiffs' pleadings are sufficient to demonstrate this fact, Plaintiffs have retained Mr. Dahl and Mr. Muria, the two aforementioned Mexican law experts, to shed further light on this subject.[16] Mr. Dahl is licensed and has been admitted to practice law in Texas, New York, Washington, D.C., Buenos Aires, Argentina and Madrid, Spain.[17] Mr. Dahl holds a J.D. and an LL.D. degree from Buenos Aires University, an L.L.M. from London University and is an expert in the field of comparative law.[18] Although Mr. Dahl is not licensed in Mexico, he was an adjunct professor of Mexican law at SMU school of Law and since 1993 has undertaken a "deep and continuous study of how [forum non conveniens] interacts with legal systems in Latin America, including Mexico…"[19] As the Secretary General of the Inter-American Bar Association and General Editor of its Law Review, Mr. Dahl has consulted with and studied among Mexican Bars and Mexican attorneys on a variety of issues of Mexican law.[20] Mr. Dahl supports his opinions in the joint affidavit through testimony from Mr. Muria, a practicing Mexican attorney and law professor at the University of Guadalajara who teaches, among other subjects, conflict of laws.[21]

It is Mr. Dahl and Mr. Muria's opinion that Mexico would not accept jurisdiction of this case.[22] It is Mr. Dahl and Mr. Muria's further opinion that, due to Defendants' delay, any opportunity for Plaintiffs to refile these claims in Mexico has now passed and the claims are barred by limitations.[23] This is one of the reasons why a Mexico court would not accept

---

[15] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[16] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 1.
[17] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 1.
[18] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 1.
[19] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 1.
[20] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 1.
[21] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 2.
[22] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 4-10.
[23] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 11-13.

jurisdiction of these claims even if they were to be refiled.[24] Moreover, the "return jurisdiction" clause does not then permit Plaintiffs to refile the case in the United States because Judge Ward conditioned the continued jurisdiction on Defendants' good faith effort to prosecute the cases in Mexico:

> Should the courts of Mexico refuse to accept jurisdiction of any of these cases for reasons other than Plaintiffs' **refusal to pursue an action** or to **comply with the procedural requirement of Mexican courts**, this Court may reassert jurisdiction upon timely notification of the same.[25]

Plaintiffs contend in their pleadings (and as supported by the affidavit of Mr. Dahl and Mr. Muria) that the Defendants' "refusal to pursue the action" in Mexico caused the claims to be forever barred in Mexico by limitations.[26] At this stage, the Court must take these allegations as true unless Defendants can conclusively rebut them and show that, even on the face of the pleadings, the court is deprived of jurisdiction. *Brenham Hous. Auth. v. Davies*, 158 S.W.3d 53, 56 (Tex. App. – Houston [14th Dist.] 2005, no pet.). Defendants' have failed to do so and their conclusory, self-serving and unsupported arguments that the claims are *not* barred in Mexico or that a federal court *will* still accept jurisdiction despite their own lack of diligence are conclusory and unmeritorious.

With the Jones Act and general maritime claims clearly barred to refiling, the issue becomes whether they would have been successful. In their petition, Plaintiffs allege that the Defendants "failed to allege that there was no available remedy in Mexico, as required to pursue a federal maritime claim under the Jones Act."[27] These allegations must be taken as true. *Davies*, 158 S.W.3d at 56. Defendants argue in their Reply that Plaintiffs have not suffered an injury because

---

[24] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[25] *See* PLAINTIFFS' RESPONSE, at Exhibit A, p. 27 (emphasis added).
[26] *See* PLAINTIFFS' SECOND AMENDED PETITION, p. 11.
[27] *See* PLAINTIFFS' SECOND AMENDED PETITION, p. 11.

Plaintiffs allegedly have a remedy under Mexican law and, if they do not, Plaintiffs may refile these claims in federal court.[28] This argument ignores the reality of the situation.

It is Plaintiffs' contention as set forth in the pleadings that they have no remedy in Mexico.[29] This contention is supported by the opinions of Mr. Dahl and Mr. Muria, experts in this field.[30] Even if a Mexico court rejects jurisdiction, Plaintiffs could not refile their Jones Act and maritime claims in the district court because these claims were finally dismissed on April 20, 2011 when Judge Ward entered the order dismissing the case on *forum non conveniens* grounds. *See Koke*, 730 F.2d at 214. "The pertinent statutes of limitations provide that claims under the Jones Act and general maritime law are time-barred unless commenced within three years from the day the cause of action accrued." *Jones v. Tidewater Marine LLC*, 262 Fed. Appx. 646, 648 (5th Cir. La. 2008)(internal quotations omitted). Thus, even taking the April 20, 2011 dismissal date as the date when limitations would begin accruing, Plaintiffs' Jones Act and general maritime law claims were barred by April 20, 2014. *See Id.*

The wavier of limitations executed by Defendants is immaterial and did not act to toll these claims. First, the underlying defendants only agreed to waive limitations in the event that Plaintiffs refiled the case in Mexico, not the United States.[31] Moreover, this waiver of limitations would be invalid under Texas and federal law because it was not specific and did not provide for a pre-determined length of time. *See Hoff v. Texas Med. Liab. Trust*, 1998 Tex. App. LEXIS 2219, at *8 (Tex.App. – Austin Apr. 16, 1998, pet. denied)(affirming summary judgment in medical malpractice case on statute of limitations ground because a waiver of limitations was void as against public policy because it was not specific and did not provide for a pre-determined

---

[28] ARNOLD & ITKIN REPLY, at p. 10.
[29] *See* PLAINTIFFS' SECOND AMENDED PETITION, p. 11.
[30] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[31] *See* PLAINTIFFS' RESPONSE, at Exhibit F, p. 1-2.

length of time). Plaintiffs' pleadings, which must be taken as true, are sufficient to demonstrate this fact and, even if the damages alleged are speculative, this is "fodder for a summary judgment motion, not a dismissal for lack of ripeness in a plea to the [trial court's] jurisdiction." *Vanderweyst*, 2003 Tex. App. LEXIS 8549, at *14-15.

    **D.**    **PLAINTIFFS' PLEADINGS DEMONSTRATE THAT, HAD SUFFICIENT ARGUMENT AND EVIDENCE BEEN PRESENTED IN RESPONSE TO THE *FORUM NON CONVENIENS* MOTION, THE OUTCOME WOULD HAVE BEEN DIFFERENT.**

Plaintiffs allege that, had certain substantive argument and evidence been presented to the underlying court in response to the *forum non conveniens* motion, the Eastern District of Texas federal court would not have granted the *forum non conveniens* motion and allowed, at minimum, Plaintiffs' Mexico claims to proceed.[32] In fact, the Eastern District of Texas did rule differently under similar circumstances when the proper evidence, expert testimony and argument were presented. *Sacks v. Four Seasons Hotel Ltd.*, 2006 U.S. Dist. LEXIS 17768 (E.D. Tex. Mar. 7, 2006).[33] Nonetheless, Defendants argue the *Sacks* opinion is immaterial because the Mexican law experts in *Sacks*, including one of Plaintiffs' experts in this case, Mr. Dahl, were allegedly "discredited, and, in the end, were not relied upon by the court."[34] This statement is completely inaccurate and false.

After the court in *Sacks* denied the defendants *forum non conveniens* motion, the defendants requested the court to reconsider its decision, arguing that one of the plaintiffs' experts, **<u>Mr. Pereznieto</u>**, should be discredited due to alleged fraud in a separate proceeding.[35] The defendants also argued that the opinions of Mr. Dahl, who was a second expert for the

---

[32] PLAINTIFFS' SECOND AMENDED PETITION, p. 8.
[33] This is the same court that granted the motion and dismissed the underlying case because Defendants failed to make these arguments.
[34] ARNOLD & ITKIN REPLY, at p. 14.
[35] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 12.

plaintiffs in *Sacks*, should likewise be discredited because his affidavit was influenced by the opinions of Mr. Pereznieto.[36] Although the Magistrate Judge was not convinced that Mr. Pereznieto's alleged fraud in another case necessitated complete disregard of his opinions, the Magistrate did so out of an abundance of caution.[37] However, despite Defendants' contentions in their Reply, the Magistrate considered the expert opinion from Mr. Dahl reliable.[38]

Specifically, the Magistrate stated "the Court is not convinced Dahl's opinions, as an independent expert on Mexican law, are inextricably linked to Pereznieto's fraud in the Indiana case as to invalidate Dahl's opinions in this case."[39] Thus, the Magistrate Judge specifically considered Mr. Dahl's opinions, including (1) that the effect of *forum non conveniens* violates Mexican law; (2) how after a case is filed in the United States, Mexican jurisdiction is preempted; (3) how procedural rights that may be subject to negotiation in the United States cannot be agreed to by the parties in Mexico; and (4) the lack of jurisdiction over non-residents in Mexico.[40] Mr. Dahl's opinions provided in this case are consistent with those he provided in *Sacks* but are further supported by Mr. Muria, a Mexican attorney and law professor. Thus, the Magistrate found that Mr. "Dahl's affidavit provide[d] adequate support for the Court's conclusion regarding the lack of an available forum in Mexico."[41]

Having considered Mr. Dahl's affidavit, the Magistrate found that Mexico was not an available forum because the claims were barred by limitations and the "tolling statute only applies to lawsuits filed within the territories of Mexico."[42] The Magistrate also relied upon Mr. Dahl's affidavit to conclude that "stipulations made before a United States court to waive the

---

[36] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 13.
[37] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 13.
[38] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 13.
[39] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 13.
[40] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 13-14.
[41] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 14.
[42] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 14.

Mexican statute of limitations are meaningless in Mexico."[43] The Magistrate, citing further to Mr. Dahl's affidavit, also found Mexico to be an unavailable forum because Mexico cannot accept jurisdiction "no matter how adamantly Defendants want to submit themselves to the jurisdiction of the Mexican court…"[44] Simply put, the Magistrate in *Sacks* heavily considered Mr. Dahl's affidavit in affirming her denial of the defendants' *forum non conveniens* motion.[45]

The Defendants in this case argue that the district court in *Sacks* "upheld the denial of the *forum non conveniens* motion in that case, but in doing so the court disregarded the Mexican law opinions Plaintiffs herein attempt to rely upon because of the evidence discrediting them."[46] This is incorrect as the court in *Sacks* affirmed the Magistrate's exclusion of Mr. Pereznieto's opinions but relied on Mr. Dahl's opinions to find that Mexico is not an **available** forum:

> The Magistrate Judge properly removed from her consideration all of Dr. Pereznieto's opinions **and found Nayarit, Mexico is not an available and adequate alternative forum. Each finding, alone, prevents a dismissal of this case.**

*Sacks v. Four Seasons Hotel Ltd.*, 2007 U.S. Dist. LEXIS 98050, at *9 (E.D. Tex. Sept. 10, 2007)(emphasis added). Regardless, the objections to Mr. Dahl's affidavit at issue in *Sacks* – that he relied on a discredited Mexican law expert – are not at issue in this case because Mr. Dahl's affidavit is supported by that of Mr. Muria, a Mexican attorney and law professor.[47]

In further effort to rebut Plaintiffs' inadequate forum argument, Defendants contend that "Plaintiffs do not cite a single case where a court has held that such a waiver of limitations is invalid or unenforceable under Texas or federal law."[48] Yet, Defendants confuse the burden. Plaintiffs' pleadings allege that the waivers of limitations are invalid and these allegations must

---

[43] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 15.
[44] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 15.
[45] Exhibit "B" – *Sacks* June 7, 2007 Report & Recommendation, at p. 13-18.
[46] ARNOLD & ITKIN REPLY, at p. 14.
[47] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[48] ARNOLD & ITKIN REPLY, at p. 15.

be taken as true. *Davies*, 158 S.W.3d at 56. If the waivers are invalid, then Plaintiffs may not refile their claims in Mexico and, as a result, Plaintiffs' claims are ripe.

Defendants further allege that "[c]ourts routinely require defendants who move for *forum non conveniens* to waive statute of limitations defenses as a condition to granting their motion."[49] Yet, the cases cited by Defendants either did not discuss the language of the waivers, *See Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 242 (U.S. 1981), or failed to discuss the validity of the waivers under the foreign law. *See Taylor v. Tesco Corp. (US)*, 754 F. Supp. 2d 840, 849 (E.D. La. 2010). Again, for an agreement to waive limitations it "must be specific and for a predetermined length of time" and "[a] general agreement in advance to waive or not plead the statute of limitations on a particular obligation is void as against public policy. *See Lett*, 2015 U.S. Dist. LEXIS 14627, at \*10, n. 2. Defendants argue that "this Court is not the proper forum to speculate about whether a hypothetical court in Mexico would accept the stipulations filed by the [underlying defendants]."[50] Plaintiffs agree. In this malpractice case it is the *jury* (not this Court) who must decide what a court (Mexico or otherwise) would have done in the underlying case under hypothetical circumstances. *See Alexander*, 146 S.W.3d at 122.

**E.** ***Gunn v. Minton* and *Rangel v. Lapin* support Plaintiffs' position.**

In their Further Reply, Defendants contend that *Gunn v. Minton*, 133 S. Ct. 1059 (2013) and *Rangel v. Lapin*, 177 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) do not support Plaintiffs' position because "both show that … Plaintiffs may not prove causation by offering expert testimony about the hypothetical outcome of the unresolved underlying case."[51] In the same breath, Defendants acknowledge that in *Minton*, the state court was required to decide "the **hypothetical** case within the case" and that, no matter this decision, "the real-world

---

[49] ARNOLD & ITKIN REPLY, at p. 14-15.
[50] ARNOLD & ITKIN REPLY, at p. 16.

result of the prior federal patent litigation will not change."[52] Nonetheless, Defendants contend that *Minton* is distinguishable because the underlying case had been finally resolved and "the final resolution of the patent case was essential to the outcome in *Minton*."[53] Defendants are mistaken.

Just as in *Minton*, Plaintiffs must prove causation in a hypothetical sense because their underlying United States case has been finally dismissed. There is evidence that they may not now be re-filed in Mexico due to, among other reasons, lack of diligence and limitations.[54] The delay in re-filing was caused by Defendants' "refusal to pursue an action" in Mexico and thus, the "return jurisdiction" clause is inapplicable here.[55] With the underlying claims final, the same "hypothetical case within a case" discussed in *Minton* will be applicable. The jury's resolution of the malpractice claim will not reverse "the real-world result" of Defendants' failure to properly handle these claims in the first instance.

Defendants also contend that *Rangel v. Lapin*, 177 S.W.3d 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) "supports the arguments made by Defendants in this suit" *i.e.* that "Plaintiffs cannot use expert testimony to prove causation when they have not, in fact, lost out on the opportunity to proceed with the underlying case."[56] *Rangel* undoubtedly supports Plaintiffs' position because in *Rangel,* the underlying case that the client alleged he lost due to the lawyer's conduct was never even filed. *Id.* at 19-20. In that case, the client was involved in an automobile collision. *Id.* at 19-20. The client hired the attorneys to represent him in a lawsuit against the other vehicles driver. *Id.* at 20. The law firm agreed, but later withdrew from *this* representation after it discovered that no party carried insurance. *Id.* The client then, **<u>without even attempting</u>**

---

[51] *See* BECK REDDEN DEFENDANTS' FURTHER REPLY, p. 1.
[52] *See* BECK REDDEN DEFENDANTS' FURTHER REPLY, p. 2 (emphasis added).
[53] *See* BECK REDDEN DEFENDANTS' FURTHER REPLY, p. 2
[54] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.

**to bring a lawsuit against Honda**, sued the lawyers alleging that their erroneous advice to sell the Honda that he was driving "prevented him from pursuing a products liability case against [Honda] with respect to the Honda Accord's passive restraint system." *Id.*

Although a court was free to consider its own jurisdiction, *See Waco Indep. Sch. Dist. v. Gibson*, 22 S.W.3d 849, 850 (Tex. 2000), the Houston Court of Appeals did not dismiss the malpractice claims as unripe because the lawsuit against Honda had never even been attempted. *See Rangel*, 177 S.W.3d at 20. Rather, the *Rangel* court implicitly indicated that the case *was* ripe for review and acknowledged that "one proves causation in a legal malpractice suit by expert testimony." *Id.* at 22. "Here, the underlying case against Honda required expert testimony, to show that [the client] would have prevailed against Honda, had the suit properly been prosecuted." *Id.* Because the client did not provide expert testimony to support the underlying product liability case, the *Rangel* court held that the client "failed to raise a material fact issue on the suit-within-a-suit causation element of his legal malpractice claim." *Id.* at 23. Like the client in *Rangel* who was not required to file the products liability suit clearly lost by the lawyers' conduct, Plaintiffs are not required to file their clearly-barred claims in Mexico. *See Id.* Plaintiffs need only prove their damages through expert testimony on causation. *Id.* at 22. Defendants' contention that "Mexican courts may accept [Plaintiffs] lawsuit given the waiver of limitations" is immaterial to this Court's jurisdiction. *See Mayer*, 245 Conn. at 92 ("because the trier of fact hearing the plaintiff's malpractice case must determine … whether an [underlying] action is time barred, there is no need for a prior determination that the statute of limitations has run as a condition precedent to the plaintiff pursuing this [malpractice] case.").

---

[55] *See* PLAINTIFFS' RESPONSE TO DEFENDANTS' PLEA TO THE JURISDICTION, at Exhibit A, p. 27 (emphasis added).
[56] *See* BECK REDDEN DEFENDANTS' FURTHER REPLY, p. 3.

**F.** **ABATEMENT IS NOT APPROPRIATE BECAUSE PLAINTIFFS ARE NOT REQUIRED TO FILE THEIR CLEARLY-BARRED CLAIMS IN MEXICO.**

Plaintiffs agree with Defendants that "the viability of the malpractice action depends on the outcome of the underlying litigation."[57] The fundamental disagreement, however, concerns whether the underlying proceedings have been concluded. As discussed above, the underlying claims in the United States reached their conclusion in April of 2011 and Plaintiffs' claims in Mexico are now time barred.[58] Defendants' unsupported assertion that the claims may still be filed in Mexico because of the waivers of limitations are not evidence sufficient to overcome Plaintiffs' pleadings and expert opinions from Mr. Muria and Mr. Dahl. *See In re Manion,* No. 07-08-0318-CV; 2008 Tex. App. LEXIS 6813, 2008 WL 4180294 *7 (Tex. App. – Amarillo Sept. 11, 2008, orig. proceeding) (memo. op.)("statements of counsel are not evidence").

Abating this case would be equal to dismissing it for lack of jurisdiction because either way the Court would be requiring Plaintiffs to re-file clearly time barred claims in Mexico or, subsequently, the federal district court and subject themselves to paying costs of the litigation in Mexico[59] or Rule 11 sanctions. *See Comer v. Interstate United Corp.*, 119 F.R.D. 392, 393 (N.D. Ill. 1988). The mere fact that Plaintiffs are required to carry out this hopeless endeavor rather than immediately purse their claims in the United States – which is what Plaintiffs would have been able to do "but for" Defendants' negligence – underscores the salient fact that Plaintiffs have suffered at least *some* injury as a result of Defendants' negligence. *See Vanderweyst*, Tex. App. LEXIS 8549, at *4. And even a **slight injury** is sufficient for this Court to maintain jurisdiction over these claims. *Id.*

---

[57] ARNOLD & ITKIN REPLY, at p. 16.
[58] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, at p. 13.
[59] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.

Defendants argue that Plaintiffs have failed to offer "any valid reason that this Court should not follow the precedent of *Philips*, *Texas Collegiate* and *Rothrock v. Akin, Gump, Hauer & Feld*, 1994 WL 183318 \*7 (Tex.App. – Dallas 1994, no pet.), which Plaintiffs do not even attempt to distinguish."[60] Yet, as noted in Plaintiffs' Response, the Court need not follow *Texas Collegiate* because in that case it was undisputed that the malpractice claims were premature as the underlying litigation had not concluded. *Tex. Collegiate*, 367 S.W.3d at 465 ("Wolf **does not dispute** that the malpractice claims are premature or that the trial court could have chosen to abate the malpractice claims.")(emphasis added). Here, Plaintiffs' contend that the underlying litigation has, in every practical sense, concluded.

Similarly, the Court does not need to follow *Philips* because, unlike the plaintiff in *Philips* who did not know whether she would incur any tax liability, Plaintiffs have already incurred at least some injury caused by Defendants' negligence. *Philips*, 620 S.W.2d at 751 ("Since it has not been determined whether relator is liable for the taxes in question, she has not been harmed and, therefore, her cause of action has not accrued."). At minimum, Defendants' failure to properly handle the *forum non conveniens* motion injured Plaintiffs by depriving them of their right to initiate their Mexican law claims in the United States where they would not be hampered by the limited-to-non-existent discovery and procedural rules of Mexico.[61] *See Vanderweyst*, 2003 Tex. App. LEXIS 8549, at \*14-15.

As to *Rothrock v. Akin, Gump*, Plaintiffs did not waste the ink to distinguish this case in their initial Response because it is patently distinguishable on its face. The only abatement at issue in that case dealt with an "agreed order which abated the lawsuit so that the proper DTPA notices could be delivered and acted upon." *Rothrock*, 1994 Tex. App. LEXIS 3526 at \*8.

---

[60] ARNOLD & ITKIN REPLY, at p. 18.
[61] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.

Further, the case does not discuss ripeness, and the only issue even remotely relating to jurisdiction concerned the trial court's jurisdiction to grant summary judgment against a party not before the court. *Id.* at \*33 ("it was error to render judgment against him because the trial court lacked jurisdiction over the trustee and his claims."). It is baffling why Defendants even cited *Rothrock* in the first instance.

Defendants' next argue that various "practical concerns" support their abatement request because, if the case is not abated to allow Plaintiffs to refile their claims in Mexico, Defendants would have to inquire "into the advice given by Plaintiffs' current counsel, and whether they bear any responsibility to the extent any of Plaintiffs' underlying claims are 'lost.'"[62] Such arguments are at best red herrings and at worst patently and intentionally misleading. First, the undersigned counsel was not hired to re-file the underlying claims; Defendants were and have had this opportunity since April 2011. Second, it is no secret that Plaintiffs have not refiled their claims in Mexico because they understand (and, in fact, have expert opinion) that these claims are now barred by limitations due to Defendants' gross malfeasance.[63] Defendants do not, as they contend, need to probe into the privileged mental impressions of Plaintiffs' current malpractice counsel to determine why Plaintiffs "are not pursuing th[e] claims in Mexico at all."[64] These claims are barred and were barred prior to the retention of the undersigned counsel or the initiation of this lawsuit months ago. Thus, Plaintiffs' malpractice counsel could in no way "bear any responsibility" for the loss of Plaintiffs' underlying claims. Defendants' threat to seek clearly privileged information is specious.

On the other hand, abating or dismissing this case and requiring another attorney to re-file Plaintiffs' claims in Mexico will exacerbate Plaintiffs' already established injuries by

---

[62] ARNOLD & ITKIN REPLY, at p. 19.
[63] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.

subjecting Plaintiffs to further attorney's fees to pursue these barred claims and, perhaps, costs and sanctions for filing a frivolous lawsuit.[65] In fact, Mr. Dahl and Mr. Muria have opined that "[i]f an attempt were made to file the underlying lawsuit once again in Mexico, it would certainly be dismissed due to the statute of limitations" and Plaintiffs, as the defeated party, "would likely have to pay the adversary's costs, as determined by the Federal Code of Civil Procedure…"[66] Defendants in this case may then have a legitimate responsible third party argument or at least would argue some superseding or intervening cause on the part of the new lawyer, further complicating these matters.

Defendants contend that "[i]t is not appropriate to engage in a battle of experts about what might happen if Plaintiffs were to pursue their underlying claims to resolution."[67] But Defendants know full well that Plaintiffs' underlying claims have been dismissed in the United States and are doomed in Mexico.[68] To quote Kurt Arnold "the chances of the Court accepting the jurisdiction for these cases even after following all steps [and refiling the cases in Mexico] **is remote.**"[69] That is why they withdrew from the representation in October 2014 and "urge[d] [Plaintiffs] to seek the advice of Mexican Counsel concerning refiling these cases in Mexico to see if the Courts will accept jurisdiction consistent with the requirements of the Eastern District of Texas order."[70] Mexican counsel has indicated that a Mexico court will not accept jurisdiction due to Defendants' malfeasance and these claims are ripe for adjudication.[71] Suddenly, after

---

[64] ARNOLD & ITKIN REPLY, at p. 19.
[65] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[66] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl, p. 13.
[67] *See* ARNOLD & ITKIN REPLY, at p. 19.
[68] *See* PLAINTIFFS' RESPONSE, at Exhibit "D" – Arnold & Itkin October 3, 2014 Letter to Clients.
[69] *See* PLAINTIFFS' RESPONSE, at Exhibit "D" – Arnold & Itkin October 3, 2014 Letter to Clients (emphasis added).
[70] *See* PLAINTIFFS' RESPONSE, at Exhibit "D" – Arnold & Itkin October 3, 2014 Letter to Clients.
[71] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.

being sued, Mr. Arnold shamelessly shifts to a contrary position simply because it is convenient.[72]

Causation in malpractice cases are often a "battle of the experts." *See Creech v. Columbia Med. Ctr. of Las Colinas Subsidiary, L.P.*, 411 S.W.3d 1, 14-15 (Tex. App.—Dallas 2013, no pet.)(medical malpractice case); *Morrell v. Finke*, 184 S.W.3d 257, 282 (Tex. App.—Fort Worth 2005, pet. denied) (en banc)(medical malpractice case); *see also Alexander*, 146 S.W.3d at 120. "It is particularly within the jury's province to weigh opinion evidence and the judgment of experts." *Creech*, 411 S.W.3d at 15. In the legal malpractice context, expert testimony is what converts mere speculation as to what would have happened in the underlying case into actual causation. *See Alexander*, 146 S.W.3d at 120. Abating this case to require Plaintiffs to obtain a ruling on whether their Mexican claims are barred would be prejudicial to Plaintiffs as Mr. Dahl and Mr. Muria have opined that "it would be impossible to obtain a Mexican attorney willing to take the underlying lawsuit on a contingency basis since it is so obviously vulnerable to the statute of limitations."[73] Such a course of action would be a waste of judicial resources and significant time, as the federal Mexican legal process can take up to five years.[74] The re-filing serves no legitimate interest and, more importantly, is not required under the law. *See Garcia*, 2007 U.S. Dist. LEXIS 63432, at *18; *Mayer*, 245 Conn. at 92 ("because the trier of fact hearing the plaintiff's malpractice case must determine … whether an [underlying] action is time barred, there is no need for a prior determination that the statute of limitations has run as a condition precedent to the plaintiff pursuing this [malpractice] case.").

---

[72] The Texas Supreme Court has admonished such conduct, stating "for the law to countenance this abrupt and shameless shift of positions would give prominence (and substance) to the image that lawyers will take any position, depending on where the money lies, and that litigation is a mere game and not a search for truth." *Mallios v. Baker*, 11 S.W.3d 157, 163 (Tex. 2000)(internal quotations omitted).

**III**
**CONCLUSION & PRAYER**

At minimum, the lost benefit of pursuing the underlying Mexican law claims in a United States court is at least *some* "concrete injury" which has already occurred and is not contingent on any future event, thereby rendering these claims ripe. *See Vanderweyst*, 2003 Tex. App. LEXIS 8549, at *14-*15. For this reason, and the reasons set forth in Plaintiffs' Response and herein, Defendants' Pleas to the Jurisdiction and Alternative Pleas in Abatement should be denied.

WHEREFORE, Plaintiffs pray that the Court deny Defendants' Pleas to the Jurisdiction and Alternative Pleas in Abatement and grant Plaintiffs any further relief, at law and in equity to which Plaintiffs may show themselves to be justly entitled, to which the Court believes Plaintiffs to be deserving, and for which Plaintiffs will ever pray.

---

[73] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.
[74] Exhibit "A" – Joint Affidavit of Aranau Muria and Henry Saint Dahl.

Respectfully submitted,

**THE KASSAB LAW FIRM**

/ s / David Eric Kassab
**LANCE CHRISTOPHER KASSAB**
Texas State Bar No. 00794070
lck@texaslegalmalpractice.com
**DAVID ERIC KASSAB**
Texas State Bar No. 24071351
dek@texaslegalmalpractice.com
1420 Alabama
Houston, Texas 77004
t.713.522.7400
f.713.522.7410

**DOHERTY✶WAGNER**

/ s / Brett Wagner
**BRETT WAGNER**
Texas State Bar No. 20654270
brett@dwlawyers.com
**LARRY JOE DOHERTY**
Texas State Bar No. 05950000
larry@dwlawyers.com
**RYAN W. SMITH**
Texas State Bar No. 24063010
ryan@dwlawyers.com
13810 Champion Forest Drive, Suite 225
Houston, Texas  77069
t.281 583-8700
f.281 583-8701

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing instrument has been forwarded to all parties pursuant to the Texas Rules of Civil Procedure on this the 31st day of August, 2015.

/s/ David Eric Kassab
David Eric Kassab

# EXHIBIT "A"

## AFFIDAVIT OF ARNAU MURIA AND HENRY SAINT DAHL

WASHINGTON, D.C.        :
        and            : SS
GUADALAJARA, MEXICO:

1.     My name is **Henry Saint Dahl**. I am of age, sound of mind and otherwise competent to sign the present affidavit. As stated with more detail in my resume (attached as **Exhibit 1),** I am an attorney-at-law, having been admitted to the practice of law in Buenos Aires, Argentina (1973), in New York (1982), in Texas (1990), in Madrid, Spain (1991) and in Washington, D.C. (2003). I have also been admitted to the Bar of the U.S. District Court, Northern District of Texas (1996) and to the U.S. Court of Appeals for the Fourth Circuit (1998).

2.     I have a J.D. and an LL.D. degree from Buenos Aires University, where I studied law between 1968 and 1973. I also hold an L.L.M. from London University, where I studied comparative law in 1976-1977. I also hold a post-graduate degree from Leningrad University (now Saint Petersburg University, Russia), where I studied comparative law in 1977-1979.

3.     I have published nine books and approximately forty articles dealing with international and comparative law. Some of these publications deal extensively with forum non conveniens ("FNC" from now on). One of my books, <u>Dahl's Law Dictionary</u> (English and Spanish) (fifth edition, 2010), contains a detailed treatment of Mexican law. During 1997-1998 I was an adjunct law professor of Mexican law at the SMU School of Law. Since 1993 I have undertaken a deep and a continuous study of how FNC interacts with legal systems in Latin America, including Mexico, and in Europe, particularly

1

France. I have been a consultant on the issue of FNC to several Latin American countries, to France and to the Inter-American Juridical Committee. Until recently, as the Adjunct Secretary General and Secretary General of the Inter-American Bar Association (IABA)[1] and as the General Editor of the Inter-American Bar Association Law Review, I have been in contact with Mexican Bars, Mexican attorneys on a variety of issues of Mexican law. I am also very familiar with the Spanish and with the French legal systems, the two main sources of Mexican law.

4.      I have worked extensively on cases dealing with FNC, including Mexico, but these Mexican cases have now ended.. My FNC work as a practitioner and as an academic has always been consistent. My statements are based on my personal knowledge and the translations mentioned below are true and correct.

5.      My name is **Arnau Muria**, I am of age, sound of mind and otherwise competent to sign the present affidavit. As stated with more detail in my resume (attached as **Exhibit 2),** I am an attorney-at-law, admitted to practice in Mexico and in good standing.

6.      Since 2004 I have been a law professor at the University of Guadalajara where I teach, among other subjects, conflict of laws. Since 2003 I have worked as an attorney in Guadalajara, in matters related to litigation, to foreign investments and other legal areas.

---

[1] The IABA was founded in 1940 to promote the rule of law and the administration of justice throughout the Americas and to advance the science of jurisprudence, particularly the study of comparative law. It is headquartered in Washington, DC and it has branches and chapters throughout the Americas, including Mexico. More details are available at www.iaba.org

7.      My work as a law professor and as a practitioner has often put me in contact with matters of domestic and international jurisdiction, evidence, and constitutional law among many others.  Because of the nature of my practice and my teaching I am very familiar with Mexican federal law, and the law of the remaining Mexican States, the latter tending to be very uniform. My statements are based on my personal knowledge and  the translations mentioned below are true and correct.

8.      Included in **Exhibit 3** are the pertinent report sections from the Inter-American Juridical Committee (IAJC),[2] an official organ of the Organization of American States, to which both Mexico and the United States are parties.  This report was drafted by Henry Dahl, at the request of the IAJC. Included in **Exhibit 4** are the relevant texts, in their original Spanish, of Mexican Federal  Code of Civil Procedure and of the Federal Civil Code cited in this affidavit.

9.      We have been asked by attorney Lance Kassab, counsel for plaintiffs in *Maria Santos Lopez Dominguez et al. v. Arnold & Itkin, L.L.P. et al.*, and to prepare a report on the effectiveness of the defense against the a forum non conveniens defense, filed in *Maria Santos Lopez Dominguez et al. v. Gulf Coast Marine & Associates et al., Civil Action N0. 9:08-cv-200 (TJW)*, from now on referred to as "the underlying lawsuit".

---

[2] The Inter-American Juridical Committee dates back to the Resolution adopted by the III American Conference held in Rio de Janeiro in 1906. According to the OAS Charter *"The purpose of the Inter-American Juridical Committee is to serve the Organization as an advisory body on juridical matters; to promote the progressive development and the codification of international law; and to study juridical problems related to the integration of the developing countries of the Hemisphere and, insofar as may appear desirable, the possibility of attaining uniformity in their legislation."* (Art. 99). *"The Inter-American Juridical Committee represents all of the Member States of the Organization, and has the broadest possible technical autonomy."* (Art. 102).

3

10. We understand that the underlying events took place in Mexican territorial waters which, from a Mexican point of view, makes Mexican federal law applicable. In order to form an opinion we have studied the following pleadings filed in the underlying lawsuit:

- Plaintiffs' Motion to Reinstate the Case with Exhibits;
- Defendants' Joint Response In Opposition to Plaintiffs' Motion to Reinstate Case;
- Plaintiffs' Reply In Support of Motion to Reinstate Case;
- Defendants' Joint Sur-Reply In Opposition to Plaintiffs' Motion to Reinstate Case;
- Judge Clark's May 29, 2009 Order Re: Motions to Dismiss For Forum Non Conveniens;
- Judge Ward's Memorandum and Order Dismissing the Case;
- Judge Ward's Order Dismissing the Case;
- Judge Marcia A. Crone May 14, 2014 Memorandum and Order.

11. We have reviewed the relevant Mexican law, particularly the Mexican Federal Code of Civil Procedure; the Federal Mexican Civil Code; and the Mexican Federal Constitution.

12. We find that the following arguments could have been raised in the underlying case.

## I.  Mexico Is Not An Available Forum

13. We are not aware of any Mexican judgment that knowingly accepts the filing of a lawsuit pursuant to a FNC dismissal. FNC is an unknown concept in Mexican law. The effects of FNC violate Mexican law not only in a strictly juridical sense, but also politically.[3] Since the effects of FNC are illegal in Mexico, no jurisdiction attaches

---

[3] FNC is perceived throughout Latin America as "judicial imperialism" where a court of country A determines what will happen in the courts of country B, as the following indicates: "*Sovereignty. It is injurious for a country that a foreign judge unilaterally imposes the commission of certain procedural acts in such country, for instance the filing of a claim*." (1999 IAJC Report, at p. 3, see **Exhibit 3**).

4

pursuant to a FNC dismissal. The Mexican judge cannot provide help in violating his own legal system. Consequently, Mexico is not an alternative jurisdiction.

## II.  Preemptive Jurisdiction

14.  The theory of preemptive jurisdiction, known as *competencia preventiva,* is deeply rooted in Mexican law. Even if Mexico had had concurrent jurisdiction, once one court issues summons, the jurisdiction that the other court might have had is dissolved. Therefore, no alternative court remains.

15.  This principle is established in the Federal Code of Civil Procedure, which states in its pertinent part as follows:

> **Article 328**.- The effects of summons are:
> I. To <u>preempt</u> the lawsuit in favor of the issuing court.
> II. To <u>bind</u> the defendant to follow the lawsuit with the court that summoned him, if it had jurisdiction at the time of issuing the summons.
> [...] (Emphasis added. See **Exhibit 4** for the original Spanish text).

16.  Further, supervening changes that take place after the issuance of summons, do not alter the jurisdiction acquired through summons:

> **Article 12**.- Changes in factual situations, that take place after the issuance of summons, do not change jurisdiction. (See **Exhibit 4** for the original Spanish text).

17.  Thus, under Mexican law, the filing before the U.S. Court preempts Mexican jurisdiction.

18.  The 2000 IAJC Report describes the impact of preemptive jurisdiction on a filing resulting from an FNC dismissal as not generating jurisdiction in the Mexican court.

> "Even when there is concurrent jurisdiction, the claim filed before one court extinguishes the jurisdiction of the other court." (At pp. 2 - 3, see **Exhibit 3**).

k

5

19. The principle of preemptive jurisdiction is uniformly followed in Mexico, and it applies to international as well as to domestic cases. The Supreme Court of Mexico issued a ruling in 1989, concerning conflict of jurisdictions between two Mexican States, but equally applicable to international cases since the Mexican norms in question are the same. In this decision, attached as **Exhibit 5**, the Supreme Court held that "*jurisdiction shall lie in the defendant's domicile* [...] *if there were several defendants with different domiciles, the procedural rules* [of Mexican States] *agree that the court of the domicile of one of the defendants, as chosen by plaintiff, shall have jurisdiction.*" The Supreme Court concludes by holding that "*when jurisdictional rules grant jurisdiction to several courts, the one hearing the case first shall preempt the others.*"

### III.   Mexican Procedural Law Tends to Be Nonnegotiable

20. Mexican law, including of course its notion of jurisdiction, cannot be modified by stipulations, as the Federal Code of Civil Procedure states:

> **Article 3.-** The reciprocal relationships between the parties, inside the proceeding, with their respective rights and duties as well as terms, challenges, and all types of measures that this Code grants, the parties, their actions in the case, cannot be modified, in any way, due to laws or statutes relative to the way of operating, or by one of the parties being special, whether plaintiff or defendant. At any rate, the principle of equality between the parties must be observed within the proceeding, even if the parties' role becomes inverted during the case. (Emphasis added). (See **Exhibit 4** for the original Spanish text).

21. Accordingly, stipulations made before a U.S. court are completely meaningless in Mexico:

> "The promises made to a foreign court [e.g. a U.S. Court] about the wish to submit to a Latin American jurisdiction do not generate jurisdiction in Latin America. Such promises, regardless of how sincere, are procedurally irrelevant." (1999 IAJC Report, at p. 7, see **Exhibit 3**).

6

22.     Due to the above, the underlying Defendants' consent or submission to the Mexican legal system in the underlying lawsuit would not confer jurisdiction to Mexican courts.

## IV.     Jurisdiction in Defendant's Domicile

23.     Mexican law determines that jurisdiction in a personal action lies in the defendant's domicile.

> **Article 24.-** Territorial jurisdiction is determined by
> [...]
> **IV.** The defendant's domicile for real actions over chattels, or personal actions, or class actions or those referring to civil status.
> [...] (See **Exhibit 4** for the original Spanish text).

24.     Mexican law does not go into determining by itself where precisely that domicile is located in the given foreign country, what venue rules it may trigger, etc. Mexico refers to defendant's country, allowing such country to apply its internal rules in determining the location of the domicile in question and its jurisdictional significance. Obviously, Mexican law does not, and could not, impose jurisdiction on such foreign country. Said Article 24 becomes operative if the foreign country has jurisdiction according to its own legal system.

## V.  Mexico's Policy

25.     Mexico does not have any law, interest or policy which prevents its nationals from reaching to a judicial system abroad and benefit from the advantages offered by the legal system of that forum.

26.     To the contrary, Mexico has a long history of supporting its nationals when asserting their rights in foreign tribunals. For instance, Mexico adhered, on March 23, 1991, to the **United Nations International Covenant on Civil and Political Rights**.

7

Under Articles 14 and 26 of the Covenant, our nationals are entitled to avail themselves with the rights and remedies afforded by laws of a foreign forum that is a party to the Covenant, just as foreign citizens would be entitled likewise to the rights and remedies afforded by Mexican laws. The United States adhered to said treaty on June 9, 1992[4]. Said articles 14 and 26 state as follows:

> **Article 14**
> 1. All persons shall be equal before the courts and tribunals. […]
>
> **Article 26**
> All persons are equal before the law and are entitled without any discrimination to the equal protection of the law. In this respect, the law shall prohibit any discrimination and guarantee to all persons equal and effective protection against discrimination on any ground such as race, colour, sex, language, religion, political or other opinion, national or social origin, property, birth or other status[5]. (Emphasis added.)

27.  This goes a long way into explaining why a Mexican court would not take kindly to the argument of "less deference" being accorded to a Mexican plaintiff because he resides in Mexico. In fact, if a Mexican judge accepted that posture he or she would be violating the Mexican Constitution[6], which states as follows:

> **Article 1**. Every person in the United Mexican States shall enjoy the guarantees granted by this Constitution, which cannot be restricted or suspended except in such cases and under such conditions as are herein provided. (See **Exhibit 4** for the original Spanish text).

28.  Just as the U.S. and most countries in the world, Mexican law grants supremacy to international treaties, i.e. the International Covenant of Political and Social Rights. A Mexican judge who knowingly accepted jurisdiction based on "less deference"

---

[4] In https://treaties.un.org/pages/viewdetails.aspx?chapter=4&src=treaty&mtdsg_no=iv-4&lang=en it can be seen that both, Mexico and the USA are parties to this Convention.

having been granted to a Mexican litigant by a foreign court would be violating Article 1 of the Mexican Constitution, as well as many of the other Mexican rules explained in this opinion. In other words, absolute procedural equality is a constitutional right in Mexico, which clashes with the "less deference" theory. This is another reason why Mexico is not an alternative forum.

## VI.  Mexican Rejection of FNC Does not "Trump" or "Antagonize" US Law

29.  FNC is a highly technical issue where Comparative Law and Conflict of Laws converge. As many other topics, a political angle could or could not be added to it. In Latin America, including Mexico, FNC usually causes problems of illegality, loss of evidence and a score of other practical obstacles which, strictly speaking, are not more convenient for reaching a decision on the merits.

30.  When these obstacles are raised in opposition to FNC, sometimes the reply by FNC proponents is more political than legal:

> One often hears replies such as: it would be impermissible to allow the law of country X to trump American law in an American court, or that it would be absurd for country Y to dictate to this court whether to apply FNC or not. This argument is misplaced. FNC explicitly refers to the foreign legal system. It is not that the law of Paraguay, for example, "invades" US law or "prevents" American law from being applied. Quite to the contrary, US law expressly calls for the application of the foreign legal system concerned.
> American law is not challenged or antagonized by a foreign system that becomes applicable by express mandate of American law. Those who state the opposite are confusing the status of an invitee with that of a trespasser. (See Dahl, H. S.

---

[5] In http://www.ohchr.org/en/professionalinterest/pages/ccpr.aspx the whole Convention is available.
[6] Article 1 also bans any discrimination based on nationality. See **Exhibit 4**.

9

Forum Non Conveniens, Latin America and Blocking Statutes[7], 35 Inter-American Law Review, 44 (2003).).

31. As stated in a US federal case, also representative of Mexico:

Implied in defendants' argument that Costa Rican law should not be able to dictate to American judges what cases they must hear, is the notion that it is simply unfair that Costa Rica can take a position that undercuts American forum non conveniens law, and thus "dictate" what cases they must hear. However, it should be emphasized that this Court could never reach the forum non conveniens issue if it had not first been established that it is fundamentally fair for this action to proceed in this Court. (See *Lucas Pastor Canales Martinez et al. v. Dow Chemical Company, et al.*, 219 F. Supp. 2d 719; 2002 U.S. Dist. LEXIS 13481, at p. 9).

32. The above helps understanding why Mexico never was an alternative forum in the underlying lawsuit.

## VII. Mexico Is Not an Adequate Forum

33. Mexico's evidentiary law is remarkably weak when compared to the U.S. legal system. For instance, Mexico has no discovery and no depositions. When filing a lawsuit the plaintiff has to produce all the documentary evidence, and without discovery:

**Article 323.**- Together with the claim, plaintiff must file the documents on which the action is based. If he did not have them, he must indicate the archive or place where the originals are so that, at his expense, a copy of those documents be made, as determined by law, before the claim can be admitted. It is understood that the claimant has the documents available, provided that he can legally request an authorized copy of the originals. (See **Exhibit 4** for the original Spanish text).

34. Mexican law is very clear in the sense that documents found after the lawsuit is filed, are inadmissible:

**Article 324.**- Together with the claim all documents held by plaintiff, and which he means to rely on, must be filed and, those presented later, in violation of this rule, shall not be admitted. [...](Emphasis added. See **Exhibit 4** for the original Spanish text).

---

[7] In http://repository.law.miami.edu/cgi/viewcontent.cgi?article=1189&context=umialr the complete article is available.

35. Mexican law knows, of course of testimonial evidence. But this takes place in open court, without the possibility of having interrogated the witness previously. Further, Mexican law does not admit requests to produce documents by abstract categories. As Article 323 of the Federal Code of Civil Procedure states, if the plaintiffs is not in possession of the documentary evidence, he must *"indicate the archive or place where the originals are."*

36. Even the testimonial evidence available in Mexico is severely limited:

**Article 166.-** A party can only present up to five witnesses for each fact, except express legal rule to the contrary. (See **Exhibit 4** for the original Spanish text).

37. This means that, in a case where plaintiff needs to prove some type of engineering malfunctioning, for instance if a valve failed to operate as intended to, and the defendants are in the U.S., the support afforded by Mexican evidentiary rules is close to zero. X. Mexican law completely rejects any American type of discovery. That is why the Federal Rules of Civil Procedure have incorporated the following article that effectively bans any type of U.S. discovery from Mexican soil:

**Article 561.-** The duty to produce documents and objects in proceedings taking place abroad shall not include the one to produce documents or copies of documents identified by generic characteristics.
In no way can a national court order or carry out a general inspection of archives that are not of public access, except in cases allowed by national laws. (Emphasis added. See **Exhibit 4** for the original Spanish text).

38. For such reasons, stipulations agreeing *"to submit to discovery in the Mexican forum in accordance with the procedural rules of the Mexican court"* are nonsensical since there is no discovery in Mexico. Stipulations agreeing to *"make all relevant witnesses and documents available in Mexico, to the extent consistent with*

11

*Mexican law"* are not really an advantage since Mexican law is, as shown above, very restrictive.

39.     Leaving evidentiary issues behind, Mexico is also an inadequate forum since lawsuits in Mexico take considerably longer than what they would in the U.S. International service of process, for instance, against several defendants residing in various U.S. states, could take between one and two years. Reaching a final decision could take five or six years.

### VIII.    Statute of Limitations

40.     The Mexican statute of limitations applicable to torts is of two years, as determined by the Mexican Federal Civil Code:

> **Article 1161**.- A two-year term applies to the statute of limitations concerning:
> [...]
> V. Civil liability emerging from torts ;
> The statute of limitations begins to run as from the day when the acts in question were committed. (See **Exhibit 4** for the original Spanish text).

41.     The Civil Code also establishes that the statute of limitations comes into effect automatically, without the need of any act in particular:

> **Article 1158**.- The statute of limitations accrues by the mere passage of the time determined by law.  (See **Exhibit 4'**for the original Spanish text).

42.     As stated above, in Mexico the statute of limitations for torts is of two years. The accident in question took place in 2007. Therefore the underlying action  is already time barred in Mexico.

43.     The statute of limitations, once accrued, provides an unbeatable defense, so strong that it is constitutionally protected, in a way akin to due process in the U.S. In this sense the Mexican Federal Constitution states as follows:

12

> **Article 14.** [...]
> Nobody can be deprived from his freedom or of his property, possessions or rights except with a lawsuit followed before pre-established courts and <u>according to the Laws</u> in place before the acts in question. [...] (Emphasis added). (See **Exhibit 4** for the original Spanish text).

44.     As explained below, neither the Mexican filing, nor the filing of the underlying lawsuit in the U.S. can toll the action in Mexico. In this respect the Mexican Federal Civil Code states :

> **Article 1168.**- The statute of limitations is tolled :
> I. [...]
>      II. By the filing of a lawsuit or any other claim before a judge, served to the person in possession or to the debtor, as the case may be;
> It will be considered that the action is not tolled through a judicial claim if the plaintiff nonsuits it, or if the claim were dismissed. (See **Exhibit 4** for the original Spanish text).

45.     We understand that, in the underlying case, the claim that was filed in Mexico where: **a)** it was not served on the defendants and, **b)** it was dismissed. For any of these two reasons, and with greater reason for both, the Mexican filing did not toll the statute of limitations, as determined by the said Article 1168.

46.     Since the underlying lawsuit was also finally dismissed by the American Court, such U.S. filing cannot be raised in Mexico as having tolled the action.

47.     If an attempt were made to file the underlying lawsuit once again in Mexico, it would certainly be dismissed due to the statute of limitations, as explained above. Further, the defeated party would likely have to pay the adversary's costs, as determined by the Federal Code of Civil Procedure:

> **Article 7.** The losing party must pay the adversary's costs. [...]

13

48.     Further, it would be impossible to obtain a Mexican attorney willing to take the underlying lawsuit on a contingency basis since it is so obviously vulnerable to the statute of limitations.

## IX.     Conclusions

49.     We are of the opinion that the reasons stated above could have been raised before the American court in the underlying lawsuit. We believe that had such defenses been raised, forum non conveniens would not have been granted.

50.     We further think that, strategically, discovery in the U.S. and according to American law would have been the best way to obtain evidence.

51.     We also believe that the underlying lawsuit is irretrievably time-barred in Mexico.

52.     Finally, we are quite certain that no Mexican attorney would be willing to litigate the underlying lawsuit, in Mexico, under a contingency agreement.

53.     Further affiants say naught.


I, **Arnau Muria**, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August __29__, 2015, in Jalisco, Mexico.

I, **Henry Saint Dahl**, declare under penalty of perjury that the foregoing is true and correct.

Executed on August __30th__, 2015, in Washington, DC.

14

# EXHIBIT 1


**Resume of**

**Henry Saint Dahl**

**HENRY SAINT DAHL**
1301 Connecticut Avenue, N.W.
Suite 350
Washington, D.C. 20036
Tel (434) 284-1934

## PRESENT & PAST ACTIVITIES

- *International Legal Consulting*. Consultant to US, European and Latin American law firms in matters of international and comparative law. (2015 -      ).
- *Boudreau & Dahl, Partner*. Washington, D.C.; Dallas, TX. International business law, international litigation, international arbitration. (1990 – 2014).
- *Law Professor*. On international & comparative law, in the US, in Latin America and in France, as described below. (1984 – 2010).
- *Consultant to Foreign and U.S. Governmental Entities.*
- *Associate Attorney*. M&M Bomchil (Argentina), Curtis-Mallet, Prevot & Mosle (N.Y.) (1979 - 1983).
- *Author*. Of legal books and scholarly articles.
- *Latest Positions Held*. President, Inter-American Bar Foundation (2010 – 2013). Secretary General, Inter-American Bar Association (2014 – 2015). Vice President (2012-2013) and President (2014-2015), Inter-American Legal Affairs Committee, Washington, D.C. Bar.

## REPRESENTATIVE WORK

- Handling contractual / governmental aspects of the installation of an oil rig in the South Atlantic.
- Representing a British manufacturer in the sale of aircraft to a Latin American nation.
- International loan agreements, foreign investments, transfer of technology involving US, Latin American and European enterprises.
- US AID - Evaluating project on the Administration of Justice. Assessing and reporting on criminal law systems of Central America.
- Helping a U.S. mining company to establish operations throughout Latin America.
- Consultant to the *Bureau du Droit Européen et International en Matière Civile et Commerciale* (France).
- Opening contacts and negotiating contracts in Europe and in the U.S. for a Brazilian corporation.
- Litigation over lead contamination in Mexico.
- Representing a U.S. TV personality before a French District Court and the Paris Court of Appeals, pleading in French. Case won in both instances.
- Advising a consortium of law firms who obtained the highest settlement in the U.S. for a massive tort committed abroad.

1

- Helping the authorities of Argentina, Costa Rica, Colombia, Uruguay and Venezuela obtain the donation of Swedish software to fight child pornography and human trafficking.
- Consultant to the Inter-American Juridical Committee of the Organization of American States on matters of international litigation (Washington, D.C., Rio de Janeiro).
- As lead attorney, representing a local importer against one of the biggest multinational corporations, obtained the biggest award ever granted for an arbitration in Costa Rica.
- Forum non conveniens litigation in Ivory Coast and Burkina Faso.
- Appearing as an expert on Latin America and on French law in court proceedings throughout the U.S.
- Asbestos litigation in Spain.
- International class actions in Argentina in matters of consumer fraud.
- Lawsuit in the U.S. for environmental contamination in Peru, advising group of U.S. law firms.
- Triggered a $1.8MM donation to the health system of Guatemala by suing the US government due to non-consented experiments on Guatemalan children. http://www.washingtonpost.com/national/health-science/us-pledges-18-million-in-response-tounethical-guatemalan-medical-studies/2012/01/10/gIQAGeXLpP_story.html

## LICENSED TO PRACTICE IN
- *U.S.A.* Washington, D.C. (2003).
- Texas (1990, presently inactive).
- New York (1982)
- *Spain.* Madrid (1991, presently inactive).
- *Argentina.* Buenos Aires (1973, presently inactive).

## FOREIGN LANGUAGES
- *Spanish*, mother tongue together with *English*.
- *French*, fluent.
- *Russian*, fluent.
- *Italian*, fluent.
- *Portuguese*, fluent.

## UNIVERSITY DEGREES
- *LL.D*. *Buenos Aires University, School of Law*, Argentina. (1980).
- *Stazhor. Leningrad University, School of Law,* Russia. (1979).
- *LL.M. London University, King's College*, England. (1977).
- *LL.B. Buenos Aires University, School of Law*, Argentina. (1973).
- *Translator* (legal French). *Buenos Aires University, School of Law*, Argentina. (1972).
- *Translator* (legal English). *Buenos Aires University, School of Law*, Argentina. (1971).

## SCHOLARSHIPS AND DISTINCTIONS
- *Scholarship granted by the British Government* for post-graduate legal studies in England (1976 - 1977).
- *Scholarship granted by the Russian Government* for post-graduate legal studies in the Russia. (1977 - 1979).
- *Scholarship granted by the French Government* for post-graduate legal studies in France. (1977).
- *William Roy Vallance Award*, Inter-American Bar Foundation (2012).

## CONSULTANT TO FOREIGN AND U.S. GOVERNMENTAL ENTITIES
- Congress of Peru, on international litigation, 2015.
- Congress of Brazil, on international litigation, 2010.
- Bureau du Droit Européen et International en Matière Civile et Commerciale (France), on Forum Non Conveniens, 2006.
- Congress of Panama, on international litigation, 2006 – 2007.
- U.S.AID, on improving the business legal system in El Salvador 2003 - 2004.
- Attorney General of Ecuador, on international law, 1999.
- Inter-American Juridical Committee of the Organization of American States, on international litigation, 1999 – 2000.
- Congress of Guatemala, 1997, on international litigation.
- Congress of Costa Rica, 1997, on international litigation.
- U.S.AID, Evaluating project on the Administration of Justice. Assessing and reporting on criminal law systems of Latin America, 1987 – 1988.

## DRAFTSMAN OF LAWS & OTHER STATUTORY MATERIALS
**Brazil** :
- *Bill Determining Damages in International Litigation.*

**Costa Rica**:
- *Law for the Defense of Procedural Rights of Citizens and Residents.* Bill Number 12.655, Unanimous Affirmative Opinion by the Permanent Juridical Committee of the Legislative Assembly of Costa Rica, dated June 10, 1997.

**Dominica**:
- *Transnational Causes of Action (Product Liability) Act 1997.*

**Ecuador**.
- *Interpretative Law of Articles 27, 28, 29 and 30 of the Code of Civil Procedure for Cases of International Concurrent Jurisdiction*, published in the Registro Oficial, 1/30/98, pp. 1 and 2

**Guatemala**:
- *Law for the Defense of Procedural Rights of Nationals and Residents*, enacted on May 14, 1997.

**Honduras**:
- Resolution in the Defense of Legislative Sovereignty, Judicial Independence and Procedural Rights, Honduras Congress, March 1996.

**Model Law / Litigation.**

- *Latin American Model Law on International Litigation*:

**Model Law / Human Rights.**
- *Latin American Model Law on Human Rights.*

**Nicaragua**:
- *Law for the Defense of Procedural Rights of Nationals and Residents in Nicaragua*; bill filed on May 12, 1997.

**Organization of American States**:
- *Proposal for an Inter-American Convention on the Effects and Treatment of the Forum Non Conveniens Theory*. OAS/Ser.Q, CJI/doc.29/99, July 14, 1999.
- *Proposal for an Interamerican Convention on the Effects and Treatment of the Forum Non Conveniens Theory. Forum non conveniens and the Hague Convention. Latin American Position*, OAS/Ser.Q, CJI/doc.2/00, March 3, 2000.
- *Proposal for an Inter-American Convention to Fight the Use of Tobacco. The Use of Tobacco in Latin America and its Possible Control*. OAS/Ser.Q, CJI/doc.1/00, March 3 2000.

**Panama**:
- *Law 32 of June 26, 2006 Establishing Rules for the Resolution of International Conflicts in Matters of Private Law and Determining other Issues.*
- *Bill Amending Law 45 of October 31, 2007, Adding Art. 125 on International Consumer Litigation.*
- Law 19, of February 18, 2008, allowing foreign plaintiffs.

**Parlatino:**
- *Model Law on International Jurisdiction and Applicable Law to Tort Liability.*

**Peru:**
- Draft Law on International Litigation.

## APPEARED AS EXPERT
- **Law of France**. *Express One International, Inc. v. Caisse Nationale de Credit Agricole*. US Bankruptcy Court for the Eastern District of Texas, Sherman Division. Case No. 95-41189. (1999).
- **Law of Ecuador**. *Carlos Zambrano Ferrin et al. v. Million Air, Inc. et al.* Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida. General Jurisdiction Division. Case No. 98-22638 CA 15. (1999).
- **Law of France**. *MGE UPS Systems, Inc. v. Fakouri Electrical Engineering, Inc. et al.* US District Court for the Northern District of Texas, Fort Worth Division. Civil Action No. 4-04CV-445-Y. (2005 - 2006).
- **Law of Venezuela**. *Banco Standard Chartered, S.A. v. Stone Container Corporation*. US District Court, Northern District of Illinois, Eastern Division. Case No. 00-C-0274. Venezuelan law. (2000).
- **Law of The Philippines**. *Antonio Omus v. Royal Caribbean Cruises Ltd.* Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida. General Jurisdiction Division. Case No. 00-7612 CA 21. Law of the Philippines. (2000).
- **Law of Costa Rica**. *Super Helechos, S.A. et al. v. E. I. Du Pont de Nemours & Company, Inc. et al.* Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida. Case No. 01-06932 CA 23. (2001).

4

- **Law of Peru**. *Julio Alberto Lira Garcia v. Ravenscroft Shipping, Inc. et al.* Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida. General Jurisdiction. Case No. 01-6665 CA 04. (2002).
- **Law of Venezuela**. *Carolina Pru Bellorin et al. v. Bridgestone / Firestone Corporation et al.* District Court of Dallas County, Texas, 116th Judicial District. Case No. 02-03033-F. (2002).
- **Law of Panama**. *Central de Finanzas, S.A. v. Bridgefarmer & Associates, Inc.* US District Court for the Northern District of Texas, Dallas Division,. Cause No. 3-01-CV-1841-R. (2002).
- **Law of Honduras**. *Fantome, S.A. et al. v. Sarah Frederick et al.* US District Court, Southern District of Miami. Miami Division "In Admiralty". (2002).
- **Law of Guatemala**. *Margarita Perez Mendez et al. v. Teledyne Technologies, Inc. et al.* US District Court for the Southern District of Texas, Corpus Christi Division. Civil Action No. C-01-226. (2002).
- **International and comparative law**. *Holly Ann Sacks et al. v. Four Seasons Hotels et al.* U.S. District Court for the Eastern District of Texas. Case No. 5:04-cv-073. (2005).
- **Law of Nicaragua**. *Martha A. Downs Callaso, as Personal Representative of the Estate of William Smith, deceased v. Morton & Company et al.* Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida. General Jurisdiction. Case No. 01-10488 CA 02. (2002).
- **Law of Argentina**. Juan Carlos Esteban v. Maria Laura Beade. US District Court. Middle District of Florida. Orlando Division. Case No. 6:03.CV-408-ORL-18-DAB. (2003).
- **Law of Panama**. *Intcomex Holdings, LLC v. Grant Thorton International and Grant Thorton LLP*. Circuit Court of the 11th Judicial Circuit, in and for Miami Dade County, Florida. Case No. 03-03543 CA 06. (2005).


## PUBLICATIONS
**Books**
- *OHADA, Traités, Actes Uniformes et Règlements Annotés*, Paris 2013, 2014. Co-author.
- *Dahl's Law Dictionary*. Spanish - English and English - Spanish. USA, 1992, 1995, 1999, 2010. Available in LEXIS.
- *Dahl's Law Dictionary*. French - English and English - French. 1995, 1998, 2001, 2007 USA, France. Available in LEXIS.
- *Costa Rica, Family and Succession Law.* International Encyclopaedia of Laws, The Hague, 2003. Co-author.
- *McGraw-Hill's Spanish and English Law Dictionary*, August 2003.
- *Legal Accountability for Human Rights Violations in Argentina: One Step Forward and Two Steps Backward*. 8 Human Rights Law Journal, 283 - 477 (1987) [Co-author]
- *Multinational Corporations. Investments, Technology, Tax, Labor and Securities: European, North and Latin American Perspectives*. Co-editor (USA, 1986). Reviewed: Revue International de Droit Comparé (France), April - June

1987, Nr. 2, at p. 517 (by André Tunc).
- ***West's Law and Commercial Dictionary in Five Languages***. English, Spanish, French, Italian and German, in two volumes. Senior editor (USA, 1985). Reviewed: The American Journal of Comparative Law, vol. 34, Summer 1986, Nr. 3 (by Thomas Reynolds). Available in WESTLAW.
- ***Soviet Private Law\**** (Argentina, 1981).

## Articles
- ***Forum Non Conveniens, Latin America and Blocking Statutes***. 35:1 Inter-American Law Review 21 - 63 (2003 - 2004). http://repository.law.miami.edu/cgi/viewcontent.cgi?article=1189&context=umialr
- ***International Commercial Arbitration***. On-Line course for Salamanca University, Spain (2003).
- ***International Torts: A Latin American Point of View***. XXVII (2000) Curso de Derecho Internacional, Inter-American Juridical Committee, Organization of American States, 563 - 578. Corresponding course taught in Rio de Janeiro, Brazil.
- ***The Protection of People, Natural Resources and the Environment Through International Law.\**** XXVI (1999) Curso de Derecho Internacional, Inter-American Juridical Committee, Organization of American States, 359 - 365. Corresponding course taught in Rio de Janeiro, Brazil.
- ***USA: Bankruptcy Under Chapter 11\*\****, 5 International Business Law Journal, 555 - 566 (1992)
- ***The Influence and Application of the Standard Penal Code for Latin America***, 17 American Journal of Criminal Law 235-285 (1990).
- ***U.S. Restrictions on High Technology Transfer. Impact Abroad and Domestic Consequences***. 26:1 Columbia Journal of Transnational Law, 27-52 (1987).
- ***Socialist Law in the Americas. The foreign Trade Point of View***. 3:2 Connecticut journal of International Law, 273 – 309.
- ***Enforcement of American Judgments in Spain***. 5 Boston University International Law Journal, 29 - 57, (1987).
- ***International Commercial Arbitration in Cuba. A Convergence of Soviet and Latin American Trends***. Lawyer of the Americas 441-466 (1984). [Co-author]. Republished in 7 Modern Legal Systems Cyclopedia 66-89 (1985).
- ***Argentina's System of Foreign Investments***. 6 Fordham International Law Journal 33 -71 (1982-83).

## Notes and Translations
- ***Sur un droit européen du contrat***, IABA XL Conference,
- ***French Contract Law – Similarities and Differences with the U.S. System***, Texas Transnational Law Quarterly, vol. 13, No. 4, June 1998, pp. 3 – 9.
- ***Criminal Liability of Enterprises in French Law***, Texas Transnational Law Quarterly, vol. 12, No. 3, October 1995, pp. 46 - 50.
- ***Simplified Corporations in France***, Texas Transnational Law Quarterly, vol. 10,

no. 2, May 1994, pp. 11 -12.

- *France, Latest Developments, Securities Law*, 24:3 The International Lawyer, 817-824 (1990).
- *France, Consumer Law*, 24:1 The International Lawyer, 269 - 274 (1990).
- *France, New Statutes*, 2:1 The International Lawyer, 577-582 (1988).
- *France, Competition* Law, 22:2 The International Lawyer, 217-221 (1988).
- *The Use of Arbitration in Cuba: International Solutions to Solve Domestic Problems*\*. ABA Section of International Law and Practice, *Conferencia sobre Arbitraje Internacional*, 153 -164 (1988). Republished in *Arbitraje Comercial y Laboral en America Central*, ABA Section of Int'l Law and Practice (USA 1990).
- *Argentina: Judgment on Human Rights Violations by Military Leaders. Introductory Note and Translation*. 26 International Legal Materials, 317-372 (1987).
- *Procedural Law, a Latin American Bibliography*. Encyclopedia Britannica (1987)
- *Argentine Draft Code of Private International Law. An Introductory Note and a Translation*. 24 (2) International Legal Materials 269-291 (1985)
- *Enforcing a Foreign Judgment in Spain*. West's International Law Bulletin, 25 (Spring 1984).
- *Telex Contracts in English Law, Place of Formation*. West's International Law Bulletin, 26 (Winter 1984).
- *Latin American Trends in Foreign Sovereign Immunity*. Wests's International Law Bulletin, 24 (Winter 1984).
- *Handbook on International Maritime Law. Argentine Section*. (The Netherlands 1983). [Co-author].
- *Contracts with the U.S. and the U.S.S.R. Six Points of Comparison*\* D. La Ley, 61 (1981), (Argentina).
- *International Commercial Arbitration in the U.S.S.R*. 78 The Law Society's Gazette, 636 (1981), (England).
- *Argentina's New Promotional Mining Regime*. 8 Bulletin of Argentine Legal Development, 1 (1980), (Argentina).
- *Private International Law, a Comparative Glance*\* A La Ley, 812 (1978), (Argentina).
- *One Aspect of the English Common Law, a Divided Profession*\* 54 Juris, 15 (1977), (Argentina).

## Book Reviews
- *Droit des Affaires*. 25 The International Lawyer 295-297 (1991).
- *Economic Integration Among Developing Nations: Law and Policy*. 2 Latin American Legal Link (1987).
- *Legal Aspects of Doing Business in Latin America*. 2 Latin American Legal Link, 35 (1986).
- *U.S. Claims Court Reporter*. West's International Law Bulletin, 16 (Winter 1984).
- *El Derecho en el Socialismo Desarrollado*. 10 Review of Socialist Law, 91

(1984).

**Editorial Work**
- *Latin American Legal Link*, co-founder and editor, (1984-1986).

## LAW PROFESSOR
**USA**
- *Southern Methodist University, School of Law* (Dallas). Adjunct professor of Mexican law. Associate Director of the SMU NAFTA Law Center. (Spring 1997 – 1998).
- *Texas Wesleyan University.* Adjunct professor of Comparative Business Law and of Mexican Law. (Fall 1991 – 1993).
- *University of Texas at Dallas.* Adjunct professor of International Business Transactions. (Summer 1993).
- *Southern Methodist University, School of Law.* (Dallas) Visiting professor.
- International Litigation and Arbitration, Comparative Trade Law. (Spring 1987).
- *University of San Diego, School of Law.* Teaching East/West Trade Law, in Russia and in Poland. (Summer 1986 and 1987).

**Europe**
- *Paris University* (France). American Business Law. (2009 – 2010).
- *Conservatoire National Des Arts et Métiers* (Paris, France). One annual course on American law, to French attorneys. (October – November 1986 – 2007).
- *Paris Bar.* American law, to French attorneys. (October 1993 – 1995.).
- *Université de Cergy-Pontoise, School of Law.* American business law. (October 1995).
- *Université de Bordeaux, School of Law.* Visiting professor. American business law. (Summer 1985).
- *Universidad de Barcelona. School of Law.* Visiting Professor. Russian and American Conflict of Laws. (Summer 1984).

**Latin America**
- *Puerto Rico University, School of Law.* Law Professor, Comparative Business Law, International Business Law, Doing Business in Eastern Europe and Introduction to Law. (Spring and Fall 1989).
- *Sao Paulo University, School of Law* (Brazil). Visiting professor teaching U.S. Business Organizations. (August – September 1986).
- *Buenos Aires School of Law* (Argentina). Adjunct professor of law teaching Commercial Law and Conflict of Laws. (January – December 1975 – 1976.).

## PODIUM
- *The Implementation of the UN Principles on Business and Human Rights in Private International Law*, Swiss Institute of Comparative Law, Lausanne, 10 October 2014.
- *Legal Myths and Reality.* Guatemalan Bar Association, October 23, 2013.

- *Proposed Human Rights Exception to the FSIA*,U.S. Congress, October 8, 2013.
- *International Litigation and Arbitration*, Zaragoza Bar Association, Spain, September 2013.
- *International Commercial Arbitration*, Guatemalan Bar (Guatemala), November 2012.
- *Approaches to International Litigation*, Colombian Bar (Bogotá), November 2012.
- *Model Law for International Litigation in Latin America\*.* 40th IABA Congress, Madrid, Spain, June 24,2004.
- *Amending the Latin American Codes of International Civil Procedure in Matters of International Litigation\**, IABA 39th Conference, New Orleans, June 18, 2003.
- *The Free Trade Agreement Chile - USA*, IABA 39th Conference, New Orleans, June 19, 2003.
- *What To Do (and Not To Do) When a Latin American Case Hits Your Desk*, Inter-American Bar Association, Washington, DC, May 30, 2003.
- *International Business Law and Arbitration*, University of Lima, Peru, May 19 - 20, 2003.
- *How Napoleonic Codes Work*, American Translators' Association, New Jersey, May 5, 2003
- *Legal and Business English\*,* Peruvian-American Chamber of Commerce, Lima, Peru, 3 - 5 March, 2003.
- *Latin America and Blocking Statutes*, University of Miami Law School, March 28, 2003.
- *Cours de Droit des Affaires Américain\*\**, CNAM, Paris, France, October 28-November 25, 2002.
- *Situación Económica en Iberoamérica. Riesgos y Garantías*, Inter-American Bar Association, Granda, Spain, November 15, 2002.
- *Tour d'Horizon du Droit des USA\*\**, CEPRIM, Paris, France, November 23, 2002.
- *Les Sociétés dans le Droit Américain\*\**, Centre de Formation Professionnelle Notariale de Paris, France, November 19, 2002.
- *Enjeux Financiers et Ethique\*\**, Centre National des Professions Financières, Paris, France, November 6, 2002.
- *Lobbying in American Law\**, UCES, Buenos Aires, Argentina, October 10, 2002.
- *Litigation in Cases of International Pollution.* American University, Washington College of Law, June 4, 2002.
- *International Law: Regionalism and Universalism.* Inter-American Juridical Committee, OAS, Rio de Janeiro, Brazil August, 2000.
- *International Law and the Protection of Natural Resources, the Environment and Health* Inter-American Juridical Committee, OAS, July, 1999, Rio de Janeiro, Brazil.
- *Doing Business in Mexico.* Dallas Bar Association. September, 1993.
- *Copyright Protection and Piracy.\** El Salvador Bar Association, San Salvador,

9

September, 1992.

- ***Entering and Remaining in the American Market.**** E.A.D.A. Barcelona, Spain, October 1991.
- ***Legal Aspects of Doing Business with the European Community***. Paper on Merger Control and Competition Law, Dallas Bar Association, International Law Section, January 1991.
- ***New Dimensions in International Trade***. International Trade Summit. (October, 1990, Arkansas).
- ***International Arbitration***. Puerto Rico University School of Law. Co-chairman of conference on The Civil Code Centenary. (November, 1989).
- ***International Solutions to Solve Domestic Problems***. A.B.A. Conference on International Commercial Arbitration. (March 1988, Costa Rica) (Published).
- ***Socialist Law in the Americas***. UCLA School of Law, Conference on Latin American Law. (November 1986). (Published).
- ***U.S. Restrictions on Exports from Third Countries of U.S. Technology***. Madrid University, School of Law (Spain). Private International law convention (May, 1986). (Published).
- ***Reorganization of Multinational Enterprises: Legal and Tax Aspects***. Louisiana State University, Law Center. Co-Chairman of conference. (October, 1984). (Published).

## MEMBER OF
- Inter-American Bar Association, Adjunct Secretary General (2004-2007); Secretary General (2013 - 2015 ).
- Inter-American Legal Affairs Committee of Washington D.C. Bar, Vice-President (2011 - 2013); President (2013 - 2015).
- Founding member of Cercle K-2, a think tank headquartered in Paris, France. https://www.cercle-k2.fr/ (2014 -   )
- ICDR, Neutral's List, Arbitrator (2007 – 2012).
- Russian-American Chamber of Commerce (President 1992 - 1994).
- USA-Argentine Chamber of Commerce (President 1994 - 1996).
- Advisory Council of the Dallas Bar Association, International Law Section (1992 - 1996).
- American Society of International Law (1994 - 2002).

------
\* In Spanish     \*\* In French

# EXHIBIT 2

**Resume of**

**Arnau Muriá Tuñón**

**Arnau Muriá Tuñón**

Bogotá 3155 · Dpto. 301 · Col. Colomos-Providencia · Guadalajara, Jalisco ·
amuria@yahoo.com · 3642.3929

**Law Professor**

University of Guadalajara, Jalisco (2004 -        ). Teaching International Conflict of Laws and International Business Law.

Teaching Citizen's Law at the Master's Program.

**Mexican Senate.**

Advisor to the PRI in legal matters. (2012 -   ).

**Attorney.**

Guadalajara, Jalisco. Administrative law, civil law, litigation, foreign investments. (2003 -   ).

**Staff Attorney.**

Permanent Bureau at The Hague Conference of Private International Law. Working on matters of International Conflict of Laws, International Procedural Law, and Family Law. The Hague, Holland (2000 – 2003).

**Associate Attorney.**

At the law firm of García Barragán y Villela Abogados, S.C. Corporate law. Contracts. Foreign investments. México, D.F. (1998-1999).

At the law firm of attorney Miguel Claudio Jiménez Vizcarra (1993-1997)

**Electoral Board Officer.**

Electoral Commission for the Federal District of Mexico City. (1997).

**Education.**

Escuela Libre de Derecho. Diploma on International Business Law. Mexico, D.F. (1998-1999).

Pittsburgh University. Master on International and Comparative Law. (1997 – 1998).

The Hague Academy of International Law. Course on Public International Law and on Private International Law. (2001 – 2002).

University of Pompeu Fabra, Barcelona, Spain. Master in  International Relations, specialty law. (1999 – 2001).

University of Guadalajara. J.D. Graduation thesis on State Liability for Illegal Administrative Acts. (1997).

Harvard University. Introduction to American Government and US Foreign Policy. (1994).

**Scholarships for master's studies.**

MacArthur/Ford/Hewlett Foundation.

Magdalena O. Vda. de Brockmann Foundation.

Concejo Nacional para la Ciencia y la Tecnología (CONACYT).

Casals, of the Generalitat de Cataluña, Spain..

**Distinctions.**
Pace University, N.Y. Second place in competition on the Convention for the International Sale of Goods. (1998).
First Prize for the best legal thesis of 1997, Guadalajara University.
Scholarship for outstanding students, obtained twice, 1994 and 1995. Guadalajara University.
Mariano Otero Prize, awarde to the highest GPA. (1994).
International Book Market. First Prize for short stories (1990).
Champion at the Mathematics Olympic Games (1989).

**Other Activities and Associations.**
Columnist at the El Occidental news paper.
Sworn translator, Judiciary Power of Guadalajara: English and Spanish.
American Association of Private International Law, full member.
Mexican Academy of Private International and Comparative Law, full member.
Mexican Bar Association, full member.
SERVAS International, full member.

**Foreign Languages.**
English, fluent.
Catalan, fluent.
French, intermédiate.
Portuguese, intermediate.

# EXHIBIT 3

# ORGANIZATION OF AMERICAN STATES

### INTER-AMERICAN JURIDICAL COMMITTEE



CJI

## PROPOSAL FOR AN INTER-AMERICAN CONVENTION ON THE EFFECTS AND TREATMENT OF THE *FORUM NON CONVENIENS* THEORY

# ORGANIZATION OF AMERICAN STATES

## INTER-AMERICAN JURIDICAL COMMITTEE



. 55th Regular Period of Sessions
August 2 to 27, 1999
Rio de Janeiro, Brazil

CJI

OEA/Ser.Q
CJI/doc.29/99
14 July, 1999
Original: Spanish

## PROPOSAL FOR AN INTERAMERICAN CONVENTION ON THE EFFECTS AND TREATMENT OF THE FORUM NON CONVENIENS THEORY

### (Prepared by Dr. Gerardo Trejos Salas)

### FORUM NON CONVENIENS IN LATIN AMERICA

This study outlines the effects caused in the region by forum non conveniens and it describes the reactions triggered in several countries and international organizations. In order to explain the issues involved more realistically, the text is illustrated by the following cases where forum non conveniens was applied: *Piper Aircraft v. Reyno*[i], *Delgado v. Shell Oil Co.*[ii], *Gerardo Dennis Patrickson et al v. Dole Food Company, Inc. et al*[iii] and *Ruth Linares Polanco v. H. B. Fuller*[iv].

Latin America reacted against forum non conveniens with an overwhelming rejection. Several countries produced official opinions from the respective Attorney General's Office, judgments that have even reached the Supreme Court, Congressional Resolutions, including that of an international organization and even laws specifically enacted to counter this issue[v]. In spite of this, forum non conveniens continues to cause problems in the region, as the following shows.

### I. ILLEGALITY OF AND PROBLEMS CAUSED BY FORUM NON CONVENIENS

Several are the reasons why forum non conveniens contravenes Latin American law and, consequently, it cannot generate jurisdiction. These reasons are so strong that

1

Latin American judges just have to cite a few -constitutional, procedural, a special statute- before reaching the conclusion that the case should be dismissed. Notice first how this doctrine operates as a whole:

The foreign judge has full jurisdiction and lacks any personal reason (e.g. kinship, degree of friendship, etc…) to decline the case. However, he decides, against the plaintiff's will, that there is another court –with concurrent jurisdiction- that is more convenient and sends the plaintiff there, to file a new claim. When the "more convenient" court is abroad, the original judge does not send any rogatory letter and does not request the consent of the foreign authorities in any other way[vi]. He simply orders the plaintiff to file a new claim in another country[vii]. Frequently the original judge imposes certain conditions –for instance that the claim be filed within 30 days, that defendants cannot raise certain exception –e.g. statute of limitations-, that to return to the original court it is necessary to have a judgment from the Supreme Court of the second country establishing lack of jurisdiction, etc…

Under such system, Latin American plaintiffs must refile their claim in their country of origin, with the following peculiar results:

a) The original judge continues to have underlying jurisdiction and it is normal that the parties appear before him from time to time, to complain about what the other party does or omits doing in the second court, to request reconsideration of a previous ruling, etc…

b) The plaintiffs are gagged, not being able to tell the judge of the second court that they are there against their will or that they believe that such judge should rule for lack of jurisdiction.

c) When plaintiffs return to the original court with a ruling for lack of jurisdiction from the second court, it becomes standard for defendant to object and to request that the original court consider the dismissal by the second court as "inappropriate", "abusive", "the result of procedural bad faith", etc…[viii]

A foreign judge who unilaterally imposes work[ix] on a Latin American colleague is acting as if he were hierarchically superior. The foreign judge who imposes, again unilaterally, the commission of certain procedural acts in Latin America, establishing conditions, terms, etc… behaves in a no less offensive way.

Briefly stated, the following are some of the specific violations caused by forum non conveniens:

**1. Constitutional Law.** Forum non conveniens contravenes about six principles usually found in Latin American constitutions[x]:

*a) Sovereignty.* It is injurious for a country that a foreign judge unilaterally imposes the commission of certain procedural acts in such country, for instance the filing of a claim[xi].

2

***b) Supremacy of international treaties***. Forum non conveniens violates the supremacy of several bilateral and multilateral international treaties.

   **- Bilateral treaties**. No fewer than eleven Latin American countries have signed bilateral treaties of Friendship, Commerce and Navigation with the United States of America[xii]. Typically these conventions include an article that assures the access by the nationals of one country to the courts of the other[xiii]. *"...it is not clear how the application of a judicial theory ("forum non conveniens"), inferior in ranking to international treaties, can close the doors of American courts to citizens of my country."[xiv]*

   **- Multilateral treaties**. Forum non conveniens also violates the following multilateral treaties that guarantee a free access to the courts of law:

   a) Convention Regarding the Status of Aliens in the Respective Territories of the Contracting Parties (art. 5)[xv],
   b) American Declaration of the Rights and Duties of Man (arts. II, XVII and XVIII)[xvi],
   c) Universal Declaration of Human Rights (arts. 7 and 8)[xvii], and
   d) finally, as forum non conveniens discriminates against the foreign plantiff, it also violates the Charter of the Organization of American States[xviii].

   Since forum non conveniens is an institution of the internal law[xix] of some countries, it cannot be used to block the rights stemming from international conventions – whether bilateral or multilateral-, as is clearly established by the Vienna Convention on the Law of Treaties[xx].

***c) Equality before the law***. This concept as a strong constitutional root in Latin American countries[xxi]. Forum non conveniens cases are based on the *Piper* case which explicitly and clearly discriminates against the foreign plaintiff[xxii]. This discrimination is not even covert and it appears from the mere reading of forum non conveniens judgments[xxiii]. A Latin America judge cannot accept and give continuity to a claim whose legal basis is a foreign judgment that discriminates procedurally against the plaintiff, because the latter is a foreigner in the original court. Such discrimination against the foreign plaintiff is so generalized in some countries that it is even held as correct and forum non conveniens judgments explain it clearly, as if it were something very natural[xxiv].

***d) Lis pendens***. Some countries have constitutional clauses establishing that: *"No court can hear cases pending before another."[xxv]*

***e) Removal of a judge with jurisdiction.*** Another principle found in several constitutions is that: *"No person can be removed from the judge with jurisdiction."[xxvi]* Some countries include such principle in their codes of civil procedure[xxvii].

***f) Principle of legality***. Obviously, forum non conveniens is an unknown theory in Latin American systems. Accordingly, it cannot be a factual basis to generate jurisdiction[xxviii].

***j) Jurisdiction and service.*** In Latin American law the court has jurisdiction or not, according to what the law determines. If the defendants have or have not been served is an independent factor, unrelated to jurisdiction. The service of summons and of the claim causes important procedural consequences. For instance, it sets a time limit to answer. However, the service of summons is not a basis for jurisdiction. The fact that the defendant promises, before the first court, that he will accept service of summons from the second court, is not a jurisdictional basis either[xliii].

***k) Promises to submit are inoperative.*** An example of how this topic causes confusion in the common law is seen when the second court assumes that, not the submission but the mere statement about having the intention to submit is procedurally relevant and should be informed to the judge in the second court[xliv].

That is not so. The promises made to a foreign court, about the wish to submit to a Latin American jurisdiction do not generate jurisdiction in Latin America. Such promises, regardless of how sincere, are procedurally irrelevant. What could be relevant is the actual submission, express or implicit. However, the constitutional and procedural impediments that forum non conveniens creates in Latin American legal systems renders the actual submission inoperative.

***l) Claims ruled by the corresponding law.*** Eventually the plaintiffs would return to the first court with a judgment for lack of jurisdiction from the second court. It is not unusual then for defendants to charge plaintiffs with having drafted the second claim "in bad faith", by including or omitting certain information. The truth is that the Latin American codes of civil procedure have sections where the requirements that the claim must contain are specifically mentioned. For instance: Argentina, art. 330; Bolivia, art. 327; Costa Rica, art. 290; Ecuador, art. 71; Panama, art. 654, etc…

In these legal systems it is nor a requirement to state if defendants have expressed or not their intention to submit to such jurisdiction. Accordingly, it seems wrong that the court of the first country could impose certain consequences against plaintiff for not having done, before the second court, what the law of that country does not require. The plaintiffs cannot be forced to litigate before the second court abiding by rules and requirements that are not contemplated in such legal system[xlv].

***m) Illusory submission by defendants.*** In *Patrickson* and *Delgado* it can be seen how forum non conveniens lends itself for the defendants to litigate abroad without running the risk of paying an adverse judgment. Such technique works in the following way:

To obtain that the case be moved to another country the defendants promise the first judge that they will submit to the jurisdiction of foreign courts. Following the procedure of the first country, defendants file a pleading before the first court where the promise to submit is recorded. But in the same pleading, together with the promise of "submission" to the foreign court, defendants *"reserve the right to contest"* a **final** judgment of such foreign court, before the first court and for legal grounds of the first country[xlvi].

7

# ORGANIZATION OF AMERICAN STATES

## INTER-AMERICAN JURIDICAL COMMITTEE



56th REGULAR PERIOD OF SESSIONS  
March 20-31, 2000  
Washington, DC, USA

OEA/Ser.Q  
CJI/doc.2/00  
3 March 2000  
Original: English  
Restricted*

## PROPOSAL FOR AN INTER-AMERICAN CONVENTION
## ON THE EFFECTS AND TREATMENT OF THE
## *FORUM NON CONVENIENS* THEORY

**(Presented by Dr. Gerardo Trejos Salas)**

***Forum non conveniens* and the**
**Hague Convention.**
**Latin American Position**

## I. INTRODUCTION
## ILLEGALITY AND PROBLEMS CAUSED
## BY FORUM NON CONVENIENS

During the previous period of regular sessions a report on forum non conveniens (FNC) was introduced (OEA/Ser. Q, CIJ/doc.29/99, July 14, 1999). Some of the illegalities and problems caused by said theory can be summarized as follows:

**No jurisdiction if no acts performed in the country**. Latin American jurisdictional notions, not surprisingly, are different from those in Common Law systems. By a US standard, Latin American jurisdiction seems more restricted. Absent, for instance, is the American theory of "long-arm jurisdiction", or the idea that service of process confers jurisdiction. Also, when a person has performed all the activity in question outside the Latin American country, there would be no national jurisdiction either[1]. If adverse effects follow from conduct deployed abroad, Latin American law

---

[1] For instance, the Code of Civil Procedure of **Costa Rica** states that there is local jurisdiction "*When the action is based on a fact occurred or in an act that took place in Costa Rica.*" (art. 46, para 3). Such

1

assumes that jurisdiction lies in the foreign country where the acts occurred. Conversely, Latin American countries would have jurisdiction over acts performed there, even if the consequences in question take place abroad[2].

In spite of this, some foreign judges persist in applying FNC and ordering that lawsuits be filed in Latin America when the relevant acts took place abroad, although there is no jurisdiction in Latin America.

**Lack of jurisdiction if no power to constrain.** As it can be seen in footnotes 60 and 61, together with their accompanying text, the FNC defendant is not bound to obey a final judgment from the second court. That is also a reason causing lack of jurisdiction, since jurisdiction cannot exist *"without the power to compel the enforcement of what has been ordered."* (M. Morales Lebrón, <u>Diccionario Jurídico Según la Jurisprudencia del Tribunal Supremo</u> de Puerto Rico, p. 563, San Juan, 1977).

**Jurisdiction is terminated.** Even when there is concurrent jurisdiction, the claim filed before one court extinguishes the jurisdiction of the other court[3].

**And is not reborn.** For jurisdiction to be reborn in Latin America, there has to be a (voluntary) nonsuit of the first case and an new (voluntary[4]) filing of the claim before the second court. A FNC filing does not generate jurisdiction.

Despite such a clear rule, some foreign courts persist in applying FNC. When the Latin American court dismisses the case for lack of jurisdiction, they refuse to accept the

---

interpretation was held in Carlos Luis *Abarca et al. v. Shell Oil Company et al.*, affirmed by the Costa Rican Supreme Court on 2/21/96. In **Brazil**, art. 88, of the Code of Civil Procedure, states exactly the same principle: *"Brazilian courts have jurisdiction when ... III The case is based on a fact that occurred, or in an act that was performed in Brazil."* In **Honduras**, art. 146, first paragraph, of the *Ley de Organización y Atribuciones de los Tribunales*, does not grant jurisdiction against a corporation who did not perform any acts in Honduras (Attorney General of Honduras, opinion of 6/2/95). According to the Attorney General of **Nicaragua**, in his opion of 5/24/95, *"The procedural rules of our system do not grant jurisdiction to Nicaraguan courts against manufactureres ... who have only made and sold their product abroad, without having performed acts in Nicaraguan territory. Code of Civil Procedure, article 265, para. 1"* In **Panama**, there is a judgment from the Primer Tribunal Superior de Justicia, of 4/18/95, stating that jurisdiction over foreign corporations lies: *"... with the court situated where the corporations have their principal office."* This precedent was followed twice in FNC cases, in 1995 and in 1999.

[2] Such a territorial notion has a political angle. It is a way of protecting the borders and the sovereignty of the country concerned: by refraining from judging acts performed abroad, under foreign laws, it is more probable that foreign courts will refrain from judging acts that took place in our country. It is a variation of the expression *par in parem imperium non habet*. In this way Latin America departs from French law, where the plaintiff's nationality generates local jurisdiction, even for acts performed abroad (**France**, Civ. Code, art. 14).

[3] Once jurisdiction attaches, it cannot be altered, see for instance, Codes of Civil Procedure of **Guatemala**, art. 5; **Ecuador**, art. 15 (see also Ecuadorian Constitution, art. 24, para. 11); **Honduras**, arts. 138 and 141; **Panama**, art. 253, **Brazil**, art. 87, **Nicaragua**, art. 255. The term of art for this is *"prevención"*, or *"competencia preventiva"*. From *"prevenire"*, a Latin term meaning to arrive (*venire*) earlier (*pre*) and consequently preventing or blocking the way for others.

[4] It is so basic that a lawsuit cannot be ordered by the courts that Latin American procedural codes do not bother to mention this principle. As an exception, the Code of Civil Procedure of **Costa Rica** elaborates that *"Nobody can be forced to file a lawsuit ..."* (arts. 122 and 477).

case, or they allow it to remain dormant for years. (For instance, see footnotes 15 – 18 and their corresponding text.)

**Procedural freedom**. FNC *forces and/or constrains* plaintiff to file the second lawsuit. It is intolerable for a national judge to force or to constrain a citizen to file a claim[5]. It is worse still if who forces and constrains is a foreign judge.

*Actor sequitur forum rei*. The proper court for personal actions is the one of the defendant's domicile[6]. A foreign court with jurisdiction cannot export its FNC theories when they clash with this principle.

**Bilateral treaties with the USA**. FNC is a domestic law. Consequently, it is trumped by international treaties[7]. It then follows that FNC cannot block access to the courts which is, precisely, what these treaties guarantee[8].

**Sovereignty**. A foreign judge should not try to impose, unilaterally, the performance of procedural acts in Latin America, particularly when such conduct breaches Latin American law[9]. FNC cannot be exported if it violates the second country's laws[10].

**Equality before the law**. This principle is a constitutional rule[11]. FNC discriminates openly against the foreign plaintiff[12]. Logically, a Latin American judge

---

[5] Latin American law knows the theory of *acto personalísimo*. These are acts where the free will of the person is so important that they cannot be forced upon anybody. Examples are marriage and the making of a will. No judge can order someone to get married, or to make a will. The filing of a claim falls in this same category. A Latin American judge cannot order anyone to file a claim. And with greater reason, a Latin American judge cannot preside over a lawsuit that has been filed following a foreign court's order. The functional equivalent of this would be to expect Latin American notions of forced heirship, in a US probate proceeding, just because the decedent was Latin. See also, for instance, the Constitution of **Honduras**, art. 70: "... *nobody can be forced to do what the law does not command, nor prevented from doing what the law does not prohibit.*" Obviously, FNC cannot breach this rule.

[6] It just suffices to mention article 323 of the Bustamante Code, adopted by **Bolivia, Brazil, Chile, Costa Rica, Cuba, Dominican Republic, Ecuador, El Salvador, Guatemala, Haiti, Honduras, Nicaragua, Panama and Peru**. Latin American countries that have not adopted the Bustamante Code still follow the same principle. Example: **Argentina**, Code of Civil Procedure, art. 5 (4) states that: "*In personal actions stemming from civil liability [jurisdiction lies with the court] of the place where the facts occurred, or of the defendant's domicile, as chosen by plaintiff.*" (emphasis added).

[7] Vienna Convention on the Law of Treaties, art. 27. See, for instance, the Constitution of **Honduras**, arts. 16 and 18 (Supremacy of Treaties).

[8] In some treaties, the right of access to courts is unfettered. In others, access is granted on equal footing with nationals.

[9] For instance, the Constitution of **Honduras**, art. 82, establishes that "*The citizens of the Republic have free access to the courts, to exercise their action in the way determined by the laws*". Obviously, said laws are Honduran, not the foreign ones.

[10] Latin American codes, special statutes, judgments and opinions of Attorneys General say very explicitly that FNC violates important constitutional and procedural rules.

[11] For instance, see the Constitutions of: **Brazil**, art. 5; **Costa Rica**, art. 33; **Ecuador**, art. 23(3); **Guatemala**, art. 4 and **Honduras**, art. 60, para 1 and 2, and art. 61.

[12] For instance, in *Gerardo Denis Patrickson et al. v. Dole Food Company, Inc. et al.*, cuse Nr. 97-0156, before the United States District Court for the District of Hawaii, determines that "*When the plaintiff is*

cannot, and should not, become the successor, or the accomplice, of the procedural discrimination initiated by the original court. It should be added that the discrimination against the foreign plaintiff that FNC perpetrates, also breaches important multilateral treaties as, for instance, the OAS Organizational Charter[13].

**The first court remains as an appeals court for the second and it behaves as a Constitutional Court for the second country**. Strange as it may seem, the final judgment of the second court, is not really final. According to American law such judgment can still be challenged before the first court, and on grounds of American law[14]. Final control over the case –ordering effectively that the defendant pay an adverse decision- remains under the first court's control. The supposed "jurisdiction" and "sovereignty" of the second court is just an illusion. This explains why Latin American judges are not enthusiastic about accepting these cases.

*Lis pendens.* While the case is being prosecuted in the second country, the FNC dismissal could still be under appeal in the first country. Usually the second court is not

---

*non-foreign, there is a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors weigh in favor of trial in the alternative forum. See Piper Aircraft Co. v. Reyno, 454 U.S. 235, 255-56 (1981). This is because "[w]hen the home forum has been chosen, it is reasonable to assume that this choice is convenient." Id. When the plaintiff is foreign, however, this assumption is less reasonable and the **plaintiff's choice is afforded less deference**. Id. In such cases, the showing required to obtain dismissal is reduced. See Empresa Lineas Maritimas Argentinas S.A. v. Schichau-Unterwesser A.G., 955 F2d 368 (5th Cir. 1992).* (Bold added).

The forum non conveniens judgment in *Delgado v. Shell Oil Company*, published in 890 F. Supp. 1324 (S.D. Tex. 1995), says virtually the same.

Another example is *Ruth Linares Polanco v. H. B. Fuller*, cause Nr. 3-96-8, before the US District Court, District of Minnesota, Third Division. A judgment of September 23, 1996, while applying the theory of forum non conveniens states, at page 25, in reference to the *Piper* case, as follows:

*"The Court began its own analysis by noting that while a plaintiff's choice of forum was normally entitled a strong favorable presumption, district courts are "fully justified" in according less weight to this choice **when the plaintiff is foreign**. Id at 255-256. This is because it is much less reasonable to assume that **a foreign plaintiff** has chosen an American forum for reasons of convenience.* (Bold added).

At page 35, in the same ruling, an identical thought is expressed:

"Plaintiff's continuing reliance on Reid-Walen is again misplaced, because **the plaintiff in that case was an American citizen**, a fact which entitled the plaintiff to a strong presumption of deference in her forum choice." (Bold added).

[13] Article 5(j) of the Charter of the Organization of American States , re-numbered as 3(j) in its 1967 version, says as follows:

"The American States proclaim the fundamental rights of the individual without distinction as to race, **nationality**, creed or sex." [Emphasis added]. The United States ratified this convention first on June 19, 1951 (see U.S.T. 2394, T.I.A.S. Nr. 2361 and, after the Buenos Aires Protocol, the same text was ratified by the United States on April 26, 1968 (see T.I.A.S. Nr. 6847. O.A.S.T.S. Nr. 1-A, O.A.S.O.R., O.E.A./Ser.A/2.add2). The second draft of the convention entered into force in the United States on February 27, 1970. All Latin American countries, with the exception of **Cuba**, are members of this treaty.

It should be added that in 1959 the OAS created an **Inter-American Human Rights Commission**, whose goal was to further respect for human rights, expressly "those established in the American Declararion of the Rights and Duties of Man." In 1967, when the OAS Charter was restructured, the Inter-American Human Rights Commission was given the rank of "principal organ" (art. 51). Protecting compliance with human rights falls within the purview of this Commission. (See Thomas Burgenthal, *The Revised OAS Charter and the Protection of Human Rights* 69 A.J. Int'l L. 828, 1975.)

[14] See section VIII, below, for more detail.

informed about this appeal since the plaintiff is "gagged" by the first court and the defendant does not want to jeopardize his possibility to remain in the second court. This happened, for instance in the *Delgado* and in the *Patrickson* cases. The Latin American judges in these cases could one day be informed, to their surprise, that a foreign court of appeals has decided that the cases shall return to the first country.

The judge who applies FNC resorts to an exceptional mechanism. Having jurisdiction and not being disqualified by personal reasons he expects another judge to take charge of the case. If the second court rules it has no jurisdiction, then first court should reassume adjudicating the case. In re *Ecuadorean Shrimp Litigation*[15] this did not happen. Here the case was dismissed on FNC and plaintiffs were ordered to refile in Ecuador. The US court had established that it would reassume adjudicating the case if the Supreme Court of Ecuador ruled for lack of jurisdiction. Eventually the Ecuadorian Supreme Court upheld lower rulings for lack of jurisdiction and the case was brought again before the US court. The American judge still refused to take the case based on two reasons. One reason was that Ecuadorian law (law 55 and art 15 of the Code of Civil Procedure) *"has the effect of vitiating Florida law on forum non conveniens and forcing Florida courts to accept jurisdiction ..."* The second reason was that plaintiffs had acted in bad faith by lobbying for the enactment of Ecuadorian law 55, which destroyed the FNC option.

These two arguments are flawed and they illustrate why FNC cannot be exported. The fact that said Ecuadorian laws "vitiated" Florida FNC law is not a reason to ignore them. FNC is the *subservient system* to foreign law. It is not that foreign law should accommodate FNC, but exactly the opposite should happen[16].

The second argument also fails. Latin American constitutions allow, and even encourage, people to present petitions to the authorities (*derecho de peticionar a las autoridades*)[17]. This is in fact one of the pillars of any democratic system. When plaintiffs -Ecuadorian nationals- were sent to Ecuador they had a perfect right, while in Ecuador, to lobby for whatever laws they wanted[18]. It is politically incorrect for a foreign judge to send plaintiffs to refile a lawsuit in Ecuador and to punish them later because they availed themselves, while litigants in Ecuador, of rights granted by the Ecuadorian Constitution.

---

[15] Case Nr. 94-10139 (27), Circuit Court of the 17th Judicial Circuit, in and for Broward County, Florida, ruling of 9/24/99. Other times the foreign court does not openly reject the Latin American decision for lack of jurisdiction, but it does not accept jurisdiction either, allowing the case to remain dormant for years. As an example, see Delgado v. Shell Oil Co., 890 F. Supp. 1324 (S.D. Tex. 1995).

[16] FNC is based on the "availability" of a foreign forum. FNC theory does not say that foreign laws that do not accommodate FNC lawsuits shall be disregarded. FNC is *subordinated to* the existence of an alternative available forum. It is not the other way around.

[17] See, for instance, the Constitution of **Honduras**, art. 80 *"Any person ... has the right to present petitions to the authorities ..."*

[18] As the origin of the word indicates, lobbying was invented, and is widely practiced in the USA. In 1992, a group of FNC defendants (Alfaro case) lobbied –successfully- to have Texas anti-FNC law abolished. Tobacco companies are famous for lobbying the US Congress. They even lobby Congresses in Latin America. No US court penalizes US corporations for lobbying. Why cannot Latin American plaintiffs do the same in their own country?

# EXHIBIT 4

MEXICAN FEDERAL RULES OF CIVIL PROCEDURE

MEXICAN FEDERAL CIVIL CODE

MEXICAN FEDERAL CONSTITUTION

# MEXICAN FEDERAL RULES OF CIVIL PROCEDURE

Available at http://www.diputados.gob.mx/LeyesBiblio/pdf/6.pdf

## CÓDIGO FEDERAL DE PROCEDIMIENTOS CIVILES

**ARTICULO 3º.-** Las relaciones recíprocas de las partes, dentro del proceso, con sus respectivas facultades y obligaciones así como los términos, recursos y toda clase de medios que este Código concede para hacer valer, los contendientes, sus pretensiones en el litigio, no pueden sufrir modificación, en ningún sentido, por virtud de leyes o estatutos relativos al modo de funcionar o de ser especial de una de las partes, sea actora o demandada. En todo caso, debe observarse la norma tutelar de la igualdad de las partes dentro del proceso, de manera tal que su curso fuera el mismo aunque se invirtieran los papeles de los litigantes.

**ARTICULO 7º.-** La parte que pierde debe reembolsar a su contraria las costas del proceso. […]

**ARTICULO 12.-** No influyen, sobre la competencia, los cambios en el estado de hecho que tengan lugar después de verificado el emplazamiento.

**ARTICULO 24.-** Por razón de territorio es tribunal competente:
**I.-** El del lugar que el demandado haya señalado para ser requerido judicialmente sobre el cumplimiento de su obligación;
**II.-** El del lugar convenido para el cumplimiento de la obligación;
**III.-** El de la ubicación de la cosa, tratándose de acciones reales sobre inmuebles o de controversias derivadas del contrato de arrendamiento. Si las cosas estuvieren situadas en, o abarcaren dos o más circunscripciones territoriales, será competente el que prevenga en el conocimiento del negocio;
**IV.** El del domicilio del demandado, tratándose de acciones reales sobre muebles o de acciones personales, colectivas o del estado civil;
**V.-** El del lugar del domicilio del deudor, en caso de concurso.
Es también competente el tribunal de que trata esta fracción para conocer de los juicios seguidos
**VI.-** El del lugar en que haya tenido su domicilio el autor de la sucesión, en la época de su muerte, tratándose de juicios hereditarios; a falta de ese domicilio, será competente el de la ubicación de los bienes raíces sucesorios, observándose, en lo aplicable, lo dispuesto en la fracción III. A falta de domicilio y bienes raíces, es competente el del lugar del fallecimiento del autor de la herencia.
Es también competente el tribunal de que trata esta fracción, para conocer:
**a).-** De las acciones de petición de herencia;
**b).-** De las acciones contra la sucesión, antes de la partición y adjudicación de los bienes, y
**c).-** De las acciones de nulidad, rescisión y evicción de la partición hereditaria;

**VII.-** El del lugar en que se hizo una inscripción en el Registro Público de la Propiedad, cuando la acción que se entable no tenga más objeto que decretar su cancelación;

**VIII.-** En los actos de jurisdicción voluntaria, salva disposición contraria de la ley, es juez competente el del domicilio del que promueve; pero, si se trata de bienes raíces, lo es el del lugar en que estén ubicados, observándose, en lo aplicable, lo dispuesto en la fracción III.

Cuando haya varios tribunales competentes conforme a las disposiciones anteriores, en caso de conflicto de competencias se decidirá a favor del que haya prevenido en el conocimiento, y

**IX.-** Tratándose de juicios en los que el demandado sea indígena, será juez competente el del lugar en el que aquél tenga su domicilio; si ambas partes son indígenas, lo será el juez que ejerza jurisdicción en el domicilio del demandante.

**ARTICULO 166.-** Una parte sólo puede presentar hasta cinco testigos sobre cada hecho, salvo disposición diversa de la ley.

**ARTICULO 323.-** Con la demanda debe presentar el actor los documentos en que funde la acción. Si no los tuviere a su disposición, designará el archivo o lugar en que se encuentren los originales, para que, a su costa, se mande expedir copia de ellos, en la forma que prevenga la ley, antes de admitirse la demanda. Se entiende que el actor tiene a su disposición los documentos, siempre que legalmente pueda pedir copia autorizada de los originales.

Si el autor no pudiese presentar los documentos en que funde su acción, por las causas previstas en el artículo 213, antes de admitirse la demanda se le recibirá información testimonial u otra prueba bastante para acreditar los hechos por virtud de los cuales no puede presentar los documentos, y cuando esta prueba no sea posible, declarará, bajo protesta de decir verdad, la causa por la que no puede presentarlos.

**ARTICULO 324.-** Con la demanda se acompañarán todos los documentos que el actor tenga en su poder y que hayan de servir como pruebas de su parte, y, los que presentare después, con violación de este precepto, no le serán admitidos. Sólo le serán admitidos los documentos que le sirvan de prueba contra las excepciones alegadas por el demandado, los que fueren de fecha posterior a la presentación de la demanda y aquellos que, aunque fueren anteriores, bajo protesta de decir verdad, asevere que no tenía conocimiento de ellos.

Con las salvedades del párrafo anterior, tampoco se le recibirá la prueba documental que no obre en su poder al presentar la demanda, si en ella no hace mención de la misma, para el efecto de que oportunamente sea recibida.

**ARTICULO 328.-** Los efectos del emplazamiento son:

**I.-** Prevenir el juicio en favor del tribunal que lo hace;

**II.-** Sujetar al emplazado a seguir el juicio ante el tribunal que lo emplazó, siendo competente al tiempo de la citación;

**III.-** Obligar al demandado a contestar ante el tribunal que lo emplazó, salvo siempre el derecho de promover la incompetencia, y

**IV.-** Producir todas las consecuencias de la interpelación judicial.

**ARTICULO 561.-** La obligación de exhibir documentos y cosas en procesos que se sigan en el extranjero no comprenderá la de exhibir documentos o copias de documentos identificados por características genéricas.

En ningún caso podrá un tribunal nacional ordenar ni llevar a cabo la inspección general de archivos que no sean de acceso al público, salvo en los casos permitidos por las leyes nacionales.

## MEXICAN FEDERAL CIVIL CODE

Available at http://www.diputados.gob.mx/LeyesBiblio/pdf/2_241213.pdf

## CODIGO FEDERAL CIVIL

**Artículo 1161.-** Prescriben en dos años:
[…]
**IV.** La responsabilidad civil por injurias ya sean hechas de palabra o por escrito, y la que nace del daño causado por personas o animales, y que la ley impone al representante de aquéllas o al dueño de éstos.
La prescripción comienza a correr desde el día en que se recibió o fue conocida la injuria o desde aquel en que se causó el daño; […]

**Artículo 1158.-** La prescripción negativa se verifica por el sólo transcurso del tiempo fijado por la ley.

**Artículo 1168.-** La prescripción se interrumpe:
I. Si el poseedor es privado de la posesión de la cosa o del goce del derecho por más de un año;
II. Por demanda u otro cualquiera género de interpelación judicial notificada al poseedor o al deudor en su caso;
Se considerará la prescripción como no interrumpida por la interpelación judicial, si el actor desiste de ella, o fuese desestimada su demanda; […]

## Mexican Federal Constitution

Available at: http://www.diputados.gob.mx/LeyesBiblio/htm/1.htm

## Constitución Federal de México

**Artículo 1o.** En los Estados Unidos Mexicanos todas las personas gozarán de los derechos humanos reconocidos en esta Constitución y en los tratados internacionales de los que el Estado Mexicano sea parte, así como de las garantías para su protección, cuyo ejercicio no podrá restringirse ni suspenderse, salvo en los casos y bajo las condiciones que esta Constitución establece.

[…]

Queda prohibida toda discriminación motivada por origen étnico o nacional, el género, la edad, las discapacidades, la condición social, las condiciones de salud, la religión, las opiniones, las preferencias sexuales, el estado civil o cualquier otra que atente contra la dignidad humana y tenga por objeto anular o menoscabar los derechos y libertades de las personas.

# EXHIBIT 5

## MEXICAN SUPREME COURT CASE

| Tesis: 3a. CXXVII/89 | Semanario Judicial de la Federación | Octava Época | 207309 | 1 de 4 |
|---|---|---|---|---|
| Tercera Sala | Tomo IV, Primera Parte, Julio-Diciembre de 1989 | Pag. 261 | Tesis Aislada(Civil) | |

**RESPONSABILIDAD OBJETIVA. COMPETENCIA EN UN JUICIO. EN CONTRA DE DEMANDADOS CON DOMICILIOS DIVERSOS SI EL ACTOR NO ELIGIO UN JUEZ QUE EJERZA JURISDICCION SOBRE ALGUNO DE SUS DOMICILIOS. CORRESPONDE AL JUEZ DEL DOMICILIO DE LOS DEMANDADOS QUE PREVINO. (LEGISLACIONES DE LOS ESTADOS DE JALISCO Y NAYARIT).**

De conformidad con lo establecido por el artículo 24, fracción IV, del Código Federal de Procedimientos Civiles aplicable por estar en conflicto los códigos procedimentales civiles de los Estados de Jalisco y Nayarit, cuando se ejerce una acción personal como lo es la responsabilidad objetiva originada en los daños causados en un accidente de tránsito, será competente el juez del domicilio del demandado. Ahora bien, si existen varios demandados con domicilios diversos las legislaciones procesales civiles de las entidades federativas citadas concuerdan en que será competente el juez que del domicilio de alguno de los demandados haya elegido el actor. Sin embargo, si el juez elegido por el actor fue el del lugar en que ocurrió el accidente de tránsito y que no ejerce jurisdicción sobre el domicilio de alguno de los demandados, ante la inexistencia en los Códigos de Procedimientos Civiles de los Estados de Jalisco y Nayarit de una regla competencial para esta hipótesis, resulta aplicable supletoriamente el artículo 24, fracción VIII, del Código Federal de Procedimientos Civiles que establece que cuando conforme a las reglas de competencia resulten competentes diversos tribunales, se decidirá en favor del que haya prevenido en el conocimiento, de lo que cabe concluir que cuando haya demandados con domicilios diversos sin que el actor haya elegido un juez que ejerza jurisdicción sobre alguno de sus domicilios, será competente el juez que del domicilio de alguno de los demandados haya prevenido en el conocimiento del asunto.

Competencia 7/89. Suscitada entre los Jueces Séptimo de lo Civil de Guadalajara, Jalisco y Mixto de Primera Instancia de Santiago Ixcuintla, Nayarit. 13 de julio de 1989. Cinco votos. Ponente: Mariano Azuela Güitrón. Secretaria: María Estela Ferrer Mac Gregor Poisot

Competencia civil 191/88. Suscitada entre los jueces Séptimo de lo Civil de Guadalajara, Jalisco, y Mixto de Primera Instancia de Santiago Ixcuintla, Nayarit. 13

de julio de 1989. Cinco votos. Ponente: Mariano Azuela Güitrón. Secretaria: Lourdes Ferrer Mac Gregor Poisot.

Véase: Semanario Judicial de la Federación, Séptima Época, Volúmenes 217-228, Cuarta parte, página 287.

Notas:

En el Informe de 1989, esta tesis aparece bajo el rubro "COMPETENCIA EN UN JUICIO DE RESPONSABILIDAD OBJETIVA EN CONTRA DE DEMANDADOS CON DOMICILIOS DIVERSOS SI EL ACTOR NO ELIGIO UN JUEZ QUE EJERZA JURISDICCIÓN SOBRE ALGUNO DE SUS DOMICILIOS. CORRESPONDE AL JUEZ DEL DOMICILIO DE LOS DEMANDADOS QUE PREVINO (ESTADOS DE JALISCO Y NAYARIT).".

En el Tomo IV del Semanario Judicial de la Federación se cita como precedente el publicado en la Séptima Época, Volúmenes 217-228, Cuarta Parte, página 337, el cual se corrige como aquí se señala.

**IN THE UNITED STATES DISTRICT COURT**
**OF THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| **HOLLY ANN SACKS, Individually and** | § | |
| **as Representative of the Estate of** | § | **EXHIBIT "B"** |
| **RICHARD TODD SACKS, MELVIN** | § | |
| **PHILLIP SACKS, and MARILYN** | § | |
| **PROCTOR,** | § | |
| **Plaintiffs** | § | |
| | § | |
| **V.** | § | **No.  5:04CV73** |
| | § | |
| **FOUR SEASONS HOTEL LIMITED** | § | |
| **and FOUR SEASONS PUNTA MITA,** | § | |
| **S.A. de C.V.,** | § | |
| **Defendants** | § | |

**REPORT AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to the provisions of 28 U.S.C. § 636(b)(1) and (3) and the Amended Order for the

Adoption of Local Rules for Assignment of Duties to United States Magistrate Judges, Defendants'

Motion for Relief from Court Order (Docket Entry # 119) was referred to the Honorable Caroline

M. Craven for the purpose of preparing a report and recommendation.  The Court, having reviewed

the relevant briefing and hearing arguments of counsel,[1] recommends Defendants' motion be

**DENIED**.

**I.**

**FACTUAL BACKGROUND**

Holly Ann Sacks, Individually and as Representative of the Estate of Richard Todd Sacks,

Melvin Phillip Sacks, and Marilyn Proctor ("Plaintiffs") bring this diversity cause of action against

Four Seasons Hotels Limited, a Canadian corporation, and Four Seasons Punta Mita, S.A. de C.V.,

---

[1] The Court conducted a hearing on Defendants' motion on May 30, 2007.

a Mexican corporation ("Defendants"), alleging on or about June 6, 2003, Plaintiff Holly Ann Sacks

and Richard Todd Sacks checked into the Four Seasons Resort, Punta Mita, Mexico ("the resort").

Plaintiffs assert negligence, breach of duty of care, wrongful death, and survival causes of action

against Defendants arising from the death of Richard Sacks (the "decedent") on June 8, 2003, while

the Sacks were staying in the resort. At the time of his death, the decedent resided in Texas. Holly

Sacks currently resides in Dallas County, Texas. Melvin Sacks is a citizen of Texas, and Marilyn

Proctor is a citizen of Massachusetts.

## II.

## PROCEDURAL BACKGROUND

On July 7, 2005, Defendants filed their Motion to Dismiss Under the Doctrine of *Forum Non*

*Conveniens*. The next day, Defendants filed their Motion for Determination of Law Pursuant to Rule

44.1. After a hearing on Defendants' motions, on March 7, 2006, the undersigned issued a Report

and Recommendation recommending Defendants' motion to dismiss be denied. The undersigned

further recommended that the Court's ruling on Defendant's motion for determination of law

pursuant to Rule 44.1 be that Texas law shall apply to both liability and damages in this case.

In the Report and Recommendation, the undersigned determined that Mexico is not an

available foreign forum in this case for the following six reasons. First, under Mexican law, the

statute of limitations for refiling had expired. Second, in Mexico, parties cannot consent to U.S.

procedural rights, such as jurisdiction. Third, because the theory of preemptive jurisdiction is deeply

rooted in Mexican law, Mexico is not available because Plaintiffs have not chosen Mexico as the

forum. Fourth, the primary wrongdoing in this case originated in Canada and the United States, and

therefore, no alternative forum can exist in Mexico. Fifth, a "return jurisdiction" clause does not

change the Court's opinion that Mexico is not an available alternative forum.  Sixth, a Mexican court

lacks territorial jurisdiction over Canadian defendant Four Seasons Hotels Limited.

In addition, the undersigned held Mexico is not an adequate forum. Specifically, the

undersigned found that a transfer to Mexico would be unfair to Plaintiffs because (1) Mexico does

not have procedural safeguards to permit Plaintiffs to develop their evidence; (2) no Mexican

attorney would be likely to take this case on a contingency fee basis; (3) proceedings in Mexico will

not be concluded within a reasonable time frame; (4) Mexico's very limited damages recovery

scheme is so clearly unsatisfactory in this case that these Plaintiffs would, in essence, have no

remedy; and (5) the United States is strongly connected to the parties and evidence in this case.

(Report and Recommendation at pg. 14).

Even though the undersigned found Defendants had not met their initial burden of

establishing that Mexico is an available and adequate foreign forum, the Court still weighed the

private and public interest factors.  After consideration of the factors, the undersigned concluded they

weighed in favor of keeping Plaintiffs' case in the United States. (*Id.* at pgs. 17-21).

Finally, the undersigned weighed the relevant factors in considering choice of law and

concluded Texas law should apply to both liability and damages because Texas has the "most

significant relationship."  In so concluding, the undersigned first found Texas has the strongest

interest in determining Plaintiffs' damages theory, stating it "makes little sense to apply Mexico's

measure of damages, which indexes the amount of recovery to the prevailing wages set by the labor

law of that nation, when [the parties] are residents of Texas."  (Report and Recommendation at pg.

36, *quoting Gutierrez v. Collins*, 583 S.W.2d 312, 319 (Tex. 1979)).  The undersigned noted the only

party that Mexican law would protect is Defendant Four Seasons Punta Mita whereas the decedent,

two Texas plaintiffs, one Massachusetts plaintiff, and a Canadian defendant, do not derive their earnings from Mexican wages.  The undersigned further found Texas has the "most significant relationship" in determining Defendants' liability, noting some of the alleged tortious conduct that allegedly caused Mr. Sacks' death occurred in Canada and the United States, not Mexico.

On March 24, 2006, the District Court adopted the Report and Recommendation as the findings and conclusions of the Court.  On October 19, 2006, the Court certified the March 24, 2006 Order for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).  On January 22, 2007, the United States Court of Appeals for the Fifth Circuit denied leave to appeal from the Court's interlocutory order entered on October 19, 2006.

## III.

## DEFENDANTS' MOTION FOR RELIEF FROM COURT ORDER

### A.    Defendants' original motions

In their original motions, Defendants requested Plaintiffs' claims against them be dismissed under the doctrine of *forum non conveniens* and determine that Mexican law governs the issues in this case.  According to Defendants, Mexico provides an adequate alternative forum in this case, and the private and public interest factors also weigh in favor of resolving this case in Mexico. Defendants further asserted Mexico, not Texas, has the "most significant relationship" to this case, weighing in favor of Mexican law.  In support of their motions, Defendants submitted affidavits from Jorge de Presno and Carlos Serna, both Mexican attorneys, who provided expert opinions on the law of Mexico and the State of Nayarit.

Plaintiffs opposed both motions, asserting (1) Mexican courts do not provide an adequate or alternative forum; (2) the public and private interest factors weigh in favor of the United States; and

4

(3) the Court should apply Texas law in this case.  In their responses, Plaintiffs submitted the Affidavits of Dr. Leonel Pereznieto-Castro and Henry S. Dahl.  Pereznieto is an expert on the laws of Mexico and the Mexican State of Nayarit.  He is a practicing attorney and law professor in Mexico, specializing in conflict of laws.  Dahl is an expert in international and comparative law. He has worked on cases in Mexico specifically related to *forum non conveniens* issues.

## B.      Defendants' current motion

Currently, Defendants move for relief from this Court's March 24, 2006 Order adopting the Magistrate Judge's March 7, 2006 Report and Recommendation denying Defendants' *forum non conveniens* motion to dismiss and Defendants' Rule 44.1 motion for application of the law of Nayarit, Mexico.  Defendants move for relief, asserting there is newly discovered evidence and evidence of fraud warranting a reconsideration of this Court's March 24, 2006 Order.  *See* FED. R. CIV. P. 60(b)(2) and (3).  Specifically, Defendants assert Plaintiffs' lead expert on the law of Nayarit and Mexico, Dr. Pereznieto, was sanctioned on December 18, 2006 by the United States District Court for the Southern District of Indiana and ordered to pay $100,000 for his "double role" as the "mastermind" behind perpetuating a fraud upon the court regarding his service as an expert on Mexico law relative to a *forum non conveniens* motion that was before that court.  *In re: Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 2006 WL 3895059 (S.D. Ind. Dec. 18, 2006).  The court ordered Pereznieto barred from providing further testimony against those defendants as long as the monetary sanctions remain unpaid, and the court struck all of Pereznieto's opinions on Mexican law from being considered on the *forum non conveniens* issue.  *Id.* at *2.

According to Defendants, the Indiana court sanctioned Pereznieto for the fraud he perpetrated on the court, which was directly related to Pereznieto's fraudulent activity in obtaining the dismissal

5

of the related case in Morelos, Mexico.  Here, Pereznieto relied heavily on the result from the same case from Morelos, Mexico as a basis for his opinions on *forum non conveniens* that the courts of Nayarit, Mexico would not accept jurisdiction over the instant case and therefore would not provide an "available" alternative forum.  Defendants assert Pereznieto's opinions on the jurisdiction of the courts in Nayarit, Mexico and his opinions on the availability of the courts in the instant case as well as his reliance on the *Morelos* decision for those opinions have been directly discredited due to the fraud.  Defendants further assert consideration of this fraud should lead the Court to grant Defendants' *forum non conveniens* and Rule 44.1 motions.

## IV.

## APPLICABLE LAW

### A.    The Doctrine of *Forum Non Conveniens*

"The doctrine of *forum non conveniens* rests upon a court's inherent power to control the parties and cases before it and to prevent its processes from becoming an instrument of abuse or injustice." *In re Air Crash Disaster Near New Orleans*, 821 F.2d 1147, 1153-54 (5th Cir. 1987)(en banc), *vacated by Pan Am. World Airways, Inc. V. Lopez*, 490 U.S. 1032 (1989), *reinstated except as to damages by Air Crash Disaster v. Pan Am. World Airways, Inc.*, 883 F.2d 17 (5th Cir. 1989)(en banc).  Applying this power, a federal court may decline to exercise jurisdiction, even though the court has jurisdiction and venue, "where it appears that the convenience of the parties and the court and the interests of justice indicate that the action should be tried in another forum." *Id.* at 1154. A "federal court sitting in a diversity action is required to apply the federal law of forum non conveniens when addressing motions to dismiss a plaintiff's case to a foreign forum." *Id.* at 1159.

In *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) and *Koster v. American Lumbermens*

*Mutual Casulty Co.*, 330 U.S. 518 (1947), the Supreme Court established the principle "that a court may resist imposition upon its jurisdiction even when jurisdiction is authorized." *Gulf Oil*, 330 U.S. at 507.  According to the Court, in deciding whether to exercise or decline jurisdiction, "the ultimate inquiry is where trial will best serve the convenience of the parties and the ends of justice." *Koster*, 330 U.S. at 527.  "The determination of what is most convenient rests upon several private and public factors which the Court stated should be considered and balanced by a court when presented with a motion to dismiss for forum non conveniens." *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1162.

The decision of whether to grant or deny a motion to dismiss for *forum non conveniens* is within the discretion of the court.  *Id.* at 1165.  The decision "should be an exercise in structured discretion founded on a procedural framework guiding the district court's decisionmaking process." *Id.*  "A defendant of course bears the burden of invoking the doctrine and moving to dismiss in favor of a foreign forum." *Id.* at 1164.  "This burden of persuasion runs to all elements of the forum non conveniens analysis," including demonstrating that an "adequate and available forum exists as to all defendants if there are several." *Id.*  If defendant meets this initial burden, "it must also establish that the private and public interests weigh heavily on the side of trial in the foreign forum." *Id.*

**B.     Available and Adequate Alternative Forum**

In *Piper Aircraft Co. V. Reyno*, 454 U.S. 235, 255 (1981), the Supreme Court reaffirmed the principles enunciated in *Gulf Oil* and *Koster* as appropriate for use in diversity cases.  In *Reyno*, the Court emphasized that prior to balancing the private and public interest factors, a court must first determine whether another adequate forum is available to hear the case "because the forum non conveniens presupposes the existence of at least two forums in which all defendants are amenable

7

to process." *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1164. "The *Reyno* court also stated that a foreign plaintiff's selection of an American forum deserves less deference than an American citizen's selection of his home forum." *Id.* However, a citizen's selection of his home forum is not dispositive, and "if the balance of conveniences suggests that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court, dismissal is proper." *Reyno*, 454 U.S. at 257, n. 23.

The issue of whether an available and adequate foreign forum exists is a two-part inquiry: availability and adequacy. *In re Air Crash Disaster Near New Orleans*, 821 F.2d at 1165. "A foreign forum is available when the entire case and all parties can come within the jurisdiction of that forum." *Id.* "A foreign forum is adequate when the parties will not be deprived of all remedies or treated unfairly . . . even though they may not enjoy the same benefits as they might receive in an American court." *Id.*

## C.    Private and Public Interest Factors

If the court decides the foreign forum is both available and adequate, the court should then consider what forum is most convenient by balancing the numerous private and public interest factors. *Id.* at 1162, 1165. The private interest factors to be considered are "the relative ease of proof; availability of compulsory process for attendance of unwilling witnesses; and the costs of obtaining attendance of willing. . . witnesses; probability of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious, and inexpensive." *Id.* at 1162. "If the district court finds that the private interests do not weigh in favor of the dismissal, it must then consider the public interest factors." *Id.* at 1165. The public interest factors include "the administrative difficulties flowing from court congestion; the local

interest in having localized controversies resolved at home; the interest in having the trial of a diversity case in a forum that is familiar with the law that must govern the action; the avoidance of unnecessary problems in conflicts of law, or in application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty."  *Id.* at 1162-63.

According to the Fifth Circuit, if the court determines the above consideration favor trial in a foreign forum, "it must finally ensure that a plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice and that if a defendant obstructs such reinstatement in the alternative forum that the plaintiff may return to the American forum."  *Id.* at 1166.  The denial of a motion to dismiss for forum non conveniens may be reversed only when there has been a clear abuse of discretion.  *Id.*  The trial court's decision "deserves substantial deference" when the court has considered all relevant factors and where its balancing of the factors is reasonable.  *Id.*

## V.

## PEREZNIETO'S FRAUD

In *In re Bridgestone/Firestone, Inc. Tires Product Liability Litigation*, 470 F.Supp.2d 917, 920 (S.D. Ind. Nov. 14, 2006), the district court initially granted the defendants' *forum non conveniens* motion, dismissing the plaintiffs' complaint stemming from the 2002 death of their husband and father as a result of a roll-over of the Ford Explorer he was driving in Veracruz, Mexico.  Pereznieto was a retained expert for some of the plaintiffs in the Indiana case and had submitted an affidavit on their behalf in opposition to the defendants' motion.  The plaintiffs appealed the dismissal of their complaint.

While the appeal was pending, the plaintiffs' counsel informed the Seventh Circuit Court of Appeals that the plaintiffs had hired Pereznieto as Mexican counsel and had attempted to sue the

9

defendants in a court in Morelos, Mexico.  According to the plaintiffs, the Mexican court determined it did not have jurisdiction to hear the case.  *In re Bridgestone/Firestone, Inc. Tires Product Liability Action*, 420 F.3d 702, 705 (7th Cir. 2005).  Based on this new evidence, the Seventh Circuit found the Mexican forum was not available under the circumstances, but remanded to the district court for further investigation of the circumstances surrounding the *Morelos* decision because the court expressed concerns about whether the *Morelos* case was handled in good faith and whether the *Morelos* decision was entitled to recognition by the district court.  *Id.* at 706.

On remand, the Indiana court conducted extensive discovery and held an evidentiary hearing. *In re Bridgestone/Firestone, Inc. Tires Product Liability Litigation*, 470 F.Supp.2d 917, 919-20 (S.D. Ind. Nov. 14, 2006).  The evidence established that in filing the case in Morelos, Mexico, the attorneys for the plaintiffs acted with the clear purpose of having the case dismissed and in seeking that result, "manipulated the process to insure that the dismissal would be based on a particular reason that was calculated to improve the chances of the dismissal being sustained on appeal." *Id.* at 920.  The court further held the *Morelos* orders were obtained in bad faith and were not subject to recognition by courts in the United States.  *Id.*

The Indiana court further discussed Pereznieto's involvement and found he "played a double role in this attempted fraud on the court - as Plaintiffs' Mexican counsel in the *Morelos* suit and as an expert witness.  In addition, he accepted a contingent fee interest in Plaintiffs' recovery from the Defendants as a compensation for his work." *Id.* at 928.

On December 18, 2006, the Indiana court amended its November 14, 2006 Order and sanctioned Pereznieto for the fraud he perpetrated on the court. *In re Bridgestone/Firestone, Inc. Tires Product Liability Litigation*, 2006 WL 3895059 (S.D. Ind. Dec. 18, 2006).  The court called

Pereznieto the "apparent mastermind behind these frauds on the U.S. and Mexican courts" and ordered him to pay over, as a personal sanction, the amount of one hundred thousand dollars. *Id.* at *2. The court further ordered that as long as the sanction remains unpaid, Pereznieto is barred from providing any testimony against any defendant in that cause of action anywhere in the United States. *Id.* The court also struck all sworn opinions of Pereznieto, whether made directly or indirectly, in the remaining cases in the *Bridgestone/Firestone* multidistrict litigation. *Id.*

## VI.

## DISCUSSION

On March 7, 2006, the undersigned recommended Defendants' *forum non conveniens* and Rule 44.1 motions be denied, first finding that Mexico is neither an available nor an adequate alternative forum in this case. Now, Defendants assert Pereznieto's fraud in the Indiana case should lead the Court to grant Defendants' *forum non conveniens* and Rule 44.1 motions.

In the March 7, 2006 Report and Recommendation, the Court first determined that Mexico is not an available forum for six detailed reasons. In this portion of the Court's analysis, the Court referenced Pereznieto's affidavit for the proposition that Mexico lacks territorial jurisdiction over Canadian Defendant Four Seasons, and therefore is not an available forum. The undersigned made no reference to the *Morelos* decision in its discussion. Using a different case referenced by Pereznieto, *Garcia v. Ford Motor Company, et al.,* as one example and Article 30, Section IV of the Code of Civil Procedure for the State of Nayarit, the Court concluded that "a Mexican court lacks territorial jurisdiction over Canadian defendant Four Seasons Hotels Limited." The Court also gave five other reasons to find that Mexico is not an available forum. These reasons are separate and apart from the principle of territorial jurisdiction, which was the only principle connected to the *Morelos*

11

decision.

Now, not only do Defendants assert the *Morelos* decision should be removed as authority in this case, with which Plaintiffs and the Court fully agree, but Defendants also assert all of Pereznieto's opinions on the jurisdiction and availability of the courts in Nayarit, Mexico in the instant case have been directly discredited due to the fraud in the Indiana case.  However, according to Plaintiffs, Defendants fail to articulate any valid reason for disregarding the entire expert testimony of  Pereznieto. Plaintiffs assert the fact that an expert witness has been criticized and sanctioned in another case against another defendant by a another court, does not, standing alone, justify tossing out all of that witness' work in the instant case.

Unlike the factual situation in this case, the allegations against Pereznieto in the Indiana case were fully developed after almost one year of discovery and a two-day evidentiary hearing.  There, the evidence established that in filing the case in Morelos, Mexico, the attorneys for the plaintiffs, along with Pereznieto, acted with the clear purpose of having the case dismissed and in seeking that result, "manipulated the process to insure that the dismissal would be based on a particular reason that was calculated to improve the chances of the dismissal being sustained on appeal." *In re Bridgestone/Firestone, Inc. Tires Product Liability Litigation*, 470 F.Supp.2d 917, 920 (S.D. Ind. Nov. 14, 2006).  Here, Defendants have not presented evidence of any fraud being perpetrated upon this Court in this case.  Instead, Defendants rely on the fraud found by the Indiana court, asserting that finding justifies invalidation of Pereznieto's opinions in this case.  Defendants further assert Pereznieto's fraud in the Indiana case affected this Court's ruling on its *forum non conveniens* and

Rule 44.1 motions.[2]

Although the Court is not convinced Pereznieto's fraud in the Indiana case necessitates the Court's complete disregard of Pereznieto's opinions in this case, out of an abundance of caution, the Court disregards the *Morelos* decision and strikes all of Pereznieto's opinions offered in this case. However, the Court disagrees with Defendants that taking the *Morelos* decision and Pereznieto's opinions completely out of this case and out of the *forum non conveniens* analysis warrants a different ruling from the Court on Defendants' *forum non conveniens* and Rule 44.1 motions.  This is so for the following reasons.

Even disregarding the *Morelos* case and Pereznieto's affidavit in its entirety, Plaintiffs have offered other extensive analysis of Mexican law from Plaintiffs' other expert, Henry S. Dahl. The Court specifically relied on and made reference to Dahl's affidavit in its March 7, 2006 Report and Recommendation on pages 11 through 14.

Defendants assert Dahl's affidavit is infected by Pereznieto's fraud because Dahl stated he had read Pereznieto's affidavit and agreed with his views.  However, the Court is not convinced Dahl's opinions, as an independent expert on Mexican law, are inextricably linked to Pereznieto's fraud in the Indiana case as to invalidate Dahl's opinions in this case.  The Court therefore considers Dahl's affidavit.

In his affidavit, Dahl opines that Mexico is not an available forum and states his reasons, primarily based upon his interpretation of Mexican law. First, Dahl opines that the effects of *forum non conveniens* violate Mexican law. Second, Dahl explains preemptive jurisdiction in Mexican law,

---

[2] Again, the undersigned made no reference to the *Morelos* decision in its March 7, 2006 Report and Recommendation.

concluding that after a case has been filed in a United States court, Mexican jurisdiction is preempted. Third, Dahl expresses his opinion that procedural rights that may be subject to negotiation in the United States legal system cannot be agreed to by the parties in the Mexican context. Fourth, Dahl explains that jurisdiction over Canadian Defendant Four Seasons would not be in Mexico. Dahl's affidavit provides adequate support for the Court's conclusion regarding the lack of an available forum in Mexico.

Moreover, in response to Defendants' current motion, Plaintiffs have filed with the Court seventeen cases filed by Mexican citizens that were refiled in Mexico after dismissed in the United States on *forum non conveniens* grounds. In each case, the Mexican court dismissed the case for lack of jurisdiction.[3]

The Court, having considered the cases filed by Plaintiffs and without relying on the *Morelos* decision or Pereznieto's opinions, remains of the opinion, based on the facts of this case, that Mexico is not an available forum. First, there is the limitations issue. Under the Civil Code for the State of Nayarit Article 1145, the statute of limitations for this case is two years. The decedent died on June 8, 2003, and Plaintiffs persuasively argue Defendants improperly assert the expired two-year statute of limitations in this case would be tolled. According to Plaintiffs, Nayarit's tolling statute only applies to lawsuits filed within the territories of Mexico.

As for Defendants' offer to consent to the jurisdiction of the Mexican legal system, Dahl

---

[3] The Court notes that in the Indiana case, the court was not concerned with the availability of Mexico as a forum in general, but only with the two specific questions referred by the Seventh Circuit Court of Appeals. Therefore, the Indiana court did not consider the decisions submitted by the plaintiffs wherein Mexican courts had refused jurisdiction. *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation*, 470 F.Supp.2d 917, 920 n.5 (S.D. Ind. 2006).

makes clear in his affidavit that many procedural rights that are subject to negotiation in the United States legal system cannot be agreed to by the parties in a Mexican court. According to Dahl, stipulations made before a United States court to waive the Mexican statute of limitations are meaningless in Mexico. The Court questions whether Defendants' consent or submission to the jurisdiction of a Mexican court would actually confer jurisdiction under the laws of Mexico.

Moreover, there is a question of whether a Mexican court would even accept jurisdiction over this action. Dahl explains in his affidavit that the theory of preemptive jurisdiction is deeply rooted in Mexican law, and the filing before this Court preempts Mexican jurisdiction. Plaintiffs have not chosen, and will not be voluntarily choosing, the Mexican forum to file suit as is required under Article 8 of Nayarit's Civil Procedure law– no matter how adamantly Defendants want to submit themselves to the jurisdiction of the Mexican court or if this Court dismisses this case on *forum non conveniens* grounds.

Second, a Mexican court lacks territorial jurisdiction over Canadian Defendant Four Seasons Hotels Limited. According to Dahl, Article 30, Section IV of the Code of Civil Procedure for the State of Nayarit, determines that jurisdiction in a personal injury action lies in the defendant's domicile, and when a defendant is not domiciled in a particular judge's jurisdiction, the Mexican judge will declare himself without jurisdiction and must refuse to accept or admit the case into his court. Defendants have failed to show that Mexico is an available alternative forum in this case. Even though Defendants have failed to show that a Mexican forum is available and the Court need not proceed further into the *forum non conveniens* inquiry, assuming *arguendo* Mexico is an available forum, the next step would be to analyze the adequacy of Mexico as an alternative forum.

In the March 7, 2006 Report and Recommendation, the undersigned found that Mexico is an

15

inadequate alternative forum. In so doing, the undersigned gave five reasons for the recommendation to retain this case.  None of the reasons contained any reference to the *Morelos* decision, and this issue has nothing to do with the *Morelos* decision. Even though the undersigned considered Pereznieto's affidavit regarding discovery practices in Mexico and Mexico's limited damages recovery scheme, the Court's conclusion is not altered even removing from the Court's consideration Pereznieto's affidavit.

Dahl, Plaintiffs' other expert on Mexican law, opines that Mexico is not an adequate forum because of the limited possible recovery and the unlikelihood of obtaining Mexican counsel on a contingency fee basis. Thus, the affidavit of Dahl provides adequate support for the Court's conclusion regarding the lack of an adequate forum in Mexico.  The Court, having removed Pereznieto's opinions from its consideration, remains of the opinion Mexico is not an adequate forum.

Even if the Court were to find Mexico is an adequate foreign forum, Defendants' motion for relief from the Court's March 24, 2006 Order still fails because the private and public interest factors weigh in favor of keeping Plaintiffs' case in the United States.  The Court has determined that, if Mexico were an available and adequate forum, only two of the four private interest factors would weigh in favor of resolving this case in Mexico. In addition, the Court finds the public interest factors (the administrative difficulties flowing from court congestion, the local interest in having localized controversies decided at home, the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action, the avoidance of unnecessary problems in conflict of laws, and the unfairness of burdening citizens in an unrelated forum with jury duty) weigh in favor of resolving this litigation in Texas.

The Court notes that in response to Defendants' current motion, Plaintiffs have provided the Court the February 27, 2004 Order by the Southern District of Indiana, wherein the court denied the defendants' motions to dismiss for *forum non conveniens* as the United States resident plaintiffs for accidents occurring in Mexico and where there was a non-Mexican defendant.  *In re Bridgestone/Firestone, Inc. Tires Products Liability Litigation* (S.D. Ind. February 27, 2004).  The court held the United States resident plaintiffs' cases should not be dismissed because the presumption of convenience accorded a plaintiff's choice of her home forum as well as the balance of the private and public interest factors pointed toward retention of the cases in the federal courts of Texas.  *Id.*

Here, two of the three plaintiffs reside in Texas.  Both Defendants conduct business in Texas. The relationship between the parties began in Texas. The Court finds Plaintiffs' case should not be dismissed because the presumption of convenience accorded Plaintiffs' choice of her home forum, as well as the balance of the private and public interest factors, weigh in favor of retaining this case.

## VII.

### RECOMMENDATION

In sum, the Court removes from its consideration all of Pereznieto's opinions.  The finding that a Mexican forum is unavailable or the finding that a Mexican forum is inadequate, each alone, prevents a dismissal of this case. Even so, the Court continued with its *forum non conveniens* analysis and found that the balance of private and public interest factors favored resolving the case in Texas.  Again, this finding that the interest factors weigh in favor of United States jurisdiction, alone, prevents dismissal.  At each of the three steps in the Court's analysis (availability, adequacy, and balance of interest factors), and without any reliance on the *Morelos* decision referred to by

17

Pereznieto in his affidavit or any of Pereznieto's other opinions, the Court concludes that Plaintiffs' case should not be dismissed and transferred to Mexico.   For all these reasons, the Court recommends Defendants' motion for relief from the Court's March 24, 2006 Order be denied. Based on the foregoing, it is

**RECOMMENDED** that  Defendants' Motion for Relief from Court Order (Docket Entry # 119) be **DENIED**.

Within ten (10) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations of the magistrate judge.  28 U.S.C.A. 636(b)(1)(C).

Failure to file written objections to the proposed findings and recommendations contained in this report within ten days after service shall bar an aggrieved party from *de novo* review by the district court of the proposed findings and recommendations and from appellate review of factual findings accepted or adopted by the district court except on grounds of plain error or manifest injustice. *Thomas v. Arn*, 474 U.S. 140, 148 (1985); *Rodriguez v. Bowen*, 857 F.2d 275, 276-77 (5th Cir.1988).

**SIGNED this 7th day of June, 2007.**

CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE

# Appendix Tab 4

8/12/2015 3:54:48 PM
Chris Daniel - District Clerk
Harris County
Envelope No: 6469324
By: TOLMAN, TAMMY E
Filed: 8/12/2015 3:54:48 PM

## CAUSE NO. 2015-28543

| | | |
|---|---|---|
| MARIA SANTOS LOPEZ DOMINGUEZ, | § | IN THE DISTRICT COURT |
| INDIVIDUALLY AND AS NEXT FRIEND | § | |
| OF KAREN MARIEN ANDRADE LOPEZ, | § | |
| MAIRET SAMELI ANDRADE LOPEZ | § | |
| AND IMAR GERARDO ANDRADE LOPEZ | § | |
| ON BEHALF THE ESTATE OF OMAR | § | |
| GERARDO ANDRADE LOPEZ, ET AL | § | |
| | § | |
| V. | § | OF HARRIS COUNTY, TEXAS |
| | § | |
| ARNOLD & ITKIN, L.L.P., | § | |
| BECK REDDEN, L.L.P., | § | |
| ALBRITTON LAW FIRM, | § | |
| KURT ARNOLD, CORY ITKIN, | § | |
| JASON ITKIN, RUSSELL POST, | § | |
| FIELDS ALEXANDER, JAS BRAR and | § | |
| ERIC ALBRITTON | § | 11TH JUDICIAL DISTRICT |

### ORDER DENYING DEFENDANTS' PLEA TO THE JURISDICTION AND PLEA IN ABATEMENT

**On this day** came on to be considered the Plea to the Jurisdiction, and, in the Alternative, Plea in Abatement of Defendants, **ARNOLD & ITKIN, L.L.P., BECK REDDEN, L.L.P., ALBRITTON LAW FIRM, KURT ARNOLD, CORY ITKIN, JASON ITKIN, RUSSELL POST, FIELDS ALEXANDER, JAS BRAR AND ERIC ALBRITTON**, and Plaintiff's Response to All Defendants' Plea to the Jurisdiction, and, In the Alternative, Plea in Abatement, and the Court, after considering same and hearing argument of counsel is of the opinion that said motion and pleas should be denied, and it is, therefore

**Ordered** that all Pleas to the Jurisdiction and all Pleas in Abatement of Defendants, **ARNOLD & ITKIN, L.L.P., BECK REDDEN, L.L.P., ALBRITTON LAW FIRM, KURT ARNOLD, CORY ITKIN, JASON ITKIN, RUSSELL POST, FIELDS ALEXANDER, JAS BRAR AND ERIC ALBRITTON**, are hereby denied in their entirety.

**Signed** this \_\_\_\_\_ day of _____, 2015.

Signed:
9/17/2015 _____
Judge Mike Miller

# Appendix Tab 5

REPORTER'S RECORD
VOLUME 1 OF 1 VOLUMES
TRIAL COURT CAUSE NO. 2015-28543


LOPEZ DOMINGUEZ, ET AL    ) IN THE DISTRICT COURT
                          )
vs.                       ) HARRIS COUNTY, TEXAS
                          )
ARNOLD & ITKIN, LLP, ET AL) 11th JUDICIAL DISTRICT


_____

**STATUS CONFERENCE**

_____


On the 19th day of October, 2015, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Mike Miller, Judge Presiding, held in Houston, Harris County, Texas.

Proceedings reported by computerized stenotype machine.

**APPEARANCES**

Mr. David Kassab
KASSAB LAW FIRM
1420 W. Alabama Street
Houston, Texas  77004
Telephone:  713-522-7400
Counsel for PLAINTIFFS


Mr. Samuel A. Houston
SHEPHERD, SCOTT, CLAWATER & HOUSTON, LLP
2777 Allen Parkway, 7th Floor
Houston, Texas  77019
Telephone:  713-650-6600
Counsel for DEFENDANT ARNOLD & ITKIN, LLP


Mr. Reagan W. Simpson
YETTER COLEMAN, LLP
909 Fannin St., #3600
Houston, Texas  77010
Telephone:  713-632-8002
Counsel for DEFENDANTS BECK REDDEN, RUSSELL POST, FIELDS
ALEXANDER, JAS BRAR

P R O C E E D I N G S

THE COURT: Here we go. I will be the first one to admit that it was fairly obvious, I think, that I was wavering under the misimpression that all denials of the Pleas to the Jurisdiction were subject to interlocutory appeal. I was confusing them, I guess, because the City of Houston takes up every single one. I guess there is no specific statutory prerogative to do the same in this context. It was obvious that is what I thought.

Anyway, I read -- I want to be candid, okay, that to say I was absolutely confident that I was making the right ruling with regard to whether we have sufficient ripeness in this case, I do not have -- I still have some level of ambivalence. It may be my lack of familiarity with malpractice cases and how they typically run. It seems to me there is probably some requirement -- like I said last time, I was certainly under the impression that I thought and, frankly, I thought you had to try the case, take it up on appeal and go the whole nine yards before you can file a malpractice case. I always believed that to be the circumstance.

But then the cases you cited. I am not

sure really -- that is the case in every Summary Judgment I deny. I can say the same thing on every single Summary Judgment. If I deny the Summary Judgment, that means we are going to have to try the case. Spend all that money. Would it help everyone to know if I did it right? Sure. We don't do things that way.

I am not sure that I see any distinction in this case from every other Summary Judgment that I am not sure whether I did the right thing when I deny it. If I am wrong and I should have granted it, yeah, we wouldn't have to try the case. It would save a lot of time 18 months from now when we get the opinion.

Anyway, I don't know. I am about as sure or unsure the issue you are presenting today as I was when I had to deal with that ruling on the Plea to the Jurisdiction.

MR. HOUSTON: Well, appreciate that. But really what we set this morning it is about the status conference, which I appreciate what you are saying.

I do think it is a little different than your normal denial of a Summary Judgment when you have two parties. This case involves already 15 plaintiffs and they brought in more, however many the other day. We are talking about much more intense discovery, much

more long term.

Also particularly since we are talking about a novel issue, that is whether or not a plaintiff can sue their lawyers when all that has been happening is you have had a conditional grant of a forum non conveniens. In other words, there is no case law. There is no Texas case law specifically addressing it.

Really all we are asking because I know you struggled with the issue on whether the abatement and Plea to the Jurisdiction are correct, but under this statute, the permissive appeal, it seems to me this would be the perfect situation for it. It is not your run of the mill Summary Judgment. We are very early in the case so we can decide about the abatement. They still have an opportunity to pursue the case. If we are right, they need to go ahead and pursue the cases in Mexico and that is what they need to do.

Really I looked at this and looking at the statute, I don't know how often you have addressed this issue. But it is really a two-step process.

THE COURT: Haven't done it in seven years.

MR. HOUSTON: It is a two-step process and this is what is important. The order we submitted and, again, the issues that I think were before you simply

allows us within 15 days to see if the Court of Appeals is going to look at it anyway. A lot of those issues that you raised and whether or not they -- we would know --

THE COURT: Tell me about that. Assuming that I were to say, yes, you still have to convince the Court of Appeals that I had a lick of sense when I said yes, right?

MR. HOUSTON: Right.

THE COURT: Frankly, from the cases they have cited, that doesn't happen very often, does it?

MR. HOUSTON: Maybe not.

THE COURT: Are there opinions -- do they write an opinion when they say, yes, we will agree to hear that?

MR. SIMPSON: Sure. They write an opinion.

MR. HOUSTON: I don't think there is a lot of case law period on this.

MR. SIMPSON: When the statute was first passed, both sides had to agree. That didn't happen very often. Sometimes it did.

THE COURT: Every now and then it can. Both sides can say -- I agree. It can happen.

MR. SIMPSON: There have been instances

where both sides agree and the Court of Appeals said, no, we don't agree. They have to make a decision about using their judicial resources in what they decide and (inaudible).

Here our argument is it is a controlling issue of law on whether it is ripe and you would have a conditional dismissal for forum non conveniens. That is an issue that itself has not been addressed by any Texas case. It is a novel issue.

They cite some -- they claim analogous cases from other jurisdictions. We have an analogous case from this jurisdiction. But there is nothing that has been dealt with in terms of -- the Court has dealt with the conditional dismissal which is all we are talking about in this case. It is a novel issue. It hasn't been decided.

THE COURT: The problem is there is so many issues is my difficulty. It is not just one issue. I will be -- I felt like I had a reasonable grasp of all the different layers and arguments.

What you-all are saying is even if it is not -- you are saying there is a cause of action out there from the fact that they couldn't pursue their Mexican law claims in the U.S., even if it is not otherwise ripe? Tell me about that again.

MR. KASSAB: Absolutely, Your Honor. David Kassab on behalf of the plaintiffs. That issue is if the lawyers would have handled the forum non conveniens motion from the outset properly, the argument is that they would have been able to pursue those Mexican law claims even if that is all that is left at the end of the day in the U.S.

We have submitted expert testimony from Dahl and another Mexican law lawyer that says that being limited in Mexico they're not entitled to the same amount of discovery that they have in the United States. They're essentially limited in how they can pursue and prove their case. So we have argued that their ability to pursue those Mexican law claims even in the U.S. is some benefit that the lawyers deprive them of through their malpractice.

MR. SIMPSON: But it is a conditional dismissal. That is the problem. The court said: Go to Mexico. If you don't succeed down there, come back to us. They haven't lost anything at this point.

It is sort of like -- it is not exactly the same -- but let's say I am a plaintiff's lawyer, I don't argue well enough about a continuance and my case gets delayed six months.

THE COURT: My difficulty is and, again, I

am going to be candid with you. I don't think that analogy is appropriate in this case. I think -- if you send them back to Mexico at this point and tell them they have to litigate through the entire system, I think it is a black hole that they will never come back from. I think you are dismissing the case. I think it is dispositive of the case. There is really not a remedy that will allow them -- how many plaintiffs are there?

MR. KASSAB: Your Honor, we have added additional ones. I believe -- we have some we haven't quite filed yet. I believe there is going to be around 20.

THE COURT: You are going to have to go file and litigate 20 cases, take it all the way through the appellate system before they have a right to bring this case. I just have a sense that is a burden that they will never -- my sense is that what you are doing here, if I grant this Plea to the Jurisdiction, it is dispositive of the case. That is the whole idea. They will never come back. You will never see --

Then we have to argue whether it is a final judgment in Mexico and whether or not there were other appellate remedies they could have pursued. It will never become ripe, ever.

I very honestly think that is precisely

what is going on here is that we are going to send it down the black hole and it is never going to come back. That is just my impression.

As is often the case, my ruling may have been more of a pragmatic -- it may turn out that is what the law is. Sorry. You have got to go back and litigate all these and we all know we are never going to see them again if that happens. Maybe that is the outcome we will get. But I don't feel comfortable doing that. I still don't feel comfortable doing that. That is kind of where I ended up for a variety of reasons.

I kind of doubt also this is the sort of thing they had in mind because of the multiplicity of the issues and how complex it is. To say that there is some central narrow controlling legal issue that can be determined here that is outcome determinative, I think that is wishful thinking. I think that is probably the response you are going to get from them.

They do have the prerogative to do that. As you pointed out in your cases, that seems to be what they more often do than not, right?

MR. KASSAB: They are just talking about deny it for lack of jurisdiction.

THE COURT: I don't know. The Court of Appeals will say that this is inappropriate for a

permissive appeal.

MR. KASSAB: Then they will dismiss it for lack of jurisdiction under those circumstances because they don't have the jurisdiction under this statute.

THE COURT: Isn't that what you found -- your argument, in essence, is this isn't a proper case and you have cited all the cases where they agreed with you and refused to hear it?

MR. KASSAB: But I think that the trial court is the first doorway to prevent us from going through that unnecessary process.

THE COURT: I will tell you what I am going to do. I will give you your opportunity in the Court of Appeals. If the Court of Appeals agree it is a controlling issue, then perhaps I got it so wrong that they want to jump in there to address it. I will give you the opportunity to do that. I will give you the chance and we will see what the Court of Appeals says. I have my doubts. That doesn't seem unreasonable to me. Frankly, I think most of the time they're not going to do it.

MR. KASSAB: I understand the Court's instruction. Are you going to be giving them that opportunity with the order that is currently in place?

MR. HOUSTON: I was about to say, can we

just put together one order for all the defendants and submit it?

THE COURT: See if you-all can agree on something. Do you want to sit down and do that while you-all are all here today? Or do you want to -- is everyone going to go back to their office and start sending e-mails?

MR. HOUSTON: What do you want to do?

MR. KASSAB: I would prefer to have Lance available. Lance is not available because he is out of town. So have him look at it. We are in disagreement with the issues that they think are controlling. That is the problem, Your Honor.

THE COURT: I agree with you. I am not even sure what the issues are. They contend that that answers the question and there are so many involved I think. That is the whole point. Let's see what the Court of Appeals thinks if they're correct or not. I don't see there is a lot of downside to that and it can be dealt with within reasonable time constraints. I think that is a sensible solution. I will give you the chance to do it.

MR. HOUSTON: One thing. There has been a lot of discovery proposed, admissions. Can we stay discovery while we are doing that, the admissions and

all?

THE COURT: No. Why do we need to do that?

MR. HOUSTON: Well, there is 172 admissions.

THE COURT: Requests for Admissions?

MR. HOUSTON: Yes.

MR. KASSAB: Your Honor, in all fairness, they're true and false for the questions.

THE COURT: Go ahead and answer it. If the Court of Appeals wants to stay it, let them do it. I try not to stay discovery unless I am required to. I am going to let you-all go give it a shot. You can answer the admissions.

(HEARING CONCLUDED)

STATE OF TEXAS:

COUNTY OF HARRIS:

I, Terri W. Anderson, Official Court Reporter in and for the 11th District Court of Harris, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the total cost for the preparation of this Reporter's Record is $_____ and was paid/will be paid by _____.

_____

Terri W. Anderson, CSR
Texas CSR 877
Official Court Reporter
11th District Court
Harris County, Texas
201 Caroline, #945
Houston, Texas 77002
Telephone: 713-368-6030
Expiration: 12/31/16

## 1

**11th [3]** 1/6 14/5 14/22
**12/31/16 [1]** 14/24
**1420 [1]** 2/3
**15 [2]** 4/23 6/1
**16 [1]** 14/24
**172 [1]** 13/4
**18 [1]** 4/13
**19th [1]** 1/18

## 2

**20 [2]** 9/12 9/14
**201 [1]** 14/23
**2015 [1]** 1/18
**2015-28543 [1]** 1/2
**2777 [1]** 2/7
**28543 [1]** 1/2

## 3

**3600 [1]** 2/11

## 6

**6030 [1]** 14/24
**6600 [1]** 2/8

## 7

**713-368-6030 [1]** 14/24
**713-522-7400 [1]** 2/4
**713-632-8002 [1]** 2/12
**713-650-6600 [1]** 2/8
**7400 [1]** 2/4
**77002 [1]** 14/23
**77004 [1]** 2/4
**77010 [1]** 2/12
**77019 [1]** 2/8
**7th [1]** 2/7

## 8

**8002 [1]** 2/12
**877 [1]** 14/21

## 9

**909 [1]** 2/11
**945 [1]** 14/23

## A

**abatement [2]** 5/9 5/14
**ability [1]** 8/13
**able [1]** 8/5
**about [12]** 4/14 4/19 4/25 5/3 5/14 6/5 7/2 7/15 7/25 8/23 10/22 11/25
**above [3]** 1/19 14/6 14/10
**above-styled [1]** 14/10
**above-titled [1]** 1/19
**absolutely [2]** 3/13 8/1
**action [1]** 7/22
**added [1]** 9/9
**additional [1]** 9/10
**address [1]** 11/16
**addressed [2]** 5/19 7/8
**addressing [1]** 5/7
**admissions [5]** 12/24 12/25 13/5 13/6 13/14
**admit [1]** 3/4
**again [4]** 5/25 7/25 8/25 10/8
**agree [8]** 6/14 6/21 6/24 7/1 7/2 11/14 12/3 12/14

**agreed [1]** 11/7
**ahead [2]** 5/16 13/10
**AL [2]** 1/4 1/6
**Alabama [1]** 2/3
**ALEXANDER [1]** 2/13
**all [21]**
**Allen [1]** 2/7
**allow [1]** 9/8
**allows [1]** 6/1
**already [1]** 4/23
**also [2]** 5/2 10/12
**always [1]** 3/23
**am [11]** 3/25 4/8 4/9 4/11 4/14 8/22 9/1 11/12 12/14 13/12 13/13
**ambivalence [1]** 3/16
**amount [1]** 8/11
**analogous [2]** 7/10 7/11
**analogy [1]** 9/2
**Anderson [2]** 14/4 14/20
**another [1]** 8/9
**answer [2]** 13/10 13/14
**answers [1]** 12/16
**any [3]** 4/8 7/8 14/15
**anything [1]** 8/20
**anyway [3]** 3/12 4/14 6/2
**appeal [4]** 3/7 3/21 5/11 11/1
**Appeals [9]** 6/1 6/7 7/1 10/25 11/14 11/14 11/18 12/18 13/11
**APPEARANCES [1]** 2/1
**appellate [2]** 9/15 9/23
**appreciate [2]** 4/18 4/20
**appropriate [1]** 9/2
**are [28]**
**argue [2]** 8/23 9/21
**argued [1]** 8/13
**argument [3]** 7/5 8/4 11/6
**arguments [1]** 7/20
**ARNOLD [2]** 1/6 2/9
**around [1]** 9/11
**as [4]** 4/14 4/15 10/4 10/20
**asking [1]** 5/8
**Assuming [1]** 6/5
**available [2]** 12/10 12/10

## B

**back [7]** 8/19 9/3 9/5 9/20 10/2 10/6 12/6
**be [15]**
**because [5]** 3/8 5/8 10/13 11/3 12/10
**BECK [1]** 2/13
**become [1]** 9/24
**been [8]** 5/4 6/25 7/8 7/13 7/16 8/5 10/5 12/23
**before [4]** 1/20 3/22 5/25 9/15
**behalf [1]** 8/2
**being [1]** 8/9
**believe [2]** 9/10 9/11
**believed [1]** 3/23
**benefit [1]** 8/15
**black [2]** 9/5 10/2
**both [3]** 6/21 6/24 7/1
**BRAR [1]** 2/13
**bring [1]** 9/15
**brought [1]** 4/24
**burden [1]** 9/16

## C

**came [1]** 1/19

**can [14]** 3/22 4/2 5/4 5/14 6/23 6/24 6/24 8/12 10/15 11/25 12/3 12/19 12/24 13/13
**candid [2]** 3/12 9/1
**Caroline [1]** 14/23
**case [25]**
**cases [8]** 3/17 3/25 5/16 6/10 7/11 9/14 10/20 11/7
**cause [4]** 1/2 1/20 7/22 14/11
**central [1]** 10/15
**certainly [1]** 3/19
**certify [3]** 14/6 14/13 14/16
**chambers [1]** 14/12
**chance [2]** 11/18 12/22
**circumstance [1]** 3/24
**circumstances [1]** 11/3
**cite [1]** 7/10
**cited [3]** 3/25 6/11 11/7
**City [1]** 3/8
**claim [1]** 7/10
**claims [3]** 7/24 8/6 8/14
**CLAWATER [1]** 2/7
**COLEMAN [1]** 2/11
**come [4]** 8/19 9/5 9/20 10/2
**comfortable [2]** 10/9 10/10
**complex [1]** 10/14
**computerized [1]** 1/22
**CONCLUDED [1]** 13/17
**conditional [4]** 5/5 7/7 7/14 8/17
**conference [2]** 1/11 4/20
**confident [1]** 3/13
**confusing [1]** 3/7
**constraints [1]** 12/20
**contains [1]** 14/7
**contend [1]** 12/15
**context [1]** 3/10
**continuance [1]** 8/23
**controlling [4]** 7/5 10/15 11/15 12/12
**conveniens [3]** 5/6 7/7 8/4
**convince [1]** 6/6
**correct [3]** 5/10 12/18 14/7
**correctly [1]** 14/14
**cost [1]** 14/16
**could [1]** 9/23
**couldn't [1]** 7/23
**counsel [4]** 2/5 2/9 2/13 14/9
**COUNTY [4]** 1/5 1/21 14/2 14/22
**court [19]**
**Court's [1]** 11/22
**CSR [2]** 14/20 14/21
**currently [1]** 11/24

## D

**Dahl [1]** 8/9
**David [2]** 2/2 8/2
**day [3]** 1/18 4/24 8/7
**days [1]** 6/1
**deal [1]** 4/16
**dealt [3]** 7/13 7/13 12/20
**decide [2]** 5/14 7/3
**decided [1]** 7/16
**decision [1]** 7/2
**DEFENDANT [1]** 2/9
**defendants [2]** 2/13 12/1
**delayed [1]** 8/24
**denial [1]** 4/22
**denials [1]** 3/6

## D

deny [4] 4/2 4/3 4/10 10/23
deprive [1] 8/15
determinative [1] 10/16
determined [1] 10/16
did [3] 4/6 4/10 6/22
didn't [1] 6/21
different [2] 4/21 7/20
difficulty [2] 7/18 8/25
disagreement [1] 12/11
discovery [5] 4/25 8/11 12/24 12/25 13/12
dismiss [1] 11/2
dismissal [3] 7/7 7/14 8/18
dismissing [1] 9/6
dispositive [2] 9/7 9/19
distinction [1] 4/8
DISTRICT [4] 1/4 1/6 14/5 14/22
do [22]
does [1] 6/11
doesn't [2] 6/11 11/19
doing [4] 9/17 10/9 10/10 12/25
DOMINGUEZ [1] 1/4
don't [13] 4/6 4/14 5/19 6/18 7/2 8/19 8/23 9/1 10/9 10/10 10/24 11/4 12/19
done [1] 5/21
doorway [1] 11/10
doubt [1] 10/12
doubts [1] 11/19
down [3] 8/19 10/2 12/4
downside [1] 12/19

## E

e-mails [1] 12/7
early [1] 5/13
end [1] 8/7
ended [1] 10/11
enough [1] 8/23
entire [1] 9/4
entitled [1] 8/10
essence [1] 11/6
essentially [1] 8/12
ET [2] 1/4 1/6
even [5] 7/21 7/24 8/6 8/14 12/15
ever [1] 9/24
every [5] 3/8 4/1 4/2 4/9 6/23
everyone [2] 4/5 12/6
evidence [1] 14/8
exactly [1] 8/21
exhibits [1] 14/14
expert [1] 8/8
Expiration [1] 14/24

## F

fact [1] 7/23
fairly [1] 3/4
fairness [1] 13/8
false [1] 13/9
familiarity [1] 3/17
Fannin [1] 2/11
feel [2] 10/9 10/10
felt [1] 7/19
FIELDS [1] 2/13
file [2] 3/22 9/14
filed [1] 9/11
final [1] 9/22

FIRM [1] 2/3
first [3] 3/4 6/20 11/10
Floor [1] 2/7
following [1] 1/18
foregoing [1] 14/6
forum [3] 5/5 7/7 8/3
found [1] 11/5
frankly [3] 3/20 6/10 11/20
further [2] 14/13 14/16

## G

get [3] 4/13 10/9 10/18
gets [1] 8/24
give [5] 11/13 11/16 11/17 12/21 13/13
giving [1] 11/23
go [9] 3/3 3/22 5/16 8/18 9/13 10/6 12/6 13/10 13/13
going [16]
got [2] 10/6 11/15
grant [2] 5/5 9/18
granted [1] 4/11
grasp [1] 7/19
guess [2] 3/7 3/9

## H

had [7] 3/21 4/16 5/5 6/7 6/21 7/19 10/13
handled [1] 8/3
happen [3] 6/11 6/21 6/24
happening [1] 5/4
happens [1] 10/8
HARRIS [5] 1/5 1/21 14/2 14/5 14/22
has [5] 5/4 7/8 7/13 7/13 12/23
hasn't [1] 7/16
have [37]
haven't [3] 5/21 8/20 9/10
he [1] 12/10
hear [2] 6/15 11/8
HEARING [1] 13/17
held [2] 1/19 1/21
help [1] 4/5
here [6] 3/3 7/5 9/18 10/1 10/16 12/5
hereby [1] 14/6
him [1] 12/11
hole [2] 9/5 10/2
honestly [1] 9/25
Honor [4] 8/1 9/9 12/13 13/8
Honorable [1] 1/20
Houston [8] 1/21 2/4 2/6 2/7 2/8 2/12 3/8 14/23
how [5] 3/17 5/19 8/12 9/8 10/14
however [1] 4/24

## I

idea [1] 9/19
important [1] 5/24
impression [2] 3/20 10/3
inappropriate [1] 10/25
inaudible [1] 7/4
included [1] 14/9
instances [1] 6/25
instruction [1] 11/23
intense [1] 4/25
interlocutory [1] 3/7
involved [1] 12/16
involves [1] 4/23
is [84]

isn't [2] 11/5 11/6
issue [12] 4/15 5/3 5/9 5/20 7/6 7/8 7/9 7/15 7/18 8/2 10/15 11/15
issues [6] 5/25 6/2 7/18 10/14 12/12 12/15
it [60]
ITKIN [2] 1/6 2/9
itself [1] 7/8

## J

JAS [1] 2/13
Judge [1] 1/20
judgment [7] 4/2 4/3 4/4 4/9 4/22 5/13 9/22
judicial [2] 1/6 7/3
jump [1] 11/16
jurisdiction [8] 3/6 4/17 5/10 7/12 9/18 10/23 11/3 11/4
jurisdictions [1] 7/11
just [5] 7/18 9/16 10/3 10/22 12/1

## K

Kassab [3] 2/2 2/3 8/2
kind [2] 10/11 10/12
know [7] 4/6 4/14 5/8 5/19 6/3 10/7 10/24

## L

lack [3] 3/16 10/23 11/3
Lance [2] 12/9 12/10
last [1] 3/19
law [10] 2/3 5/6 5/7 6/19 7/6 7/24 8/6 8/9 8/14 10/6
lawyer [2] 8/9 8/22
lawyers [3] 5/4 8/3 8/15
layers [1] 7/20
left [1] 8/6
legal [1] 10/15
let [2] 13/11 13/13
let's [2] 8/22 12/17
level [1] 3/16
lick [1] 6/7
like [3] 3/19 7/19 8/21
limited [2] 8/10 8/12
litigate [3] 9/4 9/14 10/7
little [1] 4/21
LLP [4] 1/6 2/7 2/9 2/11
long [1] 5/1
look [2] 6/2 12/11
looked [1] 5/18
looking [1] 5/18
LOPEZ [1] 1/4
lost [1] 8/20
lot [5] 4/12 6/2 6/18 12/19 12/24

## M

machine [1] 1/23
mails [1] 12/7
make [1] 7/2
making [1] 3/14
malpractice [3] 3/17 3/23 8/16
many [4] 4/24 7/18 9/8 12/16
may [3] 3/16 10/4 10/5
Maybe [2] 6/12 10/8
me [6] 3/18 5/11 6/5 7/25 11/19 14/12
means [1] 4/4
Mexican [4] 7/24 8/6 8/9 8/14

## M

**Mexico [5]** 5/17 8/10 8/19 9/3 9/22
**Mike [1]** 1/20
**mill [1]** 5/13
**Miller [1]** 1/20
**mind [1]** 10/13
**misimpression [1]** 3/5
**money [1]** 4/5
**months [2]** 4/13 8/24
**more [5]** 4/24 4/25 5/1 10/5 10/21
**morning [1]** 4/19
**most [1]** 11/20
**motion [1]** 8/4
**Mr [3]** 2/2 2/6 2/10
**much [2]** 4/25 4/25
**multiplicity [1]** 10/13
**my [8]** 3/16 7/18 8/23 8/25 9/17 10/3
 10/4 11/19

## N

**narrow [1]** 10/15
**need [3]** 5/16 5/17 13/2
**never [7]** 9/5 9/17 9/20 9/20 9/24 10/2
 10/7
**nine [1]** 3/22
**nine yards [1]** 3/22
**no [6]** 1/2 3/9 5/6 5/7 7/2 13/2
**non [3]** 5/5 7/7 8/3
**normal [1]** 4/22
**not [22]**
**nothing [1]** 7/12
**novel [3]** 5/3 7/9 7/15
**now [2]** 4/13 6/23
**numbered [2]** 1/20 14/11

## O

**obvious [2]** 3/4 3/10
**occurred [1]** 14/11
**October [1]** 1/18
**offered [1]** 14/15
**office [1]** 12/6
**Official [2]** 14/4 14/21
**often [5]** 5/19 6/11 6/22 10/4 10/21
**okay [1]** 3/13
**one [5]** 3/4 3/8 7/18 12/1 12/23
**ones [1]** 9/10
**open [1]** 14/11
**opinion [3]** 4/13 6/14 6/17
**opinions [1]** 6/13
**opportunity [4]** 5/15 11/13 11/17 11/24
**order [3]** 5/24 11/24 12/1
**other [6]** 4/9 4/24 5/6 7/11 9/23 14/8
**otherwise [1]** 7/25
**our [1]** 7/5
**out [4]** 7/22 10/5 10/20 12/10
**outcome [2]** 10/9 10/16
**outset [1]** 8/4

## P

**paid [2]** 14/18 14/18
**paid/will [1]** 14/18
**Parkway [1]** 2/7
**particularly [1]** 5/2
**parties [3]** 4/23 14/9 14/15
**passed [1]** 6/21
**perfect [1]** 5/12

**perhaps [1]** 11/15
**period [1]** 6/19
**permissive [2]** 5/11 11/1
**place [1]** 11/24
**plaintiff [1]** 5/3
**plaintiff's [1]** 8/22
**plaintiffs [4]** 2/5 4/23 8/2 9/8
**Plea [3]** 4/16 5/10 9/18
**Pleas [1]** 3/6
**point [3]** 8/20 9/3 12/17
**pointed [1]** 10/20
**portions [1]** 14/8
**POST [1]** 2/13
**pragmatic [1]** 10/5
**precisely [1]** 9/25
**prefer [1]** 12/9
**preparation [1]** 14/17
**prerogative [2]** 3/9 10/19
**presenting [1]** 4/15
**Presiding [1]** 1/21
**prevent [1]** 11/10
**probably [2]** 3/18 10/17
**problem [3]** 7/17 8/18 12/13
**proceedings [4]** 1/19 1/22 14/8 14/14
**process [3]** 5/20 5/23 11/11
**proper [1]** 11/6
**properly [1]** 8/4
**proposed [1]** 12/24
**prove [1]** 8/13
**pursue [6]** 5/15 5/16 7/23 8/5 8/12 8/14
**pursued [1]** 9/23
**put [1]** 12/1

## Q

**question [1]** 12/16
**questions [1]** 13/9
**quite [1]** 9/11

## R

**raised [1]** 6/3
**read [1]** 3/12
**Reagan [1]** 2/10
**really [6]** 4/1 4/19 5/8 5/18 5/20 9/7
**reasonable [2]** 7/19 12/20
**reasons [1]** 10/11
**RECORD [4]** 1/1 14/10 14/13 14/17
**REDDEN [1]** 2/13
**reflects [1]** 14/14
**refused [1]** 11/8
**regard [1]** 3/14
**remedies [1]** 9/23
**remedy [1]** 9/7
**reported [2]** 1/22 14/12
**Reporter [2]** 14/4 14/21
**REPORTER'S [4]** 1/1 14/10 14/13
 14/17
**requested [1]** 14/8
**Requests [1]** 13/6
**required [1]** 13/12
**requirement [1]** 3/19
**resources [1]** 7/3
**respective [1]** 14/15
**response [1]** 10/18
**right [8]** 3/14 4/6 4/10 5/16 6/8 6/9
 9/15 10/21
**ripe [3]** 7/6 7/25 9/24
**ripeness [1]** 3/15

**ruling [3]** 3/14 4/16 10/4
**run [2]** 3/18 5/13
**RUSSELL [1]** 2/13

## S

**said [4]** 3/19 6/7 7/1 8/18
**same [4]** 3/10 4/2 8/10 8/22
**Samuel [1]** 2/6
**save [1]** 4/12
**say [9]** 3/13 4/2 6/6 6/14 6/24 8/22
 10/14 10/25 11/25
**saying [3]** 4/20 7/21 7/22
**says [2]** 8/9 11/18
**SCOTT [1]** 2/7
**see [8]** 4/8 6/1 9/20 10/8 11/18 12/3
 12/17 12/19
**seem [1]** 11/19
**seems [3]** 3/18 5/11 10/20
**send [2]** 9/3 10/1
**sending [1]** 12/7
**sense [3]** 6/7 9/16 9/17
**sensible [1]** 12/21
**set [1]** 4/19
**seven [1]** 5/21
**SHEPHERD [1]** 2/7
**shot [1]** 13/13
**should [1]** 4/11
**sides [3]** 6/21 6/24 7/1
**simply [1]** 5/25
**Simpson [1]** 2/10
**since [1]** 5/2
**single [2]** 3/8 4/3
**sit [1]** 12/4
**situation [1]** 5/12
**six [1]** 8/24
**so [6]** 5/14 7/17 8/13 11/15 12/11
 12/16
**solution [1]** 12/21
**some [6]** 3/16 3/18 7/10 8/15 9/10
 10/15
**something [1]** 12/4
**Sometimes [1]** 6/22
**Sorry [1]** 10/6
**sort [2]** 8/21 10/12
**specific [1]** 3/9
**specifically [1]** 5/7
**Spend [1]** 4/5
**St [1]** 2/11
**start [1]** 12/6
**STATE [2]** 14/1 14/5
**States [1]** 8/11
**status [2]** 1/11 4/19
**statute [4]** 5/11 5/19 6/20 11/4
**statutory [1]** 3/9
**stay [3]** 12/24 13/11 13/12
**stenotype [1]** 1/22
**step [2]** 5/20 5/23
**still [4]** 3/16 5/15 6/6 10/10
**Street [1]** 2/3
**struggled [1]** 5/9
**styled [1]** 14/10
**subject [1]** 3/6
**submit [1]** 12/2
**submitted [2]** 5/24 8/8
**succeed [1]** 8/19
**sue [1]** 5/4
**sufficient [1]** 3/15

## S

**Summary [6]** 4/1 4/3 4/3 4/9 4/22 5/13
**sure [7]** 4/1 4/6 4/8 4/10 4/14 6/16 12/15
**system [2]** 9/4 9/15

## T

**take [2]** 3/21 9/14
**takes [1]** 3/8
**talking [4]** 4/25 5/2 7/15 10/22
**Telephone [4]** 2/4 2/8 2/12 14/24
**tell [4]** 6/5 7/25 9/3 11/12
**term [1]** 5/1
**terms [1]** 7/13
**Terri [2]** 14/4 14/20
**testimony [1]** 8/8
**TEXAS [12]** 1/5 1/21 2/4 2/8 2/12 5/7 7/8 14/1 14/6 14/21 14/22 14/23
**than [2]** 4/21 10/21
**that [87]**
**their [7]** 5/4 7/3 7/23 8/13 8/13 8/16 12/6
**them [9]** 3/7 8/15 9/3 9/3 9/8 10/8 10/18 11/23 13/11
**then [5]** 3/25 6/23 9/21 11/2 11/15
**there [22]**
**these [1]** 10/7
**they [35]**
**they're [5]** 8/10 8/12 11/20 12/18 13/9
**thing [4]** 4/2 4/10 10/13 12/23
**things [1]** 4/6
**think [17]**
**thinking [1]** 10/17
**thinks [1]** 12/18
**this [25]**
**those [4]** 6/2 8/5 8/14 11/3
**thought [3]** 3/11 3/20 3/21
**through [4]** 8/15 9/4 9/14 11/11
**time [4]** 3/19 4/13 11/20 12/20
**titled [1]** 1/19
**today [2]** 4/15 12/5
**together [1]** 12/1
**total [1]** 14/16
**town [1]** 12/11
**transcription [1]** 14/7
**trial [2]** 1/2 11/9
**true [2]** 13/9 14/7
**truly [1]** 14/14
**try [4]** 3/21 4/4 4/12 13/12
**turn [1]** 10/5
**two [3]** 4/23 5/20 5/23
**two-step [2]** 5/20 5/23
**typically [1]** 3/18

## U

**U.S [3]** 7/24 8/7 8/14
**under [5]** 3/5 3/20 5/10 11/3 11/4
**understand [1]** 11/22
**United [1]** 8/11
**unless [1]** 13/12
**unnecessary [1]** 11/11
**unreasonable [1]** 11/19
**unsure [1]** 4/15
**up [3]** 3/8 3/21 10/11
**us [3]** 6/1 8/20 11/10
**using [1]** 7/3

## V

**variety [1]** 10/11
**very [4]** 5/13 6/11 6/22 9/25
**volume [2]** 1/1 14/10
**VOLUMES [1]** 1/1

## W

**want [5]** 3/12 11/16 12/4 12/5 12/8
**wants [1]** 13/11
**was [11]** 3/4 3/5 3/7 3/10 3/13 3/13 3/19 4/15 6/20 11/25 14/18
**wavering [1]** 3/5
**way [2]** 4/7 9/14
**we [35]**
**well [3]** 4/18 8/23 13/4
**were [5]** 3/6 5/25 6/6 9/22 14/12
**what [17]**
**when [8]** 4/10 4/13 4/16 4/22 5/4 6/7 6/14 6/20
**where [3]** 7/1 10/11 11/7
**whether [8]** 3/14 4/10 5/3 5/9 6/3 7/6 9/21 9/22
**which [3]** 4/20 7/14 14/11
**while [2]** 12/4 12/25
**whole [3]** 3/22 9/19 12/17
**Why [1]** 13/2
**will [19]**
**wishful [1]** 10/17
**within [2]** 6/1 12/20
**words [1]** 5/6
**would [8]** 4/5 4/12 5/12 6/3 7/6 8/3 8/5 12/9
**wouldn't [1]** 4/12
**write [2]** 6/14 6/16
**writing [1]** 14/9
**wrong [2]** 4/11 11/15

## Y

**yards [1]** 3/22
**yeah [1]** 4/11
**years [1]** 5/22
**yes [4]** 6/6 6/8 6/14 13/7
**yet [1]** 9/11
**YETTER [1]** 2/11
**you [42]**
**you-all [4]** 7/21 12/3 12/5 13/13
**your [9]** 4/22 5/12 8/1 9/9 10/20 11/6 11/13 12/13 13/8

TERRI W. ANDERSON, CSR
201 CAROLINE, #945   HOUSTON, TEXAS  77002